Stuart C. Gillespie (CO Bar No. 42861) *(pro hac vice pending)*
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 996-9616
sgillespie@earthjustice.org

Janette K. Brimmer (WA Bar No. 41271) *(pro hac vice pending)*
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
jbrimmer@earthjustice.org

*Counsel for Pascua Yaqui Tribe, Quinault Indian Nation,*
*Menominee Indian Tribe of Wisconsin, Tohono O'odham*
*Nation, and Fond du Lac Band of Lake Superior Chippewa*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## AT TUCSON

| | |
|---|---|
| PASCUA YAQUI TRIBE; QUINAULT INDIAN NATION; FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA; MENOMINEE INDIAN TRIBE OF WISCONSIN; TOHONO O'ODHAM NATION; and BAD RIVER BAND OF LAKE SUPERIOR CHIPPEWA,<br><br>                    Plaintiffs,<br><br>   v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency; UNITED STATES ARMY CORPS OF ENGINEERS; and R.D. JAMES, in his official capacity as Secretary of the Army for Civil Works,<br>                    Defendants. | Case No.<br><br>COMPLAINT |

**INTRODUCTION**

1.   Congress declared a single objective for the Clean Water Act: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that objective, the Act prohibits and regulates the discharge of pollutants into "navigable waters," which the Act defines broadly as "the waters of the United States." *Id.* § 1362(7).

2.   Congress adopted the Clean Water Act as a uniform and comprehensive national approach to water protection to replace decades of fragmented approaches that had relied on the states and had failed to protect the nation's waters.  It is one of the nation's most important and successful environmental laws.

3.   Plaintiffs Pascua Yaqui Tribe, Quinault Indian Nation, Menominee Indian Tribe of Wisconsin, Fond du Lac Band of Lake Superior Chippewa, Tohono O'odham Nation, and Bad River Band of Lake Superior Chippewa (the "Tribes") challenge two final rules promulgated by the United States Environmental Protection Agency ("EPA"); Andrew Wheeler, Administrator of the EPA; the United States Army Corps of Engineers ("Corps"); and R.D. James, Assistant Secretary of the Army for Civil Works (collectively, "the Agencies").  The first, entitled "Definition of Waters of the U.S.: Recodification of Pre-Existing Rules," 84 Fed. Reg. 56,626 (October 22, 2019) (the "Repeal Rule"), repealed the 2015 "Clean Water Rule" which defined the term "waters of the United States" in the Clean Water Act.  The second, entitled "The Navigable Waters Protection Rule:  Definition of Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020) (the "Navigable Waters Rule"), replaced the Clean Water Rule and its

predecessor rules with a definition of "waters of the United States" that substantially narrows the waters protected by the Act.

4.   The Navigable Waters Rule exceeds the Agencies' statutory authority and is contrary to the Clean Water Act's text, structure, objectives, and legislative history requiring broad protection of all the Nation's waters, because its provisions exclude waters from the protections required and afforded by the Act.

5.   The Tribes also challenge the Repeal Rule and the Navigable Waters Rule as arbitrary and capricious because both rules are contrary to the evidence before the Agencies, including vast volumes of science and technical evidence in the administrative record and the uncontroverted findings made by the EPA and its own Science Advisory Board.  The Agencies also failed to explain their decision to reverse prior regulations and failed to consider important aspects of the problem, including the effects on water quality and aquatic ecosystems of stripping protections for large numbers of waters, the ecological importance of protecting the excluded waters, and the effects of the reversal on the objectives of the Clean Water Act.  These decisions are arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

6.   The Tribes ask the Court to vacate and set aside the Repeal Rule and the Navigable Waters Rule, and to reinstate the Clean Water Rule.

## PARTIES

7.   Plaintiff PASCUA YAQUI TRIBE, headquartered in Tucson, Arizona, is a federally-recognized sovereign tribe with approximately 11,000 enrolled members.  For

hundreds of years, the Yaqui have lived, travelled, and hunted throughout the Gila and Santa Cruz River Valleys.  In 1964, the Pascua Yaquis received 202 acres of land southwest of Tucson, which forms their present-day reservation.  Water has always been part of the Tribe's subsistence, culture, and identity.  Their ancestors built villages along the ephemeral and intermittent streams in the mountains surrounding Tucson.  Their reservation sits atop a major ephemeral stream, known as Black Wash, which conveys storm flows at a rate of 100,000 cubic feet per second (cfs) and connects with another wash on the reservation that conveys flows at 2,000 cfs.

8.   Plaintiff QUINAULT INDIAN NATION is a federally-recognized Indian tribe and sovereign tribal government whose members have lived near and depended on the Quinault River, Grays Harbor, the Chehalis River Basin, and the Washington Coast since time immemorial.  The Quinault people have been called the Canoe people because of the importance of the ocean, bays, estuaries, and rivers to every aspect of tribal life.  The Quinault Nation is also part of the Grays Harbor community, and is a leading contributor to the economic and social lifeblood of this region.  The Quinault Nation has usual and accustomed fishing places in Grays Harbor and its watershed, including the Chehalis River Basin and including the Humptulips River.  *United States v. Washington*, 459 F.Supp. 1020, 1038 (W.D. Wn. 1978) aff'd, 645 F.2d 749 (9th Cir. 1981).  Throughout these terrestrial, riverine and marine usual and accustomed fishing areas—including the entire Chehalis River Basin—Quinault is either a full manager or co-manager of treaty resources and the habitats that support them.  Development and logging in the Chehalis Basin has adversely affected wetlands and headwaters streams for the river, exacerbating

-4-

flooding in the region, degrading water quality, and depleting and jeopardizing fish species and habitat for those species, including the fish that the Quinault rely on for subsistence and cultural purposes.

9.  Plaintiff MENOMINEE INDIAN TRIBE OF WISCONSIN is a federally-recognized Indian tribe whose ancestral territory spans the area now known as the State of Wisconsin and parts of the States of Michigan and Illinois.  In treaties with the United States in 1831, 1832, 1836, 1848, and 1854, the Menominee Tribe ceded a large portion of their ancestral territory, including the Menominee River, which is currently the border between Wisconsin and the Upper Peninsula of Michigan, and areas along the River including Green Bay.  The Menominee Tribe retained a tract of land in reserve lying along the Wolf River in Wisconsin, which is the present day Menominee Indian Reservation.  The Reservation supports extensive wetland habitats, as well as the Wolf River, which provides important habitat for the sturgeon, a culturally critical species for the Menominee.  Wetlands, lakes and streams outside of the reservation boundaries are often upstream of the reservation and are overall part of the north-central mixed hardwoods and conifer ecosystem of the Upper Midwest which is the Menominee's reservation and ancestral home.  Although Menominee did not retain treaty rights in their ceded lands, since time immemorial the Menominee Tribe has lived, hunted, fished, gathered, farmed and otherwise occupied and used the ceded lands, including lands along and at the mouth of the Menominee River—the Menominee Tribe's sacred place of origin, and continue to do so today.  The Menominee Tribe has also practiced, and continues to practice, cultural and religious ceremonies within reservation lands, ceded

-5-

lands, and ancestral lands around the Menominee River. In recent years, the Menominee Tribe has worked in partnership with communities at the mouth of the River to replant wild rice where the river enters Green Bay. The Menominee Tribe has also been active in protecting archaeologically important historical Menominee dwelling, farming, and burial sites along the Sixty Islands segment of the Menominee River, an area of mixed wetlands, small streams and forest.

