1   Stuart C. Gillespie (CO Bar No. 42861) (admitted pro hac vice)
    EARTHJUSTICE
2   633 17th Street, Suite 1600
    Denver, CO 80202
3   (303) 996-9616
4   sgillespie@earthjustice.org

5
    Janette K. Brimmer (WA Bar No. 41271) (admitted pro hac vice)
6   EARTHJUSTICE
7   810 Third Avenue, Suite 610
    Seattle, WA 98104
8   (206) 343-7340
9   jbrimmer@earthjustice.org

10
    *Counsel for Pascua Yaqui Tribe et al.*
11

12              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ARIZONA
13

14  Pascua Yaqui Tribe, et al.,

15                                          Case No. 4:20-cv-00266-RM
         Plaintiffs,
16                                          Assigned Judge: Rosemary Márquez
17       v.

18  United States Environmental Protection    **PLAINTIFFS' OPPOSITION TO**
    Agency, et al.,                           **DEFENDANTS' MOTION TO HOLD**
19                                            **CASE IN ABEYANCE FOR 90 DAYS**

20       Defendants.

21

22         Plaintiffs Pascua Yaqui Tribe, Quinault Indian Nation, Menominee Indian Tribe of

23  Wisconsin, Fond du Lac Band of Lake Superior Chippewa, Tohono O'odham Nation, and

24  Bad River Band of Lake Superior Chippewa (the "Tribes") oppose the Army Corps of

25  Engineers ("Corps") and U.S. Environmental Protection Agency's ("EPA") (together,

26  "Agencies") motion to hold the case in abeyance.  The Agencies' request to delay a ruling

27  in this case would cause substantial harm to the Tribes with no avoided hardship for the

28  Agencies or judicial economy.

                                    1

1

**INTRODUCTION**

2      This case challenges two integrally related rules—the Repeal Rule and Navigable

3  Waters Rule[1]—that eliminate long-standing protections for the Nation's waters, including

4  over 84% of all streams in Arizona.  This extraordinary and wide-reaching rollback violates

5  the text, purpose, and structure of the Clean Water Act, as well as the Supreme Court's

6  decision in *Rapanos v. United States*, 547 U.S. 715, 768 (2006) (Kennedy, J., concurring).

7  It is also arbitrary and capricious due to the Agencies' failure to articulate a rational,

8  record-based foundation for such a striking reversal.

9      Despite these errors, the Agencies are widely implementing the Navigable Waters

10 Rule, revising jurisdictional determinations to allow projects to proceed without Clean

11 Water Act permits (despite previously requiring such permits), and eliminating long-

12 standing protections for waters of the United States, including those of critical—indeed

13 sacred—importance to the Tribes.  For example, the Corps is evaluating a request to revoke

14 Clean Water Act jurisdiction over the waters on the Rosemont Mine site in the Santa Rita

15 Mountains southeast of Tucson based on the Navigable Waters Rule.  Such a reversal

16 would eviscerate long-standing protections for some of the highest quality streams and

17 wetland ecosystems in Arizona—an unacceptable outcome that would cause "severe,

18 irreversible, and irretrievable" harm to the Tohono O'odham Nation and Pascua Yaqui

19 Tribe, whose members have relied on the sites' life-giving waters for thousands of years.

20 This example is just the tip of the iceberg given the regulatory vacuum created by the Rules

21 across the country.

22     The Tribes depend on this lawsuit to safeguard their interests and protect the

23 Nation's waters from the significant and unacceptable harms created by the Rules' rollback

24 of Clean Water Act protections.  To that end, the Tribes are prepared to brief this case on

25 cross-motions for summary judgment, as set forth in the schedule ordered by the Court.

26

27
28
[1] The Agencies proposed and finalized two integrally related rules narrowing the scope of
the Clean Water Act.  Definition of "Waters of the United States"—Recodification of Pre-
Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) (Repeal Rule); The Navigable Waters
Protection Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020) (Navigable Waters Rule).

1   The Agencies, however, move to vacate all briefing deadlines while they continue to

2   implement the Rules to strip waters of the important protections to which they are entitled

3   under the Clean Water Act.  The Agencies do not provide any commitment to fix the fatal

4   flaws in the Rules or any timeline for taking remedial action that would justify such a self-

5   serving attempt to stave off judicial review.

