Stuart C. Gillespie (CO Bar No. 42861) *(admitted pro hac vice)*
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 996-9616
sgillespie@earthjustice.org

Janette K. Brimmer (WA Bar No. 41271) *(admitted pro hac vice)*
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
jbrimmer@earthjustice.org

*Counsel for Plaintiffs Pascua Yaqui Tribe, Quinault Indian Nation,*
*Menominee Indian Tribe of Wisconsin, Tohono O'odham*
*Nation, Fond du Lac Band of Lake Superior Chippewa,*
*and Bad River Band of Lake Superior Chippewa*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA AT TUCSON

PASCUA YAQUI TRIBE, *et. al*,
        Plaintiffs,
    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et. al*,

        Defendants,
 and

ARIZONA ROCK PRODUCTS
ASSOCIATION, *et. al*,

        Intervenors-Defendants,
and

CHANTELL SACKETT; MICHAEL
SACKETT,

        Proposed Defendant-Intervenors.

Case No. 4:20-cv-00266-RM

Assigned Judge: Rosemary Márquez

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND TO COMPLETE RECORD**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND AND STATEMENT OF CASE....................................................................2

    I.     THE CLEAN WATER ACT'S PURPOSE IS TO RESTORE AND
          PROTECT THE WATER RESOURCES OF THE UNITED STATES. ...............2

          A.     Waters Of The U.S. Has Historically Been Broadly Defined....................2

          B.     Two More-Recent Supreme Court Cases Focused The Court On
               Science And The Breadth Of Clean Water Act Jurisdiction......................5

    II.    THE CLEAN WATER RULE.................................................................................7

    III.   THE REPEAL AND REPLACEMENT OF THE CLEAN WATER RULE ..........9

    IV.   SCIENCE, THE RECORD, AND THE NAVIGABLE WATERS RULE. ..........11

STANDING ...........................................................................................................................13

STANDARD OF REVIEW ....................................................................................................14

ARGUMENT ........................................................................................................................16

    I.     THE NAVIGABLE WATER RULE VIOLATES THE CLEAN WATER
          ACT....................................................................................................................16

          A.     The Navigable Waters Rule Is Inconsistent With The Text,
               Purpose, And Structure Of The Act...........................................................16

          B.     The Agencies' Interpretation Is Unreasonable In Excluding Waters
               That Affect The Chemical, Physical, And Biological Integrity Of
               The Nation's Waters. ................................................................................20

          C.     Section 101(b) Of The Clean Water Act Provides No Justification
               For the Navigable Waters Rule..................................................................24

    II.    THE REPEAL AND NAVIGABLE WATER RULES ARE ARBITRARY
          AND CAPRICIOUS. ..........................................................................................26

           A.     The Agencies Failed To Consider And Address Undisputed
               Science, Including Findings Of Their Own Experts.................................26

1           1.     The Agencies failed to consider the Science Report ....................27

2.     The Agencies failed to consider and address the opinions of its own experts .......................................................................................29

3.     Jurisdiction cannot be divorced from the science .........................30

B.     The Agencies Failed To Acknowledge And Explain Their Change In Position And Conflict With Earlier Findings. ........................................32

C.     The Navigable Waters Rule Is Also Internally Inconsistent, And Thus Arbitrary And Capricious. ...........................................................34

1.     The Agencies' inconsistent treatment of ephemeral streams is irrational and unscientific ...............................................................34

2.     The Agencies' inconsistent treatment of wetlands is irrational and unscientific....................................................................................36

D.     The Agencies Failed To Analyze The Environmental Justice Implications Of The Rules. .........................................................................37

III.     THE WASTE TREATMENT EXCLUSION IS ARBITRARY AND CAPRICIOUS.............................................................................................40

A.     The Waste Treatment Exclusion Allows Waters Of The U.S. To Be Used As Waste Dumps And It Was Expanded By The Navigable Waters Rule...............................................................................................40

B.     The Waste Treatment Exclusion Violates The Law. ................................42

IV.     THE AGENCIES HAVE IMPROPERLY BIFURCATED AND EXCLUDED DOCUMENTS FROM THE ADMINISTRATIVE RECORD. ..................................................................................................45

A.     The Navigable Waters Rule Record Must Include The Documents Considered During The Repeal..................................................................46

B.     The Agencies Must Include The Scientific Evidence................................48

CONCLUSION..................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdul-Kabir v. Quarterman,*
    550 U.S. 233 (2007)............................................................................................ 19

*Am. Paper Inst., Inc. v. Env't Prot. Agency,*
    890 F.2d 869 (7th Cir. 1989) .............................................................................. 3

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................................ 15

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
    467 U.S. 837 (1984)................................................................................ 16, 20, 43

*City of Milwaukee v. Illinois and Michigan,*
    451 U.S. 304 (1981)......................................................................................... 4, 17

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402, 415-16 (1971) .............................................................................. 46

*Cnty. of Maui v. Hawai'i Wildlife Fund,*
    140 S. Ct. 1462 (2020)................................................................................... 17, 21

*Ctr. for Biological Diversity v. Bernhardt,*
    982 F.3d 723 (9th Cir. 2020) ......................................................................... 15-16

*Ctr. for Biological Diversity v. BLM,*
    No. C-06-4884-SI, 2007 WL 3049869 (N.D. Cal. Oct. 18, 2007) ............................. 47

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    698 F.3d 1101 (9th Cir. 2012) ........................................................................... 16

*Defs. of Wildlife v. Browner,*
    191 F.3d 1159 (9th Cir. 1999) ........................................................................... 17

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015) ............................................................................. 49

*Dist. Hosp. Partners, L.P. v. Sebelius,*
    971 F. Supp. 2d 15 (D.D.C. 2013) ..................................................................... 49

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ................................................................ 26, 43, 45

*Env't Prot. Agency v. California*,
   426 U.S. 200 (1976) ..................................................................................... 3

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................ 16, 32, 33

*Forest Guardians v. Kempthorne*,
   No. 06CV2560-L(LSP), 2008 WL 11337359 (S.D. Cal. Apr. 1, 2008) ................ 47-48

*Gen. Chem. Corp. v. United States*,
   817 F.2d 844 (D.C. Cir. 1987) ................................................................... 34

*Gill v. Dep't of Justice*,
   No. 14-cv-03120-RS (KAW), 2015 WL 9258075, at *5 (N.D. Cal. Dec. 18,
   2015) ....................................................................................................... 46

*Golden Gate Salmon Ass'n v. Ross*,
   No. 1:17-cv-01172 ...................................................................................... 48

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) .............................................................................. 17

*Leslie Salt Co. v. Froehlke*,
   578 F.2d 742, 754-55 (9th Cir. 1978) ......................................................... 4

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
   453 U.S. 1 (1981) ...................................................................................... 4

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
   460 U.S. 1 (1983) ..................................................................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................... 15, 16, 27, 44

*N. Cal. River Watch v. City of Healdsburg*,
   496 F.3d 993 (9th Cir. 2007) ..................................................................... 6

*N. Cal. River Watch v. Wilcox*,
   633 F.3d 766 (9th Cir. 2011) ..................................................................... 6

*Nat'l Ass'n of Mfrs. v. Dep't of Lab.*,
   159 F.3d 597 (D.C. Cir. 1998) .................................................................. 43

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ................................................................. 20

*NRDC, Inc. v. Costle*,
    568 F.2d 1369 (D.C. Cir. 1977) ................................................ 43

*NRDC, Inc. v. Pritzker*,
    828 F.3d 1125 (9th Cir. 2016) .................................................. 29

*Nw. Coal. for Alts. to Pesticides v. U.S. Env't Prot. Agency*,
    544 F.3d 1043 (9th Cir. 2008) .................................................. 15

*Oceana, Inc. v. Pritzker*,
    No. 16-cv-06784-LHK (SVK), 2017 WL 2670733 (N.D. Cal. June 21,
    2017) ............................................................................ 46, 49

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ............................................. *passim*

*Portland Audubon Soc'y v. Endangered Species Comm.*,
    984 F.2d 1534 (9th Cir. 1993) ......................................... 55, 56, 57

*Precon Dev. Corp., Inc. v. United States Army Corps of Eng'rs*,
    633 F.3d 278 (4th Cir. 2011) ............................................... 45, 47

*Orchard Hill Bldg. Co. v. Army Corps of Eng'rs*,
    2017 WL 4150768, *6 (N.D. Ill. 2017) ....................................... 18

*Rapanos v. United States*,
    547 U.S. 715 (2006) ......................................................... *passim*

*Solid Waste Agency of Northern Cook Cnty. ("SWANCC") v. United States
    Army Corps of Eng'rs*,
    531 U.S. 159, 162, 174 (2001) .................................................. 5

*Tennessee Valley Auth. v. Hill*,
    437 U.S. 153 (1978) .............................................................. 17

*Thompson v. U.S. Dep't of Lab.*,
    885 F.2d 551 (9th Cir. 1989) ............................................... 45, 49

*In re U.S.*,
    138 S. Ct. 371 (2017) ......................................................... 45-46

*United States v. Ashland Oil & Transp. Co.*,
    504 F.2d 1317 (6th Cir. 1974) .................................................. 4

v

*United States v. Bailey*,
    571 F.3d 791 (8th Cir. 2009) ............................................................ 7

*United States v. Cundiff*,
    555 F.3d 200 (6th Cir. 2009) ............................................................ 6

*United States v. Davis*,
    825 F.3d 1014 (9th Cir. 2016) (en banc) ......................................... 9

*United States v. Donovan*,
    661 F.3d 174 (3d Cir. 2011) ............................................................ 6

*United States v. Gerke Excavating, Inc.*,
    464 F.3d 723 (7th Cir. 2006) ............................................................ 6

*United States v. Home Concrete & Supply, LLC*,
    566 U.S. 478 (2012) ...................................................................... 20

*United States v. Hubenka*,
    438 F.3d 1026 (10th Cir. 2006) ...................................................... 4

*United States v. HVI Cat Canyon, Inc.*,
    213 F. Supp. 3d 1249 (C.D. Cal. 2016) ......................................... 4

*United States v. HVI Cat Canyon, Inc.*,
    314 F. Supp. 3d 1049 (C.D. Cal. 2018) ....................................... 18

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ...................................................................... 19

*United States v. Johnson*,
    467 F.3d 56 (1st Cir. 2006) ............................................................. 7

*United States v. Lucas*,
    516 F.3d 316 (5th Cir. 2008) ............................................................ 6

*United States v. Phelps Dodge Corp.*,
    391 F. Supp. 1181 (D. Ariz. 1975) ............................................... 18

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985) ............................................................. 4, 5, 21

*United States v. Robison*,
    505 F.3d 1208 (11th Cir. 2007) ...................................................... 6

*Upstate Forever v. Kinder Morgan Energy Partners, L.P.*,
   887 F.3d 637 (4th Cir. 2018), cert. granted, judgment vacated, 140 S.
   Ct. 2736 (2020) .................................................................................... 6-7

*Valencia v. Lynch*,
   811 F.3d 1211 (9th Cir. 2016) ................................................................ 17

*Vasquez v. Hillery*,
   474 U.S. 254 (1986) ............................................................................... 19

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ................................................................. 29

