1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JAMES M. MANLEY, Ariz Bar No. 031820
Pacific Legal Foundation
3241 E Shea Boulevard, # 108
Phoenix, Arizona 85028
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
jmanley@pacificlegal.org

ANTHONY L. FRANÇOIS, Cal. Bar No. 184100*
CHARLES T. YATES, Cal. Bar No. 327704*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
afrancois@pacificlegal.org
cyates@pacificlegal.org

*Attorneys for Defendant-Intervenors*
*Chantell and Michael Sackett*

*pro hac vice*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pascua Yaqui Tribe, et al.,<br><br>                              Plaintiffs,<br><br>        v.<br><br>United States Environmental Protection Agency, et al.,<br><br>                              Defendants,<br><br>and<br><br>Arizona Rock Products Association, et al.,<br><br>                      Defendant-Intervenors,<br><br>and<br><br>Chantell Sackett; Michael Sackett,<br><br>                      Defendant-Intervenors. | No. CV-20-00266-TUC-RM<br><br>**DEFENDANT-INTERVENORS THE SACKETTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ............................................................................ 2

I.  The Clean Water Act, the *Rapanos* Decision, and the Agencies' Historic Failure To Define "Navigable Waters" ............................................ 2

II.  The Navigable Waters Protection Rule and the Exclusion of Non-Abutting Wetlands from Federal Authority .......................................... 3

III.  This Lawsuit ........................................................................................... 4

IV.  The Agencies' Decision To Rewrite Their Definition of "Navigable Waters" Yet Again ................................................................. 5

STANDARD OF REVIEW ................................................................................. 5

ARGUMENT ...................................................................................................... 6

I.  The Act's Text Limits "Navigable Waters" to Navigable-In-Fact Waterways ...... 8

    A.  Prior uses of the phrase "navigable waters" preclude a broad reading of the Clean Water Act ................................................ 8

    B.  Reading Section 404(g)(1) of the Clean Water Act in conjunction with Section 10 of the Rivers and Harbors Act precludes a broad reading of the Act ................................................ 9

    C.  The Act's purpose section shows that the proper reading of "navigable waters" is a narrow one ........................................ 11

II.  Under the Controlling Plurality Opinion in *Rapanos*, the Act Does Not Regulate Non-Abutting Wetlands ......................................... 12

    A.  In *Rapanos*, a divided Supreme Court limited the Clean Water Act's application to wetlands ........................................ 13

    B.  The Supreme Court has adopted the *Rapanos* plurality as the controlling opinion, as shown most recently in *County of Maui* ................................... 14

    C.  Under *Marks v. United States*, the plurality opinion is the holding of *Rapanos* ................................................ 16

        1.  This Court Must Apply *Rapanos* Using the *Marks* Framework as Clarified by the Ninth Circuit's Decision in *United States v. Davis* ...... 16

        2.  The *Rapanos* plurality opinion is a "logical subset" of the concurrence as to the definition of "navigable waters" and is therefore the holding under *Davis* ................................ 18

        3.  Under *Davis*, Justice Kennedy's lone concurrence cannot be the holding of *Rapanos* ........................................ 23

D.  The Ninth Circuit's superseded decision in *City of Healdsburg* does not control the *Marks* analysis of *Rapanos* ........................................................ 25

1.  Any district court in this circuit can hold that *Davis* fatally undermines *Healdsburg* ............................................................................................. 25

2.  *Healdsburg* Uses the Now Forbidden Results-Based Approach ............ 26

E.  There is no other precedential Ninth Circuit decision on which of the *Rapanos* opinions controls ............................................................................ 27

III.  The Constitution Requires the Court to Adopt the *Rapanos* Plurality's Narrow Reading of "Navigable Waters" To Exclude Non-Abutting Wetlands .................. 28

1.  The Commerce Clause and Tenth Amendment limit agency regulation of non-abutting wetlands ........................................................ 29

2.  The non-delegation doctrine also limits agency regulation of non-abutting wetlands .............................................................................. 31

IV.  The Tribes' APA-Based Claims Are Unavailing Because Procedural or Factual Deficiencies Cannot Provide Grounds To Reverse a Non-Discretionary Agency Decision ................. 33

V.  The Sacketts Have Standing To Defend the Rule .................................................. 36

CONCLUSION ............................................................................................................ 37

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ............... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*, 573 U.S. 169 (2014)...............................................................15

*ALA Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).......................31–32

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015)............................15

*Ark. AFL-CIO v. Fed. Commc'ns Comm'n*, 11 F.3d 1430 (8th Cir. 1993).......................35

*Ass'n v. Interstate Commerce Comm'n*, 784 F.2d 959 (9th Cir. 1986)............................34

*Cardenas v. United States*, 826 F.3d 1164 (9th Cir. 2016) ...................................18, 26–27

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)....................................................................................*passim*

*Clark v. Martinez*, 543 U.S. 371 (2005).........................................................................28

*County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020).......................14–16, 27

*Coyt v. Holder*, 593 F.3d 902 (9th Cir. 2010) ...................................................................6

*Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*,
   788 F.3d 312 (D.C. Cir. 2015)....................................................................36–37

*Crowell v. Benson*, 285 U.S. 22 (1932)...........................................................................28

*The Daniel Ball*, 77 U.S. 557 (1870)..........................................................................8, 10

*Exxon Shipping v. Baker*, 554 U.S. 471 (2008)..............................................................15

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)..........................................................................................29

*Freeman v. United States*, 564 U.S. 522 (2011)........................................................*passim*

*Frlekin v. Apple, Inc.*, 979 F.3d 639 (9th Cir. 2020) ........................................................5

*George Hyman Const. Co. v. Brooks*, 963 F.2d 1532 (D.C. Cir. 1992)............................34

*Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019)............................................3

*Gibson v. American Cyanamid Co.*,
   760 F.3d 600 (7th Cir. 2014) ............................................................................27

*Gregg v. Georgia*, 428 U.S. 153 (1976)...........................................................................16

*Gundy v. United States*, 139 S. Ct. 2116 (2019).......................................................31–32

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987) ..........2

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)....................................................................15

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995)..............................36

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)................................................................28

*Kang v. Attorney General*, 611 F.3d 157 (3d Cir. 2010)................................................34

*King v. Palmer*, 950 F.2d 771 (D.C. Cir. 1991) (en banc) ............................ 17

*Koyo Seiko Co. v. United States*, 95 F.3d 1094 (Fed. Cir. 1996) ...................... 35

*Kucana v. Holder*, 558 U.S 233 (2010) ...................................................... 15

*Marks v. United States*, 430 U.S. 188 (1977) ........................................ *passim*

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) ................................ 31

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994) ........................................................................ 29

*Memoirs v. Massachusetts*, 383 U.S. 413 (1966) .................................... 19

*Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) (en banc) ............ 25

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc) ........................ 25

*N.C. Comm'n of Indian Affairs v. U.S. Dep't of Labor*,
   725 F.2d 238 (4th Cir. 1984), *cert. denied,* 469 U.S. 828 (1984) ............... 35

*National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617 (2018) ............... 15–16

*Nelson v. Int'l Brotherhood of Elec. Workers, Local Union No. 46, AFL-CIO*, 899 F.2d 1557 (9th Cir. 1990) ................................................... 25–26

*Northern California River Watch v. City of Healdsburg*,
   496 F.3d 993 (9th Cir. 2007) ........................................................ 24–27

*Overstreet v. United Brotherhood of Carpenters and Joiners of Am., Local Union No. 1506*, 409 F.3d 1199 (9th Cir. 2005) ................................ 25–26

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ............................... 31–32

*Paul v. United States*, 140 S. Ct. 342 (2019) ........................................ 32

*Perry v. Schwarzenegger*, 628 F.3d 1191 (9th Cir. 2011) .......................... 36

*PPL Montana, LLC v. Montana*, 565 U.S. 576 (2012) ............................ 15

*Railway Labor Execs.' Ass'n v. Interstate Commerce Comm'n*,
   784 F.2d 959 (9th Cir. 1986) ....................................................... 34–35

*Rapanos v. United States*, 547 U.S. 715 (2006) .................................. *passim*

*Reyes v. Lewis*, 833 F.3d 1001 (9th Cir. 2016) ...................................... 23

*Sackett v. EPA*, 566 U.S. 120 (2012) .................................................. 15

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ............ 6–7

*Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998) ...................................... 34

*Securities and Exchange Comm'n v. Chenery Corp.*,
   332 U.S. 194 (1947) ...................................................................... 35

*Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*,
   531 U.S. 159 (2001) .................................................................. 9, 30

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016) ....... 15

*Union Pacific R.R. Co. v. U.S. Dep't of Homeland Sec.*,
    738 F.3d 885 (8th Cir. 2013) ................................................................ 34

*United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc) ............................ *passim*

*United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006)..................... 26–27

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) .................... *passim*

*United States v. Robertson*, 875 F.3d 1281 (9th Cir. 2017) ............................................ 27

*Valenzuela Gallardo v. Lynch*, 818 F.3d 808 (9th Cir. 2016) ......................................... 29

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ......................... 36

*W. Watersheds Project v. U.S. Forest Serv.*,
    No. CV-11-08128-PCT-NVW, 2012 WL 6589349 (D. Ariz. Dec. 17,
    2012), *aff'd*, 603 F. App'x 612 (9th Cir. 2015)............................................................ 5

*Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997) ......................................................... 29

*Zabala v. Astrue*,
    595 F.3d 402 (2d Cir. 2010).................................................................................. 33–34

**Statutes**

5 U.S.C. § 706(2)(A) .......................................................................................................... 6

33 U.S.C. § 403 ................................................................................................................... 8

33 U.S.C. § 1251 ............................................................................................................... 11

33 U.S.C. § 1251, *et seq.* ................................................................................................. 2, 8

33 U.S.C. § 1251(b) ..................................................................................................... 11, 30

33 U.S.C. § 1251(g) .......................................................................................................... 12

33 U.S.C. § 1311(a) ............................................................................................................ 2

33 U.S.C. § 1344(g)(1) ....................................................................................................... 9

33 U.S.C. § 1362(7)......................................................................................................... 2, 8

33 U.S.C. § 1362(12) .......................................................................................................... 2

Pub. L. No. 74-738, § 1, 49 Stat. 1570 (June 22, 1936).................................................... 9

**Regulations**

33 C.F.R. § 328.3 (1987).................................................................................................. 2–4

33 C.F.R. § 328.3(a) ........................................................................................................ 2, 4

33 C.F.R. § 328.3(b) ........................................................................................................... 4

33 C.F.R. § 328.3(c) ........................................................................................................... 4

33 C.F.R. § 328.3(c)(1)................................................................................................... 4, 36

33 C.F.R. § 328.3(c)(1)(i)–(iv) .......................................................................................... 4

40 C.F.R. § 120.2................................................................................................................ 4

40 C.F.R. § 120.2(3)(i) ................................................................ 4

**Rule of Court**

Fed. R. Civ. P. 56(a) ................................................................ 5

**Miscellaneous**

80 Fed. Reg. 37,054 (June 29, 2015)........................................ 3

84 Fed. Reg. 56,626 (Oct. 22, 2019) ....................................... 3

85 Fed. Reg. 22,250 (Apr. 21, 2020)................................... 1, 3–4

*1969 Santa Barbara Oil Spill Policy Consequences*, Wikipedia,
   https://en.wikipedia.org/wiki/1969_Santa_Barbara_oil_spill#Policy_con
   sequences .................................................................. 11