10. Plaintiff FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA ("Fond du Lac" or "Band"), is a federally recognized Indian tribe whose homeland is the Lake Superior region, including the St. Louis River, a major tributary of Lake Superior. The Band occupies a reservation in northeastern Minnesota pursuant to a treaty with the United States: the Treaty of LaPointe with the Chippewa, September 30, 1854. 10 Stat. 1109 ("1854 Treaty"). Under the 1854 Treaty, the Band continues to hold rights to hunt, fish and gather on the lands ceded by the Chippewa to the United States, a water-rich area that extends over 5 million acres of northeastern Minnesota. The exercise of these treaty rights is fundamental to the Band's culture and way of life. The Band's present-day reliance upon the harvest of natural resources, including wetland and water resources such as cranberries and wild rice, both on-reservation and in the territory ceded by the 1854 Treaty, remains as important to the Band and its members today as it was at the time the rights were originally reserved. Those resources are required to meet the religious, ceremonial, medicinal and subsistence needs of the Band. The St. Louis River, a major tributary to Lake Superior, flows through the reservation. Many lakes, streams and wetlands cover the reservation. The St. Louis River headwaters also arise within the

ceded territories in northern Minnesota peatland wetlands, some of which are isolated

wetlands or do not have surface connections to larger bodies of water.  The Band has

approved water quality authorities under §§ 106, 319, 303(c) and 401 of the Clean Water

Act.  Its delegated authorities apply to a substantial reach of the St. Louis River, which is

the United States headwaters of Lake Superior and the entire Great Lakes system.

11. Plaintiff TOHONO O'ODHAM NATION, headquartered in Sells, Arizona, is

a federally-recognized sovereign Indian tribe with approximately 33,000 enrolled

members.  For thousands of years, the Tonoho O'odham and their ancestors occupied

much of Sonora, Mexico, and southern Arizona from the San Pedro River in the east to

the Colorado River in the west.  The Tohono O'odham thrived in this arid landscape,

settling along the Salt, Gila, and Santa Cruz Rivers, where they created sophisticated

canal systems to irrigate their crops of cotton, tobacco, corn, beans, and squash.  The

Tohono O'odham ancestors also constructed villages, including vast ball courts and

ceremonial mounds, along the ephemeral streams that flow down from the mountains in

response to storm events.  The Tohono O'odham Nation now holds a combined area of

2.8 million acres of reservation land, which is crisscrossed by ephemeral and intermittent

streams.

12. Plaintiff BAD RIVER BAND OF LAKE SUPERIOR CHIPPEWA ("Bad

River" or "Band"), is a federally recognized Indian tribe whose homeland is the Lake

Superior region of Wisconsin, along the southern shores of Lake Superior and among the

many wetlands and streams that comprise the Lake Superior Basin.  The Band occupies a

reservation in northern Wisconsin along and south of Lake Superior pursuant to a treaty

with the United States: the Treaty with the Chippewa, September 30, 1854. 10 Stat. 1109

("1854 Treaty").  The Band's reservation is rich in wetlands and streams, containing

almost 500 miles of rivers and streams, over 30,000 acres of wetlands, and 38 miles of

Lake Superior shoreline.  As the Bad River flows north to Lake Superior, the river

spreads out into diverse flood plain forests, sedge meadows, and conifer bogs

characterized by stands of tamarack, white cedar, and black ash; and where the Kakagon

River and Bad River empty into Lake Superior a coastal wetland ecosystem that is a

mosaic of sloughs, bogs, and coastal lagoons harboring the largest natural wild rice beds

in the Great Lakes and supporting rare plant and animal species, important fish spawning

and nursery sites, and critical stopover habitats for migratory birds.  Under the 1842

Treaty, the Band continues to hold rights to hunt, fish and gather on the lands ceded by

the Chippewa to the United States, a water-rich area that extends over 25,000 square

miles (or 16 million acres) in the northern one-third of Wisconsin and Upper Peninsula of

Michigan.  The exercise of these treaty rights is fundamental to the Band's culture and

way of life.  The Band's present-day reliance upon the harvest of natural resources,

including wetland and water resources such as cranberries and wild rice, both on-

reservation and in the territory ceded by the 1842 Treaty, remains as important to the

Band and its members today as it was at the time the rights were originally reserved.

Those resources are required to meet the religious, ceremonial, medicinal and subsistence

needs of the Band.  The Band has approved water quality authorities under §§ 106, 319,

303(c) and 401 of the Clean Water Act.  Its delegated authorities apply to the many

wetlands and streams within the Band's reservation and protect important uses of those

waters such as the harvesting of wild rice, a water-dependent species.  The Band has been mapping the waters and wetlands on the reservation in order to better protect them, including headwaters streams for Lake Superior.

13. All of the tribes maintain a deep personal, cultural, and spiritual relationship to water both within their reservation boundaries but also throughout their ancestral lands. No matter the water body size, whether an ocean, lake, river, stream, creek, spring or seep, the water is treated with respect and dignity as a living entity.

14. Defendant U.S. Environmental Protection Agency is a federal agency charged with administering the Clean Water Act through its Administrator, Andrew Wheeler.  33 U.S.C. § 1251(d).  It co-promulgated the Navigable Waters Rule and the Repeal Rule, the rules challenged here.

15. Defendant U.S. Army Corps of Engineers is a federal agency within the Department of the Army.  It is authorized to issue permits for the discharge of dredged or fill material into the waters of the United States, through the Secretary of the Army for Civil Works, R.D. James.  *Id.* §§ 1344, 1362(7).  It co-promulgated the Navigable Waters Rule and the Repeal Rule, the rules challenged here.

16. The Tribes and their members will suffer imminent harm if the Repeal Rule and Navigable Waters Rule are allowed to stand.  With the Repeal Rule and Navigable Waters Rules, the agencies stripped the protections of the Clean Water Act from wetlands and streams across the country, purposely limiting the statute's reach, leaving many wetlands vulnerable to degradation and destruction and entirely eliminating protections for ephemeral streams.  Because the Tribes and their members rely on waters that have

lost Clean Water Act protections as a result of the defendant agencies' rules, along with downstream waters that will be harmed by the pollution or destruction of unprotected waters upstream, they will be injured as a result of the regulations.