6          The Agencies fall far short of their obligation to demonstrate that an abeyance is

7   warranted under the three-factor test set forth in *Landis v. N. Am. Co.*, 299 U.S. 248, 254

8   (1936).  First, their motion simply ignores the fact that the requested delay poses a

9   substantial, indeed almost certain, risk of harm to the Tribes given the Agencies' ongoing

10  implementation of the Rules.  Second, the Agencies have not demonstrated *any*

11  countervailing hardship warranting a delay of this case, let alone the "clear case of

12  hardship" required by *Landis*.  Third, an abeyance is likely to frustrate judicial economy

13  and cause potentially irreparable harm to the Tribes in the meantime.  Each of these factors

14  weighs heavily against the Agencies' motion for an abeyance, which the Court should

15  deny.

16                              **BACKGROUND**

17         Congress declared a single objective for the Clean Water Act: "to restore and

18  maintain the chemical, physical, and biological integrity of the Nation's waters."  33

19  U.S.C. § 1251(a).  To that end, the Act prohibits and regulates the discharge of pollutants

20  into "navigable waters," which the Act defines broadly as "the waters of the United States."

21  *Id*. § 1362(7).

22         The Agencies defined the term "waters of the U.S." in the Clean Water Rule, 80

23  Fed. Reg. 37,054, 37,114 (June 29, 2015), after conducting a rigorous review of the

24  scientific literature, including more than 1,200 peer-reviewed scientific papers that

25  document how wetlands and streams effect the chemical, physical, and biological integrity

26  of downstream waters.  This massive effort resulted in a definition based on "the text of the

27  statute, Supreme Court decisions, the best available peer-reviewed science, public input,

28

1 and the agencies' technical expertise and experience in implementing the statute." *Id*. at

2 37,055.

3      Following a directive from President Trump, however, the Agencies repealed the

4 Clean Water Rule without any such support or consideration and without addressing the

5 vast body of scientific work and evidence in the record concerning the chemical, physical,

6 and biological connectedness of the Nation's waters.  *See* Exec. Order No. 13,778, 82 Fed.

7 Reg. 12,497 (Feb. 28, 2017), *revoked by* Exec. Order. No. 13,990, 86 Fed. Reg. 7,037 (Jan.

8 20, 2021).  Instead, the Agencies adopted an unduly narrow definition of waters of the U.S.

9 that is less-protective than at any time in the almost 50-year history of the modern-day

10 Clean Water Act.  For example, the Navigable Waters Rule categorically excludes

11 ephemeral streams—waters that flow in response to precipitation[2]—even though many

12 such waters were protected not only under the Clean Water Rule but also under prior,

13 longstanding definitions of waters of the U.S.,[3] and have been shown to "exert a strong

14 influence on the . . . integrity of downstream waters."  Clean Water Rule, 80 Fed. Reg. at

15 37,063.[4]  This particular exclusion eliminates protections for millions of miles of the

16 Nation's streams, including at least *84% of waterways* in Arizona.[5]

17      The Navigable Waters Rule also eliminates protections for streams that do not

18 contribute surface flow in a "typical year" to one of the limited categories of waters under

19

20 [2] The following video from Walnut Gulch—a tributary to the San Pedro River in Arizona—depicts the intense, but typical, flows in ephemeral streams in the southwest:

21 http://www.tucson.ars.ag.gov/unit/Movies/Aug_1_1990_with_animation.wmv.

22 [3] *See, e.g.*, 80 Fed. Reg. at 37,079; 82 Fed. Reg. at 34,901–02; U.S. EPA & Dep't of the Army, *Rapanos* Guidance 1, 8, 12 (2007), https://www.regulations.gov/document/EPA-

23 HQ-OW-2017-0203-15631.

24 [4] *See also* U.S. EPA, Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence ES-2, B-39, B-59 (2015), available at

25 https://www.regulations.gov/document/EPA-HQ-OW-2018-0149-0389.

26 [5] *See, e.g.*, Comment submitted by C. H. Huckelberry, County Administrator, Pima County Governmental Center, County, Administrator's Office, 6 (April 15, 2019) (noting that

27 approximately 96% of Arizona's streams are non-perennial), available at https://www.regulations.gov/document/EPA-HQ-OW-2018-0149-4856; Comment of Steve

28 Moyer, Trout Unlimited 5, 13–14 (Apr. 15, 2019) (explaining that ephemeral streams likely comprise closer to 57% of Nation's stream miles, including 84% of Arizona's).