**Statutes**

5 U.S.C. § 704 .......................................................................................... 15

5 U.S.C. § 706 .................................................................................... 15, 45

33 U.S.C. § 1251 ........................................................................................ 2

33 U.S.C. § 1251(a) ........................................................................ 2, 21, 31

33 U.S.C. § 1251(a)(1) ....................................................................... 17, 43

33 U.S.C. § 1251(a)(2) ............................................................................... 2

33 U.S.C. § 1251(b) .............................................................................. 24, 25

33 U.S.C. § 1311(a) .............................................................................. 2, 17

33 U.S.C. § 1312 ........................................................................................ 2

33 U.S.C. § 1313 ................................................................................... 2, 4

33 U.S.C. § 1313(c)(2)(A) ............................................................... 2, 3, 25

33 U.S.C. § 1314 ................................................................................. 4, 25

33 U.S.C. § 1316 ................................................................................... 2, 4

33 U.S.C. § 1317 ........................................................................................ 2

33 U.S.C. § 1342 ............................................................................ 2, 4, 26

33 U.S.C. § 1344 .............................................................................. 2, 26

33 U.S.C. § 1362(7) .................................................................. 2, 4, 17, 42

33 U.S.C. § 1362(12) ............................................................................ 17

**Other Authorities**

33 C.F.R. § 328.3(a)(5) (2015) ................................................................ 8

33 C.F.R. § 328.3(a)(6) (2015) ................................................................ 8

33 C.F.R. § 328.3(a)(7)-(8) (2015) ......................................................... 9

33 C.F.R. § 328.3(a)(8)-9) (2015) ........................................................... 9

33 C.F.R. § 328.3(c)(5)-(9) (2015) ......................................................... 9

44 Fed. Reg. 32,854 (June 7, 1979) ....................................................... 40

45 Fed. Reg. 33,290 (May 19, 1980) ............................................ 40-41, 44

45 Fed. Reg. 48,620 (July 21, 1980) ........................................... 41, 44-45

59 Fed. Reg. 7629 (Feb. 16, 1994) ......................................................... 38

80 Fed. Reg. 37,054 (June 29, 2015) ............................................... 7, 8, 41

82 Fed. Reg. 12,497 (Feb. 28, 2017) ............................................. 9, 18, 48

82 Fed. Reg. 12,532 (Mar. 6, 2017) ....................................................... 48

82 Fed. Reg. 34,899 (July 27, 2017) ........................................................ 9

84 Fed. Reg. 4154 (Feb. 14, 2019) ........................................................... 9

84 Fed. Reg. 56,626 (Oct. 22, 2019) ........................................................ 9

85 Fed. Reg. 22,250 (Apr. 21, 2020) ............................................... *passim*

Fed. R. Civ. P. 56(a) ............................................................................ 15

H.R. Rep. No. 92-911 (1972) ..................................................... 3, 21 25

S. Rep. No. 92-414, *reprinted in* 1972 U.S.C.C.A.N. (October 28, 1971) ............... *passim*

INTRODUCTION

Water is life for the Pascua Yaqui Tribe, Quinault Indian Nation, Fond du Lac Band of Lak Superior Chippewa, Menominee Indian Tribe of Wisconsin, Tohono O'odham Nation, and the Bad River Band of Lake Superior Chippewa (the "Tribes"). Water is a source of sustenance, of economic vitality, and it is an integral part of each Tribe's history, culture, and spiritual identity.  It has been so since time immemorial.

Since 1972, the Clean Water Act, one of our earliest and most important environmental laws, has helped protect and restore our Nation's waters.  For decades, the Clean Water Act was broadly applied to protect "the Nation's waters," which included many types of waters from the mightiest rivers to the most hidden springs, rare wetlands, and desert streams that convey thundering torrents of water during monsoon rains.  This case challenges the Trump Administration's rules that eliminated the longstanding protections Congress directed be applied to the Nation's waters.  The challenged rules exclude entire categories of waterbodies from the Clean Water Act's protections against pollution or destruction based on a legal interpretation rejected by five justices of the Supreme Court as contrary to the text, purpose, and structure of the Clean Water Act.  In the words of the Environmental Protection Agency Science Advisory Board, the rule is inconsistent with established and recognized science, will not meet the objectives of the Clean Water Act, and will potentially introduce substantial new risks to human and environmental health.

The Trump Administration's Navigable Waters Protection Rule, along with the repeal of the Obama Administration's Clean Water Rule, is contrary to law, contrary to

1

the intent and purpose of the Clean Water Act, contrary to science and the administrative record, and is therefore arbitrary and capricious. The Tribes ask this Court to vacate the Navigable Water Protection Rule and the repeal of the Clean Water Rule to restore protections to the Nation's waters.

BACKGROUND AND STATEMENT OF CASE

I.   THE CLEAN WATER ACT'S PURPOSE IS TO RESTORE AND PROTECT THE WATER RESOURCES OF THE UNITED STATES.

Congress' stated goal and purpose for the Clean Water Act was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress defined that to mean that water quality must be protected as necessary to foster and ensure clean water for public water supplies, propagation of fish, shellfish, and wildlife, use for recreation, agriculture, and industry, and for the protection of navigation. *Id.* §§ 1251(a)(2), 1313(c)(2)(A).

Congress enacted a comprehensive scheme to set standards for water quality, to control water pollution at its source, and to prohibit "the discharge of any pollutant by any person" except in compliance with the Act's permitting requirements. *Id.* §§ 1311(a) (incorporating *id.* §§ 1312, 1316, 1317, 1328, 1342, and 1344), 1313. The protections of the Clean Water Act extend to "navigable waters," which the Act broadly defines as including all "waters of the United States, including the territorial seas." *See id.* §§ 1251, 1321, 1342, 1344, 1362(7).

A.   <u>Waters Of The U.S. Has Historically Been Broadly Defined.</u>

Congress passed the Clean Water Act in 1972 to expand and strengthen the laws

2

protecting the Nation's waters, because prior to that time the law was restricted to providing assistance to states in an attempt to incentivize them to protect and clean up the water.  *Env't Prot. Agency v. California*, 426 U.S. 200, 202-09 (1976); *Am. Paper Inst., Inc. v. Env't Prot. Agency*, 890 F.2d 869, 870-71 (7th Cir. 1989).  That state-based approach failed, necessitating more comprehensive federal measures.  *California*, 426 U.S. at 202-09.  In developing a law that would provide consistent and comprehensive protections for water across the Nation, Congress directed the "broadest possible" definition of "navigable waters" of the United States, distinct from earlier narrower interpretations.  H.R. Rep. No. 92-911 at 76-77 (1972).[1]  Congress spoke to the science of waters being interconnected and the need to ensure that aquatic ecosystems—waters upstream of and in connection with "traditionally navigable" waters—be protected if the Clean Water Act's purpose is to be fulfilled, recognizing that "[w]ater moves in hydrological cycles and it is essential that discharge of pollutants be controlled at the source."  S. Rep. No. 92-414 at 77, *reprinted in* 1972 U.S.C.C.A.N. at 3742 (Oct. 28, 1971).

Courts have consistently found that Congress intended to "occupy the field" of protecting waters, that the Clean Water Act was intended to wholly supplant the states-

---

[1]Additional evidence that Congress intended the definition of "navigable waters of the United States" to be more broad than water considered traditionally navigable, is found in the direction to states to adopt and implement water quality standards that are protective of water taking into consideration waters' uses and value for "public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial and other purposes, and also taking into consideration their use and value for navigation."  33 U.S.C. § 1313(c)(2)(A).  Navigation was only one consideration.

dependent law that came before, that Congress intended to regulate the discharge of

pollutants into non-navigable tributaries and adjacent wetlands because anything less

leaves even traditionally navigable waters unprotected, and that Congress "knew exactly

what it was doing" when it defined "navigable waters" broadly to mean the "waters of the

United States." *United States v. Ashland Oil & Transp. Co*., 504 F.2d 1317, 1321,1324,

1325 (6th Cir. 1974) (interpreting 33 U.S.C. § 1362(7)); *see also, e.g.*, *City of Milwaukee

v. Illinois and Michigan*, 451 U.S. 304, 317-19 (1981); *Middlesex Cnty. Sewerage Auth.

v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 22 (1981) (existing statutory scheme of state

control and incentives completely revised by Clean Water Act); *United States v.

Hubenka*, 438 F.3d 1026, 1030-1032 (10th Cir. 2006); *United States v. HVI Cat Canyon,

Inc*., 213 F. Supp. 3d 1249, 1268 (C.D. Cal. 2016) (citing *Leslie Salt Co. v. Froehlke*, 578

F.2d 742, 754-55 (9th Cir. 1978) ("navigable waters" must be given the broadest possible

constitutional interpretation).  While Congress assigned states the obligation to develop

water quality standards and provided a mechanism for EPA to delegate permitting

authority, Congress made plain that the state's role is *always* subject to the review and

backstop of EPA to ensure Clean Water Act minimum standards for water quality,

permitting, and effluent limits.  *See* 33 U.S.C. §§ 1313, 1314, 1316, 1342.

Consistent with Congress's vision, for nearly three decades the Agencies

implemented the Act to fully protect the waters of the United States, including tributaries

and wetlands.  The Supreme Court recognized the Act's broad scope in *United States v.

Riverside Bayview Homes, Inc*., 474 U.S. 121, 132 (1985), when it upheld the Act's

application to adjacent wetlands, observing the Act incorporates a "broad, systemic view

of the goal of maintaining and improving water quality." The Court noted Congress's

determination that "[p]rotection of *aquatic ecosystems*. . . demanded broad federal

authority to control pollution, for '[w]ater moves in hydrologic cycles and it is essential

that discharge of pollutants be controlled at the source.'" *Id*. at 132-33 (quoting S. Rep.

No. 92-414 at 77 (1971)) (emphasis added).

B.    Two More-Recent Supreme Court Cases Focused The Court On Science
      And The Breadth Of Clean Water Act Jurisdiction.

Two cases in the last 20 years posed questions regarding the breadth of the Act's

coverage, while underscoring the scientific underpinnings of the Act. In *Solid Waste

Agency of Northern Cook Cnty.* ("*SWANCC*") *v. United States Army Corps of Eng'rs*,

531 U.S. 159, 162, 174 (2001), the Court ruled on a narrow question that the Agencies'

"Migratory Bird Rule," could not be used to extend the reach of the Act to "an abandoned

sand and gravel pit."

Then, in *Rapanos v. United States*, 547 U.S. 715, 729 (2006), the Court remanded,

for further review, the Corps' application of the Act to four wetlands "l[ying] near ditches

or man-made drains that eventually empty into traditional navigable waters." *Rapanos'*

produced splintered opinions: a four-Justice opinion authored by Justice Scalia, proposed

one test for determining whether a water is a "water of the United States"; Justice

Kennedy, concurring only in the judgment for remand but not in the substance of Justice

Scalia's opinion, proposed another, commonly referred to as the "significant nexus" test;

and four dissenting Justices would have left the Agencies' action in place, but also said

they would uphold the broadest protection for waters if the water satisfied *either* of the

plurality's or Justice Kennedy's test. *Id.* at 810 (Stevens, J., dissenting).  Importantly, Justice Kennedy and the four dissenting justices expressly found that Justice Scalia's "relatively permanent waters" test, which had been offered by no party in the litigation, as "inconsistent with the Act's text, purpose, and structure." *Id.* at 768 (Kennedy, J., concurring); *see id*. at 800 (Stevens, J., dissenting).