Breyer, Stephen G., *Judicial Review of Questions of Law and Policy*,
   38 Admin. L. Rev. 363 (1986)................................................ 29

EPA, *Army Announce Intent to Revise Definition of WOTUS*, EPA News
   Releases (June 9, 2021), https://www.epa.gov/newsreleases/epa-army-
   announce-intent-revise-definition-wotus ................................ 5

Friendly, Henry J., Chenery *Revisited: Reflections on the Reversal and
   Remand of Administrative Orders*, 1969 Duke L.J. 199.............. 33

Parish, Gary E. & Morgan, J. Michael, *History, Practice and Emerging
   Problems of Wetlands Regulation: Reconsidering Section 404 of the
   Clean Water Act*, 17 Land & Water L. Rev. 43 (1982) .............. 30

Stack, Kevin M., *The Constitutional Foundations of* Chenery,
   2007 Yale L.J. 952 ........................................................ 33

**INTRODUCTION**

This case is about the United States Environmental Protection Agency (EPA) and the United States Army's (Army) (together the "Agencies") decades of effort to define "navigable waters" within the meaning of the Clean Water Act. Plaintiffs Pascua Yaqui Tribe, *et al.*'s (the "Tribes") claim is that the Agencies abused their discretion and contravened the Clean Water Act by adopting a narrow interpretation of "navigable waters" in the Navigable Waters Protection Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020) (Rule). But they are wrong as to the Rule's definition of "adjacent wetlands." A plain reading of the text of the Clean Water Act, as authoritatively interpreted by the Supreme Court, precludes the Agencies from regulating those wetlands that the Tribes argue the Rule illegally excludes. Because the Agencies have no discretion to extend their regulations to encompass them, their decision not to include most non-abutting wetlands in the definition of "navigable waters" was compelled by statute, and the Tribes' claims of illegal discretionary rulemaking must fail. Four arguments establish that conclusion.

*First*, a rigorous textual analysis of the Clean Water Act shows that the proper reading of "navigable waters" is a narrow one that includes navigable-in-fact waterways and their downstream receiving waters, but not non-navigable wetlands. *Second*, under Supreme Court precedent for interpreting fractured decisions, the plurality opinion in *Rapanos* is the controlling rule of law. Since the plurality opinion compels the exclusion of non-abutting wetlands from federal authority, the Tribes' claims necessarily fail as to the Rule's definition of "adjacent wetlands." *Third*, the interpretation of "navigable waters" is subject to constitutional constraints. These constraints require this Court to reject the broad reading of the Act urged by the Tribes, adopt the *Rapanos* plurality as the holding, and conclude that the Clean Water Act compels the Rule's exclusion of non-abutting wetlands from federal authority. *Fourth*, because the exclusion of non-abutting wetlands from federal authority is statutorily compelled, the Tribes' APA-based claims necessarily fail. Alleged deficiencies in the Agencies' reasoning or in the rulemaking process are not germane to the Agencies' non-discretionary exclusion of non-abutting wetlands from

1   federal authority.

2       The Court should grant the Sacketts' cross-motion for summary judgment and deny

3   the Tribes' motion for summary judgment as to Counts I and II, to the extent those Counts

4   challenge the Rule's "adjacent wetlands" provisions.

5                 **STATEMENT OF THE CASE**

6
7   **I.    The Clean Water Act, the *Rapanos* Decision, and the**
          **Agencies' Historic Failure To Define "Navigable Waters"**

8       EPA and the Army have spent decades trying to define the Clean Water Act term

9   "navigable waters" without violating the statute or the Constitution. That Act, 33 U.S.C.

10   § 1251, *et seq.*, regulates discharges of "pollutants" from "point sources" to "navigable

11   waters." 33 U.S.C. §§ 1311(a), 1362(12). The Act defines "navigable waters" as "waters

12   of the United States, including the territorial seas." *Id.* § 1362(7). Although the Act defines

13   "territorial seas," it does not otherwise define "waters of the United States." *Id.* § 1362(8).

14       A person engaged in unpermitted, nonexempt discharges or permit violations faces

15   citizen suits, administrative cease-and-desist and compliance orders, administrative

16   penalties, civil actions for monetary penalties and injunctive relief, and criminal

17   prosecution. *See generally Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,

18   484 U.S. 49, 52–53 (1987). These severe burdens make it critically important that the

19   regulated public know what is meant by "navigable waters."

20       Despite the need for a durable and legally sound definition of "navigable waters,"

21   there have been many failed attempts over the years. As a result, the scope of the Agencies'

22   control over Americans' property has remained in a near constant state of flux. This is

23   especially true of non-navigable wetlands. In 1986, the Army adopted a definition that

24   stretched "navigable waters" to include all non-navigable wetlands "adjacent" (broadly

25   defined as "bordering, contiguous, or neighboring") to any other regulated waters. *See* 33

26   C.F.R. § 328.3 (1987) (the 1986 Regulations); *id*. § 328.3(a)(7) & (c) (1987) (defining

27   adjacent wetlands).

28       In 2006, a divided Supreme Court rejected this definition as exceeding the scope of

the statutory term "navigable waters." *See Rapanos v. United States*, 547 U.S. 715, 739 (2006). In assessing the legality of the 1986 Regulations, a four-Justice plurality determined that the language, structure, and purpose of the Clean Water Act restrict federal authority over non-navigable wetlands to only those that physically abut relatively permanent and continuously flowing waters, with an immediate surface water connection making the wetland and water body "indistinguishable." *Id.* at 755.

Justice Kennedy provided a fifth vote rejecting the 1986 Regulations' definition of "adjacent wetlands" as overbroad, joining the plurality in the judgment. But he proposed a broader interpretation of "navigable waters" than the plurality: the "significant nexus" test. *Id.* at 759 (Kennedy, J., concurring). Under this view, the government can regulate a non-abutting wetland if it significantly affects the physical, chemical, and biological integrity of a navigable-in-fact waterway. *Id.* at 779–80 (Kennedy, J., concurring). Wetlands may be analyzed under this standard either standing alone or in combination with features "similarly situated" within an otherwise undefined "region." *Id.* at 780 (Kennedy, J., concurring).

In 2015, after several years of effort to address *Rapanos*, EPA and the Army adopted new regulations redefining "navigable waters," including a new and very broad definition of "adjacent wetlands." 33 C.F.R. § 328.3 (2016); 80 Fed. Reg. 37,054 (June 29, 2015) (the 2015 Rule). Several lawsuits challenged the 2015 Rule. On August 21, 2019, the U.S. District Court for the Southern District of Georgia ruled on summary judgment that the 2015 Rule violated the Clean Water Act and permanently enjoined it. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1382–83 (S.D. Ga. 2019). A short time later, partially in response to the decision in *Georgia v. Wheeler*, EPA and the Army published a regulation that repealed the 2015 Rule and readopted the 1986 Regulations. 84 Fed. Reg. 56,626 (Oct. 22, 2019) (the 2019 Repeal Rule).

**II.    The Navigable Waters Protection Rule and the Exclusion of Non-Abutting Wetlands from Federal Authority**

On April 21, 2020, EPA and the Army again redefined "navigable waters" by

1  publishing the Navigable Waters Protection Rule, at issue in this case. 85 Fed. Reg. 22,250

2  (Apr. 21, 2020). This Rule defines "navigable waters" as comprising four separate

3  categories: "the territorial seas," "tributaries," "lakes and ponds, and impoundments of

4  jurisdictional waters," and "adjacent wetlands," 33 C.F.R. § 328.3(a); lists features that

5  are not "navigable waters," 33 C.F.R. § 328.3(b); and defines terms used in the operative

6  text of the Rule, 33 C.F.R. § 328.3(c).[1]

7      The Rule defines "adjacent wetlands" as wetlands that abut or are flooded by other

8  regulated waters, or are physically separated from such waters only by natural barriers or

9  by permeable artificial barriers. 33 C.F.R. § 328.3(c)(1)(i)–(iv). The Rule excludes from

10  federal authority most wetland features that do not directly abut other regulable water

11  bodies. Many of these "excluded" wetlands were regulated under prior broader definitions

12  of "adjacent wetlands."

13  **III.   This Lawsuit**

14      On June 22, 2020, the Tribes filed this lawsuit to challenge the Navigable Waters

15  Protection Rule. *See* ECF No. 1. The Tribes allege that in excluding previously regulated

16  non-abutting wetlands from federal authority, the Agencies engaged in arbitrary decision-

17  making and abused their discretion, and that the Rule's exclusion of non-abutting wetlands

18  from Agency authority violates the Clean Water Act. *See* ECF No. 1 ¶¶ 94(c), 101. The

19  Tribes ask this Court to declare that the Navigable Waters Protection Rule is unlawful and

20  vacate it in its entirety. *Id.* at 37–38.[2]

21  ///

22

---

23  [1] Subsequent references to 33 C.F.R. § 328.3 and its subdivisions are, unless indicated
otherwise, to the version published in the Federal Register on April 21, 2020, at 85 Fed.

24  Reg. at 22,338–39, and the identical provisions at 40 C.F.R. § 120.2, published the same
date at 85 Fed. Reg. at 22,340–41. 40 C.F.R. § 120.2(3)(i) corresponds to 33 C.F.R.

25  § 328.3(c)(1).

26  [2] In addition to challenging the Navigable Waters Protection Rule, the Tribes' complaint
challenges and seeks vacatur of the 2019 Repeal Rule, and partially challenges and seeks

27  partial vacatur of the 2015 Rule. *See* ECF No. 1 at 37–38. The Sacketts sought intervention
only as to the Navigable Waters Protection Rule, and only to defend the Rule's "adjacent

28  wetlands" provisions.

On May 5, 2021, this Court granted a group of trade associations led by the Arizona Rock Products Association (the "Business Intervenors") leave to intervene to defend the interests of their Arizona members. *See* ECF No. 43. On May 7, 2021, the Sacketts—who have fought a fourteen-year battle with EPA over permission to build a house on their vacant residential lot in Priest Lake, Idaho, which EPA claims is occupied by a federally regulated wetland—moved to intervene to defend the Rule's definition of "adjacent wetlands" because that definition rightly excludes their property. *See* ECF No. 44 at 3–4; ECF No. 45 ¶¶ 10–12, 16–20 (Declaration of Chantell Sackett). Per this Court's October 28, 2020, and January 8, 2021, scheduling orders, *see* ECF Nos. 20, 24, the Tribes filed their motion for summary judgment on May 11, 2021. *See* ECF Nos. 47–68. The Sacketts were granted leave to intervene on May 14, 2020, and their Answer to the Tribes' complaint was filed the same day. *See* ECF Nos 70–71.

## IV.   The Agencies' Decision To Rewrite Their Definition of "Navigable Waters" Yet Again

On June 9, 2021, the Agencies announced their intention (for the fourth time in six years) to rewrite the definition of "navigable waters." *See EPA, Army Announce Intent to Revise Definition of WOTUS*, EPA News Releases (June 9, 2021), https://www.epa.gov/newsreleases/epa-army-announce-intent-revise-definition-wotus. On July 2, 2021, the Agencies—no longer willing to defend the Rule on the merits—filed a motion to remand the Rule without vacatur. *See* ECF No. 72.

## STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (citation omitted). When summary judgment is sought in an action that is based on an administrative record—such as this one—the motion serves as "the mechanism for deciding as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *W. Watersheds Project v. U.S. Forest Serv.*, No. CV-11-

08128-PCT-NVW, 2012 WL 6589349, at *4 n.3 (D. Ariz. Dec. 17, 2012), *aff'd*, 603 F. App'x 612 (9th Cir. 2015) (quoting *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.,* 819 F. Supp. 2d 1077, 1083–84 (E.D. Cal. 2011)). Under the Administrative Procedure Act (APA) standard of review, a reviewing court "shall hold unlawful and set aside" agency actions found to be "arbitrary, capricious, an abuse of agency discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

The exclusion of non-abutting wetlands from the definition of "navigable waters" is a question of statutory construction. *Rapanos*, 547 U.S. at 731–32. When reviewing the lawfulness of an administrative agency's construction of a federal statute pursuant to the APA's standard of review, courts apply the two-step test set forth in *Chevron*. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984)). Under this test, the reviewing court must first examine "whether Congress has directly spoken to the precise question at issue." *Coyt v. Holder*, 593 F.3d 902, 905 (9th Cir. 2010) (quoting *Chevron*, 467 U.S. at 842). If the court determines the "intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Satterfield*, 569 F.3d at 952 (quoting *Chevron,* 467 U.S. at 842–43)). If—and only if—"a statute is silent or ambiguous with respect to the issue at hand" the reviewing court then proceeds to step two. *Satterfield*, 569 F.3d at 952 (quoting *Chevron,* 467 U.S. at 843). Under *Chevron* step two, the reviewing court determines whether the agency action "is based on a permissible construction of the statute," and if so, defers to it. *Id*.

**ARGUMENT**

The Court should grant the Sacketts' cross-motion for summary judgment and deny the Tribes' motion for summary judgment. The essence of the Tribes' claims is that in selecting the narrow reading of "navigable waters" adopted by the *Rapanos* plurality over the broader reading endorsed by Justice Kennedy, the Agencies failed to comply with the reasoned decision-making standards of the APA. *See* ECF No. 1 ¶¶ 95–104; ECF No. 48

at 35–48. The Tribes also allege that the narrower interpretation of "navigable waters" set forth in the Rule is inconsistent with the text, purpose, and structure of the Clean Water Act. *See* ECF No. 1 at ¶¶ 90–94; ECF No. 48 at 25–35.  For their part, the Agencies have consistently defended the Rule as an exercise of agency discretion, entitled to deference under *Chevron* and *National Cable & Telecommunications Association v. Brand X Internet Services*.[3]

The fundamental error in both the Tribes' and the Agencies' approach is that the exclusion of non-abutting wetlands was not an exercise of agency discretion. Under Supreme Court precedent for interpreting fractured decisions, the *Rapanos* plurality is controlling, and Justice Kennedy's broader reading (which is textually, constitutionally, and precedentially suspect) is not available to the Agencies or the courts as a rule of law. A plain reading of the text of the Clean Water Act, as authoritatively interpreted by the *Rapanos* plurality, precludes the Agencies from regulating wetlands that do not directly abut other regulable water bodies. As the text of the Act shows, as Supreme Court precedent dictates, and as the Constitution requires, the Clean Water Act only regulates wetlands that directly abut other regulable water bodies. The Rules' definition of "adjacent wetlands" was not discretionary and the broad reading of the statute urged by the Tribes must be rejected. Moreover, because any alleged deficiencies in the Agencies' reasoning or in the rulemaking process were not germane to the Agencies' non-discretionary exclusion of non-abutting wetlands from federal authority, the Tribes' APA-based claims necessarily fail.

As a result, no relief is available to the Tribes. *See Satterfield*, 569 F.3d at 952 (if the court determines the "intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

---

[3] *See* Appellants' Opening Brief at 26–35, *Colorado v. EPA*, No. 20-1238 (10th Cir. July 9, 2020), Doc. No. 010110374057 at 38–47 (arguing for *Chevron* deference); Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment at 12–17, *Conservation Law Found. v. EPA*, No. 1:20-cv-10820-DPW (D. Mass. Dec. 3, 2020), ECF No. 46 at 22–27 (same).

1   Congress." (quoting *Chevron,* 467 U.S. at 842–43))

2 **I.   The Act's Text Limits "Navigable Waters" to Navigable-In-Fact Waterways**

3       A straightforward textual analysis of the Clean Water Act shows that the proper

4 reading of "navigable waters" is a narrow one that includes navigable-in-fact waterways

5 and their downstream receiving waters, but excludes non-navigable wetlands.

6
7       **A.   Prior uses of the phrase "navigable waters"
              preclude a broad reading of the Clean Water Act**

8       The proper interpretation of "navigable waters" begins with prior uses of the phrase

9 in relevant statutes. *See Rapanos*, 547 U.S. at 723. For over a century, Congress regulated

10 the obstruction of navigation on rivers and lakes through statutes that applied to "navigable

11 waters of the United States." *See id*. In the case of *The Daniel Ball*, the Supreme Court

12 interpreted this term to refer to "[t]hose rivers . . . which are navigable in fact . . . [and]

13 form . . . a continued highway over which commerce is or may be carried on with other

14 States or foreign countries in the customary modes in which such commerce is conducted

15 by water." 77 U.S. 557, 563 (1870); *see also Rapanos*, 547 U.S. at 723. That is, "navigable

16 waters of the United States" was limited to navigable-in-fact lakes and rivers used to ship

17 goods from state to state.

18       The phrase "navigable waters of the United States" was used in Section 10 of the

19 Rivers and Harbors Act ("Section 10") when that statute was first adopted in 1899, Mar. 3,

20 1899, c. 425, § 10, 30 Stat. 1151, and remains in use today, 33 U.S.C. § 403. Section 10

21 prohibits obstructions of "the navigable capacity of the waters of the United States" unless

22 authorized by Congress. 33 U.S.C. § 403. Section 10 lists several types of water bodies in

23 addition to the channels of the "navigable waters of the United States" that the Army Corps

24 also regulates under the Rivers and Harbors Act: "port[s], roadstead[s], haven[s], harbor[s],

25 canal[s], lake[s], harbor[s] or refuge[s], or inclosure[s] within the limits of any

26 breakwater[.]" 33 U.S.C. § 403.

27       In 1972, Congress adopted significant amendments to the Federal Water Pollution

28 Control Act, 33 U.S.C. § 1251, *et seq.*, since called the Clean Water Act. The Act defines

"navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The terms "navigable waters" and "waters of the United States, including the territorial seas," are very close to the predecessor statutes' words "navigable waters of the United States" and the expression "navigable capacity of the waters of the United States" that have appeared since 1899 in Section 10 of the Rivers and Harbors Act. This evinces a congressional intent that the terms in the two statutes be interpreted in a closely related if not identical way. The only material variation is the Act's introduction of the term "the territorial seas." This indicates that the Act applies to navigable-in-fact waters as defined in *The Daniel Ball*, plus *downstream* waters to and including the territorial seas.

Nothing in the Act's definition or use of "navigable waters" extends the term to *non*-navigable waters upstream of, or isolated from, navigable-in-fact waters (such as the non-abutting wetlands excluded from the Navigable Waters protection Rule). Likewise, nothing in the legislative history of the Act shows that Congress "intended to exert anything more than its commerce power over navigation." *Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159, 168 n.3 (2001) (*SWANCC*).[4] In contrast, when Congress has intended to extend its reach to waters that are not navigable, it has said so expressly. For instance, the Flood Control Act of 1936 claimed jurisdiction over "navigable waters or their tributaries, including watersheds thereof." Pub. L. No. 74-738, § 1, 49 Stat. 1570 (June 22, 1936).

**B.      Reading Section 404(g)(1) of the Clean Water Act in conjunction with Section 10 of the Rivers and Harbors Act precludes a broad reading of the Act**

The Supreme Court has only once pointed to a provision of the Act, 33 U.S.C. § 1344(g)(1) ("Section 404(g)(1)"), as the basis for interpreting "navigable waters" to extend to non-navigable wetlands abutting navigable rivers or lakes. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 135–39 (1985). *But see SWANCC*, 531 U.S.

---

[4] The Tribes overlook the significant constitutional limits that *SWANCC* imposes on the reading of the Clean Water Act and that decision's rejection of legislative history as a reason to read the Act broadly. *See* ECF No. 48 at 14.

at 171 (Section 404(g)(1) not dispositive of meaning of "navigable waters"); *id.* at 169 n.5 (Section 404(g)(1) falls short of congressional acquiescence in agency practice). The Supreme Court has never ruled on the precise meaning of the "other waters" provision of Section 404(g)(1), other than to hold in *Riverside Bayview*[5] that it reasonably includes wetlands immediately abutting and intermingling with navigable-in-fact creeks, 474 U.S. at 134, in *SWANCC* that it does not include isolated ponds, 531 U.S. at 171–72, and in *Rapanos* that the Act does not encompass all non-navigable tributaries or adjacent wetlands broadly defined, 547 U.S. at 734; *id.* at 787 (Kennedy, J., concurring in judgment).

Section 404(g)(1) provides evidence that the Act defines "navigable waters" to mean "waters of the United States, including the territorial seas" in order to gather within one term those waters that are navigable-in-fact and two categories of waters downstream of them: waters subject to the ebb and flow of the tide, and the territorial seas. Waters subject to the ebb and flow of the tide were expressly not covered by *The Daniel Ball* definition. 77 U.S. at 563. And the tides are not mentioned in Section 10 of the Rivers and Harbors Act. Particular waters subject to the ebb and flow of the tide might be navigable-in-fact and thus within *The Daniel Ball*'s definition, but the role of the tide is neither here nor there in whether they were navigable-in-fact. But the Clean Water Act, by referencing waters subject to the ebb and flow of the tide in Section 404(g)(1), clearly expands on navigable-in-fact waters by adding these downstream tidal waters, which are generally seaward (or are the seaward portion) of rivers and lakes that are navigable-in-fact.

The territorial seas were never expressly included within the scope of *The Daniel Ball*'s definition. This stands to reason since congressional statutes to prevent states from interfering with the transport of goods in interstate and foreign commerce would not have been concerned with state efforts to place fill as much as three miles out to sea. And as

---

[5] The Tribes are incorrect that *Riverside Bayview* held that the Act must be read broadly. *See* ECF No. 48 at 13–14. The decision discussed the issue, but its holding is limited to affirming the Army's decision to regulate shoreline wetlands that directly abutted navigable-in-fact creeks where it was difficult to say where the creek ended and the wetland began. *Riverside Bayview*, 474 U.S. at 134.

expected, no Supreme Court decision citing *The Daniel Ball* deals with the oceans. The Clean Water Act's definition of "navigable waters" includes the territorial seas, but Section 404(g)(1) does not, since they would not be within the jurisdiction of any state. So, any "extra" waters beyond "navigable waters of the United States" covered by the Clean Water Act are those downstream of traditionally navigable rivers and lakes. These waters (tidal waters and the ocean) would not have been the subject of older legislation in aid of navigation against state interference, but they were the subject of congressional concern to prevent pollution in enacting the Clean Water Act. *See, e.g., 1969 Santa Barbara Oil Spill Policy Consequences*, Wikipedia ("While the Santa Barbara oil spill was not the sole event which built the regulatory and legislative superstructure of the modern environmental movement in the United States—some prominent pieces of which include the . . . Clean Water Act . . .—it was one of the most dramatic and visible of the several key events that led up to those changes.").[6]

### C. The Act's purpose section shows that the proper reading of "navigable waters" is a narrow one

Additional textual indications that "navigable waters" should be read very similarly to Section 10 of the Rivers and Harbors Act's "navigable waters of the United States" are in the Clean Water Act's purpose section. 33 U.S.C. § 1251. Section 1251(a) sets forth the federal water quality purposes of the Act and articulates the overarching objective to "restore and maintain the . . . integrity of the Nation's waters." Section 1251(a)(1)—in order to achieve that objective—declares "the national goal that the discharge of pollutants into the navigable waters be eliminated[.]" But Section 1251(b) establishes the Act's federalism purpose to "recognize, preserve, and protect the primary rights of States to . . . plan the development and use (including restoration preservation, and enhancement) of land and water resources."