17. In the arid southwest, the Navigable Waters Rule would strip away protections for thousands of miles of ephemeral streams, including the vast majority of surface waters that crisscross the Pasqua Yaqui Tribe and Tohono O'odham Nation reservations and provide a crucial source of surface water flows. The Rule would also exclude headwater ephemeral streams, such as those in the Santa Rita Mountains that Pascua Yaqui and Tohono O'odham members visit to gather traditional materials and offer prayers for their ancestors. Many of these waters are threatened by development activities that could destroy or pollute the waters in the absence of the limits or mitigation required by Clean Water Act permits. This includes a vast network of ephemeral streams in the Santa Rita Mountains that would be destroyed by the proposed Rosemont open-pit copper mine, causing significant impacts to water quality and aquatic resources in the mountains and downstream.

18. The loss of Clean Water Act protections would be equally severe in the water-rich Great Lakes region, home to the Fond du Lac and Bad River Bands. There, the restrictive definition of WOTUS could mean that many of the iconic inland lakes and wetlands of this area would no longer be protected under the Clean Water Act. This region would also see a dramatic decline in wetland acreage under Clean Water Act protection, even though there are large areas across the northern Great Lakes with vast contiguous wetland complexes still relatively intact. The loss of these waters would

cause adverse impacts to fisheries, wild rice waters, and other aquatic resources providing ecosystem services that are vital to the Fond du Lac and Bad River Bands and their cultural values, practices and ways of life.  For example, the Fond du Lac Band's ceded lands as well as the St. Louis River will be adversely affected by the many proposed sulfide mineral mines in Northeastern Minnesota such as the PolyMet Mine, a mine proposed in the very headwaters wetlands of the St. Louis River.  The Bad River Band's ceded lands as well as land within the reservation will be adversely affected by proposed fossil fuel pipeline projects adversely affecting the integrity of wetlands and wild rice beds and posing an unacceptable risk of spill and resulting devastation to all surrounding waters and in turn to the Bad River Band's way of life.

19. The Rules also jeopardize waters on which the Quinault Nation depends and to which it has Treaty-secured rights, including rights to fish, hunt, and gather.  For example, the Navigable Waters Rule excludes many waters (including pools, intermittent headwaters streams, ephemeral tributaries, and floodplain wetlands and estuaries) that are crucial to the survival of salmon and other Treaty fish resources.

20. The Repeal and Navigable Waters Rules would also expose headwater streams and wetlands upstream of and on the reservation as well as along the Menominee and Wolf Rivers that the Menominee Nation relies upon to fish, hunt, recreate, and that are important for the Tribe's members historically and to visit for cultural practices.  For example, the proposed Back Forty Mine along the Menominee River will destroy and alter numerous wetlands, which are part of the integrated cultural landscape, some of which may lose Clean Water Act protections under the Navigable Waters Rule.

-11-

21. Members of the Tribes, use and rely on wetlands, ephemeral streams, and other upstream waters that may or have lost Clean Water Act protections under the Repeal Rule and the Navigable Waters Rule.  Many of these waters are now threatened by imminent agricultural, mining, and development activities that could destroy or pollute the waters in the absence of the limits or mitigation required by Clean Water Act permits.  Members of the plaintiff organizations also fish, kayak, canoe, and swim in downstream rivers, streams, and lakes that face an imminent threat of being polluted as a result of the loss of Clean Waters Act protections for upstream waters under the challenged regulations.

22. The Tribes also have organizational standing to bring this action.  Defendants' adoption of the Repeal Rule and Navigable Waters Rule has made it more difficult for the Tribes to achieve their institutional objectives in protecting their members, and aquatic environments from the harms associated with unpermitted activities that harm or destroy waters.  Some of the Tribes have Treatment as a State ("TAS") status, wherein the Tribe promulgates its own water quality standards to protect designated uses for waters on tribal lands.  If waters are no longer protected under the Clean Water Act, tribal waters downstream may be adversely affected requiring Tribes to become involved in more regulatory matters outside their borders to protect themselves.  For Tribes that do not have TAS status, the Tribe is dependent upon EPA to protect waters even within the reservation boundaries.  Waters that lose protections under the Clean Water Act as a result of the rules challenged here will lose all protections because they will no longer be protected under the Clean Water Act and the state will not have jurisdiction on the reservation.  The potential injury to those Tribes is extreme. Finally, tribes will be

required to promulgate and develop much more extensive regulatory programs within their boundaries if Clean Water Act protections are lost and Tribes are forced to fill that gap.  This will cost Tribes significant resources in that some do not have well-staffed natural resources departments and even those that do will need to increase budgets and personnel in order to achieve the level of water protection necessary to meet what is currently in place with the Clean Water Act.

23. Each of these injuries are fairly traceable to the challenged regulations and are capable of redress by an order of this Court vacating the rules.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), and the Clean Water Act, 33 U.S.C. § 1369(b); *Nat'l Assoc. of Manufacturers v. Dep't of Defense*, 138 S.Ct. 617 (2018).  The Court is authorized to grant relief under 5 U.S.C. § 706 (Administrative Procedure Act), and 28 U.S.C. § 2202 (further necessary or proper relief).

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because two of the plaintiffs, Pascua Yaqui and Tohono O'odham, reside in this district.

## LEGAL FRAMEWORK

I.     THE CLEAN WATER ACT

26. The objective of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

27. The Act protects waters from pollution, and from damage or destruction from dredging or filling, by prohibiting "the discharge of any pollutant by any person" except

in compliance with the Act's permitting requirements and other pollution-prevention programs. *Id.* § 1311(a) (incorporating *id.* §§ 1312, 1316, 1317, 1328, 1342, and 1344). These programs include the National Pollutant Discharge Elimination System ("NPDES"), *id.* § 1342; the section 404 permitting program for discharges of dredged or fill material, *id.* § 1344; and the section 311 oil-spill prevention and response programs, *id.* § 1321.

28. The protections of the Clean Water Act extend to "navigable waters," which the Act broadly defines as including all of the "waters of the United States, including the territorial seas." *See id.* §§ 1251, 1321, 1342, 1344; 1362(7).

29. The Act followed and sought to reverse years of failed efforts to protect and clean up the Nation's waters through the implementation of state-based water-quality standards. S. Rep. No. 92-414 at 7 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3672.

30. The Act's legislative history confirms that Congress adopted the "broadest possible" definition of "navigable waters" of the United States, unencumbered by earlier and narrower administrative interpretations. H.R. Rep. No. 92-911 at 76-77 (1972). As the conference report emphasized, "the conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." Clean Water Act Legislative History, Senate Consideration of the Rpt. of the Conference Committee, Oct. 4, 1972, at 178. The Senate Committee on Public Works "was reluctant to define" the term "navigable waters" based "on the fear that any interpretation would be read narrowly[,]" and it reiterated that it "fully intend[ed] that the

term 'navigable waters' be given the broadest possible constitutional interpretation."  Clean Water Act Legislative History at 818.