1    the rule.  It excludes most wetlands that do not have a surface water connection to other

2    waters that are indisputably covered by the Clean Water Act.  Perversely, it would even

3    strip protections from waters that lost their connection to jurisdictional waters as a result of

4    the Corps' authorization of an activity that cut off the connection (i.e., dredging or filling a

5    downstream channel).

6         The Tribes filed this lawsuit challenging this extraordinary rollback of Clean Water

7    Act protections as arbitrary, capricious, and contrary to law.  *See* Compl., ECF No. 1.  The

8    Tribes proposed a consolidated briefing schedule that would resolve the case on cross-

9    motions for summary judgment, which the Court adopted.  *See* Scheduling Order, Oct. 28,

10   2020, ECF No. 20.  The Agencies lodged the Administrative Record on November 16,

11   2020, ECF Nos. 21 & 22, and the Court amended the schedule to require the Tribes'

12   opening motion for summary judgment by May 11, with briefing concluded by October 5.

13   ECF No. 24 at 1–2.  The Court stated that it "is not inclined to grant further extensions

14   absent exceptional circumstances." *Id.* at 1.

15        The Agencies now ask not just for an extension of the briefing schedule but to

16   vacate all deadlines and hold the case wholly in abeyance while they undertake a review of

17   the Rules pursuant to Executive Order 13,990, entitled "Protecting Public Health and the

18   Environment and Restoring Science To Tackle the Climate Crisis." 86 Fed. Reg. 7,037

19   (Jan. 20, 2021).  *See* Defs.' Mot. to Hold Case in Abeyance for 90 Days, ECF No. 25

20   ("Mot.").  The Agencies do not provide a date for initiating this forthcoming review.  Nor

21   do they provide any commitment regarding the results of that review.  Though the

22   Agencies style their motion as a request for a 90-day abeyance, they submitted a proposed

23   order requesting "[a]ll current litigation deadlines in this case" be "vacated" indefinitely.

24   Defs.' Proposed Order, ECF No. 25-1.

25        In seeking this abeyance, the Agencies nowhere acknowledge the substantial risk of

26   harm created by the Rules, which roll back longstanding Clean Water Act protections for

27   the Nation's waters.  The Agencies also fail to disclose the fact that they are actively

28   implementing the challenged Rules to eliminate Clean Water Act jurisdiction, such as at

1  the Rosemont Mine site in the Santa Rita Mountains southeast of Tucson.  Previously, in

2  2009, the Corps approved a preliminary jurisdictional determination for the mine site,

3  thereby triggering Rosemont's obligation to obtain a Clean Water Act Section 404 permit

4  to construct its mine.  Nunez Decl. Ex. B, at 2–3 & n.6.  EPA steadfastly opposed the

5  permit because the mine would cause significant and unacceptable adverse impacts to

6  waters of the U.S., in violation of the Clean Water Act.  Nunez Decl. ¶ 11 (citing and

7  attaching EPA's Nov. 2017 Letter titled "Environmental Consequences of the Proposed

8  Rosemont Copper Mine: Significant Degradation to Waters of the United States").  The

9  Corps' Los Angeles District, in turn, recommended denial of the permit because the mine

10  would cause significant degradation in violation of the Clean Water Act, as well as severe

11  impacts to the Tribes' cultural resources.  *Id.* ¶ 12.  The Corps' South Pacific Division,

12  however, abruptly reversed course under the Trump Administration and granted the

13  permit—a decision that the Tohono O'odham Nation and Pascua Yaqui Tribe challenged in

14  this court.  *Id.* ¶ 13.

15        Rosemont subsequently asked the Corps to revoke jurisdiction over all of the waters

16  on the mine site based on the Navigable Waters Rule, thereby eliminating the company's

17  obligation to obtain a Section 404 permit.  *Id.* ¶ 14.   Upon learning of this hasty request to

18  take advantage of the Navigable Waters Rule, the Tohono O'odham Nation and Pascua

19  Yaqui Tribe promptly sent the Corps a detailed letter explaining that the Corps' request

20  violates the Clean Water Act.  *Id.* ¶ 15 (citing and attaching as Exhibit B Tribes' Letter to

21  Corps dated Dec. 8, 2020).  The Tribes also requested government-to-government

22  consultation due to the adverse effects on cultural resources, including seeps and springs.