Both *SWANCC* and Justice Kennedy's controlling opinion in *Rapanos* emphasized that for a nonnavigable water or wetland to be covered by the Act, it must have a "close" or "potentially. . . close" connection to a navigable water; a "significant nexus." *Id*. at 767.  The four justices in the *Rapanos* dissent agreed with Justice Kennedy that at a minimum, any waterbody with a significant nexus is and must be protected by the Act. *Id.* at 810.

Following *Rapanos*, the Circuits all either adopted Justice Kennedy's significant nexus test or applied the broadest result finding that a waterbody that met *either* the significant nexus test or Justice Scalia's test, should be protected.  *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007) (followed by *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir. 2011) where court describes Justice Kennedy's concurrence as the "controlling rule of law")); *United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006); *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007); *United States v. Lucas*, 516 F.3d 316, 327 (5th Cir. 2008); *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011); *Precon Dev. Corp., Inc. v. United States Army Corps of Eng'rs*, 633 F.3d 278, 289-90 (4th Cir. 2011); *Upstate Forever v. Kinder*

*Morgan Energy Partners, L.P.*, 887 F.3d 637, 649 n. 10 (4th Cir. 2018), cert. granted, judgment vacated, 140 S. Ct. 2736 (2020); *United States v. Johnson*, 467 F.3d 56, 65-66 (1st Cir. 2006); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009). These courts have consistently recognized that determining the extent of Clean Water Act jurisdiction requires a thorough assessment of scientific concepts, such as hydrological connections and flows. No court has adopted and applied Justice Scalia's test alone.

II.     THE CLEAN WATER RULE.

Following the Supreme Court's decision in *Rapanos*, the Obama Administration finalized a Clean Water Act jurisdictional rule commonly referred to as the Clean Water Rule. 80 Fed. Reg. 37,054 (June 29, 2015). The Clean Water Rule protected waters scientifically demonstrated to have a significant impact on the chemical, physical, or biological integrity of navigable waters of the United States. The U.S. Army Corps of Engineers ("Corps") and the U.S. Environmental Protection Agency ("EPA") (collectively "Agencies") began the rulemaking process by producing and vetting—with input and advice from the Science Advisory Board and various individual expert panelists—the Science Report, a state-of-the-art review and synthesis of the extensive scientific literature describing the numerous important connections between tributaries, adjacent waters, wetlands, and downstream waters.[2] The Science Report synthesized the

---

[2] "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (hereinafter the "Science Report"). Ex.100. *See* Exs.7-9, 21-25 for drafts of Science Report and review and comments by SAB and individual panel members, filed with this brief as part of Plaintiffs' Excerpts of Record. The Tribes have chosen to provide the court with an Excerpts of Record to ease the court's review of cited record materials given that the record was filed in two parts and is

published, peer-reviewed scientific literature discussing the physical, chemical, and

biological connectivity between various kinds of streams, wetlands, and other waters, and

downstream water bodies, providing the scientific foundation for much of the Clean

Water Rule. Ex.100; 80 Fed. Reg. at 37,057, 37,065.

The Science Report found unequivocal and consensus evidence that *all* tributaries,

including perennial, intermittent, and ephemeral streams, "exert a strong influence on the

integrity of downstream waters," Ex.100 at ES-2, and that all tributaries have a

significant nexus to traditional navigable waters, interstate waters, and the territorial seas.

Thus, the Agencies restored the Clean Water Act's categorical coverage of tributaries, as

defined in the Clean Water Rule.  33 C.F.R. § 328.3(a)(5) (2015).  The Science Report

also found clear evidence that wetlands and open waters in floodplains are "highly

connected" to tributaries and rivers "through surface water, shallow groundwater, and

biological connectivity."  Ex.100 at 4-39; *see also id.* at ES-3, 4-1 et seq.  The Agencies

concluded that all waters adjacent to navigable waters, impoundments, and tributaries

have a significant nexus to navigable waters and are jurisdictional under the Clean Water

Act.  33 C.F.R. § 328.3(a)(6) (2015).  Finally, the Science Report found that wetlands and

open waters located outside of floodplains also provide numerous functions, such as

storage of floodwater, that benefit downstream water integrity, Ex.100 at ES-3, 6-5, 4-21

to 4-30, such that certain non-adjacent waters can be demonstrated on a case-by-case

basis to have a significant nexus to covered waters and therefore be under the jurisdiction

---

confusing.  The Tribes will cite to the Excerpts as "Ex._" with the excerpt pagination.
The Index to the Excerpts includes the official record citation.

of the Act.  33 C.F.R. § 328.3(a)(7)-(8) (2015).[3]  The Science Advisory Board ("SAB")

largely endorsed and supported the analysis and conclusions in the Science Report and

the Clean Water Rule.  Exs.2 and 9.

III.     THE REPEAL AND REPLACEMENT OF THE CLEAN WATER RULE

On February 28, 2017, President Trump issued Executive Order 13,778, directing

the Agencies to repeal the Clean Water Rule and replace it with a regulation employing

the reasoning of Justice Scalia's opinion in *Rapanos*.  82 Fed. Reg. 12,497.  In 2017,

following the Executive Order, the Agencies proposed to repeal the Clean Water Rule.

82 Fed. Reg. 34,899 (July 27, 2017).  In 2019, the Agencies published a final regulation

repealing the Clean Water Rule.  84 Fed. Reg. 56,626 (Oct. 22, 2019) ("The Repeal").

In February 2019, prior to adoption of the Repeal, again following Executive

Order 13,778, the Agencies proposed the Navigable Waters Protection Rule to replace the

Clean Water Rule.  84 Fed. Reg. 4154 (Feb. 14, 2019) ("Navigable Waters Rule").  In

April 2020, the Agencies published the final Navigable Waters Rule.  85 Fed. Reg.

22,250 (Apr. 21, 2020).  The Navigable Waters Rule primarily bases its narrow definition

of protected waters on Justice Scalia's opinion in *Rapanos*.  *See, e.g.*, 85 Fed. Reg. at

22,279-80, 22,288, 22,297, 22,303-04, 22,308-10.  The Navigable Waters Rule severely

limits the waters that are jurisdictional waters of the United States protected by the Clean

[3] Waters subject to case-by-case assessment were those that, echoing Justice Kennedy, are shown to individually or in combination with "similarly situated" waters in a watershed that drains to a foundational water, significantly affect the chemical, physical or biological integrity of the downstream waters, *Id*. § 328.3(c)(5) (2015), or waters located within the 100-year floodplain of a foundational water or are within 4,000 feet of a foundational water, impoundment, or tributary. *Id*. § 328.3(a)(8) (2015).

9

Water Act to:  (i) "[t]he territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide" (*i.e.* waters that are in fact navigable); (ii) "[t]ributaries," with a changed and severely-limited definition of what constitutes a tributary; (iii) "[l]akes and ponds, and impoundments of jurisdictional waters;" and (iv) "[a]djacent wetlands," with a changed and extremely constrained definition of adjacency.  *Id.* at 22,338.  The Navigable Waters Rule also categorically excludes entire waterbodies from protection, including any waters that are not specifically identified in the rule as categorically jurisdictional; "ephemeral features, including ephemeral streams, swales, gullies, rills, and pools;" and waste treatment systems, including those that have been created in waters of the U.S., among other waters.  *Id.*[4]

The Navigable Waters Rule, repeatedly citing Justice Scalia, limits jurisdiction, and thereby protections under the Clean Water Act, by substantially narrowing the definition of "tributaries" to exclude all waters considered "ephemeral," meaning waters that flow "only in direct response to precipitation," and includes only waters that Justice Scalia described as "relatively permanent" in a "typical" year.  *Id*. at 22,338-39.  The Navigable Waters Rule also significantly narrows the definition of wetlands that are waters of the United States, limiting protected wetlands to those that are directly

---

[4] The Navigable Waters Rule has no provision for case-by-case jurisdictional determinations, meaning that waters not expressly identified as protected will be excluded, even if they have a significant nexus to and impact on the water quality and aquatic ecosystems of other waters protected under the Act.

connected on the surface to at least one side to another protected water under the rule. *Id.* at 22,307. The Navigable Waters Rule excludes wetlands from protection under the Act even if the wetland is inundated by flooding from a protected water, but that flooding does not occur in a "typical year." *Id.* at 22,338. The Navigable Waters Rule also provides that a waterbody may be severed and lose its status as a protected "water of the United States" by man-made alterations such as roads, dams, berms, or levees if those alterations result in loss of surface water connection between the upstream and downstream waters or result in the loss of a surface water connection between a wetland and a waterbody, in a "typical" year. *See, e.g., id.* at 22,338-39.

The term "typical year" is defined to mean "when precipitation and other climatic variables are within the normal periodic range (e.g., seasonally, annually) for the geographic area of the applicable aquatic resource based on a rolling thirty-year period." *Id.* at 22,339. The Navigable Waters Rule does not define "normal periodic range," and does not define or provide guidance on the relevant size or type of geographic area for making these decisions that underlie jurisdictional determinations.

IV.     SCIENCE, THE RECORD, AND THE NAVIGABLE WATERS RULE.

In adopting both the Repeal and Navigable Waters Rule, the Agencies provided no explanation, analysis, discussion, or refutation of the Science Report or any of the research and studies in the administrative record for the Clean Water Rule. The Agencies prepared no comparable analysis of the scientific evidence (or even a critique of the Science Report) on how various waters that will now be excluded from protection affect physical, chemical, or biological functions and integrity of downstream water quality or

aquatic ecosystems.  The Agencies identified no different or new scientific evidence and provided no discussion of or explanation for how or why the Science Report and the technical information in the administrative record support the Navigable Waters Rule. The Agencies also failed to explain why they disregarded the Science Report and their earlier findings and conclusions based upon it.

The Agencies' release of the final Navigable Waters Rule for publication occurred before the Agencies received final feedback and comment from the SAB.  The Agencies received preliminary feedback and comments from the SAB on October 16, 2019, where the SAB reiterated that the Science Report was sound and was *still the best and established science*.  Ex.99 at 2.  The SAB was sharply critical of the Navigable Waters Rule as "in conflict with established science, the existing [Clean Water] rule developed based on the established science, and the objectives of the Clean Water Act."  *Id.* at 1. The SAB pointed out that the Navigable Waters Rule offers no peer-reviewed body of evidence comparable to the Science Report either generally, or in support of the decisions to exclude ephemeral waters or to constrain the definition of adjacent wetlands.  *Id.* at 2. Even though the Agencies knew the SAB was preparing final comments, the Agencies rushed the Navigable Waters Rule to publication before they received the final comments.

The SAB provided final comment on February 27, 2020, concluding "that the [Navigable Waters Rule] does not incorporate best available science and … that *a scientific basis for the … Rule, and its consistency with the objectives of the Clean Water*

*Act, is lacking*." Ex.1 at 1 (emphasis added).[5]  The SAB further found that the Navigable

Waters Rule "*decreases protection* for our Nation's waters and *does not provide a*

*scientific basis in support of its consistency with the objective of restoring and*

*maintaining 'the chemical, physical and biological integrity' of these waters*."  *Id*. at 2

(emphasis added).  The SAB criticized the Agencies' rejection of a sound scientific

approach and the Agencies' disregard of the Science Report, noting:

> [t]he proposed Rule does not fully incorporate the body of science on
> connectivity of waters reviewed previously by the SAB and found to
> represent a scientific justification for including functional connectivity in
> rule making[,] … [including the] EPA's 2015 Connectivity Report[.] … The
> EPA's 2015 Connectivity Report emphasizes that functional connectivity is
> more than a matter of surface geography. The report illustrates that a systems
> approach is imperative when defining the connectivity of waters, and that
> functional relationships must be the basis of determining adjacency. The
> proposed Rule offers no comparable body of peer reviewed evidence, and no
> scientific justification for disregarding the connectivity of waters accepted
> by current hydrological science.