These terms ("Nation's waters," "navigable waters," and "water resources") in close

---

[6] https://en.wikipedia.org/wiki/1969_Santa_Barbara_oil_spill#Policy_consequences (last visited July 9, 2021).

proximity show that "navigable waters" should be given a relatively narrow reading compared to all-encompassing terms like the "Nation's waters" (the integrity of which is to be restored and maintained through a wide range of methods, only one of which is regulation of discharges to "navigable waters") and "water resources" (over which the primary authority of the states is recognized and protected, presumably by not subjecting such waters to federal permitting).

And, the Act's purpose section clearly protects water rights recognized under state law, which broadly allow diversion of water from its natural course for beneficial use elsewhere, whether under riparian or appropriative legal regimes. 33 U.S.C. § 1251(g). Such water rights frequently involve the placement of dams or other diversion works in *non-navigable* tributaries and the use of substantially all of the flow of those tributaries during the irrigation season or longer. The recognition and strong protection of these rights within the Act's purpose section also indicates a reading of "navigable waters" as not including non-navigable tributaries from which significant amounts of water can be diverted under state law.

All of this is to say that a straightforward textual analysis of the statute shows that the proper reading of "navigable waters" is a narrow one that includes navigable-in-fact waterways and their downstream waterways, but does not include non-abutting wetlands. This textual reading is close to that of the *Rapanos* plurality, which limits regulation of "adjacent wetlands" to those affirmed in *Riverside Bayview* and emphasizes that the necessary connection to meet this standard was intermingling, to the point where it is difficult to say where the creek ends and the wetland begins. *Rapanos*, 547 U.S. at 742; *id.* at 741 n.10.

## II.     Under the Controlling Plurality Opinion in *Rapanos*, the Act Does Not Regulate Non-Abutting Wetlands

*Rapanos* is the best Supreme Court authority on whether wetlands that do not abut navigable-in-fact rivers and lakes are federally protected "navigable waters" under the Clean Water Act. Since *Rapanos* has no majority opinion, this Court must determine which

opinion controls. The correct answer is the plurality opinion, which prohibits the Agencies from regulating non-abutting wetlands. Since the plurality opinion compels the exclusion of non-abutting wetlands from federal authority, the Tribes' claims against the Rule's exclusion of those wetlands from the definition of "adjacent wetlands" must necessarily fail.

### A.    In *Rapanos*, a divided Supreme Court limited the Clean Water Act's application to wetlands

The issue in *Rapanos* was how to interpret whether "navigable waters" include wetlands that do not physically abut navigable-in-fact waterways. 547 U.S. at 728; *see also id*. at 759 (Kennedy, J., concurring). The Supreme Court's judgment vacated and remanded the case because the lower courts and the Agencies had not properly interpreted that term. *Id*. at 757. The five Justices supporting the judgment adopted different but concentric interpretations.

The four-Justice plurality determined that the language, structure, and purpose of the Act limit federal authority over non-navigable tributaries to "relatively permanent, standing or continuously flowing bodies of water" commonly recognized as "streams[,] . . . oceans, rivers, [and] lakes" connected to traditional navigable waters. *Id*. at 739. The plurality then limited regulation of wetlands under the Act to only those wetlands that physically abut such waters, *i.e.*, where wetland and water are "indistinguishable." *Id*. at 755.

The plurality sharply critiqued "the breadth of the [Army] Corps' determinations in the field" and especially its continued reliance on an expansive interpretation of "adjacent" waters. *Id*. at 727. It emphasized that in defining "navigable waters" as "*waters* of the United States," the Clean Water Act did not include all "*water* of the United States" but instead could only refer to "continuously present, fixed bodies of water." *Id*. at 732–33. The plurality further explained that the definition of "waters of the United States" must be rooted in the traditional understanding of "navigable waters." *Id*. at 734. As for wetlands, the plurality reiterated that the Act regulates "only those wetlands with a continuous surface

connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters and wetlands.'" *Id*. at 742.

Justice Kennedy concurred in the judgment but interpreted the Act more broadly than the plurality. He shared the plurality's concern that an overly broad interpretation of the Act would read "navigable" out of the text, and insisted that the Act could not cover "wetlands [that] lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id*. at 778 (Kennedy, J., concurring). He proposed that non-navigable waters must have a "significant nexus with navigable waters." *Id*. at 779. Under this "significant nexus" test, wetlands are regulable if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780. He emphasized that this connection must not be "speculative or insubstantial." *Id*.

**B.    The Supreme Court has adopted the *Rapanos* plurality as the controlling opinion, as shown most recently in *County of Maui***

In April 2020, the Supreme Court showed that it reads the *Rapanos* plurality as the controlling opinion in that case. In *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), the Court addressed the question of whether, under the Clean Water Act, the movement of a pollutant from an injection well (a point source) through groundwater (not a point source) to the ocean (a navigable water) is a regulated "discharge." *Id.* at 1468. The Supreme Court's application of *Rapanos* was determinative in *County of Maui*.

In *County of Maui*, the Supreme Court issued four separate opinions: a six-Justice majority opinion authored by Justice Breyer, *id*. at 1468–78, a concurrence by Justice Kavanaugh, *id*. at 1478–79 (Kavanaugh, J., concurring), and two separate dissents, one by Justice Thomas (joined by Justice Gorsuch), *id*. at 1479–82 (Thomas, J., dissenting), and one by Justice Alito, *id*. at 1482–92 (Alito, J., dissenting). All four opinions cite the *Rapanos* plurality, and all four opinions apply its discussion of point sources under the Act in evaluating whether pollutants moving through groundwater to the ocean constitute

regulated discharges. *See id.* at 1475 (citing *Rapanos*, 547 U.S. at 743) (nothing in the Clean Water Act requires that a pollutant move "directly" or "immediately" from its origin to navigable waters); *id*. at 1478 (Kavanaugh, J., concurring) (concluding that the majority reading of "discharge" "adheres to the interpretation set forth in Justice Scalia's plurality opinion in *Rapanos*"); *id*. at 1482 (Thomas, J., dissenting) (concluding that the *Rapanos* plurality opinion does not decide the precise issue presented in *County of Maui*); *id*. at 1487 n.5 (Alito, J., dissenting) (concluding that the *Rapanos* plurality opinion supports "daisy chaining" point sources). Every Justice joined at least one opinion elaborating on the *Rapanos* plurality, with Justice Kavanaugh joining both the majority and writing separately and specifically on the role of the *Rapanos* plurality in the *County of Maui* decision.

While the four opinions disagreed about how the *Rapanos* plurality opinion applied to the issue in *County of Maui* (the definition of "discharge"), they all agreed that the plurality is the *Rapanos* opinion that matters. None of the *County of Maui* opinions cited or relied on either the *Rapanos* concurrence or the dissent. Thus, when deciding the scope of the Act in *County of Maui*, every member of the Supreme Court looked only to the *Rapanos* plurality opinion.

This is consistent with and grows organically from the Supreme Court's prior citations to *Rapanos*. Before *County of Maui*, *Rapanos* was cited in opinions in nine Supreme Court cases. In *all* of those opinions, the author cited the *Rapanos* plurality opinion. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 706 (2006) (Scalia, J., dissenting); *Exxon Shipping v. Baker*, 554 U.S. 471, 508 n.21 (2008); *Kucana v. Holder*, 558 U.S 233, 253 (2010); *PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012); *Sackett v. EPA*, 566 U.S. 120, 123 (2012); *id*. at 133 (Alito, J., concurring); *Abramski v. United States*, 573 U.S. 169, 198 (2014) (Scalia, J., dissenting); *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268 (2015); *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1811–12, 1815 (2016); *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 625, 633 (2018). By contrast, the Court has only cited Justice Kennedy's *Rapanos* concurrence once, in an opinion by Justice Kennedy—and even then the citation

1    immediately followed a citation to the plurality opinion. *See PPL Montana*, 565 U.S at 592

2    (citing *Rapanos*, 547 U.S. at 730–31 and *id*. at 761 (Kennedy, J., concurring in judgment)).

3    The Sacketts' research reveals no Supreme Court citation to the *Rapanos* dissent.

4    This pattern of adopting and relying on the *Rapanos* plurality opinion can be seen

5    most clearly in the Supreme Court's post-*Rapanos* cases that arise under the Clean Water

6    Act. *See Sackett*, 566 U.S. at 123; *id*. at 133 (Alito, J., concurring); *Hawkes Co.*, 136 S. Ct.

7    at 1811–12, 1815; *National Ass'n of Mfrs.*, 138 S. Ct. at 625, 633. And as noted above, this

8    pattern culminated in *County of Maui*, in which all four opinions debated how the *Rapanos*

9    plurality opinion applies to the definition of "discharge." Notably, *none* of the Supreme

10   Court's post-*Rapanos* Clean Water Act cases cite either Justice Kennedy's concurrence or

11   the dissent.

12   Based on the Supreme Court's consistent and clear adoption of the *Rapanos*

13   plurality and that opinion's interpretation of the Act's text as clearly excluding non-

14   abutting wetlands, the Rule's exclusion of wetlands that do not abut regulated waters was

15   not merely an exercise of agency discretion, but is required by the unambiguous text of the

16   Clean Water Act. *Rapanos*, 547 U.S. at 741 (excluding non-navigable wetlands from Clean

17   Water Act authority unless they abut regulated tributaries so closely that the end of one and

18   the beginning of the other cannot be clearly discerned).

19       **C.    Under *Marks v. United States*, the plurality**
20             **opinion is the holding of *Rapanos***

21   Even absent the Supreme Court's clear and progressively more robust adoption of

22   the *Rapanos* plurality opinion, this Court can identify the plurality opinion as the holding

23   of *Rapanos* by applying the test laid out in *Marks v. United States*, 430 U.S. 188 (1977).

24       **1.    This Court Must Apply *Rapanos* Using the *Marks* Framework as**
25             **Clarified by the Ninth Circuit's Decision in *United States v. Davis***

26   In *Marks*, the Supreme Court stated that "[w]hen a fragmented Court decides a case

27   and no single rationale explaining the result enjoys the assent of five Justices, 'the holding

28   of the Court may be viewed as that position taken by those Members who concurred in the

1  judgments on the narrowest grounds.'" 430 U.S. at 193 (quoting *Gregg v. Georgia*, 428

2  U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Applying that

3  standard to *Rapanos* yields the plurality opinion as the holding.