31. In directing the broadest possible protection, Congress relied on science demonstrating the interconnectedness of waters and the need to ensure that aquatic ecosystems as a whole are protected in order to fulfill the Act's purpose, especially waters upstream of "traditionally navigable waters."  Congress recognized that "[w]ater moves in hydrological cycles and it is essential that discharge of pollutants be *controlled at the source*."  S. Rep. No. 92-414 at 77 (1971) (emphasis added).

32. The core provisions of the regulatory definition of "waters of the United States" remained largely unchanged for a long period of time, from 1979 until fairly recently.  *See* 44 Fed. Reg. 32,854, 32,901 (June 7, 1979) (defining "waters of the United States" to include, among other things, "(1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (2) Interstate waters, including interstate wetlands; (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats and wetlands the use, degradation or destruction of which would affect or could affect interstate or foreign commerce …; (4) All impoundments of waters otherwise defined as navigable waters…; (5) Tributaries of waters identified in paragraphs (1)-(4) …, including adjacent wetlands; and (6) Wetlands adjacent to waters identified in paragraphs (1)-(5)").

33. In general, federal courts, including the Supreme Court, have affirmed that the Act's protective reach must be interpreted and applied to waters broadly in order to

-15-

ensure that the purpose of restoring and maintaining the biological, physical, and chemical integrity of our Nation's waters is fulfilled. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 486 n.8 (1987) (noting that "navigable waters" "has been construed expansively to cover waters that are not navigable in the traditional sense"); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 136-39 (1985) (affirming the Corps' application of jurisdiction to wetlands adjacent to navigable waters).

34. While the Supreme Court has established that the Act's protections do not extend to each and every wet area, such as the water-filled abandoned gravel mining pits at issue in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 164-65 (2001), the Court has consistently affirmed that the EPA and the Corps have broad authority under the Clean Water Act to protect both navigable and non-navigable waters that are adjacent, connected, or have a significant nexus to navigable waters. *See id.* at 167-68; *Rapanos v. United States*, 547 U.S. 715, 740-42 (2006); *id.* at 759 (Kennedy, J., concurring in judgment).

35. The Supreme Court's 2006 decision in *Rapanos v. United States*, 547 U.S. at 715, involved disputes over whether certain wetlands fall within the protections of the Clean Water Act. While a plurality of the justices agreed to the result—a remand to address whether the Corps' assertion of jurisdiction was supported by facts in the record—all three of the opinions directly disagreed with some aspects of one another, resulting in no controlling decision or precedent. Further, the points agreed upon by a majority of the justices were few. A majority of five justices interpreted the Act as protecting all waters, including wetlands, that "possess a 'significant nexus'—a science-

based inquiry designed to meet and fulfill the objections of the Act--to waters that are or were navigable in fact or that could reasonably be so made," including Justice Kennedy and the four dissenting justices. *Id*. at 759 (Kennedy, J., concurring in judgment); *id*. at 810 (Stevens, J., dissenting). The four dissenting justices, led by Justice Stevens, would have upheld the Corps' authority to regulate the wetlands at issue outright, based on the Clean Water Act and the Corps' existing regulations. *Id*. at 787-99 (Stevens, J., dissenting). Overall, a majority of the Court decided that the Corps may have jurisdiction to protect and regulate the waters in question in the case, but must further examine and justify jurisdiction in light of the Court's discussion in the case.

36. Following *Rapanos*, most Circuit Courts have interpreted and applied the decision, and all of the Circuit Courts that have applied *Rapanos* have either adopted Justice Kennedy's "significant nexus" test or found that a waterbody that meets either the "significant nexus" test or the plurality's test is protected under the Act. No Circuit Court has ruled that only the Justice Scalia plurality opinion provides the proper test for application of the Clean Water Act.

II.     THE ADMINISTRATIVE PROCEDURE ACT

37. Final agency actions are subject to judicial review under the Administrative Procedure Act. 5 U.S.C. § 704.

38. In reviewing a final agency action, the court shall hold unlawful and set aside agency action, findings, and conclusions that are found to be arbitrary, capricious, an abuse of agency discretion or otherwise not in accordance with the law, *id*. § 706(2)(A), or agency actions that are in excess of statutory jurisdiction, authority or limitations, or

short of statutory right, *id.* § 706(2)(C), or agency actions that are not in observance of procedure required by law. *Id.* § 706(2)(D).

## STATEMENT OF FACTS

I.      THE CLEAN WATER RULE

39. On April 21, 2014, EPA and the Corps published a proposed rule to define "waters of the United States" under the Clean Water Act.  79 Fed. Reg. 22,188 (Apr. 21, 2014) ("Proposed Rule").

40. The Agencies stated their intention in the Proposed Rule to "retain[] much of the structure of the [A]gencies' longstanding definition of 'waters of the United States,' and many of the existing provisions of that definition where revisions were not required in light of Supreme Court decisions or other bases for revision." *Id.* at 22,192.

41. As the scientific foundation for the Clean Water Rule, the Agencies relied on a published "synthesis of published peer-reviewed scientific literature discussing the nature of connectivity and effects of streams and wetlands on downstream waters," prepared by EPA's Office of Research and Development, entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (2015) ("Science Report"). *Id.* at 22,189.

42. In preparing the Science Report and the Proposed Rule, EPA reviewed more than 1,200 peer-reviewed scientific papers as well as other data and information including jurisdictional determinations, relevant agency guidance and implementation manuals, and federal and state reports that address connectivity of aquatic resources and effects on downstream waters.

43. The Science Report documented the extensive evidence demonstrating that tributaries and wetlands play critical roles in maintaining the physical, chemical, and biological integrity of downstream waters.

44. EPA's Science Advisory Board conducted a peer review of the Science Report, largely endorsing its analysis and conclusions.  EPA, "Technical Support Document for the Clean Water Rule:  Definition of Waters of the U.S." (May 27, 2015), at 93-94.  The only critique came from members of the Board who believed the rule may not provide protections for enough waters.

45. In their Proposed Rule, the Agencies stated their intent to "interpret[] the scope of 'waters of the United States' in the Clean Water Act based on the information and conclusions in the [Science] Report, other relevant scientific literature, the [A]gencies' technical expertise, and the objectives and requirements of the Clean Water Act."  *Id.* at 22,196.  The final Clean Water Rule's findings cite to and rely upon the Science Report.