23  *Id.*  The Corps initially agreed to consult, only to rescind their commitment based on a

24  newfound policy that jettisons the Corps' obligation to consult with any tribe regarding any

25  jurisdictional determination anywhere in the country.  *Id.* ¶¶ 16–17; *see also id.*, Ex. D.

26  The Corps has not provided the Tribes with any further information about its pending

27  decision on the Rosemont site.  *Id.* ¶ 18.

28

1    The Corps has also implemented the Navigable Waters Rule to revoke Clean Water

2  Act protections over other waters it previously considered jurisdictional.  For example, the

3  Corps recently reversed course and rescinded protections for a jurisdictional wetland in

4  Florida, thereby allowing a developer to construct an industrial warehouse without

5  obtaining a Clean Water Act section 404 permit.  Reichert Decl. ¶¶ 3–5.

6    Given these harms, the Tribes welcome and encourage the Agencies to review—and

7  even repeal or substantially amend—the damaging and illegal Rules.  But the Tribes cannot

8  idly stand by while the Agencies fully apply and actively implement the Navigable Waters

9  Rule, which is subject of this litigation, to the detriment of the Tribes' and the Nation's

10  waters.

11                                      **STANDARD OF REVIEW**

12    To carry its burden of justifying a stay, the Agencies must "make out a clear case of

13  hardship or inequity in being required to go forward, if there is even a fair possibility that

14  the stay for which [they] pray[] will work damage to [someone] else."  *Landis*, 299 U.S. at

15  255.  The *Landis* Court set out competing interests courts must weigh in deciding whether

16  to grant a stay: [1] "possible damage which may result from the granting of a stay, [2] the

17  hardship or inequity which a party may suffer in being required to go forward, and [3] the

18  orderly course of justice measured in terms of the simplifying or complicating of issues,

19  proof, and questions of law which could be expected to result from a stay."  *CMAX, Inc. v.*

20  *Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis*, 299 U.S. at 254–55); *see also*

21  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005).  All three of these factors

22  weigh heavily in favor of denying the Agencies' motion for an abeyance.

23                                             **ARGUMENT**

24  **I.    An Abeyance Would Significantly Harm the Tribes' Interests.**

25    The Tribes urge the Court to deny the Agencies' motion for an abeyance because

26  there is more than a "fair possibility" that delaying the Court's ruling will "work damage"

27  to the Tribes' interest and the Nation's waters.  *Lockyer*, 398 F.3d at 1109 (quoting *Landis*,

28  299 U.S. at 255).  Indeed, the damage is almost certain.

1      Delaying this lawsuit would almost assuredly harm the Tribes' interests given the

2  Agencies' active and ongoing efforts to implement the Rules and unlawfully eliminate

3  Clean Water Act protections.  For example, the Corps has fast-tracked a request to

4  eliminate jurisdiction over the Rosemont Mine site, thereby giving the mining company a

5  free pass to destroy some of Arizona's richest streams and ecosystems.  Nunez Decl. ¶¶

6  15–17.  Such a reversal by the Agencies would not only violate the Clean Water Act, as

7  detailed in EPA's own comments on the mine, *id.* Ex. A, but would also cause irreversible

8  harm to the Tohono O'odham Nation and Pascua Yaqui Tribe, who consider the life-giving

9  waters on the mine site sacred to their cultures.  *Id.* ¶¶ 8–11.

10      Rosemont is not the only example of the Corps' efforts to apply the Navigable

11  Waters Rule and eliminate Clean Water Act permitting requirements.  The agency recently

12  reversed course and excluded a jurisdictional wetland in Florida from the Clean Water Act,

13  thereby allowing the construction of an industrial warehouse in a wetland without any

14  requirement to obtain a Clean Water Act permit.  Reichert Decl. ¶¶ 3–5.

15      These examples are likely just the tip of the iceberg, and they came to light only

16  because the Corps took steps to rescind or revoke its prior jurisdictional rulings based on

17  the Navigable Waters Rule.  But for other projects, such as new projects, the Rules

18  categorically eliminate jurisdiction over millions of miles of streams and wetlands across

19  the Nation, and thus do not require any actions by the Agencies.  As such, many more

20  destructive projects may simply proceed under the Navigable Waters Rule's unlawful

21  exclusions, with no notice to any regulatory agency, much less the public and Tribes,

22  resulting in significant damage.  Indeed, the Navigable Waters Rule creates a regulatory

23  vacuum in many states like Arizona, where there are no or limited state programs in place

24  to regulate the discharge of fill material absent Clean Water Act jurisdiction.  Nunez Decl.