*Id.* at 2 (footnotes omitted).

## STANDING

The Tribes have standing to bring this case.  Water, all waters, play a critical role

in the lives, livelihoods, culture, and identity of the plaintiff Tribes as well as their

individual members.  The Tribes and their members will be harmed by the Navigable

Waters Rule.  The Navigable Waters Rule strips Clean Water Act protections from

ephemeral waters, from intermittent waters, from isolated wetlands, from waters that are

[5] The Agencies excluded the final comments from the administrative record despite
receiving them well before final publication of the rule in the Federal Register.  The
Tribes are providing the Court with a copy for reference.  Ex.1.  The draft comments are
in the record. Ex.99.

not connected on the surface to other larger waterbodies.  This will open those waters to development and damage ranging from mining to housing and agriculture without regulatory oversight under the Clean Water Act.  *See* Decls. of Vega, Howes, Reiter, James, and Nunez.  That lack of Clean Water Act regulatory oversight will allow those wetlands and waters to be damaged or destroyed through mining and other development without permitting and mitigation obligations required under federal law and regulation, or through the discharge of pollutants without Clean Water Act permit limits and monitoring.  This will harm wild rice, salmon and sturgeon, cultural practices and sites, economic wellbeing, and health.  *See* Howes ¶ 9-17; Reiter ¶¶ 6-13; James ¶¶ 7-15; Vega ¶¶ 10-23 and Nunez ¶¶ 11-21.  Without federal Clean Water Act jurisdiction over these waters, the Tribes and their members also potentially lose application of other protective federal laws such as the National Historic Preservation Act, the Endangered Species Act, and the National Environmental Policy Act, laws tied to federal action.  The Corps' unlawful revocation of Clean Water Act jurisdiction over the Rosemont Mine site is a clear-cut example of the Navigable Waters Rule's adverse consequences for some of the most ecologically and culturally rich riparian ecosystems in Arizona.  Nunez ¶¶ 16-22 and exhibits thereto; Vega ¶¶ 14-24.

These harms to the Tribes and their members can be redressed by an order from this Court vacating and remanding the Repeal Rule and Navigable Waters Rule, allowing more complete protection for waters the Tribes and their members depend on.

STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  Because this case

involves review of final agency action and an administrative record, there are no genuine

issues of material fact, and resolution of the case on a motion for summary judgment is

appropriate.

Final agency actions are subject to judicial review under the Administrative

Procedure Act.  5 U.S.C. § 704.  In reviewing a final agency action, the court shall hold

unlawful and set aside agency action, findings, and conclusions that are found to be

"arbitrary, capricious, an abuse of agency discretion, or otherwise not in accordance with

the law," *id.* § 706(2)(A), or agency actions that are "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right," *id.* § 706(2)(C).  "[A]n agency rule

[is] arbitrary and capricious if the agency has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 43 (1983); *Nw. Coal. for Alts. to Pesticides v. U.S. Env't Prot. Agency*,

544 F.3d 1043, 1047-48 (9th Cir. 2008) (the agency must examine the data before it and

must demonstrate a rational connection between the facts found and the choice made);

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 739 (9th Cir. 2020) ("An agency

acts arbitrarily and capriciously when it reaches a decision that is 'so implausible'"—that

not drilling for oil will increase carbon emissions—it cannot be attributed to a difference

in view or a result of agency expertise (quoting *State Farm*, 463 U.S. at 43)).

The agency must cogently explain how it has reached its conclusions—making a rational connection between the facts found and the choice made—and its explanation must be adequate for the Court to review and make a determination regarding the reasonableness and correctness of the agency's result.  A court will not guess at an agency's reasoning nor will the court supply the reason.  *Bernhardt*, 982 F.3d at 739; *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

When, as here, an agency changes position, it must display awareness and acknowledge that it is changing position; it must explain the rationale for the change; it must show good reasons for the new position; and where the new rule rests on findings which contradict those which underlay its prior position, the agency must provide a more detailed justification for how and why that contradiction is not arbitrary and capricious. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968-69 (9th Cir. 2015).

## ARGUMENT

I.     THE NAVIGABLE WATER RULE VIOLATES THE CLEAN WATER ACT.

The Navigable Waters Rule fails under the two-step framework established in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984).

A.     The Navigable Waters Rule Is Inconsistent With The Text, Purpose, And Structure Of The Act.

When Congress' intent is clear, it is the duty of a court to enforce that intent.

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978); *Valencia v. Lynch*, 811 F.3d 1211, 1214 (9th Cir. 2016).  To glean intent, courts will use all the tools of statutory construction before "wav[ing] the ambiguity flag," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), looking to the language of the provision, but not in a vacuum.  Rather, a court must read the provision in light of the entire text, context, history, and purpose of the statute.  *See Cnty. of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462, 1470-75 (2020); *Defs. of Wildlife v. Browner*, 191 F.3d 1159, 1164 (9th Cir. 1999).

Congress enacted the Clean Water Act with a single objective: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To that end, Congress set forth an "all-encompassing program of water pollution regulation"—that is a "'total restructuring'" to the previous structure of state-based regulation that had failed—by setting minimum national standards of quality and permitting for waters of the U.S.  *City of Milwaukee*, 451 U.S. at 317-18 (1981) (quoting 1 Leg. Hist. 350-51 (remarks of Chairman Blatnik)).  As Justice Rehnquist noted, "[t]he most casual perusal of the legislative history demonstrates that … views on the comprehensive nature of the legislation were practically universal."  *Id.* at 318 n.12.

Congress also sought to control water pollution at its source.  *See* S. Rep. No. 92-414 at 77 (1971) ("[I]t is essential that discharge of pollutants be controlled at the source.").  To that end, the Act prohibits "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. §§ 1362(12), 1311(a), and defines "navigable waters" to broadly encompass "waters of the United States, including the territorial seas."  *Id.* § 1362(7).  Controlling discharge of pollutants at their source necessarily means

17

controlling discharges where they enter the aquatic system even if that is a small tributary upstream of a navigable-in-fact water.  *See, e.g.*, *United States v. Phelps Dodge Corp.*, 391 F. Supp. 1181, 1187 (D. Ariz. 1975) ("For the purposes of this Act to be effectively carried into realistic achievement," the Clean Water Act must cover discharges into tributaries, "including normally dry arroyos."); *United States v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1062 (C.D. Cal. 2018) ("It is evident that any pollutant or fill material that degrades water quality in a tributary of navigable waters has the potential to move downstream and degrade the quality of navigable waters themselves." (quoting *Orchard Hill Bldg. Co. v. Army Corps of Eng'rs*, 2017 WL 4150768, *6 (N.D. Ill. 2017))).

Despite the intent of Congress and lengthy history of broad application, the Agencies primarily rely on Executive Order 13,778 to apply Justice Scalia's opinion from *Rapanos* and thereby limit the Clean Water Act to only those waters with "relatively permanent, standing or continuously flowing bodies of water."  *Rapanos*, 547 U.S. at 739, 742; *see, e.g.,* 85 Fed. Reg. at 22,259-60 (relying on Executive Order 13,778); *id.* at 22,273 (relying on *Rapanos* to exclude ephemeral streams); *id.* at 22,309 (relying on *Rapanos* to define wetlands as only those with "continuous surface connections" to other jurisdictional waters).

A majority of justices, however, rejected the test invented by Justice Scalia as "inconsistent with the Act's text, structure, and purpose."  547 U.S. at 776 (Kennedy, J., concurring); *see id*. at 800 (Stevens, J., dissenting).  Justice Kennedy explained that requiring relatively permanent surface flows not only ignores the hydrology of waters "in

the western parts of the Nation" but "makes little practical sense in a statute concerned

with downstream water quality." *Id*. at 769.  While Congress "could draw a line to

exclude irregular waterways"—such as ephemeral streams in the desert Southwest—

Justice Kennedy concluded that "nothing in the statute suggests it has done so" and

instead found that Congress took "[q]uite the opposite" approach.  *Id*. at 770.  The four-

justice dissent likewise rejected the plurality's requirement of relatively permanent flows,

labeling it a "statutory invention" that creates an "arbitrary jurisdictional line" that are

"'without support in the language and purposes of the Act or in our cases interpreting it.'"

*Rapanos*, 547 U.S. at 800-04 (quoting *id. at* 768 (Kennedy, J., concurring)).  A majority

of the *Rapanos* Court therefore rejected the "relatively permanent waters" test adopted by

the Rule, rendering it an impermissible construction of the Act.  *See United States v.*

*Davis*, 825 F.3d 1014, 1024 (9th Cir. 2016) (en banc) ("[T]he Supreme Court … [has]

considered dissenting opinions when interpreting fragmented Supreme Court

decisions.").[6]

      The Agencies cannot sidestep that ruling by arguing that because *Rapanos* does

not dictate one unambiguous test for defining the term "waters of the United States," they

are free to drastically reduce the protections of the Clean Water Act.  It may be true that it

is difficult to identify what *Rapanos* is for.  But that does not alter what *Rapanos* is

clearly against.  *Rapanos* "unambiguously forecloses" the Agencies' attempt to resurrect

---

[6] *See also, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 251-54, 253 n.15, 257-58 (2007); *Vasquez v. Hillery*, 474 U.S. 254, 261 n.4 (1986); *United States v. Jacobsen*, 466 U.S. 109, 115-117 (1984); *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16-17 (1983).

19

Justice Scalia's exceedingly narrow and unlawful interpretation through a new rulemaking. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005); *see also United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488-89 (2012) (agencies are free to disregard an earlier court decision only when the court determined Congress purposely left a "gap" for the agency to fill). Again, five justices of the Court rejected the "relatively permanent waters" test posed by Justice Scalia as an impermissible construction of the Act, squarely foreclosing the Agencies' attempt to make that "losing" interpretation the law of the land under the guise of a new rulemaking. Thus, even if *Rapanos* does not dictate what the Agencies *must* regulate, five justices made plain what the Agencies *cannot* do, thereby squarely foreclosing the approach taken in the Rule. *See Brand X*, 545 U.S. at 982-83. The Rule must therefore be vacated as an impermissible construction of the Act.

> B.   <u>The Agencies' Interpretation Is Unreasonable In Excluding Waters That Affect The Chemical, Physical, And Biological Integrity Of The Nation's Waters.</u>

Even if this Court determines Congress did not adequately define the term "waters of the United States," the Navigable Water Rule still fails under *Chevron* step two because it is unreasonable and will frustrate the intent and purpose of the Act for two reasons. *Chevron*, 467 U.S. at 843-45.

First, as noted above, a majority of justices in *Rapanos* rejected the approach taken in the Navigable Waters Rule as "inconsistent with the Act's text, structure, and purpose." *Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring*); see id*. at 800 (Stevens, J., dissenting).