4      The Ninth Circuit recently provided definitive guidance for applying *Marks* in

5  *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc), which examined a 4-1-4

6  split decision in *Freeman v. United States*, 564 U.S. 522 (2011). *Davis*, 825 F.3d at 1019.

7  *Freeman* had addressed whether a defendant who entered into a plea agreement could take

8  advantage of a sentence reduction under the Sentencing Reform Act. *Davis*, 825 F.3d

9  at 1019. Four Justices in the *Freeman* plurality held the defendant could almost always

10  take advantage of the sentence reduction, so long as the sentence imposed reflected the

11  Sentencing Guidelines then in effect. *Id*. Justice Sotomayor separately concurred, arguing

12  that a defendant could only take advantage of the sentence reduction when the plea

13  agreement incorporates or uses the Sentencing Guidelines. *Id*. at 1019–20. Four dissenting

14  Justices would have held a defendant relying on a plea agreement could never take

15  advantage of the sentence reduction under the Sentencing Reform Act. *Id*. at 1019. To

16  determine the controlling *Freeman* opinion, the Ninth Circuit started with *Marks*:

17
18      When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.
19

20  *Davis*, 825 F.3d at 1020 (quoting *Marks*, 430 U.S. at 193).

21      The Ninth Circuit observed that after forty years, the courts are still struggling "to

22  divine what the Supreme Court meant by 'the narrowest grounds,'" with two approaches

23  emerging. *Id*. (quoting *Marks*, 430 U.S. at 193). One is the reasoning-based approach,

24  which seeks common reasoning among the concurring opinions to see if one is a logical

25  subset of the other, broader opinion. *Id*. at 1021. "In essence, the narrowest opinion must

26  represent a common denominator of the Court's reasoning; it must embody a position

27  implicitly approved by at least five Justices who support the judgment." *Id*. at 1020

28  (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). The other

approach is results-based and defines "narrowest grounds" as "the rule that 'would necessarily produce results with which a majority of the Justices from the controlling case would agree.'" *Id*. at 1021.

Of the two, *Davis* rejected the results-based approach and held that courts in this Circuit are to use the reasoning-based approach:

> To foster clarity, we explicitly adopt the reasoning-based approach to applying *Marks*. . . . A fractured Supreme Court decision should only bind the federal courts of appeal when a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably be described as a logical subset of the other. When no single rationale commands a majority of the Court, only the specific result is binding on lower federal courts.

*Id*. at 1021–22.

Shortly after *Davis*, the Ninth Circuit held that only opinions supporting the judgment can be examined as potential logical subsets of each other in determining a holding of the Supreme Court under *Marks*. *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) ("narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices *who support the judgment*") (emphasis added) (quoting *Davis*, 825 F.3d at 1020)). While a dissent may be useful in assessing the reasoning of the opinions supporting the judgment and identifying which is the logical subset of the other, a dissent itself cannot be either the broader or narrower opinion for determining the holding.[7]

### 2.    The *Rapanos* plurality opinion is a "logical subset" of the concurrence as to the definition of "navigable waters" and is therefore the holding under *Davis*

The relevant question in this Circuit is therefore which opinion supporting the judgment—the *Rapanos* plurality or the concurrence—"is the logical subset of the other." *Davis*, 825 F.3d at 1021–22. The answer to that question dictates the outcome of this matter. And in answering that question, this Court should start with what the judgment actually did in *Rapanos*.

---

[7] The Tribes argument that Justice Kennedy's concurrence and Justice Stevens' dissent taken together would include some non-abutting wetland features is foreclosed in the Ninth Circuit. *See* ECF No. 48 at 27–29.

After determining that the lower courts had not applied a proper definition of "navigable waters," the Court remanded *Rapanos* to the Sixth Circuit for further proceedings. 547 U.S at 757. The Supreme Court did not decide the merits of the case; the only question it really addressed was "what does 'navigable waters' or 'waters of the United States' mean in the Clean Water Act?"[8] And the judgment in *Rapanos* confirms that the only issue in the case is how to interpret that expression in the Act. "We vacate the judgments of the Sixth Circuit . . . and remand both cases for further proceedings." 547 U.S. at 757. Both opinions which supported this judgment did so because of an interpretation of the statute which differed from that applied by the Sixth Circuit. *Id.* ("Because the Sixth Circuit applied the wrong standard to determine if these wetlands are covered 'waters of the United States . . . .'"); *id.* at 757 (Kennedy, J., concurring) ("navigable waters" must have "significant nexus" to navigable in fact waters, supports remand "for proper consideration of the nexus requirement"). The only direction that the Sixth Circuit got from the Supreme Court in its further proceedings were the two opinions supporting remand, and the only legal rule on offer in either of those opinions is the interpretation of "navigable waters." The holding of *Rapanos*, therefore, is the opinion that is the logical subset of the other as to the meaning of "navigable waters."

This approach accords with *Marks*, in which the Supreme Court applied its prior fractured decision in *Memoirs v. Massachusetts*, 383 U.S. 413 (1966). *See Marks*, 430 U.S. at 193–94 (discussing *Memoirs*). *Memoirs* was a split decision, with three Justices stating that the First Amendment protected pornographic material unless it met three tests. 383 U.S. at 418. Two other Justices would read the First Amendment more broadly to protect all obscene material without limit. *Id.* at 421, 424 (Black and Douglas, JJ., concurring).

---

[8] Both the plurality and Justice Kennedy's concurrence show this. *See* 547 U.S. at 729 ("In these consolidated cases, we consider whether four Michigan wetlands . . . constitute 'waters of the United States' within the meaning of the Act."); *id.* at 759 (Kennedy, J., concurring) ("These consolidated cases require the Court to decide whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact.").

The Supreme Court said in *Marks* that the narrower reading of the applicable constitutional provision—i.e., the opinion that was a logical subset of the other—was the controlling opinion. *Marks*, 430 U.S. at 193. Similarly, a "logical subset" approach to applying *Marks* to *Rapanos* must look at how broadly or narrowly the two opinions supporting the judgment interpret the applicable statutory provision.

In *Rapanos*, a majority of the Supreme Court decided that the term "navigable waters" in the Clean Water Act was narrower than agency regulations defining the term. 547 U.S. at 724, 734 ("The plain language of the statute simply does not authorize this 'Land Is Waters' approach to federal jurisdiction."); *id.* at 759 (Kennedy, J., concurring) (concluding that the lower court did not apply the proper standard to determine whether the Clean Water Act applies to wetlands not abutting navigable waters). The Justices supporting the judgment adopted concentric rationales. Four Justices joined in an opinion that interprets "navigable waters" narrowly, while Justice Kennedy interpreted the term "navigable waters" more broadly, but in a way that included all the waters that the plurality would allow regulation of.

The key point of departure between them was the plurality's narrow reading of the term "significant nexus" (as describing only the type of physical intermingling that prevented a clear distinction between the waters and the wetlands) and Justice Kennedy's broad reading of it (as categorically encompassing not only wetlands that are physically intermingled, in accord with the plurality, but also encompassing other wetlands on a case-by-case basis—an approach with which the plurality disagreed). *Compare Rapanos*, 547 U.S. at 754–55 (disagreeing with Justice Kennedy's broad reading of "significant nexus"), *with id.* at 774 (Kennedy, J., concurring) (opining that Supreme Court precedent does not limit jurisdictional wetlands to physically abutting jurisdictional tributaries). As shown in more detail below, when it comes to the regulation of wetlands, the plurality opinion's position is a "logical subset" of Justice Kennedy's.

The plurality concluded that the application of the term "navigable waters" to a wetland requires a two-part inquiry:

1    [E]stablishing that wetlands . . . are covered by the Act requires two findings:
     first, that the adjacent channel contains a "wate[r] of the United States," (*i.e.*,
2    a relatively permanent body of water connected to traditional interstate
     navigable waters); and second, that the wetland has a continuous surface
3    connection with that water, making it difficult to determine where the
     "water" ends and the "wetland" begins.
4

5    *Rapanos*, 547 U.S. at 742. And for the plurality, the term "body of water" is limited to

6    lakes, streams, and rivers. *Id*. at 732–33.

7           Justice Kennedy's concurrence agreed with several important aspects of the

8    plurality opinion. For example, he agreed that the term being interpreted was "navigable

9    waters," 547 U.S. at 760 (Kennedy, J., concurring), and that the issue was whether wetlands

10   that do not directly abut such waters are nonetheless regulable, *id*. at 759 (Kennedy, J.,

11   concurring). And both the plurality and Justice Kennedy agreed that wetlands that abut

12   traditionally navigable waters are the outer scope of the term "adjacent." *Id*. at 740–41 &

13   n.10; *id*. at 759 (Kennedy, J., concurring) (addressing "whether the term 'navigable waters'

14   in the Clean Water Act extends to wetlands that do not contain and are not adjacent to

15   waters that are navigable in fact"). Justice Kennedy also expressed important points of

16   commonality with the plurality's reasoning. "The plurality's opinion begins from a correct

17   premise," which is that the Act regulates "at least some waters that are not navigable in the

18   traditional sense." *Id.* at 767 (Kennedy, J., concurring).

19          But Justice Kennedy criticized the plurality, *id.* at 768 (Kennedy, J., concurring),

20   for identifying two limitations to the Act: first, that the water adjacent to the wetland must

21   be "a relatively permanent body of water connected to traditional interstate navigable

22   waters;" and second, that the wetland must have "a continuous surface connection with that

23   water, making it difficult to determine where the 'water' ends and the 'wetland' begins."

24   547 U.S. at 742.

25          As to relative permanence ("the plurality's first requirement"), Justice Kennedy

26   viewed the plurality's reading of the Court's prior decision in *Riverside Bayview* as too

27   narrow. *Rapanos*, 547 U.S. at 771 (Kennedy, J., concurring). Justice Kennedy concluded

28   that the Army could reasonably construe the term "waters" more broadly to include not

1    only the "permanent streams" accepted by the plurality, but also "impermanent streams."

2    *Id*. at 770 (Kennedy, J., concurring).

3        Turning to "[t]he plurality's second limitation," Justice Kennedy disagreed that

4    *Riverside Bayview* limits the scope of wetlands included within the term "navigable

5    waters" to just those which abut navigable waters so closely that they cannot be

6    distinguished, or even that there must be a continuous surface connection. *Id.* at 772–73

7    (Kennedy, J., concurring). Justice Kennedy likewise disagreed with the plurality's reading

8    of *SWANCC* as requiring a surface connection between wetlands and navigable waters. *Id.*

9    at 774 (Kennedy, J., concurring). In contrast to the plurality, Justice Kennedy concluded

10   that the Army's broader definition of non-abutting but still "adjacent" wetlands would be

11   reasonable if limited to those wetlands with a significant nexus. *Id*. at 775 (Kennedy, J.,

12   concurring).