46. The Agencies finalized and published the Clean Water Rule on June 29, 2015, with three basic categories of waters identified:  (1) waters categorically protected under the Clean Water Act in all instances; (2) waters protected under the Clean Water Act on a case-by-case showing of significant nexus; and (3) waters categorically excluded from protection.  80 Fed. Reg. 37,054 (June 29, 2015).

A.     Categorically Protected Waters

47. Under the Clean Water Rule, the following waters would be categorically protected under the Clean Water Act in all instances:  "(i) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign

commerce, including all waters which are subject to the ebb and flow of the tide; (ii) All interstate waters, including interstate wetlands; (iii) The territorial seas; (iv) All impoundments of waters otherwise identified as waters of the United States under … [the rule]; (v) All tributaries … of waters identified in … [the preceding sections of the rule]; [and] (vi) All waters adjacent to a water identified in … [the preceding sections of the rule], including wetlands, ponds, lakes, oxbows, impoundments, and similar waters." *See, e.g.*, 80 Fed. Reg. at 37,114.

48. The Science Report found unequivocal consensus evidence that all tributaries, including perennial, intermittent, and ephemeral streams, "exert a strong influence on the integrity of downstream waters," and that all tributaries have a significant nexus to navigable-in-fact waters, interstate waters, and the territorial sea (navigable-in-fact waters, interstate waters, and the territorial sea collectively referred to as, "traditional navigable waters").  Science Report at ES-2.  The Science Report documented the many ways that streams affect the physical, chemical and biological integrity of downstream waters and served as the foundation for the Clean Water Rule's Technical Support Document to specify markers to be used to identify tributaries on the landscape, including indicators of bed, banks, high water marks and flow.   EPA, "Technical Support Document for the Clean Water Rule:  Definition of Waters of the United States" (May 27, 2015), at 234-35.  Based on the Science Report, the Agencies found that all tributaries should be protected by the Clean Water Act.

49. Based on the findings of the Science Report and the Agencies, the Clean Water Rule categorically protected tributaries and defined the term "tributary" as "a water that

1  contributes flow, either directly or through another water[,]" to traditional navigable

2  waters, interstate waters, or the territorial seas, and that "is characterized by the presence

3  of the physical indicators of a bed and banks and an ordinary high water mark."  79 Fed.

4  Reg. at 22,189, 22,199; 80 Fed. Reg. at 37,058-59, 37,065, and 37,115.

5       50. The Science Report also found clear evidence that wetlands and open waters in

6  floodplains are "highly connected" to tributaries and rivers "through surface water,

7  shallow groundwater, and biological connectivity."  Science Report at ES-2 and 4-1 et

8  seq., especially 4-39.  The Science Report found, too, that wetlands and open waters

9  located outside of floodplains serve numerous functions that can benefit downstream

10  water integrity, such as floodwater storage.  Based on the Science Report, the Agencies

11  found wetlands and waters in floodplains should be categorically protected, and broadly

12  defined adjacent wetlands to include "bordering, contiguous, or neighboring a water

13  [otherwise protected under the regulation], including waters separated by constructed

14  dikes or barriers, natural river berms, beach dunes, and the like."  80 Fed. Reg. at 37,058

15  and 37,105.

16       51. Finally, the Science Report also found that non-adjacent wetlands and waters

17  located outside of floodplains may also provide valuable physical, chemical, or biological

18  functions such as storage of flood waters, replenishing or cleansing of water supplies, or

19  biological functions for species dependent upon certain hydrologic ecosystems, all

20  benefitting downstream water integrity.  Science Report at ES-3, 4-20, and 4-38.

21       B.   Case-By-Case Protections

22       52. Based upon the findings in the Science Report, the Agencies found that certain

categories of waters should be protected on a case-by-case basis when necessary to

protect the physical, chemical or biological integrity of downstream waters and to serve

the objectives of the Act.  The first category of waters eligible for case-specific

determinations were enumerated, ecologically specific types of wetlands—namely,

prairie potholes, Carolina bays and Delmarva bays, pocosins, Western vernal pools, and

Texas coastal prairie wetlands that were to be considered ecologically similarly situated

and combined within a watershed for the purposes of determining significant nexus.  *See,*

*e.g.*, 80 Fed. Reg. at 37,114.  Such waters would meet the definition of "waters of the

United States" under the rule if they were "determined, on a case-specific basis, to have a

significant nexus to a water" otherwise protected under the rule.  *Id.*

53. The second category of waters eligible for a case-specific determination

included "waters located within the 100-year floodplain of a water identified … [in a

preceding section of the rule] and all waters located within 4,000 feet of the high tide line

or ordinary high water mark of a water identified … [in a preceding section of the rule]

where they are determined on a case-specific basis to have a significant nexus to [such] a

water[.]"  *See, e.g.*, *id.* at 37,114.

C.    Excluded Waters—Waste Treatment Exclusion

54. The Clean Water Rule identified waters that the Agencies would categorically

deem "not jurisdictional." One such exclusion is for "waste treatment systems," *id.* at

22,189, 22,192, essentially waste dumps created in waters, including sometimes in

protected waters.

55. In May 1980, through notice-and-comment rulemaking, EPA had removed a

provision that excluded "waste treatment systems" from where it was within the more limited definition of "wetlands," and instead excluded waste treatment systems from the larger overarching definition of "waters of the United States," potentially improperly expanding the exclusion for waste treatment and allowing any waters traditionally protected under the Clean Water Act to be used as waste dumps.  In the same rulemaking, however, EPA ensured that expansion would not occur by adding limiting language stating that "[t]his exclusion applies only to manmade bodies of water which neither were originally created in waters of the United States (such as a disposal area in wetlands) nor resulted from the impoundment of waters of the United States."  45 Fed. Reg. 33,290, 33,424 (May 19, 1980).  In so doing, EPA ensured that polluters would not be able to use the waste treatment exclusion to "convert" a water of the United States into a waste dump.  *Id.*

56. In July 1980, after "[c]ertain industry petitioners wrote to EPA expressing objections to the language," EPA announced its decision to "suspend" the limiting language it had lawfully promulgated two months earlier.  45 Fed. Reg. 48,620, 48,620 (July 21, 1980).  EPA indicated that it planned to "promptly to develop a revised definition and to publish it as a proposed rule for public comment."  *Id.* at 48,620.

57. In the 2015 Clean Water Rulemaking, the Agencies included the waste treatment exclusion without the limiting language.    80 Fed. Reg. at 37,097.

II.    THE REPEAL RULE

58. On February 28, 2017, President Trump issued Executive Order 13,778, which directed the Agencies to repeal the Clean Water Rule and consider replacing it with a

1
2

regulation employing the approach and reasoning of Justice Scalia's plurality opinion in

*Rapanos*.

3
4

59. In 2017, the Agencies proposed to repeal the Clean Water Rule and revert to

and recodify the previous regulation and guidance.  82 Fed. Reg. 34,903 (July 27, 2017).