25  Ex. B, at 12–13.  As a result, polluters can discharge fill material into waters excluded by

26  the Rules without any federal or state permitting requirements, or any obligation to inform

27  the Agencies, the public, or the Tribes of such harmful activities.

28

1    Without acknowledging their ongoing efforts to implement the Rules, the Agencies

2 ask for a delay of this lawsuit to give them an "opportunity to review the underlying rule or

3 matter." Mot. at 5. The Agencies, however, offer no commitment as to when the Agencies

4 will initiate that review, let alone complete it. Nor have they acknowledged the serious

5 legal questions that render the Rule plainly unlawful. Even if the Agencies exercise

6 "complete diligence" in undertaking a new rulemaking to revoke the Rules, the necessary

7 time delays in any rulemaking as well as "the ordinary uncertainty in the rulemaking

8 process . . . creates at least a 'fair possibility' of harm." *California v. U.S. EPA*, 360 F.

9 Supp. 3d 984, 993 (N.D. Cal. 2018) (quoting *Landis*, 299 U.S. at 254–55) (denying motion

10 to stay proceedings). But even "complete diligence" is unlikely: the Agencies warn that

11 they are still "in the process of bringing new leadership to the Agencies," who have not

12 even initiated their review of the Rules. Mot. at 7. And while the Agencies ostensibly ask

13 for a 90-day abeyance, their proposed order asks that "[a]ll current litigation deadlines in

14 this case [be] vacated" in their entirety. Defs.' Proposed Order, ECF 25-1 at 1.

15    The Agencies' request for what could well be an indefinite delay in these

16 proceedings—and without any commitment to prevent unacceptable harm in the interim—

17 threatens the Nation's waters and the Tribes' interests. This harm is particularly severe for

18 the Tribes given their deep personal, cultural, and spiritual relationship to water both within

19 their reservation boundaries but also throughout their ancestral lands, as exemplified by the

20 Rosemont mine site. Nunez Decl. ¶¶ 4–5; Compl. ¶ 13. This harm is more serious than

21 other harms that the Ninth Circuit has found to meet the "fair possibility of . . . damage"

22 standard when denying motions to hold proceedings in abeyance. *See Dependable*

23 *Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (finding

24 forced arbitration to constitute "damage"); *Lockyer*, 398 F.3d at 1112 (finding concentrated

25 ownership of multiple power plants under a single entity to constitute "damage" to

26 electricity consumers).

27

28

1 **II.     The Agencies Have Not Demonstrated a Clear Case of Hardship or**
2 **          Exceptional Circumstances.**

3      Because there is more than a "fair possibility" of damage to the Tribes if a ruling in
4 this matter is delayed, the Agencies must "make out a clear case of hardship or inequity in
5 being required to go forward." *Landis*, 299 U.S. at 255.  And yet, the Agencies have failed
6 to demonstrate *any* case of hardship or inequity if the abeyance is denied, let alone the
7 required "clear case," *id.*, or "exceptional circumstances" required by this Court, ECF No.
8 24 at 1.  Rather, their motion is nothing more than an attempt to "stave off judicial review"
9 merely by indicating that they may, or may not, take further administrative action regarding
10 the Rules. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 388 (D.C. Cir. 2012).  If that were
11 enough, "a savvy agency could perpetually dodge review." *Id*.  But, of course, that is not
12 the case; the Agencies must establish a clear case of hardship, which they have failed to do.
13 This alone is a sufficient basis to deny the motion.

14      The Agencies argue that an abeyance is warranted to "provide new EPA
15 management with an opportunity to review the underlying rule or matter." Mot. at 5.  But
16 the Agencies can conduct their review of the Rules, even as this case goes forward.  If the
17 Court vacates the Rules, the Agencies will have the benefit of the court's decision to guide
18 any future rulemaking.  Even if the Court upholds the Rules, the agencies are free to revisit
19 them based on their inherent authority to reconsider rulemakings, and the Tribes would
20 urge them to do so.

21      The Agencies also argue that briefing the illegality of the Rules is "unnecessary at
22 this time," Mot. at 7, because they have the "inherent authority" to revoke the Navigable
23 Waters Rule at some unspecified point in the future. Mot. at 6.  But any such revocation is
24 likely to come after significant damage is already done, if it comes at all.  The Agencies'
25 self-serving argument is misplaced for at least three reasons.  First, the argument cannot be
26 reconciled with the fact that the Agencies continue to implement the Rules to unlawfully
27 revoke Clean Water Act jurisdiction, including for waters of deep significance to the
28 Tribes.  A ruling on the legality of the Rules is thus not only necessary, but essential to

protect the Tribes' interests and the integrity of the Nation's waters, as required by the Clean Water Act.