Second, the Navigable Waters Rule thwarts the purpose of the Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); *see Cnty. of Maui*, 140 S. Ct. at 1468.  In drafting this provision, Congress took a "broad, systemic view" of maintaining and improving water quality, with the key word "integrity" referring "'to a condition in which the natural structure and function of ecosystems [are] maintained.'"  *Riverside Bayview*, 474 U.S. at 132 (1985) (quoting H.R. Rep. No. 92-911 at 76 (1972)).  This comprehensive approach was essential because, as Congress recognized, water moves in "hydrological cycles."  S. Rep. No. 92-414 at 77 (1971).

Here, the Agencies' own experts found that the Navigable Waters Rule fails to meet the requirements and purpose of the Act and is unsupported and unreasonable.  The SAB plainly states that in failing to apply the findings of the Science Report, the Navigable Waters Rule "does not support the objective of restoring and maintaining 'the chemical, physical and biological integrity' of [the Nation's] waters."  Ex.99 at 2.  The SAB's conclusions in this regard are sound and consistent with the Agencies' previous findings, as embodied in the Science Report, that all tributaries and all wetlands must be protected as waters of the U.S., because they "exert a strong influence on the integrity of downstream waters" and are "physically, chemically and biologically integrated" with navigable-in-fact waters.  Ex.100 at ES-2.  Nothing in the record demonstrates that any of this has changed.  Yet, the Navigable Waters Rule excludes whole categories of waterbodies which play a crucial role in the chemical, physical, and biological integrity of the Nation's waters.

The Science Report unequivocally found that all tributaries—waterbodies exhibiting a bed, bank, and high-water mark, whether or not they contained visible surface flow at all times—were critical to healthy aquatic systems, and that tributaries determine the character of the water downstream—physically, chemically, and biologically. *Id.* at 3-45 to 3-46. Tributaries supply initial flow (from snowmelt collecting, or channeling of area precipitation, or from springs or upwellings) as well as the materials that form the river's bed and banks, such as sediment, and the materials that fill it, such as water, nutrients, and organisms. *See, e.g.*, *id.* at 3-47 tbl.3-1, 4-40 tbl.4-3.

The Rule, however, categorically excludes ephemeral streams—thousands of miles of ephemeral streams in Arizona alone—which are critically important to the chemical, physical, and biological integrity of the Nation's waters. In the Southwest, where the majority of tributaries are seasonally dry, *id.* at 2-29, flows from ephemeral tributaries are a "major driver" of flows in downstream rivers, even despite their "ephemeral" nature (which simply means that they do not have visible surface water at all times). *Id.* at B-59. Ephemeral streams supply substantial amounts of surface water to rivers during infrequent, but influential, flood events. *Id.* For instance, during a high-intensity storm in New Mexico that dropped up to one-quarter of the area's annual rainfall over the course of two days, flood flows from the Rio Puerco, an ephemeral tributary to the Rio Grande River, accounted for 76% of the flood flow downstream in the Rio Grande. *Id.* at 3-7 to 3-8; *see* Ex.101 at 5 fig.2. Those flows physically affect downstream waters and play critical roles in replenishing sediments or nutrients or

22

building aquatic habitat.[7]  Even when water in ephemeral tributaries sinks into the ground before reaching downstream rivers, it plays a critical role in replenishing shallow groundwater flows, a vital source of surface water for the downstream rivers when they resurface through springs or base flow.  Ex.100 at 5-8 (ephemeral tributaries supply roughly half of the San Pedro River's "baseflow"), B-39 (most Southwest perennial and intermittent rivers are groundwater dependent).

The Navigable Waters Rule also severely constrains what wetlands are protected, allowing only those with a visible surface connection on at least one side to a jurisdictional water to be protected under the Act.  But the Science Report found that wetlands, and waters in floodplains, are "highly connected" to tributaries and rivers "through surface water, shallow groundwater, and biological connectivity." *Id.* at 4-39; *see also id.* at ES-3, 4-1 et seq.  Floods, even if infrequent, have significant, lasting, and beneficial impacts because they allow rivers and wetlands to exchange water and other materials in both directions.  *Id.* at 4-1, 4-39.  Wetlands reduce floods by storing water thereby helping to control and slow flooding downstream.  *Id.* at 4-24, 4-1, 6-4; *see also id.* at 2-12 and 4-7.  Another very important function of wetlands is to intercept contaminants, such as fertilizer and pesticides from agricultural operations, with uptake by wetland plants, preventing them from reaching downstream waters.  *Id.* at ES-3, 4-4

---

[7] The Science Report devotes more than twenty-two pages to a case study of "Southwestern Ephemeral and Intermittent Streams." That case study discusses several streams in the Southwest and explains why the San Pedro is representative of other watersheds in the region. Ex.100 at B-37 to B-59.

tbl.4-1, 4-11, 4-14.[8]

The Agencies' approach of eliminating protections for all these waters (and more) is antithetical to the Clean Water Act.  As Justice Kennedy feared, the Navigable Waters Rule protects the "merest trickle" if it happens to be lucky enough to be on the wet eastern seaboard and flows year around, but leaves "torrents thundering" that sustain a downstream river for a whole year unprotected because they are unlucky enough to be an ephemeral stream west of the 100th Meridian and flow only part of the year in response to rain.  *Rapanos*, 547 U.S. at 769 (Kennedy, J., concurring).[9]  The Rule's arbitrary line-drawing does not protect the integrity of the Nation's waters, frustrating the purpose of the Act.

> C.    Section 101(b) Of The Clean Water Act Provides No Justification For the Navigable Waters Rule.

The Agencies consistently rationalize the Navigable Waters Rule by pointing to section 101(b) of the Clean Water Act, 33 U.S.C. § 1251(b).  The Agencies' heavy reliance on this argument is misplaced, resting on an unreasonable reading of that section and the Clean Water Act that cannot save the Agencies' failure to demonstrate the Rule will maintain and restore the chemical, physical, and biological integrity of the Nation's

---

[8] Justice Kennedy concluded that the Act protects wetlands with a "significant nexus" to waters traditionally considered navigable, *Rapanos*, 547 U.S. at 759, 787, where the water, including wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id*. at 780.

[9] To see how this approach frustrates the Act's purpose, see the Rosemont Mine example where the Corps revoked Clean Water Act jurisdiction.  *See* Nunez Decl. ¶¶ 23-27 and exhibits thereto.

waters.

In section 101(b), Congress directed that it is the primary responsibility of the states to do the work of implementing the Clean Water Act. But Congress is very specific in the tasks it assigns to the states, the duties identified are clearly in service to the overarching purpose of the Act, and importantly, the section says nothing about the jurisdictional reach of the Act. 33 U.S.C. § 1251(b). There is nothing in section 101(b), express or implied, that suggests Congress intended to curtail the reach of the Clean Water Act's protections; in fact, as noted above, the Congressional Record is replete with references to the contrary. *See, e.g.*, H.R. Rep. No. 92-911 at 76-77 (1972) (Congress directed the "broadest possible" definition of "navigable waters" of the United States, distinct from earlier narrower interpretations).

Further, section 101(b) must be read in context with the rest of the Act. Time and again, Congress makes clear that while the states may have the first responsibility and opportunity to implement the requirements of the Act (for example, promulgating water quality standards, identifying waters that are not meeting those standards, and clean-up plans to address the problem), in every instance, Congress was also clear that EPA must serve as the backstop for state action and inaction, reviewing and approving/disapproving state actions and setting federal guidelines and minimums. *See, e.g.*, 33 U.S.C. §§1313(c)(2), 1314. Further, should a state fail to act, EPA is repeatedly authorized, indeed required, to step in and ensure that the minimum protections of the Clean Water Act are met. *Id.* Congress also assigned federal agencies primary permitting roles, allowing states to assume federal permitting programs only after EPA approved such a

delegation under specific standards and with continuing EPA oversight of those

programs.  *Id.* §§ 1342(b), 1344(g).  Given the history of the Clean Water Act, Congress

had no illusions about states' potential failures and the necessary work to carry out the

Act's mandates.  It is illogical, unreasonable, and contrary to the entire structure, intent,

and purpose of the Act for the Agencies to suggest that Congress with one hand stepped

in where states had repeatedly failed to act, assigned EPA the active role of federal

backstop, set significant federal minimums and permitting requirements, but then

exempted a huge swath of the Nation's waters from those protections of the Clean Water

Act.  Such an interpretation is unreasonable and contrary to the Act as a whole.

II.     THE REPEAL AND NAVIGABLE WATER RULES ARE ARBITRARY AND
        CAPRICIOUS.

        Agencies are "free to change their existing policies" only if "they provide a

reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct.

2117, 2125 (2016).  Here, the Agencies failed to provide a reasoned basis for their drastic

rollback of Clean Water Act protections.  The Agencies disregarded the overwhelming

scientific evidence refuting their unduly narrow approach; blindly countermanded their

prior factual findings rejecting the Navigable Waters Rule's approach; relied on

internally inconsistent reasoning that exposes their irrational approach; and failed to

analyze, let alone disclose, the disproportionate effects on already-burdened indigenous

communities.

        A.      <u>The Agencies Failed To Consider And Address Undisputed Science,
                Including Findings Of Their Own Experts.</u>

The Agencies' unprecedented contraction of Clean Water Act jurisdiction is not

supported by factual or scientific findings.  To the contrary, the Agencies actively

disregarded well-documented science, including the advice of their own experts, thereby

overlooking "an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

    *1.*    *The Agencies failed to consider the Science Report.*

A primary feature of the Agencies' arbitrary and capricious rollback of Clean

Water Act protections is their consistent failure, in both the Repeal and the Navigable

Water Rule, to acknowledge and address the undisputed, voluminous science

demonstrating that ephemeral and intermittent waters and isolated wetlands are critical to

the chemical, physical, and biological integrity of traditional navigable waters.

The Science Report, developed in consultation with the SAB, undertook a

comprehensive synthesis of hydrology, stream and lake morphology, geology, biology,

wetland and soil science, toxicology, and groundwater science, concluding that tributaries

and wetlands individually and cumulatively effect downstream waters, and that the

connections between those waters must be analyzed together over time.  Ex.100 at 6-10

to 6-12; 1-7 fig.1-2 and Ex. 112.  The Agencies found that *all* tributaries and most

wetlands are protected under the Clean Water Act as waters of the U.S.  *See* discussion

*supra* pp. 8-10.  Since the publication of the Science Report in 2015, additional peer-

reviewed studies have only reinforced these conclusions about the connectivity of waters

and need for comprehensive protections.  *See, e.g.*, Exs. 31-64.

Yet, the Agencies categorically eliminated protections for ephemeral streams and

large numbers of wetlands without addressing the scientific evidence before them.  To the

extent the Agencies reference the Science Report at all (they can be counted on one

hand), it is to cite it selectively to support specific concepts, like wetlands that are adjacent and connected to a navigable-in-fact water on the surface should be considered jurisdictional.  *See, e.g.*, 85 Fed. Reg. at 22,314.  But for each of the few times the Agencies cite some snippet of the Science Report to support what they have included as jurisdictional in the Navigable Waters Rule, the Agencies fail to mention the parts of the Science Report that dictate a very different and much more inclusive result than that in the Navigable Waters Rule.

For example, nowhere do the Agencies grapple with the fact that the Science Report found that tributaries, defined as having a defined bed, bank, and high-water mark, should be categorically considered jurisdictional, individually and cumulatively, because of their strong influence on the chemical, physical, and biological integrity of waters of the U.S.  *See* Ex.100 at ES-2.  Nowhere do the Agencies acknowledge, much less grapple with the Science Report's conclusions that adjacent wetlands must be defined broadly to protect the chemical, physical, and biological integrity of waters.  *See id.* at 4-43 to 4-45.  Nowhere do the agencies consider the overwhelming additional scientific evidence underscoring the importance of tributaries and isolated wetlands.  *See* Exs. 31-64.