13       In short, Justice Kennedy's concurrence agrees that those waters that the plurality

14   generally considers "navigable" are clearly covered by the Act. But Justice Kennedy's view

15   was that the plurality read the statute, *Riverside Bayview*, and "significant nexus" as used

16   in *SWANCC*, too narrowly. In his view, the Clean Water Act reaches beyond the plurality's

17   limitations. As to wetlands, Justice Kennedy agreed with the plurality that those wetlands

18   which abut covered tributaries so closely that they cannot easily be distinguished are

19   categorically covered by the Act, because they have a "significant nexus" to the covered

20   waters. *Id*. at 780 (Kennedy, J., concurring). Whereas the plurality would limit covered

21   wetlands to this category, for Justice Kennedy they are a subset of the broader group of

22   "adjacent" waters (as broadly defined by the Agencies) to which he would find the Act

23   applicable. Thus, the relatively permanent tributaries and directly abutting wetlands

24   covered by the plurality's rule are a logical subset of Justice Kennedy's broader reading of

25   "navigable waters."

26       So, following the reasoning-based approach to applying *Marks* which this Circuit

27   requires, the *Rapanos* plurality's reading of "navigable waters" is a logical subset of Justice

28   Kennedy's and is therefore the holding of the case.

### 3. Under *Davis*, Justice Kennedy's lone concurrence cannot be the holding of *Rapanos*

In holding that Justice Sotomayor's lone concurrence in *Freeman* cannot be that case's holding under *Marks*, *Davis* notes that both the plurality and dissent strongly criticized Justice Sotomayor's concurrence. *Davis*, 825 F.3d at 1020 (citing *Freeman*, 564 U.S. at 533; *Id.* at 550 (Roberts, C.J., dissenting). "The dissenting opinion accurately stated that the plurality and concurrence "agree on very little except the judgment."" *Davis*, 825 F.3d at 1020 (quoting *Freeman*, 564 U.S. at 554 (Roberts, C.J., dissenting)).

Following on this analysis, and applying the reasoning-based approach of *Davis*, it is difficult to see how any single-Justice opinion of the Supreme Court could be considered the holding under *Marks*, where all eight other Justices criticize the one Justice's reasoning. *See Reyes v. Lewis*, 833 F.3d 1001, 1007–09 (9th Cir. 2016) (Callahan, J., dissenting from denial of rehearing in banc). "Under the reasoning-based *Marks* rule, reasoning expressly rejected by at least seven Justices cannot be elevated to the status of controlling Supreme Court law." *Id.* at 1008.

As with *Freeman*, both the plurality and the dissent in *Rapanos* criticized Justice Kennedy's reasoning.

The plurality opinion broadly critiques Justice Kennedy's concurring opinion. *Rapanos*, 547 U.S. at 753–57. It starts by rejecting Justice Kennedy's broad reading of the expression "significant nexus" as irreconcilable with both *Riverside Bayview* and *SWANCC*. *Rapanos*, 547 U.S. at 753–54 (*Riverside Bayview* rejected case-by-case determinations, and *SWANCC* rejected mere ecological connection for "physically unconnected ponds"). From this, the plurality states: "In fact, Justice Kennedy acknowledges that neither *Riverside Bayview* nor *SWANCC* required, for wetlands abutting navigable-in-fact waters, the case-by-case ecological determination that he proposes for wetlands that neighbor nonnavigable tributaries." *Id.* at 754.

The plurality insists that the primary error in Justice Kennedy's analysis is his failure to read *Riverside Bayview* and *SWANCC* with the text of the Act in mind. *Rapanos*, 547

U.S. at 754; *id.* at 755 ("Only by ignoring the text of the statute and by assuming that the phrase of *SWANCC* ("significant nexus") can properly be interpreted in isolation from that text does Justice Kennedy reach the conclusion that he has arrived at."). According to the plurality, Justice Kennedy bases his interpretation on the purpose rather than the text of the Act, but in doing so also fails to address federalism, which is the second coordinate purpose along with water quality. *Id.* at 755–56.

The plurality views Justice Kennedy's interpretation of "navigable waters" as narrower than the dissent's but broader than theirs. *Id.* at 756 ("Justice Kennedy's disposition would disallow some of the Corps' excesses, and in that respect is a more moderate flouting of the statutory command than Justice Stevens'.").

In short, the plurality rejects Justice Kennedy's reasoning on two grounds: too broad a reading of the phrase "significant nexus," and too broad a reading of the statute due to focusing on one of its two purposes to the exclusion of its other purpose and its text.

The dissent for its part "[did] not share [Justice Kennedy's] view that we should replace regulatory standards that have been in place for over 30 years with a judicially crafted rule distilled from the term 'significant nexus' as used in *SWANCC*." *Rapanos*, 547 U.S. at 807 (Stevens, J., dissenting). Further, the dissent objected to the fact that Justice Kennedy's case-by-case "approach will have the effect of creating additional work for all concerned parties." *Id.* at 809 (Stevens, J., dissenting). Finally, "[u]nlike Justice Kennedy, [the dissent saw] no reason to change *Riverside Bayview*'s approach—and every reason to continue to defer to the Executive's sensible, bright-line rule." *Id.* (Stevens, J., dissenting).

Hence, as with the plurality, the dissent objected to the concurrence's case-by-case approach, considered its broad reading of "substantial nexus" to go beyond the meaning of the term as used in *SWANCC*, and considered it a misreading of the Court's holding in *Riverside Bayview*. *Rapanos*, 547 U.S. at 807-09 (Stevens, J., dissenting). And fundamentally, the dissent rejected Justice Kennedy's refusal to defer to the government's regulations. *Id.* at 810 (Stevens, J., dissenting).

As in *Davis*, which held that Justice Sotomayor's lone concurrence could not be the

holding of *Freeman* under a reasoning-based approach to *Marks*, Justice Kennedy's lone concurrence—the reasoning of which was roundly rejected by all eight of the other Justices—cannot be the controlling opinion in *Rapanos*.

### D. The Ninth Circuit's superseded decision in *City of Healdsburg* does not control the *Marks* analysis of *Rapanos*

In arguing that the Clean Water Act must be read broadly to include non-abutting wetlands, the Tribes cite *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007), for the rule that the Ninth Circuit treats Justice Kennedy's concurrence as the holding of *Rapanos*. *See* ECF No. 48 at 15. However, the subsequent intervening authority of *Davis* fatally undermines the results-based approach of *Healdsburg*, which is no longer precedent in the Ninth Circuit.

### 1. Any district court in this circuit can hold that *Davis* fatally undermines *Healdsburg*

District courts may reexamine Circuit precedent in light of intervening en banc decisions of the Ninth Circuit. *Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (en banc) (Supreme Court decisions); *Overstreet v. United Brotherhood of Carpenters and Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1205 n.8 (9th Cir. 2005) (citation omitted) (en banc Ninth Circuit decisions)).

> We hold that . . . where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled.

*Miller v. Gammie*, 335 F.3d at 893. The issues decided by the higher court need not be identical to allow a district court to dispense with prior circuit authority. "Rather, the relevant court . . . must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id*. at 900.

In *Overstreet* the Ninth Circuit examined its prior holding in *Nelson v. Int'l Brotherhood of Elec. Workers, Local Union No. 46, AFL-CIO*, 899 F.2d 1557 (9th Cir. 1990) (finding NLRB entitled to injunction under Section 10(l) of the National Labor

1    Relations Act under "reasonable cause" standard), and concluded that its subsequent en

2    banc decision interpreting a different provision of the Act relating to injunctions, *Miller v.*

3    *Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 (9th Cir. 1994) (en banc) (finding Section 10(j) of

4    the Act requires the application of ordinary standards for issuance of injunctions), had

5    overruled the prior panel decision in *Nelson* as to Section 10(l). *Overstreet*, 409 F.3d

6    at 1204-05. In analyzing whether *Nelson*'s holding on Section 10(j) overruled *Miller*'s

7    holding on Section 10(l), the Court focused on whether the reasoning of the two cases

8    regarding the standard was consistent, and decided that the later en banc decision had

9    undermined the reasoning of the earlier panel decision. *Overstreet*, 409 F.3d at 1205–06.

10         This Court must reassess *Healdsburg* under the en banc Ninth Circuit's holding in

11    *Davis*, and should conclude that *Healdsburg* no longer controls, because the reasoning-

12    based approach to *Marks*, as required by *Davis*, is clearly irreconcilable with and fatally

13    undermines *Healdsburg*.

14         **2.**    ***Healdsburg* Uses the Now Forbidden Results-Based Approach**

15         *Healdsburg* summarily concluded that the *Rapanos* concurrence controls, with little

16    discussion beyond a cursory citation to *Marks*: "Justice Kennedy, constituting the fifth vote

17    for reversal, concurred only in the judgment" and, therefore, "provides the controlling rule

18    of law." *Healdsburg*, 496 F.3d at 999–1000 (quoting *Marks*, 430 U.S. at 193). This is well

19    short of the *Marks* analysis required by *Davis*. *See Davis*, 825 F.3d at 1024 (dismissing

20    other circuit authorities that "engage with *Marks* only superficially, quoting its language

21    with no analysis"). *Healdsburg* gives no reason why it adopted the concurrence other than

22    to cite *United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006), itself a brief

23    opinion concluding without substantive application of *Marks* that the concurrence controls.

24         Fatally for *Healdsburg*, it states that the "concurrence is the narrowest ground to

25    which a majority of the Justices would assent if forced to choose in almost all cases." 496

26    F.3d at 999. This is the results-based approach which *Davis* rejected. *Healdsburg* also relies

27    on Justice Stevens' dissent in *Rapanos* to say that Justice Kennedy's concurrence is a

28    narrower subset of the dissent. 496 F.3d at 999. But this is rejected by *Cardenas*. And

*Cardenas*' rejection of dissents for *Marks* analysis, following *Davis*, is further demonstration that the Ninth Circuit has moved on from the cursory and results-oriented *Marks* analysis used in *Healdsburg*.

Also fatally, *Healdsburg* relies almost exclusively on the Seventh Circuit's decision in *Gerke*, which in turn explicitly uses the results-based approach in selecting the concurrence:

> Thus, any conclusion that Justice Kennedy reaches in favor of federal authority over wetlands in a future case will command the support of five Justices (himself plus the four dissenters), and in *most* cases in which he concludes that there is no federal authority he will command five votes (himself plus the four Justices in the *Rapanos* plurality)[.]

*Gerke*, 464 F.3d at 725 (emphasis in original).

*Healdsburg* is fatally undermined in two ways. It uses the results-based approach which *Davis* definitively rejects. And it uses the dissent as the broader opinion of which it concludes the concurrence is the narrower subset, in violation of *Cardenas*. *See also Gibson v. American Cyanamid Co.*, 760 F.3d 600, 621 (7th Cir. 2014) (*Gerke* provides no authority for using dissenting opinions in *Marks* analysis). Under *Miller v. Gamie*, *Healdsburg* is no longer the law of this Circuit.

### E.    There is no other precedential Ninth Circuit decision on which of the *Rapanos* opinions controls

There is no other precedential Ninth Circuit decision on the question of which of the *Rapanos* opinions controls and this Court is free to adopt the *Rapanos* plurality as the holding of the case based on the Sacketts' arguments above.