5
6

60. On October 22, 2019, the Agencies published a final regulation repealing the

7

Clean Water Rule and readopting the Agencies' 1986 regulation and related guidance.  84

8

Fed. Reg. 56,626 (Oct. 22, 2019) ("The Repeal Rule").  As it relates to the waste

9

treatment system exclusion, the Repeal Rule purports to "continue[]" the modification

10

expanding the waste treatment system exclusion to waste systems created in jurisdictional

11

waters of the United States.  83 Fed. Reg. at 34,907.

12
13

61. The Repeal Rule became effective on December 23, 2019.  84 Fed. Reg. at

56,626.

14

62. In adopting the Repeal Rule, the Agencies provided no explanation, analysis,

15

discussion, or refutation of the Science Report or any of the research and studies in the

16

administrative record for the Clean Water Rule.  The Agencies identified no different or

17

new scientific evidence, and provided no discussion of or explanation for how or why the

18

Science Report and the technical information in the administrative record support the

19
20

Repeal Rule.  The Agencies also failed to explain why they disregarded the Science

Report and their earlier findings and conclusions based upon it.

21
22

63. Prior to the adoption of the Repeal Rule with its reversion back to the 1986

23

regulations, the Agencies had already published the proposed Navigable Waters Rule

24

meant to replace the Clean Water Rule.  The Agencies did not explain how reinstating the

25
26

-24-

pre-2015 regulation and guidance was consistent with their stated intention to replace it with a far narrower definition of "waters of the United States."

III.     THE NAVIGABLE WATERS RULE

64. On February 14, 2019, the Agencies published the proposed Navigable Waters Rule for public comment.  84 Fed. Reg. 4154 (Feb. 14, 2019).

65. The defects in the proposed Navigable Waters Rule were presented to the Agencies in extensive comments.

66. On April 21, 2020, the Agencies published the final Navigable Waters Rule and made it effective on June 22, 2020.  85 Fed. Reg. 22,250 (Apr. 21, 2020).

67. The Navigable Waters Rule redefines the waters that are jurisdictional waters of the United States protected by the Clean Water Act, limiting them to:  (i) the territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use, in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide; (ii) tributaries; (iii) lakes and ponds, and impoundments of jurisdictional waters; and (iv) adjacent wetlands.  *Id*. at 22, 338.  The definition categorically excludes interstate waters from protection for the first time in the Act's history and removes protections for many tributaries and adjacent wetlands through its narrow definitions of those terms.

68. The Navigable Waters Rule has no provision for case-by-case jurisdictional determinations, meaning that waters not expressly identified as protected will be excluded from protection, even if they have a significant nexus to and impact on the water quality and aquatic ecosystems in other waters protected under the Act.

69. The Navigable Waters Rule also no longer provides for the case-by-case protection for waters the Science Report and the Agencies previously found may have a significant nexus to the physical, chemical, or biological functions of specific downstream waters, including prairie potholes, pocosin, Carolina Bay, or Texas coastal wetlands or Western vernal pools.

70. The Navigable Waters Rule defines waters that are categorically not protected by the Clean Water Act as (i) waters or water features that are not specifically identified in the rule as categorically jurisdictional; (ii) groundwater, including groundwater drained through subsurface drainage systems; (iii) "ephemeral" features, including ephemeral streams, swales, gullies, rills, and pools; (iv) diffuse stormwater run-off and directional sheet flow over uplands; (v) ditches that are not waters identified elsewhere in the definition; and (xii) waste treatment systems, among other waters. *Id*.

71. The Navigable Waters Rule additionally limits jurisdiction, and thereby protections under the Clean Water Act, by substantially narrowing the definition of tributaries and providing new definitions of "ephemeral" and "intermittent" tributaries. The Navigable Waters Rule, citing Justice Scalia's plurality opinion in *Rapanos* for support, narrows the definition of "tributaries" to exclude all waters that are considered "ephemeral," meaning waters that flow "only in direct response to precipitation in a typical year[,]" and includes only waters that are "relatively permanent" in a "typical" year. *Id*. at 22,338-39.

72. The Navigable Waters Rule also narrows the definition of wetlands that are waters of the United States, limiting protected wetlands to those that are directly

connected on the surface on at least one side to another protected water under the rule.  A wetland that is separated from a protected water only by an artificial dike, barrier, or similar artificial structure, may be protected but only if the barrier allows for a direct surface water connection to the protected water in a typical year through a culvert, flood or tide gate, or pump.  The Navigable Waters Rule excludes wetlands from protection under the Act if the wetland is inundated by flooding from a protected water but that flooding does not occur in a "typical year."  *Id*. at 22,338.

73. The Navigable Waters Rule also provides that a waterbody may be severed and lose its status as a protected "water of the United States" by man-made alterations such as roads, dams, berms, or levees if those alterations result in loss of surface water connection between the upstream and downstream waters, or result in the loss of a surface water connection between a wetland and a waterbody, in a "typical" year.  *See, e.g.*, *id*. at 22,338-39.

74. The term "typical year" is defined to mean "when precipitation and other climatic variables are within the normal periodic range (e.g., seasonally, annually) for the geographic area of the applicable aquatic resource based on a rolling thirty-year period."  *Id*. at 22, 339.  The Navigable Waters Rule does not define "normal periodic range," and does not define or provide guidance on the relevant size or type of geographic area for jurisdictional determinations.

75. The Navigable Waters Rule retained the waste treatment exclusion allowing historic waste treatment impoundments originally created in waters of the U.S. to be excluded from jurisdiction, but defined "waste treatment systems" for the first time.  The

definition includes all components of the waste treatment system, including lagoons and treatment ponds (such as settling or cooling ponds) designed to either convey or retain, concentrate, settle, reduce, or remove pollutants, either actively or passively, from wastewater prior to discharge (or eliminating any such discharge). *Id.* at 22,328-39. The Agencies stated that they were continuing longstanding practice without acknowledging or addressing the limiting language in the promulgated 1980 rule.

76. The Navigable Waters Rule bases much of its more limited definition of protected waters on Justice Scalia's plurality opinion in *Rapanos*.

77. As with the Repeal Rule, the Agencies provided no explanation, analysis, or discussion of the Science Report, any of the research and studies in the administrative record for the Clean Water Rule, or any of the Agency findings and conclusions based upon the Science Report and other scientific evidence when they proposed or finalized the Navigable Waters Rule.  The Agencies prepared no comparable analysis of the scientific evidence on how various waters that will now be excluded from protection affect physical, chemical or biological functions and integrity of downstream water quality or aquatic ecosystems.

78. The Agencies failed to address or consider their past findings regarding the effect of tributaries on downstream waters, the identifying features of tributaries, and the need to protect all tributaries under the Act.