Second, the argument is unavailing as "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*." *Lockyer*, 398 F.3d at 1112.  Moreover, the agencies can determine that the Rules are indefensible on the law or record, and decide not to defend them.

Third, the argument is pure speculation as the Agencies do not provide any timeline by which they will initiate, let alone conclude, their review of the Rules.  Nor is there any certainty as to whether the Agencies will undertake a new rulemaking, what changes will be made, or "when, if, or in what form, the final rule will become effective." *Andrews v. Montevalle of Scotts Valley, Inc.*, No. C 93-20560, 1995 WL 274305, at *3 (N.D. Cal. May 9, 1995).

Rather than confronting these facts, the Agencies generally note that they have sought stays or abeyances in other lawsuits challenging the Rules.  Mot. at 5 n.3.  But one size does not fit all; none of those cases involved an opposed motion for an abeyance where the plaintiffs identified concrete harms to their interests due to the Rules, as is the situation here.  To the contrary, almost all of the cases cited by the Agencies involved consent motions for short stays because there was "no prejudice to the parties" and the plaintiffs would not agree to anything longer.[6]  Here, even a short stay will prejudice the Tribes, so the fact that other plaintiffs agreed to stays in other cases under different circumstances is irrelevant and does not compel the same result here.  Furthermore, the examples cited by the Agencies are outdated. For example, the Tenth Circuit has since rejected the Agencies' abeyance request.[7]

---

[6] *See, e.g.*, *Conservation Law Found. v. EPA*, No. 1:20-cv-10820, Dkt. 98 ¶ 8 (D. Mass. Feb. 5, 2021) (consent motion for 32-day extension where motion would "not prejudice any Party"); *S.C. Coastal Conservation League v. Wheeler*, No. 2:20-cv-01687, Dkt. 95 ¶ 10 (D.S.C. Jan. 26, 2021) (joint motion for 30-day continuance of summary judgment hearing date where "this motion will not prejudice any party").

[7] *Colorado v. U.S. EPA*, Nos. 20-1238, -1262, -1263, Doc. 010110486364 (10th Cir. Mar. 1, 2021) (denying Agencies' motion to hold appeals in abeyance for 60 days).

1    Ultimately, the Agencies' motion is not designed to mitigate a true hardship or

2  exceptional circumstance.  Instead, the Agencies merely seek to avoid the issuance of a

3  ruling from this Court.  But that is hardly an inequity that warrants abeyance.  If "an

4  agency can[not] stave off judicial review of a challenged rule simply by initiating a new

5  proposed rulemaking that would amend the rule," *Am. Petroleum Inst.*, 683 F.3d at 388,

6  then the Agencies certainly may not "stave off judicial review" merely by indicating that

7  they may, or may not, take further administrative action regarding the Rules.  *Id*.  For this

8  reason, federal courts often refuse to stay cases challenging a rule based on the mere

9  chance that a federal agency may try to replace it at some time in the future. *See, e.g., Ariz.*

10 *Yage Assembly v. Barr*, No. 3:20-CV-03098-WHO, 2020 WL 5629833, at *8 (N.D. Cal.

11 Sept. 21, 2020) (refusing to grant a stay even after new rulemaking began because "it is

12 impossible to predict when the regulations will be finalized"); *California v. U.S. EPA*, 360

13 F. Supp. 3d at 993 (denying a stay despite the EPA actively preparing a new rule because

14 of "the ordinary uncertainty in the rulemaking process, which creates at least a 'fair

15 possibility' of harm").  The same reasoning applies with equal, if not greater, force here

16 given the lack of any hardship to the Agencies or any commitment to alleviate the

17 substantial harms to the Tribes caused by a delay.

18 **III.    An Abeyance Will Not Promote Judicial Economy.**

19    The Agencies have not shown that an abeyance would promote the "orderly course

20 of justice," *Lockyer*, 398 F.3d at 1110, or otherwise promote "economy of time and effort

21 for [the Court], for counsel, and for litigants." *Landis*, 299 U.S. at 254.  They claim

22 briefing is "unnecessary"—an assertion that is not only speculative but misleading given

23 their ongoing efforts to implement the Rule and further eliminate Clean Water Act

24 jurisdiction.  The Tribes certainly disagree that briefing in their case is unnecessary; they

25 should be permitted to proceed with their case and defend their interests.