In one of the most cynical and inaccurate uses of the Science Report, the Agencies include a footnote to the Report's discussion of the San Pedro River and the studies regarding the importance of desert washes to claim that these waters flow "only in response to rain," and therefore should be categorically *excluded* from the Act as ephemeral streams.  85 Fed. Reg. at 22,276, n.36.  That approach is exactly contrary to

28

the Science Report's conclusion, which discusses and references numerous studies about how desert washes and similar "ephemeral" waters are *critical* to a number of traditional navigable waters and must be protected.  Ex.100 at B-37 to B-59; *see also supra* pp. 23-24.

As these examples show, the entire manner the Agencies utilize, or not, the Science Report is arbitrary on its face.  The Agencies failed to consider the overwhelming scientific evidence contradicting the Rule's categorical exclusion of all ephemeral streams and large numbers of wetlands from the Clean Water Act.  That failure reflects a textbook example of arbitrary rulemaking that violates the APA.

2.    *The Agencies failed to consider and address the opinions of its own experts.*

Perhaps the most arbitrary aspect of the Navigable Waters Rule is the Agencies' failure to consider the opinions of their own experts at the SAB.  *See NRDC, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (agency decision in conflict with own experts is arbitrary and capricious); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011).  When presented with the proposed Navigable Waters Rule in 2019, the SAB made clear that it considered the Science Report to be *the* definitive document on what should be considered waters of the U.S.; that it did not support the proposed Navigable Waters Rule; that the proposed rule was contrary to established and recognized science; and that the rule does not support the objective of restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters, the very purpose of the Clean Water Act.  Ex.99 at 1.  The SAB additionally pointed out that

the Agencies had failed to address or explain why the Agencies were now reversing

themselves and had failed to explain what new or different science justified the

Navigable Waters Rule (while also pointing out there was no new or different science

that would support the Navigable Waters Rule). *Id.* at 2-4.

Only briefly do the Agencies admit to some critique by the SAB, 85 Fed. Reg. at

22,261, but nowhere do they discuss or refute the SAB's sharp disapproval and critique

of the Navigable Waters Rule as contrary to science and prior agency findings.  Nowhere

do the Agencies mention, discuss, or respond to the SAB's criticisms that the Navigable

Waters Rule will fail to protect the Nation's waters and will, in fact, harm even

traditional navigable waters.  The Agencies actively disregarded the SAB's sharp critique

regarding the Rule and the lack of scientific analysis and support for it.[10]  Finally, the

Agencies' actions in rushing the Rule to finalization while the SAB was preparing its

final comment highlights not just its failure to consider important aspects of the problem,

but its attempt to avoid having the important aspects of the problem officially brought to

the Agencies' attention at all.

       3.    *Jurisdiction cannot be divorced from the science.*

The Agencies' vague response to their failure to address the Science Report or the

---

[10] One rationale put forth by the Agencies for cutting waters out of Clean Water Act protections is that they relied on the "connectivity gradient" originally articulated by the SAB.  *Id.* at 22,288.  But the SAB itself states this is a mischaracterization and misuse of the concept.  While the SAB originally stated that waters lie along a connectivity gradient with some more and some less connected to navigable-in-fact waters, the SAB also pointed out that, to truly assess waters' connections, the Agencies must consider streams' cumulative and aggregate effects.  Ex.9 at 3 (PDF pagination).

SAB's critique of the Navigable Waters Rule is that "science alone cannot dictate" federal jurisdiction.  *See, e.g.*, 85 Fed. Reg. at 22,261, 22,288.  Rather, the Agencies rely primarily on the language and concepts set forth in Justice Scalia's minority opinion in *Rapanos*.  This argument completely lacks merit for several reasons.

First, if science plays no role, then it plays no role.  The Agencies cannot have it both ways.  It makes no sense that the Agencies cite to the Science Report when they perceive it helps them, but then claim it has no role where it does not.  Such cherry-picking is arbitrary.

Second, the Clean Water Act dictates that the purpose of the law is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Plainly, protecting the chemical, physical, and biological integrity of the Nation's waters requires the Agencies to analyze how and where the waters' chemical, physical, and biological integrity is affected, a necessarily scientific endeavor.  The SAB made clear that the Navigable Waters Rule does not support the Act's objective, yet the Agencies disregarded that scientific determination.  Ex.99.

Third, regardless of which legal analysis and *Rapanos* opinion the Agencies rely on, that opinion and approach requires the Agencies to assess scientific concepts such as flow and hydrologic connections.  Both Justice Scalia's and Justice Kennedy's opinions discuss the physical characteristics of water such as flow quantity, and consistency; water quality; geography; source of water; and connectedness of water to navigable-in-fact waters in determining which waters affect the chemical, physical, and biological integrity of the Nation's waters, the directive of the Act.  *See Rapanos*, 547 U.S. at 732-33, 739,

745; *see id.* at 768-72, (Kennedy, J., concurring).  For the Agencies to apply either of these (or the dissent's) approach to identifying waters of the U.S., the Agencies must assess connections to and effects upon navigable waters and to do so, the Agencies must address science as the major factor.  The Agencies have already done so in the Science Report.  Yet, the Agencies refuse to consider or even dispute the sole source of the Agency's scientific findings, the Science Report, with any competing science or conclusions.

      B.     The Agencies Failed To Acknowledge And Explain Their Change In Position And Conflict With Earlier Findings.

Agency action is arbitrary and capricious when an agency "ignores or countermands its earlier factual findings without reasoned explanation for doing so." *Fox Television*, 556 U.S. at 537 (Kennedy, J., concurring).  "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Id.* Accordingly, when an agency reverses course and takes a position that *conflicts* with its prior findings—as occurred here—the agency *must* acknowledge, discuss, and explain that conflict and what new or different evidence and findings support its new decision. *Fox Television*, 556 U.S. at 515-16; *Village of Kake*, 795 F.3d at 966.  The Agencies fail to satisfy this fundamental requirement for both the Repeal and the Navigable Waters Rule.

As noted above, the Agencies barely mention the Science Report and fail entirely to address the criticisms of the SAB.  Also as pointed out above, the Agencies' exclusion

of all ephemeral waters—that is, waters that "flow only in direct response to precipitation," 85 Fed. Reg. at 22,302—and isolated wetlands is in direct conflict with the extensive and well-supported findings of the Science Report and the Clean Water Rule. The Agencies do not provide any new or different science to counter those findings and do not repudiate or disagree with those findings in any direct way other than to reach the different, much narrower, result.

Rather, they selectively cite to Science Report statements (not analysis) that support inclusion of a water that the Agencies deign to protect in the Navigable Waters Rule, and then completely ignore and fail to discuss or analyze everything else that runs counter to the Navigable Waters Rule. That "disregard" for the Agencies' prior factual findings violates the APA. *Fox Television*, 556 U.S. at 537 (Kennedy, J., concurring).

*Organized Village of Kake* is instructive and directly on point. There, in 2001, the agency determined that the long-term ecological benefits to the nation of conserving the inventoried roadless areas in the Tongass National Forest outweighed the potential economic loss to area communities. *Village of Kake*, 795 F.3d at 967. On "precisely the same record," in 2003, the agency instead concluded that the social and economic hardships to the communities outweighed the environmental values. *Id.* The Court pointed out that the 2003 decision, without any new or contrary evidence or even emphasizing different evidence in the record, simply made factual findings contrary to those made two years prior. *Id.* at 968. The Ninth Circuit applied the reasoning from *Fox Television*, to reject the agency's about-face as contrary to and unsupported by the record and arbitrary in its failure to explain that contradiction. *Id.* at 969. "The absence

33

of a reasoned explanation for disregarding previous factual findings violates the APA." *Id.*

This case presents the same scenario. The Repeal and Navigable Waters Rule simply makes new findings, directly contrary to findings made five years earlier, on what should be navigable waters of the U.S. based on the same Science Report with no new evidence or pointing to other evidence in the record. And, it does so without any explanation for reversing its prior findings. As in *Village of Kake*, the Agencies' actions are arbitrary and violate the APA.

C.   The Navigable Waters Rule Is Also Internally Inconsistent, And Thus Arbitrary And Capricious.

An "internally inconsistent and inadequately explained" agency action is arbitrary and capricious. *See Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987). Here, the Navigable Water Rule's internally inconsistent treatment of tributaries and wetlands renders the Rule arbitrary and capricious.

1.   *The Agencies' inconsistent treatment of ephemeral streams is irrational and unscientific.*

Specific examples from the Rule show the arbitrary, internally inconsistent, contorted nature of the Agencies' approach to tributaries. Citing to research on the San Pedro River that was part of the Science Report (but studiously avoiding an actual reference to the Science Report), the Agencies proclaim that an arid-region stream that "flows only in direct response to rainfall" will not be protected even if it flows in a "relatively continuous" manner as the result of multiple individual storms during a

monsoon season.[11]  85 Fed. Reg. at 22,276.  This statement regarding refusal to protect a

"relatively continuous" stream stands in direct contrast to the Agencies' definition of the

perennial and intermittent stream that the Agencies *do* protect.  *Id.* at 22,287 (to be

jurisdictional a water "must contribute surface flow in a typical year to a traditional

navigable water").  Adding to the confusion and inconsistency, the Rule goes on to

explain that, if the arid stream sinks into the ground through the bottom or sides of the

stream bed, then it *might* be protected if it is recharging groundwater.  *Id.* at 22,276.  Of

course, that is the point made by the Science Report and SAB:  *all* desert streams fed by

monsoon rains must be protected under the Clean Water Act, because they are an integral

part of the hydrosystem, having a strong effect on the chemical, physical, and biological

integrity of the Nation's waters.  *See* Ex.100 at ES-2.  The Agencies' contortions

regarding desert streams are internally inconsistent and plainly contrary to the findings of

the Science Report—a compound error they apparently hope no one will notice.

The Rule is riddled with similar inconsistencies.  The Agencies unequivocally

state that a relatively permanent body of water (*i.e.* not ephemeral) that is connected to a

downstream jurisdictional water, but only by groundwater, will not be protected.  *Id.* at

22,278.  The Agencies fail to describe how or why this situation is different than the

situation cited above regarding arid ephemeral waters that connect waters through

---

[11] The Agencies continually discount as not worthy of Clean Water Act protection waters that flow in response to rainfall or snowmelt.  The Agencies do not explain where the water in a stream comes from other than either groundwater (not protected), rain, or snowmelt.  And even groundwater originates as rain or snow.  The Tribes are unaware of any other sources of water and the Agencies do not identify any.

groundwater recharge.  Somehow, *those* groundwater-connected waters (that are not relatively permanent) should be protected whereas "relatively permanent" waters that are connected to a jurisdictional water only through groundwater should not be.  The Tribes fail to discern a difference, and the Agencies fail to identify one.  Further, the Agencies do not bother to note that this situation was addressed in the Science Report and by the SAB, and both stated that the upstream water must be protected to maintain and restore the chemical, physical, and biological integrity of the Nation's waters.  *See* Ex.100 at B-48 to B-49, B-60; Ex.99 at 2-3, 4.