The only Ninth Circuit case decided after *Davis* to hold that Justice Kennedy's concurrence is controlling was *United States v. Robertson*, 875 F.3d 1281 (9th Cir. 2017). But the Supreme Court vacated *Robertson*. 139 S. Ct. 1543 (2019). With *Healdsburg* superseded by *Davis*, and *Robertson* vacated by the Supreme Court, there is no Ninth Circuit precedential decision on the question of which *Rapanos* opinion controls. And under *Miller v. Gamie*, the Supreme Court's extensive reliance on the *Rapanos* plurality in *County of Maui* also supersedes *City of Healdsburg* and would similarly supersede

*Robertson. See supra* 14–15. This Court is not bound by *City of Healdsburg* or *Robertson* and is free to adopt the *Rapanos* plurality as the holding of the case based on the Sacketts' arguments above.

### III.  The Constitution Requires the Court to Adopt the *Rapanos* Plurality's Narrow Reading of "Navigable Waters" to Exclude Non-Abutting Wetlands[9]

The interpretation of "navigable waters" is also subject to constitutional constraints which require that this Court reject the broad reading of the Act urged by the Tribes, adopt the *Rapanos* plurality as the holding, and conclude that the Clean Water Act compels the Rule's exclusion of non-abutting wetlands from federal authority. Under the canon of constitutional avoidance, this Court should interpret the Act to avoid giving it a constitutionally suspect meaning. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) ("When 'a serious doubt' is raised about the constitutionality of an act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Crowell v. Benson,* 285 U.S. 22, 62 (1932))). Any interpretation that would extensively regulate a wide range of non-abutting wetlands—as the reading urged by the Tribes would—raises issues under the Commerce Clause, the Tenth Amendment, and the Non-Delegation Doctrine.

The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* (quoting *Clark v. Martinez,* 543 U.S. 371, 385 (2005)). As demonstrated elsewhere in this brief, the term "navigable waters," as it is used in the Act, is not ambiguous and this Court should not read any ambiguity into it. *See supra* 7–27. Nevertheless, even assuming the term "navigable waters" were susceptible to the broad

---

[9] The Sacketts plead these constitutional arguments as affirmative defenses in their Answer to the Tribes' Complaint. *See* ECF No. 71 at 20–25. Whether in this APA action these constitutional arguments are characterized as affirmative defenses or simply as arguments against the Tribes' claims, the Sacketts advance them for their basic position on the merits: that the Rule's exclusion of non-abutting wetlands from federal authority is compelled and therefore the Sacketts' cross-motion for summary judgment must be granted and the Tribes' motion must be denied.

construction urged by the Tribes, *see* ECF No. 48 at 25–29, the canon of constitutional avoidance instructs that this Court should adopt the narrow reading of "navigable waters" set forth in the *Rapanos* plurality, and reject the Tribes' construction.[10]

### 1. The Commerce Clause and Tenth Amendment limit agency regulation of non-abutting wetlands

The Supreme Court held in *SWANCC* that the Act lacks a "clear statement" of congressional intent to exercise the Commerce Power to its outer limits. 531 U.S. at 172–74. Further, the legislative history of the Act only supports the Act's exercise of the Commerce Power over its traditional object: the transport of goods in interstate commerce through navigation. *Id.* at 168 & n.3. Any reading of "navigable waters" that authorizes regulation substantially beyond waters used to transport goods in interstate commerce would violate the Clear Statement Rule. *See SWANCC*, 531 U.S. at 172 ("Where an

---

[10] Moreover, the canon instructs against the Court's treating this as a *Chevron* step two case, as urged by the Agencies. *See supra* note 3. Courts "invoke constitutional narrowing at [*Chevron*] Step One" in order to avoid "constitutional question[s] and foreclose "constitutionally questionable interpretation[s]." *Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 816 (9th Cir. 2016) (citing *Williams v. Babbitt*, 115 F.3d 657, 662–63 (9th Cir. 1997)). To reject the Sacketts' argument that the text of the Clean Water Act unambiguously forecloses a broader reading of "navigable waters" and proceed to *Chevron* step two under the assumption that interpretation of the term was an exercise of agency discretion, would raise significant constitutional questions. As such, the canon of constitutional avoidance instructs that this Court should not read the statute as ambiguous, and should not construe this matter as a *Chevron* step two case. And even if this Court were to conclude that the Act is ambiguous, it should still not apply *Chevron* step two. Under the "major questions" doctrine, courts will not apply *Chevron* step two to "important" or "major" interpretive questions. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) ("Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration" (quoting Stephen G. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370 (1986))). If the Court were to conclude that the phrase "navigable waters" is ambiguous and defer to the Agencies' position that the Act grants them broad authority to regulate (or not regulate) a wide portfolio of non-abutting wetlands, this would be an interpretive question carrying significant regulatory consequences. *Cf. MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994) (applying the major questions doctrine to the Communications Act and finding it "is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion."). As such, instead of deferring to the Agencies' construction under *Chevron* step two, the Court should directly construe the statute in accordance with the Sacketts' arguments.

1   administrative interpretation of a statute invokes the outer limits of Congress' power, we

2   expect a clear indication that Congress intended that result.").

3       Similarly, a broad reading of "navigable waters" would violate the Tenth

4   Amendment's reservation of powers to the states, including traditional authority over land

5   use and water resource allocation, which are expressly recognized and protected in the Act.

6   33 U.S.C. § 1251(b); *see also* Gary E. Parish & J. Michael Morgan, *History, Practice and*

7   *Emerging Problems of Wetlands Regulation: Reconsidering Section 404 of the Clean*

8   *Water Act*, 17 Land & Water L. Rev. 43, 84 (1982) ("The existing [regulation] looks and

9   has an effect similar to a program of federal land use control. There should be little doubt

10  that Congress did *not* intend such a result.").

11      These constitutional concerns are exemplified by EPA's regulation of the Sacketts'

12  property, which EPA claims to be within the reach of the Agencies' prior (i.e., before the

13  Rule) and broader regulatory definition of "adjacent wetlands." ECF No. 45 ¶¶ 6–9; ECF

14  No. 45-1; ECF No. 45-2 (Sackett Decl. and Exs. A & B thereto). But the Sacketts' vacant

15  lot has no connection to any use of water for the transport of goods in interstate commerce.

16  ECF No. 45 ¶¶ 3–4 (Sackett Decl). EPA's regulation of building on the lot also directly

17  conflicts with local land use administration. The Sacketts obtained all required local

18  authorization to build; EPA's action directly countermands that decision, by deciding that

19  no home would be allowed there. *Id.* ¶¶ 3–6. A federal veto of local land use permitting is

20  exactly what *SWANCC* says the Act may not be interpreted to allow. *See SWANCC*, 531

21  U.S. at 172. In contrast, the Rule's more limited definition of "adjacent wetlands" more

22  fully respects the Commerce Power and Tenth Amendment limits on federal control over

23  land use by abandoning the Agencies' previously illegal assertion of regulatory authority

24  over non-abutting wetlands. ECF No. 45 ¶¶ 14–16 (Sackett Decl.). As such, the Court

25  should decline to adopt the broad reading of the term urged by the Tribes and reject the

26  Tribes' claims. It should also decline to construe this matter as a *Chevron* step two case.

27  ///

28  ///

1

2

**2.    The non-delegation doctrine also limits agency regulation of non-abutting wetlands**

3    A broad interpretation of "navigable waters" also raises non-delegation concerns

4    that this Court should avoid by interpreting the Act narrowly and upholding the Rule's

5    definition of "adjacent wetlands" under *Chevron* step one. Under the non-delegation

6    doctrine, Congress may not delegate legislative rulemaking authority to executive agencies

7    without providing an "intelligible principle" to guide the agency. *See Panama Refining Co.*

8    *v. Ryan*, 293 U.S. 388, 414–16 (1935); *ALA Schechter Poultry Corp. v. United States*, 295

9    U.S. 495, 529–32 (1935). To determine whether Congress has provided an intelligible

10   principle, the most important inquiry is whether Congress, and not the agency, has made

11   the policy decisions. *See Gundy v. United States*, 139 S. Ct. 2116, 2131–37 (2019)

12   (Gorsuch, J., dissenting). If the Tribes' interpretation were correct, and the Act did grant

13   the Agencies discretion to regulate an ill-defined but very broad portfolio of non-abutting

14   wetlands (while still excluding some), *see* ECF No. 48 at 25–29, then Congress has

15   delegated authority over a classic policy question to the Agencies. Indeed, the debate over

16   the extent of the federal government's power to regulate wetlands has roiled the Agencies,

17   the courts, the academy, the regulated public, and NGOs since the mid-1970s. Such

18   difficult and unsettled questions of public policy are quintessentially within the province

19   of the legislative branch to resolve. *Cf. Gundy*, 139 S. Ct. at 2133 ("it would frustrate 'the

20   system of government ordained by the Constitution' if Congress could merely announce

21   vague aspirations and then assign others the responsibility of adopting legislation to realize

22   its goals" (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892))). Yet under

23   the Tribes' interpretation, Congress simply handed resolution of that policy debate to the

24   Agencies, thus granting them the power to make law. But this is precisely what the

25   nondelegation doctrine prevents.

26   The difficulty in letting the Agencies determine where to set the outer limit of

27   federal power along the continuum from "navigable-in-fact only" to "all waters, no matter

28   how remote or insignificant," is that the Act is utterly silent on that crucial question. In

31

*Gundy*, Justice Gorsuch reasoned that there are only three constitutionally permissible delegations (1) delegations where Congress has already answered the policy question and the agency only has to "fill up the details," (2) delegations that mandate a certain result after specific agency factfinding, and (3) delegation of "non-legislative responsibilities . . . already within the scope of agency power." *Id.* at 2136. But if, as the Tribes urge, the statutory term "navigable waters" means more than navigable-in-fact waterways and their abutting wetlands, then—far from simply "filling up the details"—the Act would authorize the Agencies to make important policy choices in the first instance. Not one word in the Act offers any direction or principle to determine how small or remote or slightly connected a non-navigable non-abutting wetland may be and still be regulated. Likewise, the Act provides no guidance on the policy question of how many or what type of non-abutting wetlands should be regulated under the Act. It does not identify any facts that the agencies should investigate or use in order to address that policy question, nor does it provide any direction on how those facts should be determined or weighted.[11] *See Gundy v. United States*, 139 S. Ct. at 2135–42 (Gorsuch, J., dissenting); *id.* at 2130–31 (Alito, J., concurring); *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari). Delegation of such unbounded authority to set important policy would be a classic violation of the Supreme Court's "intelligible principle" rule. *See Panama Refining*, 293 U.S. at 414–16 (1935); *ALA Schechter Poultry Corp. v. United States*, 295 U.S. at 529–32.

As a result, to the extent that "navigable waters" is interpreted to include an extensive catalog of different categories of non-navigable waters (including some but not all non-abutting wetlands and ephemeral drainages), the Act provides no "intelligible principle" for determining which non-navigable waters are included. Because this would violate the non-delegation doctrine, the Court should decline to adopt the broad reading of

---

[11] As to Justice Gorsuch's third category of constitutionally permissible delegation, the Agencies' clearly do not possess the inherent authority to define their own regulatory authority. *See Gundy*, 139 S. Ct. at 2137.

the term urged by the Tribes and instead adopt the narrow reading of the *Rapanos* plurality opinion. It should likewise decline to find the term "navigable waters" ambiguous and proceed to *Chevron* step two.