79. The Agencies failed to address or consider the earlier findings in the Science Report and made by the Agencies, as well as Justice Kennedy's science-driven determination that ephemeral waters and certain types of wetland ecosystems, such as

prairie potholes, can and do have a significant nexus to downstream waters and can and do affect the chemical, physical, and biological integrity of those waters.

80. The Agencies failed to address or consider the earlier findings in the Science Report and by the Agencies that isolated wetlands and unconnected waters within a floodplain can and do have a significant nexus to downstream waters, and can and do affect the chemical, physical, and biological integrity of those waters.

81. The Agencies provided no explanation for their exclusion of interstate waters, and failed to consider the effects that isolated or ephemeral interstate waters have on the physical, chemical or biological integrity of downstream waters.

82. The Agencies released the final Navigable Waters Rule for publication on January 23, 2020.

83. The Agencies' release of the final rule for publication occurred before the Agencies had received final feedback and comment from the Science Advisory Board, but after the Agencies had received preliminary feedback and comments from the Science Advisory Board on October 16, 2019, where the Science Advisory Board reiterated that the Science Report was sound, was still the best science, and that the Science Advisory Board was critical of the Navigable Waters Rule as "in conflict with established science, the existing WOTUS rule developed based on established science, and the objectives of the Clean Water Act."

84. The Science Advisory Board provided final comment on the Navigable Waters Rule on February 27, 2020.  In comments "[t]he Board concluded that the … [Navigable Waters Rule] does not incorporate best available science and … that a scientific basis for

the … Rule, and its consistency with the objectives of the Clean Water Act, is lacking." Science Advisory Board, Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act, Feb. 27 2020 at 1.  The Science Advisory Board further found that the Navigable Waters Rule "decreases protection for our Nation's waters and does not provide a scientific basis in support of its consistency with the objective of restoring and maintaining 'the chemical, physical and biological integrity' of these waters." *Id.* at 2.

85. The Science Advisory Board further criticized the Agencies' rejection of a sound scientific approach in designing the Navigable Waters Rule, and their disregard in particular of the Science Report, noting that

> "[t]he proposed Rule does not fully incorporate the body of science on connectivity of waters reviewed previously by the SAB and found to represent a scientific justification for including functional connectivity in rule making[,] … [including the] EPA's 2015 Connectivity Report[.] … The EPA's 2015 Connectivity Report emphasizes that functional connectivity is more than a matter of surface geography.  The report illustrates that a systems approach is imperative when defining the connectivity of waters, and that functional relationships must be the basis of determining adjacency. The proposed Rule offers no comparable body of peer reviewed evidence, and no scientific justification for disregarding the connectivity of waters accepted by current hydrological science."

*Id.* at 2 (footnote omitted).

86.  The Science Advisory Board also specifically criticized particular parts of the Navigable Waters Rule and definitions therein as contrary to the best science and contrary to the purpose and intent of the Clean Water Act. *Id.* at 2-3.

87. Because the Agencies finalized the Navigable Waters Rule before the Science Advisory Board could finish its comments, the Agencies failed to consider the final

critique and comments of the Agencies' own expert advisory committee.

## CAUSES OF ACTION

88. The Repeal Rule and the Navigable Waters Rule are final agency actions reviewable under the APA.  5 U.S.C. § 704.

89. Under the APA, a court shall hold unlawful, set aside, and vacate final agency actions that are arbitrary and capricious, contrary to law, an abuse of discretion or not otherwise in accordance with the law; that exceed the agency's authority; and that do not follow applicable procedures.  5 U.S.C. § 706(2)(A).

## COUNT I—THE NAVIGABLE WATERS RULE IS CONTRARY TO THE CLEAN WATER ACT

90. Restates and realleges all preceding paragraphs.

91. The Clean Water Act's single objective is to restore and protect the physical, chemical, and biological integrity of the Nation's waters and to do so as broadly as possible.  33 U.S.C. § 1251.

92. A majority of the Supreme Court and all Circuit Courts that have addressed the issue have recognized that the protections of the Clean Water Act extend to all traditional navigable waters, as well as to all waters that affect or are in connection with the physical, chemical, or biological integrity of traditional navigable waters.

93. The Navigable Waters Rule is contrary to law in that it fails to afford Clean Water Act protections to waters having an effect on or connection to the physical, chemical, and biological integrity of downstream traditional navigable waters as required by the statute, the Supreme Court's interpretation of the statute, and all circuit courts of

appeal that have addressed the issue.

94. The Agencies exceeded their authority and acted contrary to the Clean Water Act, 33 U.S.C. §§ 1251-388, by adopting provisions in the Navigable Waters Rule that define waters of the U.S. to exclude waters having an effect on or connection to the physical, chemical, and biological integrity of downstream traditional navigable waters, including but not limited to:

    a.    Exclusion of all interstate waters;

    b.    Definition of tributaries that excludes ephemeral waters;

    c.    Definition of adjacent wetlands that excludes "isolated" wetlands, wetland ecosystems such as prairie potholes, and wetlands connected by non-surface or ephemeral connections between wetlands and protected traditional navigable waters;

    d.    Definition of "typical year" that is vague, unclear, and contrary to science and the record which will result in waters in significant nexus to traditional navigable waters being excluded; and

    e.    Exclusion of waters separated from traditional navigable waters that lack a surface connection in a "typical year," but have an effect on or connection to downstream traditional navigable waters.

5 U.S.C. § 706(2)(A).

## COUNT II—THE NAVIGABLE WATER RULE IS ARBITRARY AND CAPRICIOUS AND AN ABUSE OF DISCRETION

95. Restates and realleges all preceding paragraphs.

96. The Navigable Waters Rule is arbitrary and capricious because it is contrary to the entirety of the record. 5 U.S.C. § 706(2)(A).

97. The Navigable Waters Rule is arbitrary and capricious because it failed to

consider the Science Report and the comments of the Science Advisory Board supporting the broader Clean Water Rule and criticizing the Navigable Waters Rule as affording inadequate protections.  *Id.*

98. The Navigable Waters Rule is further arbitrary and capricious in that the Agencies failed to explain their change in position and their actions conflicting with the Science Report and record evidence.  *Id.*  The Navigable Waters Rule reverses findings the Agencies made in the Clean Water Rule, based on an extensive factual record of scientific support in the Science Report and related technical documents in support of the Clean Water Rule.

99. The Navigable Waters Rule is contrary to the Agencies' own scientific analysis, and the Agencies did not offer a rational explanation for this contradiction.