26    Indeed, a stay could very well undermine opportunities to "simplif[y] . . . issues,

27 proof, and questions of law," *Lockyer*, 398 F.3d at 1110, and could result in further

28 protracted litigation over the Rules.  For example, without a ruling from the Court, the

12

1   Agencies could revoke jurisdiction over the Rosemont mine site, or the countless other

2   jurisdictional waters excluded by the Rules, prompting the need for additional lawsuits

3   along with additional briefing.  So instead of promoting judicial economy, as the Agencies

4   suggest, abeyance is likely to frustrate judicial economy and cause potentially irreparable

5   harm to the Tribes in the meantime.

6          In any event, even if the requested abeyance would have some potential benefit to

7   judicial economy (which it would not), abeyance is inappropriate where grounds other than

8   judicial economy are offered and found to lack merit, as is the case here.  *Dependable*

9   *Highway Express, Inc.*, 498 F.3d at 1066 (citing *Lockyer*, 398 F.3d at 1112).  Indeed,

10  *Landis* cautions that "if there is even a fair possibility that the stay . . . will work damage to

11  some one else," the stay may be inappropriate absent a showing by the moving party of

12  "hardship or inequity."  299 U.S. at 255.  In this case, there is more than a "fair possibility"

13  that the stay will "work damage" to the Tribes, and the Agencies have failed to establish

14  any countervailing hardship.  A stay is not therefore warranted.

15                                   **CONCLUSION**

16          For the foregoing reasons, the Tribes respectfully request that the Court deny the

17  Defendants' motion to hold the case in abeyance.

18          DATED: March 4, 2021

19

20                                                  *s/ Stuart Gillespie*
                                                    Stuart C. Gillespie, CO # 42861
21                                                      (admitted pro hac vice)
                                                    EARTHJUSTICE
22                                                  633 17th Street, Suite 1600
                                                    Denver, CO 80202
23                                                  (303) 996-9616
                                                    sgillespie@earthjustice.org
24

25                                                  Janette K. Brimmer, WSBA # 41271
                                                        (admitted pro hac vice)
26                                                  EARTHJUSTICE
                                                    810 Third Avenue, Suite 610
27                                                  Seattle, WA  98104
                                                    (206) 343-7340
28

                                          13

jbrimmer@earthjustice.org

*Counsel for Pascua Yaqui Tribe, Quinault Indian Nation, Fond du Lac Band of Lake Superior Chippewa, Menominee Indian Tribe of Wisconsin, Tohono O'odham Nation, and Bad River Band of Lake Superior Chippewa*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Index

| **Declaration of Austin Nunez, ECF No. 26-1** | |
| --- | --- |
| Exhibit A | Environmental Consequences of the Proposed Rosemont Copper Mine: Significant Degradation to Waters of the United States October 5, 2017 (Revised November 30, 2017) |
| Exhibit B | Supplemental Letter on Clean Water Act Section 404 Permit No. SPL-2008-0816-MB for the Rosemont Copper Mine (Dec. 8, 2020) |
| Exhibit C | Letter from Colonel Balten to Mr. Gillespie, Tribal Consultation Concerning HudBay Mineral's Approved Jurisdictional Determination requests (Dec. 17, 2020) |
| Exhibit D | Letter from Colonel Balten to Mr. Gillespie, Tribal Consultation Concerning HudBay Mineral's Approved Jurisdictional Determination Requests (AJDs) relating to the Rosemont Copper Mine (January 8, 2021) |
| **Declaration of Christina Reichert, ECF No. 26-2** | |
| Exhibit A | Public Notice (July 8, 2019), Permit Application for Princeton Oaks North project in Orlando, FL. |
| Exhibit B | Approved Jurisdictional Determination for Princeton Oaks North Project (Aug. 28, 2020) |

1

2

**CERTIFICATE OF SERVICE**

3

I hereby certify that on March 4, 2021, I electronically transmitted the foregoing

4

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO HOLD CASE IN**

5

**ABEYANCE FOR 90 DAYS** to The Clerk's Office using the CM/ECF System for filing

6

7

and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

8

9

*/s/ Stuart Gillespie*
Stuart C. Gillespie

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16