In yet another contradiction, the Agencies decide that "subterranean rivers" are protected as are the waters upstream of them, because subterranean rivers are different than, and not considered to be, groundwater.  85 Fed. Reg. at 22,279.  The Agencies do not explain how these rivers are different than arid desert streams that sink underground to replenish groundwater and recharge hydrologic systems (not protected), do not address the Science Report's discussion of those details, and produce precisely zero scientific evidence of their own to support the different treatment of each.

> 2.    *The Agencies' inconsistent treatment of wetlands is irrational and unscientific.*

The Agencies are similarly inconsistent and heedless of their own science in their treatment of wetlands.  The Agencies explain that a wetland that abuts a protected traditional navigable water (*i.e.* has a surface water connection on at least one side of the wetland to the traditional navigable water) is protected, but that if a second wetland abuts the first (it has a surface connection to the first wetland), that second wetland is not

protected under the Act.  *Id.* at 22,280, 22,312.  That is, regardless of *a surface water connection*, only the first wetland, in a string of connected wetlands, gets Clean Water Act protection under the Navigable Waters Rule.  The Agencies cite to nothing scientific or legal to support this random decision.

Similarly, the Navigable Waters Rule protects only wetlands that receive flow from a traditionally navigable water and pointedly does *not* protect a wetland that contributes flow to a traditionally navigable water; apparently the surface water connection is a one-way ratchet.  *Id.* at 22,310.  Again, the Agencies provide no rationale for this inexplicable inconsistency, nor do they compare or contrast their action to the Science Report where the Agencies previously found all connected wetlands should be protected. Ex.100 at ES-2 to ES-4.  Under the Agencies' Navigable Waters Rule, a surface water connection is enough to confer jurisdiction—until it isn't by agency fiat.

The Navigable Waters Rule's inconsistencies and unexplained attempts to distinguish between various types of waters show why the Science Report and the SAB's approach to showing which waters affect the chemical, physical, and biological integrity of the Nation's waters—the focus and purpose of the Act—needs to, at a minimum, be rationally addressed by the Agencies if not actually followed.  Absent that, the Navigable Waters Rule's line drawing is internally inconsistent and arbitrary on multiple, layered levels.

D.    The Agencies Failed To Analyze The Environmental Justice Implications Of The Rules.

As set forth in the standing declarations, clean, undamaged waters of all types are

critical to the Tribes' ways of life.  The waters of the Nation provide sustenance, economic vitality, and spiritual and cultural values.  Some of those values are formally recognized by Treaty, such as the salmon and fishing rights of the Quinault people, or the hunting, gathering, and fishing rights on ceded lands for the Fond du Lac and Bad River Bands.  In other instances, the values are the cultural and spiritual foundations for a Tribe, such as the Menominee River as the place of origin of the Menominee Tribe and a place of critical historical importance.  The Pascua Yaqui Tribe and Tohono O'odham Nation consider seeps and springs as sacred places and have long relied on desert washes to support their way of life.  These values are unique to the Tribes and must be considered by the Agencies, yet they were not.

In 1994, President Clinton signed Executive Order 12,898, directing that each agency "shall make achieving environmental justice part of its mission."  59 Fed. Reg. 7629, 7629 (Feb. 16, 1994) (§ 1-101).  The Executive Order further made agencies responsible for "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."  *Id.*

EPA's own environmental justice plan "envision[s] an EPA that integrates environmental justice into everything" it does.  Ex.66 at 1.  Specifically, EPA aims to "[i]nstitutionalize environmental justice in rulemaking," including "rigorous assessments of environmental justice analyses in rules," in order to "deepen environmental justice practice within EPA programs to improve the health and environment of overburdened communities."  *Id.* at iii.  Recognizing that "[r]ulemaking is an important function used

by the EPA to protect human health and the environment for all communities," EPA

devotes the second chapter to "Rulemaking" and, through this chapter, aims to "ensure

environmental justice is appropriately analyzed, considered, and addressed in EPA rules

with potential environmental justice concerns, to the extent practicable and supported by

relevant information and law." *Id*. at 13.

EPA has provided guidance on how to incorporate environmental justice into the

rulemaking process, noting that "it is critical that EPA rule-writers consider

environmental justice … when developing a regulation." Ex.67 at i. The Guidance

defines an "environmental justice concern" as including "the actual or potential lack of

fair treatment or meaningful involvement of minority populations, low-income

populations, tribes, and indigenous peoples in the development ... of environmental ...

regulations." *Id*. at 9. This can arise not only when a regulation could "[c]reate new

disproportionate impacts," but also when it could "[e]xacerbate existing disproportionate

impacts." *Id*. at 10. The assessment can include qualitative or quantitative elements. *Id*.

The Repeal and the Navigable Waters Rule are likely to result in the "lack of fair

treatment" for Tribes. *See, e.g.*, Nunez Decl. ¶¶ 23-27 and exhibits thereto (detailing

cultural harms and the Corps' refusal to even consult with the Tribes). Nowhere in the

rules or the Agencies' discussion of them do the Agencies address these anticipated

disproportionate effects, as required by Executive Order 12,898, much less in a

meaningful way that prevents unfair treatment. The Repeal and Navigable Waters Rules'

failure to address environmental justice, as required by Executive Order and the

Agencies' own rule-making requirements, renders them arbitrary and capricious.

39

1

2

III.   THE WASTE TREATMENT EXCLUSION IS ARBITRARY AND
       CAPRICIOUS.

3

A.     The Waste Treatment Exclusion Allows Waters Of The U.S. To Be Used
       As Waste Dumps And It Was Expanded By The Navigable Waters Rule.

4

The Navigable Waters Rule even excludes some waters that are navigable, used in

5

interstate commerce, and otherwise jurisdictional, if they fit into any of the Rule's

6

exclusions.  85 Fed. Reg. at 22,324-25, 22,339.  The Navigable Waters Rule expands the

7

wastewater treatment system exclusion, removing protections from traditional navigable

8

waters if they provide cooling water to power plants or other facilities or waste dumps.

9

When EPA first promulgated the waste treatment exclusion in 1979, it explained

10

that cooling ponds should remain protected under the Act:

11

Such ponds are frequently extremely large in size and some harbor fish
populations which invite recreational uses . . . .  *EPA believes this use should
remain subject to control under the Act's regulatory provisions, and that such
broad jurisdiction is consistent with the thrust of the Act and its legislative history.*

12

13

14

National Pollutant Discharge Elimination System, 44 Fed. Reg. 32,854, 32,858 (June 7,

15

1979) (emphasis added).  In May 1980, through rulemaking, EPA moved the provision

16

that excluded "waste treatment systems" from the definition of "wetlands," to the larger

17

overarching definition of "waters of the United States," which could have improperly

18

expanded the exclusion for waste treatment and allow waters traditionally protected

19

under the Act to be used as waste dumps.  45 Fed. Reg. 33,290, 33,424 (May 19, 1980).

20

In the same rulemaking, however, EPA ensured the improper expansion would not occur

21

22

by adding limiting language stating that "[t]his exclusion applies *only* to *manmade* bodies

23

of water which neither were originally created in waters of the United States (such as a

24

25

26

40

disposal area in wetlands) nor resulted from the impoundment of waters of the United States." *Id.* (emphasis added).[12]  In so doing, EPA ensured that polluters would not be able to use the exclusion to convert a water of the United States into a waste dump.

Then, just two months later, in July 1980, after "[c]ertain industry petitioners wrote to EPA expressing objections to the language," EPA announced its decision to "suspend" the limiting language it had just promulgated to stay within the confines of the law.  45 Fed. Reg. 48,620, 48,620 (July 21, 1980).  EPA stated that it planned "promptly to develop a revised definition and to publish it as a proposed rule for public comment." *Id*.  EPA never did.

In the Clean Water Rule, the Agencies treated the "suspension" of the limiting language as a settled matter, refusing even to take comment.  *See* 80 Fed. Reg. at 37,097, 37,114 (simultaneously lifting suspension and suspending the same language). The Agencies also affirmed an interpretation of the exclusion that effectively authorizes new impoundments of natural waters, such as streams and wetlands, so that they can be pressed into service as industrial waste dumps.  *Id.* at 37,096-97.

Now, the Navigable Waters Rule "codifies" the waste treatment exclusion allowing waste treatment impoundments originally created in waters of the U.S. to be excluded from Clean Water Act jurisdiction, but also goes further to expand and define "waste treatment systems" to encompass *all* components of the waste treatment system,

---

[12] This is particularly significant for industries that produce coal ash waste and for the mining industry, like the mines in the upper Midwest that have created tailings basins in wetlands.

including lagoons, treatment ponds, and settling or cooling ponds, designed to either convey or retain, concentrate, settle, reduce, or remove pollutants from wastewater prior to discharge even if they are traditional navigable waters.  85 Fed. Reg. at 22,324-25, 22,339.[13]  The Agencies claimed to continue "longstanding practice" without acknowledging or addressing the limiting language in the promulgated 1980 rule, the temporary suspension, or the fact that they were expanding what was considered waste treatment to include cooling ponds.  *Id.* at 22,324-25.

> B.     The Waste Treatment Exclusion Violates The Law.

The waste treatment exclusion violates the plain language of the Clean Water Act, lacks a basis in the record, and perpetuates a longstanding dereliction of the Agencies' duty to protect all waters of the U.S. under the Act.  It does so largely by sleight of hand with actions characterized as temporary or incremental that harden into permanence a wholesale exemption from the Act.  Congress spoke clearly:  the Clean Water Act would apply to "the waters of the United States," 33 U.S.C. § 1362(7), regardless of how those waters were used.  The law contains no exceptions, much less for water bodies converted into repositories for industrial waste.  Indeed, unregulated dumping of waste is the very practice Congress meant for the Clean Water Act to end.  *See* S. Rep. No. 92-414 at 7 (1971) ("The use of any river, lake, stream or ocean as a waste treatment system is unacceptable.").  Nothing in the Act empowers the Agencies to remove waters of the U.S.

---

[13] Cooling ponds include impoundments of natural waters that do not necessarily receive waste but were used to circulate water to cool components in a facility.  Now those natural waters are no longer considered waters of the U.S. and can be polluted or otherwise degraded with no Clean Water Act oversight.

from the Act's protections.  *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Lab.*, 159 F.3d 597, 600

(D.C. Cir. 1998) ("There is, of course, no such 'except' clause in the statute [at issue in

that case], and we are without authority to insert one."); *NRDC, Inc. v. Costle*, 568 F.2d

1369, 1377 (D.C. Cir. 1977) (EPA lacked discretion to exempt entire categories of point

sources from permitting requirements).

Yet that is precisely what the waste treatment exclusion does, contravening the

clear intent of Congress.  The exclusion cannot be reconciled with the Act's purpose of

controlling and eventually eliminating pollution discharges into our Nation's waters.  *See*

33 U.S.C. § 1251(a)(1).  The exclusion fails step one of *Chevron*.  467 U.S. at 842-43.

The waste treatment exclusion must also fail under a *Chevron* step two analysis.

*Id.* at 843.  Even if the Court finds that Congress intended to delegate to the Agencies the

discretion to allow the Nation's waters to be used as waste dumps, the Agencies have

failed to exercise that discretion in a reasoned and consistent manner, have failed to

explain their interpretation of the exclusion, have changed what was originally adopted as

a temporary measure into a permanent exclusion without explanation, and have expanded

"waste treatment" to include ponds that are used simply for cooling water.  Their latest

action on the exclusion is arbitrary and capricious.  *See Encino Motorcars*, 136 S. Ct. at

2125.