## IV. The Tribes' APA-Based Claims Are Unavailing Because Procedural or Factual Deficiencies Cannot Provide Grounds To Reverse a Non-Discretionary Agency Decision

The Tribes argue that the Agencies disregarded scientific evidence, failed to explain changes in position, treated certain wetland features inconsistently, and failed to adequately address the environmental justice impacts of the Rule, in violation of the APA's requirements for "reasoned decision-making." ECF No. 1 at ¶¶ 95–104; ECF No. 48 at 35–48. Therefore, they argue, the rule is arbitrary and capricious and should be set aside under the APA. *Id*. As to the definition of "adjacent wetlands," this argument fails.

As discussed above, a plain reading of the text of the Clean Water Act, as authoritatively interpreted by the Supreme Court, precludes the Agencies from regulating wetlands that do not directly abut other regulable water bodies. *See supra* pp. 7–27. Any alleged deficiencies in the rulemaking process or the Agencies' factual determinations are ultimately not germane to the Agencies' non-discretionary exclusion of non-abutting wetlands from federal authority. The Tribes' arguments that the Rule was promulgated in violation of the procedural requirements of the APA must necessarily fail.

Procedural or factual infirmities contained in agency rulemaking record will not affect the lawfulness of non-discretionary agency action. *See* Kevin M. Stack, *The Constitutional Foundations of* Chenery, 2007 Yale L.J. 952, 965–66 ("As Judge Friendly put it, '[W]hen agency action is statutorily compelled, it does not matter that the agency which reached the decision required by law did so on a debatable or even a wrong ground, for remand in such a case would be but a useless formality.'" (quoting Henry J. Friendly, Chenery *Revisited: Reflections on the Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 210)). This general administrative law principle pertaining to the relationship between the rulemaking record and compelled agency action is illustrated by three applications.

First, in reviewing agency decisions, several courts have held that remand to the agency "is unnecessary . . . '[w]here application of the correct legal standard could lead to only one conclusion.'" *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (affirming an agency decision in a social security appeal despite factual errors in the ALJ's conclusions (quoting *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998))); *Kang v. Attorney General*, 611 F.3d 157, 167–68 (3d Cir. 2010) (refusing to remand to the Board of Immigration Appeals where "application of the correct legal principles" would not alter the legal conclusions reached by the court); *George Hyman Const. Co. v. Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992) (refusing to remand to the agency where only "one disposition is possible as a matter of law"). Likewise, remanding the adjacent wetlands provisions of the Rule to the Agencies for further proceedings that the Tribes claim are required by the APA would lead to an identical result: the exclusion of non-abutting wetlands, as required by the Clean Water Act and the *Rapanos* plurality.

Second, although "[a]n administrative remand may be appropriate when an agency procedurally errs by failing to articulate a reasoned basis for its decision[,] . . . [w]hen an agency legally errs by acting outside its statutory authority, a remand would be futile and improper." *Union Pacific R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 901 (8th Cir. 2013). In *Union Pacific*, the Eighth Circuit refused to remand a Customs decision because the agency had plainly exceeded its statutory authority, and a court "simply will not remand '[w]here application of the correct legal standard could lead to only one conclusion.'" *Id.* (quoting *Zabala*, 595 F.3d at 409). Although *Union Pacific* involved reversing rather than upholding an agency decision, it stands for the same fundamental principle: remand to the agency to correct procedural infirmities is inappropriate where the matter is resolved by a legally compelled conclusion.

Third, the *Chenery* doctrine, that an agency may not defend an administrative decision on different grounds than those on which the decision was originally based, is inapplicable where the decision was compelled by law. Numerous circuit courts—including the Ninth Circuit—have held that in performing its judicial function of resolving

a pure question of statutory construction under *Chevron* step one, a court should not be constrained by the conclusions (erroneous or not) contained in the administrative record compiled by an agency. *Railway Labor Execs.' Ass'n v. Interstate Commerce Comm'n*, 784 F.2d 959, 969 (9th Cir. 1986) (holding *Chenery* is inapplicable where "the issue in dispute is the interpretation of a federal statute"). *See also*, *e.g.*, *Koyo Seiko Co. v. United States*, 95 F.3d 1094, 1099–1102 (Fed. Cir. 1996) (affirming a proceeding on grounds other than those in the agency's record and finding *Chenery* inapplicable where the "the sole issue is one of statutory construction," the "plain language of the statute compels the conclusion," and the conclusion does not "implicate the exercise of agency discretion"); *Ark. AFL-CIO v. Fed. Commc'ns Comm'n*, 11 F.3d 1430, 1440 (8th Cir. 1993) (plurality opinion) (determining courts may find additional bases "for a correct legal result" beyond those offered by the agency because "the Supreme Court clearly limited *Chenery* to situations in which the agency failed to make a necessary determination of fact or of policy"); *N.C. Comm'n of Indian Affairs v. U.S. Dep't of Labor,* 725 F.2d 238, 240 (4th Cir. 1984), *cert. denied,* 469 U.S. 828 (1984) (finding no "*Chenery* problem . . . because the question of interpretation of a federal statute is not 'a determination or judgment which an administrative agency alone is authorized to make.'" (quoting *Securities and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*))). Likewise, the Rule's exclusion of most non-abutting wetlands from federal authority is compelled by the Act. As such, the "adjacent wetlands" provision of the Rule must be upheld under the text of the Clean Water Act, irrespective of the reasoning set forth by the Agencies and contained in the administrative record.

The general principle established in these cases recognizes that it is inappropriate to set aside or remand a non-discretionary action—such as a legally compelled regulatory interpretation of a statute—based only on alleged infirmities in the rulemaking record. Therefore, the Tribes' APA claims fail as to the Rule's non-discretionary definition of adjacent wetlands.

*///*

1    **V.    The Sacketts Have Standing To Defend the Rule**

2          The Sacketts have Article III standing to defend the "adjacent wetlands" provision

3    of the Rule.[12] An intervenor may demonstrate independent standing via the standard

4    constitutional inquiry—by proving injury-in-fact, causation, and redressability. *Idaho*

5    *Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1399 (9th Cir. 1995)

6          As noted by the D.C. Circuit (where circuit authority requires defendant-intervenors

7    prove independent standing), a defendant-intervenor seeking to defend agency action

8    demonstrates "a sufficient injury in fact where . . . [the defendant-intervenor] benefits from

9    agency action, the action is then challenged in court, and an unfavorable decision would

10   remove the party's benefit." *Crossroads Grassroots Policy Strategies v. Fed. Election*

11   *Comm'n*, 788 F.3d 312, 317 (D.C. Cir. 2015). That is precisely the case with the Sacketts.

12   Since 2007, EPA has claimed regulatory authority over the Sacketts' residentially zoned

13   vacant lot on the grounds that it allegedly contains features regulated as "adjacent

14   wetlands" under the 1986 Regulations. *See* ECF No. 45 ¶¶ 7–13; ECF Nos. 45-1, 45-2

15   (Sackett Decl. and Exs. A & B thereto). As a result, the Sacketts have been unable to build

16   a home on their lot for most of the last fourteen years. ECF No. 45 ¶¶ 11–13 (Sackett Decl.).

17   But under the Rule's revised definition of "adjacent wetlands," the Sacketts' property is

18   excluded from agency authority under the Act. *See* 33 C.F.R. § 328.3(c)(1); ECF No. 45

19   ¶¶ 3–4, 14–15; ECF Nos. 45-1, 45-2 (Sackett Decl. and Exs. A & B thereto) (establishing

20   that the Sacketts' lot has no surface water connection to any other surface water and is

21   separated from the closest surface water by an impermeable artificial barrier). Therefore,

22   for as long as the Rule remains in effect, it affords the Sacketts significant regulatory relief.

23

24   ───────────────

[12] Generally, an intervenor need not independently demonstrate Article III standing unless
they are seeking to appeal an adverse ruling and continue litigation in the absence of the
party on whose side they were permitted to intervene. *W. Watersheds Project v.*
25   *Kraayenbrink*, 632 F.3d 472, 482 (9th Cir. 2011); *Perry v. Schwarzenegger*, 628 F.3d 1191,
1195 (9th Cir. 2011). The Agencies remain parties to this case and at this stage of the
26   proceedings the Sacketts need not demonstrate Article III standing for this Court to
consider their defense of the Rule. Nonetheless, the Sacketts include this brief discussion
27   demonstrating their independent standing to defend the Rule, given the increasing
likelihood that the Agencies will not defend the Rule on the merits.

28

1    *See* ECF No. 45 ¶ 16 (Sackett Decl.).

2        But the Tribes' challenge to the Rule, if successful, would remove that relief and

3 renew the Sacketts' injuries. *See* ECF No. 1 at 37–38 (seeking vacatur of the Rule). Should

4 the Court grant the Tribes motion for summary judgment, deny the Sacketts' cross-motion,

5 and enjoin or vacate the Rule, the outcome would be the immediate revival of the

6 regulations in effect in 2007 and the return of the Sacketts' property to EPA's asserted

7 regulatory dominion. And since an EPA jurisdictional determination under those

8 regulations remains in effect as to the Sacketts' property, this injury is certain and

9 immediate. ECF No. 45 ¶ 13 (Sackett Decl.). The revival of the prior rules would therefore

10 have an immediate negative effect on the Sacketts' ability to use and enjoy their private

11 property and would remove the benefit to the Sacketts of the Rule. *See* ECF No. 45 ¶ 17–

12 19 (Sackett Decl.).

13        These injuries are directly traceable to the Tribes' lawsuit and would be redressed

14 through a judgment in favor of the Sacketts, which would prevent the immediate return to

15 the regulations in effect in 2007. *See Crossroads Grassroots Policy Strategies*, 788 F.3d

16 at 316 (finding under similar circumstances, that if a defendant-intervenor "can prove

17 injury, then it can establish causation and redressability").

18                              **CONCLUSION**

19        The *Rapanos* plurality is controlling as to the Agencies' authority to regulate

20 "adjacent wetlands," and therefore the "adjacent wetlands" provisions of the Navigable

21 Waters Protection Rule (at very least as to those wetlands the Tribes' claim were

22 unlawfully excluded) are compelled by statute. The Court should grant the Sacketts' cross-

23 motion for summary judgment and deny the Tribes' motion for summary judgment as to

24 Counts I and II to the extent those Counts challenge the Rule's "adjacent wetlands"

25 provisions.

26 ///

27 ///

28 ///

1    DATED this 13th day of July, 2021.

2                                                    Respectfully submitted,

3                                          JAMES M. MANLEY
                                           ANTHONY L. FRANÇOIS
4                                          CHARLES T. YATES

5

6                                          By_____/s/ James M. Manley_____
                                                        JAMES M. MANLEY
7
                                           *Attorneys for Proposed Defendant-*
8                                          *Intervenors Chantell and Michael Sackett*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

2          This Memorandum in Support of Cross-Motion for Summary Judgment and

3 Opposition to Plaintiffs' Motion for Summary Judgment complies with the type-volume

4 limitations set forth in ECF Nos. 20, 24, and 70, because it (combined with the separately

5 filed Cross-Motion for Summary Judgment), contains 13,726 words, as computed by Fed.

6 R. App. P. 32(f).

7          DATED this 13th day of July, 2021.

8

9                                        By_____/s/ James M. Manley_____
                                              JAMES M. MANLEY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28