100.    In the Navigable Waters Rule, the Agencies severely restricted the scope of the Clean Water Act, repeatedly admitting that "fewer waters would be subject to the CWA regulation" and that they are "narrowing the scope of CWA regulatory jurisdiction," but the Agencies failed to assess, consider and explain the effects on the physical, chemical, or biological integrity of the Nation's waters or the extent to which waters will lose Clean Water Act protections.  Without support or further explanation, they claim that they are "unable to quantify" the changes.  85 Fed. Reg. 22, 335; Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States," Jan. 22, 2020.  The Agencies' decision to significantly limit the scope of waters protected under the Clean Water Act without any analysis or quantification of the extent of waters losing protections and the impacts on both the newly excluded waters

and traditional downstream waters, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

101.    The Agencies' decision to remove the Clean Water Act's protections for ephemeral streams and many other streams, as well as many wetlands and other waters, without analyzing the extensive scientific evidence of the ecological importance of protecting these waters and their connectivity to and effects on downstream waters, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA.  5 U.S.C. § 706(2)(A).

102.    The Agencies' decision to narrow the scope of waters protected under the Clean Water Act and to base the final rule on the permanence of surface flow in a typical year without considering the effects of climate change is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA.  5 U.S.C. § 706(2)(A).

103.    The Agencies' decision to narrowly restrict the scope of waters protected by the Clean Water Act is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA.  5 U.S.C. § 706(2)(A).

104.    The Agencies' decision to narrow the scope of waters protected under the CWA without conducting an environmental justice analysis under Executive Order 12,898, "Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations," 59 Fed. Reg. 7629 (Feb. 11, 1994), is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA.  5 U.S.C. § 706(2)(A).

1
2

## COUNT III—THE NAVIGABLE WATER RULE'S WASTE TREATMENT EXCLUSION IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW

3

105.     Restates and realleges all preceding paragraphs.

4

106.     The waste treatment exclusion will exclude waters of the United States

5

from the protections of the Clean Water Act if they are newly impounded and used as

6

waste dumps.  The Navigable Waters Rule conversely defines "impoundments" of waters

7

of the United States to categorically also be waters of the United States. 85 Fed. Reg. at

8

22,338.

9

107.     In allowing waste impoundments in "waters of the United States" to be

10

redefined as not jurisdictional and not protected under the Clean Water Act while also

11

defining impoundments of waters of the United States to categorically be jurisdictional

12

and protected, the waste treatment exclusion is arbitrary and capricious and an abuse of

13

discretion.  5 U.S.C. § 706(2)(A).

14

108.     The waste treatment exclusion exceeds the Agencies' authority because it

15

unlawfully excludes traditional navigable waters from protection under the Clean Water

16

Act and violates the objective of the Act to protect and restore the physical, chemical and

17

biological integrity of all waters of the United States.  33 U.S.C. § 1251; 5 U.S.C. §

18

19

706(2)(A).

20

## COUNT IV—THE AGENCIES ADOPTED THE NAVIGABLE WATER RULE'S WASTE TREATMENT EXCLUSION WITHOUT COMPLYING WITH NOTICE AND COMMENT REQUIREMENTS.

21

22

109.     Restates and realleges all preceding paragraphs.

23
24
25
26

-35-

110.    In 1980, without notice and comment rulemaking, the Agencies suspended the regulatory limitation of the waste treatment exclusion to manmade impoundments and impoundments created prior to 1972, which had ensured that waters of the United States would not be converted into waste dumps.

111.    The 2015 Clean Water Rule continued the waste treatment system exclusion with the suspension of the limiting language and expressly did not seek comment on the exclusion.

112.    In the Navigable Waters Rule, the Agencies adopted the first definition "waste treatment systems" subject to the exclusion as including all components of the waste treatment impoundments in waters of the United States.  The Agencies expressly stated that they were not seeking comment on the definition, including its explicit acknowledgement that such systems could be in waters of the United States.  The Agencies also did not seek comment on these regulatory changes, which conflict with the limiting language in 1980 waste treatment exclusion.

113.    By taking action without comment on the legality or desirability of expressly defining waste treatment systems to include impoundments and systems in waters of the United States in the Navigable Waters Rule, the Agencies adopted the waste treatment exclusion provisions in the Navigable Water Rule "without observance of procedure required by law," in violation of the APA.  5 U.S.C. § 706(2)(D).

**COUNT V—THE REPEAL RULE IS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION AND CONTRARY TO THE CLEAN WATER ACT**

114.    Restates and realleges all preceding paragraphs.

115.    The Clean Water Act's objective is to restore and protect the physical, chemical and biological integrity of the Nation's waters and to do so as broadly as possible.   33 U.S.C. § 1251.

116.    The Repeal Rule's reversion to the 1986 regulations and guidance is arbitrary and capricious because it is contrary to the record for the Clean Water Rule and the Navigable Waters Rule, which was being developed as a package with the Repeal Rule. 5 U.S.C. § 706(2)(A).

117.    In particular, the Repeal Rule is arbitrary and capricious because it failed to consider and is contrary to the Science Report and Agency findings based upon the Science Report.  *Id.*

118.    The Repeal Rule is further arbitrary and capricious because the Agencies failed to explain their change in position from the Clean Water Rule, and failed to address the fact that the Repeal Rule is contrary to the Science Report and related record evidence.  *Id.*

119.    The Repeal Rule is further arbitrary and capricious because the Agencies failed to consider the effects of reverting to an earlier system of regulation on the physical, chemical, or biological integrity of the Nation's waters.  *Id.*

### REQUEST FOR RELIEF

Based upon the foregoing, the Tribes request relief from the court as follows:

A.    Adjudge and declare that the Navigable Waters Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), 33 U.S.C. §§ 1251-388;

B.      Vacate and set aside the Navigable Waters Rule;

C.      Adjudge and declare that the waste treatment system exclusion provisions of the Navigable Waters Rule were adopted "without observance of procedure required by law," contrary to law and are arbitrary, capricious, and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2);

D.      Adjudge and declare that the waste treatment system exclusion improperly excludes waters of the United States from the protections of the Clean Water Act contrary to law;

E.      Vacate and set aside the waste treatment system exclusion;

F.      Adjudge and declare that the Repeal Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

G.      Vacate and set aside the Repeal Rule;

H.      Reinstate the Clean Water Rule without the vacated waste treatment exclusion;

I.      Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

J.      Grant such additional and further relief as the Court may deem just, proper, and necessary.

DATED: June 22, 2020                    s/ Stuart C. Gillespie
                                        Stuart C. Gillespie, CO # 42861
                                        EARTHJUSTICE
                                        633 17th Street, Suite 1600
                                        Denver, CO 80202

(303) 996-9616
sgillespie@earthjustice.org

Janette K. Brimmer, WSBA # 41271
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
jbrimmer@earthjustice.org

*Counsel for Pascua Yaqui Tribe,*
*Quinault Indian Nation, Fond du Lac*
*Band of Lake Superior Chippewa,*
*Menominee Indian Tribe of Wisconsin,*
*Tohono O'odham Nation, and Bad River*
*Band of Lake Superior Chippewa*