Permanently adopting the waste treatment exclusion, without the language limiting

it to manmade systems, is arbitrary and capricious in three ways.  First, the exclusion flies

in the face of the Agencies' own statements in the Rule that impoundments of waters of

the U.S. remain waters of the U.S. based on their significant nexus to foundational

43

waters.  85 Fed. Reg. at 22,273, 22,300.  The Agencies provide no explanation—scientific, technical, or otherwise—for their decision to treat so-called "waste treatment systems" differently from other impounds of waters of the United States.  *See State Farm*, 463 U.S. at 43.

Second, the Agencies fail to address and/or mischaracterize the history of the waste treatment exclusion and the "suspension" that allowed navigable waters of the U.S. to be used as waste dumps.  By claiming that the regulatory exclusion has existed for decades and the Agencies are supposedly just fine-tuning the definition, the Agencies sweep years of improper regulatory failure and violations of the Act under the rug.  85 Fed. Reg. at 22,317 ("included in regulatory text for decades," but defining now); *id.* at 22,324 ("existed since 1979" without any mention or recognition of the fact that the 1979 version did not allow the exemption from waters of the U.S. but rather from a more limited set of wetlands).

Finally, EPA has never explained the shift from its 1980 position that only manmade waste treatment systems should be excluded from the definition of "waters of the United States," to its present position permanently extending the exclusion to systems created in natural waters, and now expanded to include cooling ponds.  When EPA promulgated the exclusion in 1980, it explained that it "was not intended to license dischargers to freely use waters of the United States as waste treatment systems," 45 Fed. Reg. at 33,298; rather the exclusion was limited to manmade waters "to ensure that dischargers did not escape treatment requirements by impounding waters of the United States and claiming the impoundment was a waste treatment system, or by discharging

44

wastes into wetlands." 45 Fed. Reg. at 48,620.  When EPA suspended the language

limiting the exclusion to manmade systems, the agency said it was responding to

complaints that the limitation would otherwise cover "existing waste treatment systems ...

*which had been in existence for many years*," 45 Fed. Reg. at 48,620 (emphasis added).

Now the Agencies harden the exclusion into permanence and expand its application.  The

Agencies' failure to explain their decision to convert a temporary, narrow suspension to a

permanent, wholesale exclusion makes their action arbitrary.  *See*, *e.g.*, *Encino*

*Motorcars*, 136 S. Ct. at 2125.  The Agencies have failed to provide any explanation

regarding how or why the waste treatment exclusion in either its original or now-

expanded form, is warranted by scientific or technical information in the record.  The

Agencies' action on the exclusion is arbitrary and capricious.

IV.   **THE AGENCIES HAVE IMPROPERLY BIFURCATED AND EXCLUDED**
      **DOCUMENTS FROM THE ADMINISTRATIVE RECORD.**

Courts must evaluate agency decisions based on "the whole record."  5 U.S.C. §

706.  The "whole record" includes "all documents and materials directly or indirectly

considered by agency decision-makers."  *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551,

555 (9th Cir. 1989) (emphasis omitted).  The record includes "everything that was before

the agency pertaining to the merits of its decision."  *Portland Audubon Soc'y v.*

*Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).  "If the record is not

complete, then the requirement that the agency decision be supported by 'the record'

becomes almost meaningless," *id.* at 1548, and "the reviewing court cannot engage in the

'thorough, probing, in-depth review' that the APA requires," *In re U.S.*, 138 S. Ct. 371,

372 (2017) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971)).

Here, the Agencies have improperly bifurcated and excluded documents from the administrative record, hindering this Court's review. The record is deficient in at least two respects. First, the Agencies have provided the Court with two artificially-segmented records, masking the extent of the rollback of Clean Water Act safeguards and the extent of the disconnect between science and earlier agency findings. Second, the Agencies have improperly excluded materials supporting or related to the Clean Water Rule—materials which include agency findings directly contrary to those in the Navigable Water Rule.

The Tribes seek an order compelling the Agencies to complete the administrative record, based upon the "clear evidence" that the excluded materials were considered during the rulemaking process, but excluded from the record. *Oceana, Inc. v. Pritzker*, No. 16-cv-06784-LHK (SVK), 2017 WL 2670733, at *2 (N.D. Cal. June 21, 2017) (quoting *Gill v. Dep't of Justice*, No. 14-cv-03120-RS (KAW), 2015 WL 9258075, at *5 (N.D. Cal. Dec. 18, 2015)).

A.   The Navigable Waters Rule Record Must Include The Documents Considered During The Repeal.

The Agencies must complete the Navigable Waters Rule record by including all materials considered for the Repeal. The Repeal's record speaks directly to the Agencies' consideration of the Navigable Waters Rule: both rules were part of a single initiative to adopt a new, narrow definition of waters of the U.S. *See, e.g.*, Ex.115 at 8,

42, 61, 72 (Repeal Outreach Materials) (describing the rulemaking as a "two-step" process).  Because the rulemakings were a unified initiative, all the Repeal materials were also "before the agency, at least indirectly, as part of its decision making process" for the Navigable Waters Rule.  *Ctr. for Biological Diversity v. BLM*, No. C-06-4884-SI, 2007 WL 3049869, at *4 (N.D. Cal. Oct. 18, 2007).  The Navigable Waters Rule could not be finalized without the Repeal and it matters not that those things occurred in one or two steps.

The Agencies provided an artificially segmented record that masks the extent of the Agencies' impermissible rollback of Clean Water Act safeguards.  Despite being two parts of a single, planned action, the Navigable Waters Rule record index is nearly 200 pages shorter than the Repeal Rule record index.  *Compare* ECF No. 21.2 (Repeal record index), *with* ECF No. 22.2 (Navigable Waters Rule record index).  In particular, the Navigable Waters Rule record fails to include public comments on the Repeal that documented the far-reaching consequences of that rollback, which were then compounded by the Navigable Waters Rule.  These comments were before the Agencies and "pertain[] directly to the merits of [their] decision"—because the rulemakings were part of a unified repeal-and-replace initiative.  *Portland Audubon Soc'y*, 984 F.2d at 1548.  Even more, the Navigable Waters Rule record includes the Agencies' *response* to the public comments from the Repeal, but not the comments to which the Agencies were responding.  ECF No. 22.2 at 279.  The Agencies "can not cherry pick information that supports a decision and fail to reveal information that contradicts it."  *Forest Guardians v. Kempthorne*, No. 06CV2560-L(LSP), 2008 WL 11337359, at *3 (S.D. Cal. Apr. 1,

47

2008).  Because the public comments themselves were before the Agencies, those comments, and all other documents from the Repeal record, must be included in the Navigable Waters Rule record so that the Court can review the legality of the Agencies' rulemaking.

B.      The Agencies Must Include The Scientific Evidence.

The Agencies must also complete the record for both the Repeal and the Navigable Waters Rule by including the extensive scientific record supporting the Clean Water Rule.  The Agencies undertook the rulemakings to "review and rescind or revise" the Clean Water Rule.  82 Fed. Reg. 12,532, 12,532 (Mar. 6, 2017); *see also* Exec. Order 13,778, 82 Fed. Reg. 12,497 (Feb. 28, 2017).  Because the Agencies were reviewing the Clean Water Rule, the entire rulemaking record for the Clean Water Rule was before the Agencies for consideration.  In fact, the Agencies mention that rule in the Repeal and Navigable Waters Rule.  It is "beyond credulity" for the Agencies to claim that they did not have before them and consider the Clean Water Rule's record during a pair of rulemakings that aimed to replace that very rule.  *Golden Gate Salmon Ass'n v. Ross*, No. 1:17-cv-01172 LJO-EPG, 2018 WL 3129849, at *10 (E.D. Cal. June 22, 2018).  Repeal and replacement of the Clean Water Rule was the very point of the agency action, and the case law requires the Agencies to explain and support their decisions to do so.  As in *Village of Kake*, the Agencies must explain their change in position and their new findings that conflict with the Science Report and the prior findings that are part of the Report.  795 F.3d at 967-69.

The Agencies' improper purpose in sanitizing the record is clear given that many

48

of the excluded documents support the Clean Water Rule and contradict the Agencies'
reasoning for replacing it.  The Agencies cannot "skew the record by excluding
unfavorable information" supporting the Clean Water Rule.  *Dist. Hosp. Partners, L.P. v.
Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013) (quotation marks omitted), *aff'd sub nom.
Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015).  Rather, a complete
record must include documents contrary to the agency's decision to enable effective
judicial review.  *See Thompson*, 885 F.2d at 555; *see also Pritzker*, No. 16-cv-06784-
LHK (SVK), 2017 WL 2670733, at *5 ("[M]aterial considered, but then discounted or
otherwise not relied upon, is part of the record.").  Accordingly, the Agencies must
complete both records with the rulemaking materials from the Clean Water Rule.

CONCLUSION

The Repeal and Navigable Waters Rule are contrary to the Clean Water Act's
intent and purpose and are arbitrary and unreasonable.  The Tribes respectfully request
that this Court vacate the Repeal and Navigable Waters Rules in their entirety.

DATED:  May 11, 2021

s/ Janette K. Brimmer<br>
Janette K. Brimmer, WSBA # 41271<br>
EARTHJUSTICE<br>
810 Third Avenue, Suite 610<br>
Seattle, WA  98104<br>
(206) 343-7340<br>
jbrimmer@earthjustice.org<br>
<br>
Stuart C. Gillespie, CO # 42861<br>
EARTHJUSTICE<br>
633 17th Street, Suite 1600<br>
Denver, CO 80202<br>
(303) 996-9616<br>
sgillespie@earthjustice.org

*Counsel for Pascua Yaqui Tribe,*
*Quinault Indian Nation, Fond du Lac*
*Band of Lake Superior Chippewa,*
*Menominee Indian Tribe of Wisconsin,*
*Tohono O'odham Nation, and Bad River*
*Band of Lake Superior Chippewa*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of May, 2021, I electronically filed the

foregoing **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR**

**SUMMARY JUDGMENT AND TO COMPLETE RECORD** with the Clerk of the

District Court using the CM/ECF system, which will send notice of this filing by e-mail

to all counsel of record.

Daniel Pinkston, CO #11423
999 18th Street,
South Terrace, Suite 370,
Denver, CO 80202
daniel.pinkston@usdoj.gov
Phone: (303) 844-1804
Facsimile: (303) 844-1350

*Attorney for Defendants*

Bradley J. Glass (022463)
Stuart S. Kimball (026681)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
brad.glass@gknet.com
stuart.kimball@gknet.com
Phone: (602) 530-8000
Facsimile: (602) 530-8500

*Attorneys for Intervenors-Defendants*

JAMES M. MANLEY, Ariz. Bar. No. 031820
Pacific Legal Foundation
3241 E Shea Boulevard, # 108
Phoenix, Arizona 85028
jmanley@pacificlegal.org
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

ANTHONY L. FRANÇOIS, Cal. Bar. No. 184100*
CHARLES T. YATES, Cal. Bar. No. 327704*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
afrancois@pacificlegal.org
cyates@pacificlegal.org
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

*Attorneys for Proposed Defendant-Intervenors
Chantell and Michael Sackett*

s/ Janette K. Brimmer