D. Lee Decker (Bar No. 013202)
Bradley J. Glass (Bar No. 022463)
Stuart S. Kimball (Bar No. 026681)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
Telephone:    (602) 530-8000
Facsimile:     (602) 530-8500
dld@gknet.com
brad.glass@gknet.com
stuart.kimball@gknet.com

Attorneys for Business-Intervenors-Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| PASQUA YAQUI TRIBE, *ET AL.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*,<br><br>                    Defendants,<br><br>and<br><br>ARIZONA ROCK PRODUCTS ASSOCIATION, *ET AL.*<br><br>                    Business-Intervenors-Defendants,<br><br>and<br><br>CHANTELL SACKETT AND MICHAEL SACKETT,<br><br>                    Intervenors-Defendants. | No. 4:20-cv-00266-TUC-RM<br><br>**BUSINESS-INTERVENORS-DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to the Honorable Rosemary Márquez) |

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE CASE AND SUMMARY OF ARGUMENT ......................... 1

II.   BACKGROUND ................................................................................................ 3

      A.    CWA Requirements and Permitting Programs ............................. 3

      B.    Regulatory Definition of WOTUS Prior to 2015 Rule ................. 3

      C.    Supreme Court Limitations on the Agencies' CWA Jurisdiction ................ 4

      D.    Agencies' 2008 *Rapanos* Guidance ............................................ 6

      E.    2015 Rule ...................................................................................... 7

      F.    Repeal Rule ................................................................................. 10

      G.    NWPR ......................................................................................... 10

III.  ARGUMENT ................................................................................................. 11

      A.    The NWPR is consistent with the text, purpose, and structure of the CWA and Supreme Court precedent and should be upheld ....................... 11

            1.    The NWPR reasonably and permissibly defines WOTUS. ............. 12

            2.    The NWPR recognizes and protects the Tenth Amendment rights of states and the states' traditional and primary power over land and water use. ................ 14

            3.    Plaintiffs mischaracterize the NWPR's legal and policy underpinnings and adherence to governing precedent. .................... 15

            4.    The Agencies in the NWPR addressed water quality and potential water pollution of downstream waters consistent with the CWA and states' rights. ................ 17

            5.    The NWPR properly relies on Section 101(b) of the CWA. ........... 20

      B.    The Agencies provided a reasonable and reasoned justification for the NWPR and the Repeal Rule based on science and public policy. ............. 21

            1.    The Agencies fully acknowledged and addressed the scientific record, including opinions from the SAB, in the Repeal Rule and NWPR. ................ 23

            2.    The Agencies properly balanced scientific, policy, and legal considerations in promulgating the Repeal Rule and NWPR. ......... 26

            3.    Plaintiffs' tributary arguments conflict with the Act, Supreme Court precedent, and the scientific and administrative record. ........ 29

            4.    The Agencies acknowledged and fully explained their change in position and provided a reasoned explanation for the change. ................ 31

            5.    The Agencies consistently addressed ephemeral features in the NWPR. ................ 34

            6.    Plaintiffs' challenges to the Repeal Rule and NWPR boil down to policy disagreements. ....................... 35

**TABLE OF CONTENTS**
(continued)

Page

C.   Plaintiffs' environmental justice claims are meritless and nonjusticiable........................................................................... 37

D.   The waste treatment system exclusion is lawful and serves important policy purposes........................................................ 38

1.   The WTS exclusion is a permissible and reasonable interpretation of the CWA.................................................. 40

IV.   MOTION TO STRIKE ......................................................................... 41

V.   CONCLUSION ..................................................................................... 41

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Andrade v. Lauer*,
5
729 F.2d 1475 (D.C. Cir. 1984) .................................................................. 31

6

*Ass'n of Flight Attendants-CWA v. Chao*,
7
493 F.3d 155 (D.C. Cir. 2007) ................................................................... 31

8

*Brown-Hunter v. Colvin*,
806 F.3d 487 (9th Cir. 2015) ..................................................................... 31
9

*California v. Wheeler*,
10
467 F. Supp. 3d 864 (N.D. Cal. 2020) ................................... 13, 16, 36, 37

11

*Camp v. Pitts*,
12
411 U.S. 138 (1973) .................................................................................. 41

13

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .................................................................................. 13
14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
15
401 U.S. 402 (1971) .................................................................................. 29

16

*Colorado v. EPA*,
17
989 F.3d 874 (10th Cir. 2021) .................................................................. 12

18

*Cty. of Maui v. Hawaii Wildlife Fund*,
19
140 S. Ct. 1462 (2020) ........................................................................ 17, 27

20

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .............................................................................. 33
21

*Entergy Corp. v. Riverkeeper, Inc.*,
22
556 U.S. 208 (2009) .................................................................................. 13

23

*In re EPA & U.S. Army Corps. of Eng'rs*,
24
803 F.3d 804 (6th Cir. 2015), *vacated on other grounds, In re U.S. Dep't*
*of Def.*, 713 F. App'x 489 (2018) ................................................................ 9
25

*FCC* v. *Fox Television Stations, Inc.*,
26
*556 U.S. 502 (2009)* ..................................................................... 22, 33, 36

27

*Georgia v. Pruitt*,
28
326 F. Supp. 3d 1356 (S.D. Ga. 2018) ....................................................... 9

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

iii

*Georgia v. Wheeler,*
    418 F. Supp. 3d 1336 (S.D. Ga. 2019) .......................................................... 9

*Hawai'i Wildlife Fund v. Cty. of Maui,*
    886 F.3d 737 (9th Cir. 2018) .................................................................... 17

*Johnson v. Shalala,*
    2 F.3d 918 (9th Cir. 1993) ........................................................................ 31

*Marks v. United States,*
    430 U.S. 188 (1977) ................................................................................. 16

*Morongo Band of Mission Indians v. FAA,*
    161 F.3d 569 (9th Cir. 1998) .................................................................... 38

*N. Cal. River Watch v. City of Healdsburg,*
    496 F.3d 993 (9th Cir. 2007) ......................................................... 17, 38, 39

*N. Cal. River Watch v. Wilcox,*
    633 F.3d 766 (9th Cir. 2011) .................................................................... 17

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018) ............................................................................... 10

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.,*
    545 U.S. 967 (2005) ................................................................................. 13

*North Dakota v. EPA,*
    127 F. Supp. 3d 1047 (D.N.D. 2015) .......................................................... 9

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,*
    556 F.3d 177 (4th Cir. 2009) ............................................................... 39, 40

*Oregon Cattlemen's Ass'n v. EPA,*
    No. 3:19-cv-564, Dkt. No. 58 (July 26, 2019) (*vacated as moot,* Dkt. No.
    81 (D. Or. Mar. 2, 2020)); ........................................................................ 9

*Organized Village of Kake v. U.S. Dep't of Agric.,*
    795 F.3d 956 (9th Cir. 2015) ............................................................... 33, 34

*Protect Our Communities Found. v. Salazar,*
    No. 12CV2211-GPC PCL, 2013 WL 5947137, at *15 (S.D. Cal. Nov. 6,
    2013), *aff'd sub nom., Backcountry Against Dumps v. Jewell,* 674 F.
    App'x 657 (6th Cir. 2017) ........................................................................ 38

*Rapanos v. United States,*
    547 U.S. 715 (2006) ............................................................................*passim*

*Solid Waste Agency of Northern Cook Cty. v. U.S. Army Corps of Eng'rs,*
 531 U.S. 159 (2001) .................................................................. 4, 5, 12, 21

*Texas v. EPA,*
 389 F. Supp. 3d 497 (S.D. Tex. 2019) ............................................. 9

*Texas v. EPA,*
 No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018)............................ 9

*Thompson v. U.S. Dep't of Labor,*
 885 F.2d 551 (9th Cir. 1989) ....................................................... 41

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers*
 *v. Fed. R.R. Admin.,*
 988 F.3d 1170 (9th Cir. 2021) ..................................................... 29

*United States v. Deaton,*
 332 F.3d 698 (4th Cir. 2003) ...................................................... 40

*United States v. Riverside Bayview Homes, Inc.,*
 474 U.S. 121 (1985)............................................................. 4, 12

**Statutes**

A.R.S. § 45-101(5) ................................................................ 36

33 U.S.C. § 1251(a) ................................................................ 3

33 U.S.C. § 1251(b).......................................................... 3, 5, 20, 21

33 U.S.C. § 1311(a) ................................................................ 3

33 U.S.C. § 1342 ............................................................... 3, 14

33 U.S.C § 1344 ................................................................... 3

33 U.S.C. § 1362(7), (8) ......................................................... 3, 12

Clean Water Act, 91 Stat. 1567, Pub. L. No. 95-217 (1977) ........................... 20

Tohono O'Odham Nation, Water Quality Code, §§ 1, 5.B .............................. 19

**Other Authorities**

33 C.F.R. § 328.3............................................................... 10, 11

39 Fed. Reg. 12,115 (Apr. 3, 1974).................................................. 3

42 Fed. Reg. 37,122, 37,144 (Jul. 19, 1977) .......................................... 3

v

45 Fed. Reg. 33,298 (May 19, 1980)................................................................. 40

51 Fed. Reg. 41,206, 41,216-17 (Nov. 13, 1986)................................................ 3

53 Fed. Reg. 20,764 (June 6, 1988)................................................................... 3

63 Fed. Reg. 51,164, 51,183 (Sept. 24, 1998)................................................... 38

Clean Water Rule: Definition of "Waters of the United States" ("2015 Rule"),
    80 Fed. Reg. 37,054-37,127 (June 29, 2015)......................................... *passim*

Definition of "Waters of the United States"—Recodification of Pre-Existing Rules
    ("Repeal Rule"), 84 Fed. Reg. 56,626-56,671 (Oct. 22, 2019) ............................. *passim*

The Navigable Waters Protection Rule: Definition of "Waters of the United
    States" ("NWPR"), 85 Fed. Reg. 22,250-22,342 (Apr. 21, 2020)...................... *passim*

Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 16, 1994).......................... 37

H.R. 2651, 55th Leg., 1st Session. (Az. 2021) ................................................. 19

vi

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

## I.      NATURE OF THE CASE AND SUMMARY OF ARGUMENT

Plaintiffs challenge final regulatory action by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (together, the "Agencies") on two matters.  The first challenged action is the Agencies' 2019 repeal (84 Fed. Reg. 56,626 (Oct. 22, 2019)) ("Repeal Rule") of the definition of "waters of the United States" ("WOTUS") adopted by the Agencies in 2015 (80 Fed. Reg. 37,054 (June 29, 2015)) ("2015 Rule").  As extensively documented and explained in the Repeal Rule, the 2015 Rule unlawfully imposed *per se* federal jurisdiction on dry land features located far from or conveying small amounts of flow to a traditional navigable water ("TNW").  For other potential features, including isolated features located within the 100-year floodplain of otherwise jurisdictional features, the 2015 Rule unlawfully imposed expensive case-by-case determinations that failed to provide any certainty to the regulated community.  Numerous federal courts determined that the 2015 Rule was unlawful for various reasons including that it impermissibly attempted to regulate water features and land inconsistent with the federal Clean Water Act ("CWA" or "Act"), the Administrative Procedures Act ("APA"), and relevant Supreme Court precedent.  Although their complaint requests that the Court vacate the Repeal Rule (and thus presumably reinstate the 2015 Rule despite these constitutional shortcomings and court decisions), Plaintiffs' summary judgment brief does not present independent claims of error as to the Repeal Rule.

Instead, Plaintiffs focus their summary judgment motion on the second challenged action, the Agencies' promulgation in 2020 of the "Navigable Waters Protection Rule" ("NWPR") (85 Fed. Reg. 22,250 (Apr. 21, 2020)) that revised the definition of WOTUS to better track the congressional purposes underlying the CWA to protect navigable waters and to preserve state authority under the Tenth Amendment over land and water use. Unlike the 2015 Rule, the NWPR Rule observed constitutional boundaries and followed Supreme Court precedents limiting what waters may be regulated under the CWA.

The Agencies provided a reasoned explanation in the NWPR for their policy decisions and changes, including exclusions for ephemeral drainages, isolated wetlands, and waste treatment systems.  Because the scope of CWA jurisdiction is not dictated by science, the Agencies appropriately considered and balanced a range of factors, including the scope of their statutory authority under the CWA, Congress' direction to preserve and protect the "primary" role of states in regulating water pollution, case law interpreting WOTUS, and longstanding concerns about predictability and administrability.  Contrary to the Plaintiffs' core contention here, nothing in the CWA or general administrative law principles required the Agencies to "disprove" the alleged scientific justification for the 2015 Rule before they could exercise their discretion to implement a different policy.  The Agencies' exhaustive rulemaking notices make clear that the NWPR is based on sound policy judgments, reached after careful and reasoned consideration of the entire administrative record, including scientific evidence in light of the allowable scope of federal jurisdiction.  The Plaintiffs' multiple efforts to disparage the NWPR as scientifically deficient are entirely unmoored from the CWA and the scope of federal jurisdiction allowed under the Act.  Also, unlike the 2015 Rule, the NWPR complied with the APA.

Although the Agencies have now indicated their intention to reconsider certain aspects of the NWPR, and to undertake another rulemaking effort, this Court's role is far narrower:  to decide, under the deferential statutory standard of review, whether Plaintiffs have shown that the NWPR is based on an unreasonable interpretation of the statutory text, or is otherwise arbitrary, capricious, or an abuse of discretion.  The answer to those questions is clear—this Court should uphold the NWPR as a lawful interpretation of the CWA that complies with statutory language and Supreme Court precedent, and reflects a reasonable and permissible exercise of the Agencies' discretion.

2

## II.   BACKGROUND

### A.   CWA Requirements and Permitting Programs

Congress passed the CWA with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" (33 U.S.C. § 1251(a)), while emphasizing the central policy "to recognize, preserve, and protect the primary responsibilities and rights of states to prevent, reduce, and eliminate pollution" and to "plan the development and use . . . of land and water resources" (*id.* § 1251(b)).  Under the umbrella of these overall concepts, the CWA protects water quality by prohibiting "the discharge of any pollutant by any person" (*id.* § 1311(a)) to "navigable waters," which "means the waters of the United States ["WOTUS"]" (*id.* § 1362(7)), unless the discharge is in compliance with various provisions of the Act, including the permitting programs found in Sections 402 and 404 of the Act.

Under Section 402 (*id.* § 1342), EPA or delegated states or Tribes may issue a National Pollutant Discharge Elimination System ("NPDES") permit for any addition of a pollutant other than dredged or fill material to WOTUS from any point source.  Under Section 404 (*id.* § 1344), the Corps or delegated states or Tribes may issue CWA Section 404 permits for discharges of dredged or fill material into WOTUS.

### B.   Regulatory Definition of WOTUS Prior to 2015 Rule

In 1974, the Corps adopted regulations defining WOTUS to include only waters subject to the ebb and flow of the tide or navigable-in-fact.  39 Fed. Reg. 12,115 (Apr. 3, 1974).  In 1977, the Corps issued a revised version of its regulations that substantially broadened its interpretation of WOTUS.  42 Fed. Reg. 37,122, 37,144 (Jul. 19, 1977).  In the 1980s, the Agencies adopted regulatory definitions of WOTUS substantially similar to the 1977 definition.  *See* 51 Fed. Reg. 41,206, 41,216-17 (Nov. 13, 1986) (the Corps "h[as] not made changes to existing definitions; however, we have provided clarification by simply setting them apart in a separate and distinct [part] of the regulation"); 53 Fed. Reg. 20,764 (June 6, 1988) (EPA adopted definition of WOTUS for Section 404 permitting purposes that tracked its existing definition for Section 402 purposes).

### C.   Supreme Court Limitations on the Agencies' CWA Jurisdiction

Although the text of the Agencies' definition of WOTUS remained essentially unchanged for the next 25 years, the Agencies' interpretation of their regulations continued to widen expansively.  The Supreme Court confronted those increasingly aggressive interpretations in a series of decisions beginning in 1985 and established limitations on the Agencies' scope of jurisdiction under the CWA.

First, in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) the Court addressed the question whether wetlands that are not navigable may be regulated as WOTUS on the basis that they are "adjacent to" navigable-in-fact waters and "inseparably bound up with" them because of their "significant effects on water quality and the aquatic ecosystem."  *Id*. at 131-35, n.9.  The Court held that it is "a permissible interpretation of the Act" to conclude that "a wetland that *actually abuts* on a navigable waterway" falls within the "definition of '[WOTUS].'"  *Id*. at 135 (emphasis added).

In *Solid Waste Agency of Northern Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*"), the Court rejected the Corps' assertion of jurisdiction over an abandoned sand and gravel pit in northern Illinois on a purported connection to interstate commerce based on use of the water and wetlands associated with the pit by migratory birds.  Observing that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed [the Court's] reading of the [Clean Water Act] in [*United States v. Riverside Bayview Homes*], the Court held that Congress did not authorize the Corps to regulate "nonnavigable, isolated, intrastate waters" as WOTUS because such an outcome would effectively read the term "navigable" out of the statute.  *Id.* at 167, 170-71.  Because the government's expansive view of jurisdiction would "raise significant constitutional questions" by "result[ing] in a significant impingement of the States' traditional and primary power over land and water use," the Court refused to uphold the Corps' assertion of jurisdiction absent a clear statement from Congress.  *Id*. at 172-74.  The Court recognized that "[r]ather than expressing a desire to readjust the federal-state balance in this manner, Congress chose to recognize, preserve, and protect the primary

4

responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." *Id.* at 174 (quoting 33 U.S.C. § 1251(b)).

In *Rapanos v. United States*, 547 U.S. 715 (2006), the Court considered whether four Michigan wetlands, located near ditches or man-made drains that eventually emptied into navigable waters over 20 miles away, were WOTUS subject to CWA jurisdiction.  A majority of the Court rejected the Corps' assertion of CWA jurisdiction over the wetlands. The Court focused on that portion of the Corps' regulatory definition of WOTUS that addressed the regulatory status of tributaries to navigable-in-fact waters (also referred to throughout this brief as "traditional navigable waters" or "TNWs") and wetlands adjacent to such tributaries.  A four-Justice plurality held that the Corps could assert jurisdiction over tributaries to navigable-in-fact waters but only if such tributaries are "relatively permanent, standing or continuously flowing bodies of water," and that Agencies' statutory jurisdiction did not extend to tributaries "through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Rapanos*, 547 U.S. at 739.  In reaching that conclusion, the plurality stressed that the regulation of "development and use" of "land and waters resources" is a "quintessential state and local power." *Id.* at 737-38.

Justice Kennedy concurred in the judgment, also rejecting the Corps' assertion of CWA jurisdiction.  Justice Kennedy held that the government can assert jurisdiction over wetlands only if there is a "significant nexus between the wetlands in question and navigable waters in the traditional sense." *Id.* at 779.  In so holding, Justice Kennedy disavowed the possibility that "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it" would meet his "significant nexus" standard. *Id.* at 781.  He clarified that "mere hydrologic connection" was insufficient to support CWA jurisdiction because in many cases "the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." *Id.* at 784-85.

**D.    Agencies' 2008 *Rapanos* Guidance**

In 2008, the Agencies issued a joint guidance document describing how the Agencies would interpret and implement the *Rapanos* decision.  EPA*, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States*, Regulations (Doc. ID EPA-HQ-OW-2018-0149-11695) (Dec. 2, 2008), https://bit.ly/3wmWhje.[1]  Under the guidance, the Agencies automatically asserted jurisdiction over (1) TNWs, (2) wetlands adjacent to TNWs, (3) non-navigable tributaries of TNWs that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (*e.g.*, typically three months), and (4) wetlands that directly abut such tributaries.  *Id.* at 1, 4, 6.

The Agencies also asserted jurisdiction over non-navigable, not-relatively permanent tributaries and their adjacent wetlands but *only* when such tributaries and wetlands have a "significant nexus" to a TNW.  *Id.* at 1, 8.  According to the Guidance, "[p]rincipal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a [TNW]" (*id.* at 10) as well as "relevant contextual factors that directly influence the hydrology of tributaries including the size of the tributary's watershed, average annual rainfall, average annual winter snow pack, slope, and channel dimensions" (*id.* at 11).  The Guidance cautions that where "the distance from the tributary to the navigable water increases, it will become increasingly important to document whether the tributary and its adjacent wetlands have a significant nexus rather than a speculative or insubstantial nexus with a [TNW]."  *Id.*

Notably, under the *Rapanos* guidance, from 2009 until the effective date of the NWPR in April 2020, numerous ephemeral drainages in Arizona were determined by the Agencies *not* to be subject to CWA jurisdiction based on scientifically-based conclusions

---

[1] Business-Intervenors have cited to the administrative records (Docs. 21 & 22) and provided direct links to the cited documents.

1   that the drainages lack a significant nexus to the nearest downstream TNW.[2]  *See* U.S.

2   Army Corps Engineers, *Final Regulatory Actions*,

3   https://www.spl.usace.army.mil/Missions/Regulatory/Final-Regulatory-Actions/ (last

4   visited July 12, 2021).  These non-jurisdictional determinations include, but are not

5   limited to, (1) over 180 ephemeral drainages near the village of North Komelik on the

6   Tohono O'Odham Nation (https://bit.ly/3wp5eZj), (2) approximately 14 ephemeral

7   drainages near the village of Ali Chugk on the Tohono O'odham Nation

8   (https://bit.ly/3qWvwAZ ), (3) approximately 15 ephemeral drainages on Pasqua Yaqui

9   lands near Tucson (https://bit.ly/3hsRQzm), (4) over 60 ephemeral drainages west and

10  southwest of Tucson (https://bit.ly/36ocxWQ; https://bit.ly/36pJS3E;

11  https://bit.ly/3hradV0; https://bit.ly/3wpUpGj), (5) over 300 ephemeral drainages east of

12  Casa Grande (https://bit.ly/2VoBY8k), and (6) over 170 ephemeral drainages near

13  Buckeye (https://bit.ly/2VrThWd; https://bit.ly/3xxHB28).

14      **E.      2015 Rule**

15          In 2015, the Agencies revised the regulatory definition of WOTUS that had been in

16  place since the 1980s.  Notwithstanding the express limitations placed on the scope of the

17  Agencies' CWA jurisdiction under *SWANCC* and *Rapanos*, the 2015 Rule broadly

18  identified several water and dry land features as categorically "jurisdictional by rule"

19  including all tributaries to a TNW, whether perennial, intermittent, or ephemeral, and that

20  have the physical indicators of a bed and banks and an ordinary high water mark.  80 Fed.

21  Reg. at 37,104-6.

22  _____

23  [2] In Arizona, in addition to the Colorado River, which clearly is treated as a TNW, only
    four other water segments have been determined to be a TNW on a stand-alone basis:  (1)
24  Gila River, Powers Butte to Gillespie Dam (west of Phoenix); (2) Gila River, Coolidge
    Dam to Winkelman (east of Phoenix); (3) Santa Cruz River, Tubac Gage Station to
25  Continental Gage Station (south of Tucson); and (4) Santa Cruz River, Roger Road
    WWTP to Pima/Pinal county line (just north of Tucson).  *See* U.S. Army Corps of
26  Engineers, *Traditional Navigable Waters (TNW) Decisions,*
27  https://www.spl.usace.army.mil/Missions/Regulatory/Jurisdictional-
    Determination/Traditional-Navigable-Waters/ (last visited July 12, 2021),
28  https://bit.ly/3yHzmRg.

1    The 2015 Rule also identified two categories of potentially isolated features that

2 are jurisdictional if they are "found after a case-specific analysis to have a significant

3 nexus" to a TNW. *Id.* at 37,059. The first category included certain non-adjacent features

4 such as western vernal pools in California. *Id.* at 37,104-5. The second category included

5 any features "located within the 100-year floodplain" or "within 4,000 feet of the high tide

6 line or ordinary high water mark" of any otherwise jurisdictional feature. *Id.* at 37,105.

7    EPA's report titled *Connectivity of Streams and Wetlands to Downstream Waters:*

8 *A Review and Synthesis of the Scientific Evidence* (Final Report), (Doc. ID EPA-HQ-OW-

9 2018-0149-11691) (Jan. 2015), https://bit.ly/3qTIwHK ("*Connectivity Report*") (referred

10 to by Plaintiffs as the "Science Report") was identified as providing the technical basis for

11 the 2015 Rule. 80 Fed. Reg. at 37,057. However, the proposed version of the 2015 Rule

12 included only a draft of the *Connectivity Report*, which was at the time undergoing review

13 by the EPA's Scientific Advisory Board ("SAB"). The SAB recommended several

14 substantive changes to the *Connectivity Report*. Notably, the SAB recommended that

15 "EPA should recognize that there is a gradient of connectivity" and "to make the Report

16 more technically accurate" it should be "revised to reflect a gradient approach that

17 recognizes variation in the frequency, duration, magnitude, predictability, and

18 consequences of those connections." EPA, Letter to Gina McCarthy, *SAB Review of the*

19 *Draft EPA Report Connectivity of Streams and Wetlands to Downstream Waters: A*

20 *Review and Synthesis of the Scientific Evidence* at 2-3 (Doc. ID EPA-HQ-OW-2018-0149-

21 0386) (Oct. 17, 2014), https://bit.ly/3ALSS0E.

22    Numerous parties sought judicial review of the 2015 Rule, both in federal circuit

23 and district courts. In response to these challenges, several district courts stayed or

24 enjoined the 2015 Rule. *See, e.g.*, *Oregon Cattlemen's Ass'n v. EPA*, No. 3:19-cv-564,

25 Dkt. No. 58 (July 26, 2019) (enjoining, *vacated as moot*, Dkt. No. 81 (D. Or. Mar. 2,

26 2020)); *Texas v. EPA*, No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018)

27 (enjoining 2015 Rule in Texas, Louisiana, and Mississippi); *Georgia v. Pruitt*, 326 F.

28 Supp. 3d 1356, 1365 (S.D. Ga. 2018) (enjoining 2015 Rule in eleven states and finding

that tributary definition in 2015 Rule "is similar to the one invalidated in *Rapanos*, and it carries with it the same concern that Justice Kennedy had there—it seems 'to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water.'").  Two district courts also eventually ruled on summary judgment that the 2015 Rule was "unlawful" and remanded it to the Agencies. *See Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497 (S.D. Tex. 2019).

Notably, the United States District Court for the District of North Dakota enjoined the 2015 Rule in thirteen states, including in Arizona, just before the effective date of the 2015 Rule.  *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015).  Among other concerns with the 2015 Rule, the court found that:

> [T]he definition of a tributary set forth in the [2015] Rule allows for regulation of any area that has a trace amount of water so long as "the physical indicators of a bed and banks and an ordinary high water mark" exist. This is precisely the concern Justice Kennedy had in *Rapanos*, and indeed the general definition of tributary is strikingly similar. While the Agencies assert that the definitions exclusion of drains and ditches remedies the defect, the definition of a tributary here includes vast numbers of waters that are unlikely to have a nexus to navigable waters within any reasonable understanding of the term. The States have established a fair chance of success on the merits of their claim that the Rule violates the congressional grant of authority to the EPA.

*Id.* at 1056 (citations omitted).

In 2015, the Sixth Circuit granted a nationwide stay of the 2015 Rule, finding among other things that "it is far from clear that the new Rule's distance limitations are harmonious" with even the most expansive reading of the Supreme Court's instructions in *Rapanos*.  *In re EPA & U.S. Army Corps. of Eng'rs*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated on other grounds, In re U.S. Dep't of Def.*, 713 F. App'x 489 (2018).  The Sixth Circuit eventually vacated its nationwide stay of the 2015 Rule in response to the Supreme Court's unanimous opinion holding that challenges to a rule defining WOTUS must be brought in district court, and "remand[ing] the case [to the Sixth Circuit] with instructions to dismiss the petitions for review for lack of jurisdiction."  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 634 (2018).

As a result of the above challenges to the 2015 Rule, and just prior to adoption of the Repeal Rule in 2019 and the NWPR in 2020, the 2015 Rule was being applied in less than half of the states and was stayed or enjoined in the other states, including in Arizona.

**F.    Repeal Rule**

In light of the numerous legal deficiencies with the 2015 Rule and the lack of a uniform definition of WOTUS applicable throughout the country, the Agencies proposed, received comments on, and eventually published a final rule on October 22, 2019 to repeal the 2015 Rule and re-codify the regulatory text and definition of WOTUS that existed prior to the 2015 Rule.  84 Fed. Reg. at 56,626.  The Repeal Rule became effective on December 23, 2019 and was in effect in all 50 states until the adoption of the NWPR in 2020.

**G.    NWPR**

On April 21, 2020, the Agencies published the NWPR—codified in pertinent part at 33 C.F.R. § 328.3.  The Agencies explained in the preamble to the NWPR that the rule presents "a unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to [TNWs] or the territorial seas."  85 Fed. Reg. at 22,252, 22,271, & 22,301; *see also infra* III.B (detailing Agencies' rationale for promulgating the NWPR).

The NWPR clarified that WOTUS are limited to (1) TNWs including the territorial seas, (2) tributaries, (3) lakes and ponds, and impoundments of jurisdictional waters, and (4) adjacent wetlands.  33 C.F.R. § 328.3(a)(1)-(4).

"Tributary" is defined in the NWPR as "a river, stream, or similar naturally occurring surface water channel that contributes surface water flow to a [TNW] in a typical year either directly or through one or more waters [including through excluded water features] . . . [and] must be perennial or intermittent in a typical year."  *Id.* § 328.3(c)(12).  "Perennial" is defined as "surface water flowing continuously year-round."  *Id.* § 328.3(c)(8).  "Intermittent" is defined as "surface water flowing continuously during certain times of the year and more than in direct response to

1  precipitation (*e.g.*, seasonally when the groundwater table is elevated or when snowpack

2  melts)." *Id.* § 328.3(c)(5).

3  "Wetland" is defined in the NWPR as "areas that are inundated or saturated by

4  surface or groundwater at a frequency and duration sufficient to support, and that under

5  normal circumstances do support, a prevalence of vegetation typically adapted for life in

6  saturated soil conditions." *Id.* § 328.3(c)(16). "Adjacent wetlands" means "wetlands that

7  (i) abut, meaning to touch at least at one point or side of [an otherwise jurisdictional

8  water]; (ii) are inundated by flooding from [an otherwise jurisdictional water] in a typical

9  year; (iii) are physically separated from [an otherwise jurisdictional water] only by a

10  natural berm, bank, dune, or similar natural features; or (iv) are physically separated from

11  [an otherwise jurisdictional water] only by an artificial dike, barrier, or similar artificial

12  structure so long as that structure allows for a direct hydrologic surface connection

13  between the wetlands and the [otherwise jurisdictional water] in a typical year . . ." *Id.*

14  § 328.3(c)(1).

15  The NWPR contains several exclusions from the definition of WOTUS. *Id.*

16  § 328.3(b). These exclusions include: (1) ephemeral features, including ephemeral

17  streams, swales, gullies, rills, and pools; and (2) waste treatment systems. *Id.*

18  § 328.3(b)(3), (12). "Ephemeral" is defined as "surface water flowing or pooling only in

19  direct response to precipitation (*e.g.*, rain or snow fall)." *Id.* § 328.3(c)(3).

20  The NWPR became effective in all states but Colorado on June 22, 2020. The rule

21  became effective in Colorado on March 2, 2021 after the Tenth Circuit overturned a

22  district court-ordered stay of the NWPR. *See Colorado v. EPA*, 989 F.3d 874 (10th Cir.

23  2021).

## III.   ARGUMENT

### A.   The NWPR is consistent with the text, purpose, and structure of the CWA and Supreme Court precedent and should be upheld.

27  The definition of WOTUS in the NWPR followed the text of the CWA and applied

28  a balanced consideration of Supreme Court precedent. Because Congress clearly

specified that navigable waters including the territorial seas should be regulated as WOTUS (33 U.S.C. § 1362(7), (8)), the NWPR properly included such waters, referred to herein as "traditional navigable waters" or "TNWs." 85 Fed. Reg. at 22,338 (codified at 33 C.F.R. § 328(a)(1)). By asserting jurisdiction over TNWs while establishing an outer bound of federal jurisdiction, the NWPR also properly recognized and implemented the dual congressional goals of the CWA—restore and maintain the integrity of navigable waters and preserve and protect the primary responsibility of states to plan the development and use of land and waters resources. *Id.* at 22,252, 22,262, 22,264-65, 22,269-73, 22,287-88, 22,308.

In terms of Supreme Court precedent, the NWPR implemented the *SWANCC* majority (531 U.S. at 172), *Rapanos* plurality (547 U.S. at 731), and Justice Kennedy's *Rapanos* concurrence (547 U.S. at 778-79) to limit interpretation of the term "navigable" while at the same time following the Supreme Court's view in *Riverside Bayview* (474 U.S. at 133), *SWANCC* (531 U.S. at 167), and *Rapanos* (547 U.S. at 731 (plurality), 767-768 (Kennedy, J., concurring)) that Congress intended to extend federal CWA jurisdiction to some waters that are not navigable in the traditional sense. *E.g.*, 85 Fed. Reg. at 22262-69, 22,273. The NWPR meets these Supreme Court readings by appropriately extending federal jurisdiction to tributaries with at least perennial or intermittent flow to downstream TNWs based on the potential of such flows to impact the "chemical, physical and biological integrity" of the downstream TNWs. *E.g., id* at 22,287-89.

The NWPR's extension of jurisdiction over wetlands adjacent to TNWs is based on the Supreme Court's unanimous decision in *Riverside Bayview* permitting the Corps to interpret WOTUS to include adjacent wetlands. Consistent with the Court's decision in *SWANCC*, however, the Agencies properly refrained from defining adjacency so broadly that it could encompass wetlands that are either fully isolated or wetlands only tangentially connected to TNWs. *E.g., id* at 22,308-10.

### 1. The NWPR reasonably and permissibly defines WOTUS.

While there are some statutory guideposts (*e.g.*, TNWs are WOTUS) and some

1   limiting principles in the statutory text and Supreme Court precedent, the term WOTUS is
2   ambiguous in certain relevant aspects.  The NWPR is based on the text and purposes of
3   the statute, is informed by Supreme Court decisions, and clearly represents a "permissible
4   construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467
5   U.S. 837, 843 (1984).  This need not be "the only possible interpretation, nor even the
6   interpretation deemed most reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*,
7   556 U.S. 208, 218 (2009).  Interpreting ambiguous language "involves difficult policy
8   choices," so judicial deference is critical, as "Agencies are better equipped to make [such
9   choices] than courts." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S.
10  967, 980 (2005).

11          Consistent with these principles, the Supreme Court's two most recent decisions on
12  the Agencies' scope of CWA jurisdiction (*i.e.*, *SWANCC* and *Rapanos*) must be read in
13  their proper context: both cases focus on what *limits* Congress placed on the federal
14  government's jurisdiction over non-navigable water features, such as tributaries and
15  adjacent wetlands—not whether the Agencies had gone far enough.  *See California v.*
16  *Wheeler*, 467 F. Supp. 3d 864, 873 (N.D. Cal. 2020) (so holding in denying preliminary
17  injunction of NWPR).  Therefore, Justice Kennedy's concurring opinion in Rapanos does
18  not stand for the proposition that any water feature with a "significant nexus" to TNWs is
19  *per se* jurisdictional.  Instead, what Justice Kennedy's opinion makes clear is that if the
20  Agencies want to assert jurisdiction over non-navigable features and adjacent wetlands,
21  there must, at a minimum, be a "significant nexus" with TNWs.  In his words, "[a]bsent a
22  significant nexus, jurisdiction under the Act is lacking."  *Rapanos*, 547 U.S. at 767
23  (Kennedy, J., concurring).  But that is far different from saying that the CWA compels the
24  Agencies to assert jurisdiction over any water feature that meets such "significant nexus"
25  test—as Plaintiffs here contend.  Like the Supreme Court's other pronouncements on the
26  meaning of WOTUS, Justice Kennedy's *Rapanos* concurrence (and the plurality's for that
27  matter) provides little instruction on the waters bodies and features over which the
28  Agencies *must* assert jurisdiction.

In summary, the NWPR represents a reasonable policy choice, consistent with the statutory text and Supreme Court precedent, to assert federal jurisdiction "over those [non-navigable] waters and wetlands that maintain a sufficient surface water connection to [TNWs]." 85 Fed. Reg. at 22,252.  This "unifying legal theory" properly avoids federal regulation of non-navigable, non-adjacent water features that lack a sufficient connection to TNWs and that are appropriately within the inherent jurisdiction of the states.

### 2. The NWPR recognizes and protects the Tenth Amendment rights of states and the states' traditional and primary power over land and water use.

The CWA expressly limits its permit requirements only to certain discharges of pollutants to "navigable waters," *not* to any discharge to *any* type of land or water features within an individual state's or Tribe's boundaries.  *See, e.g.*, 33 U.S.C. §§ 1342(a) (NPDES permits), 1342(l) (limitations on NPDES permits), 1344(a) (Section 404 permits), 1344(f) (non-prohibited discharges of dredged or fill material), 1362(12) (definition of "discharge of a pollutant"), 1362(14) (definition of "point source"). Consequently, the statute itself envisions that there will be water and land features and discharges to such features that will *not* be regulated under the CWA but that will be left to be regulated, as deemed necessary, by individual states and Tribes.

Consistent with the Tenth Amendment and Congress' policy under Section 101(b) of the CWA, the NWPR recognized that states and Tribes have inherent authority to regulate water features, even if those features lack a sufficient connection to TNWs under the CWA and applicable Supreme Court precedent to support federal jurisdiction.  85 Fed. Reg. at 22,269-70.  The Agencies also explained that the NWPR "better balances" the CWA's objective in Section 101(a) of the CWA with the need to respect state authority over land and water resources as mandated by Congress in Section 101(b) of the CWA. 85 Fed. Reg. at 22,261, 22,277, 22,287, & 22,308.

14

### 3.   Plaintiffs mischaracterize the NWPR's legal and policy underpinnings and adherence to governing precedent.

Plaintiffs argue that the NWPR violates the CWA because it relies on principles from the *Rapanos* plurality while a majority of the justices rejected the jurisdictional test from the plurality.  Plaintiffs Br. 18.  The basis for Plaintiffs' arguments is incorrect.  The NWPR does not wholly adopt the *Rapanos* plurality opinion nor wholly reject Justice Kennedy's concurrence.  Rather, the Agencies found that "there are sufficient commonalities between these opinions to help instruct the Agencies on where to draw the line between Federal and State waters" (NWPR, 85 Fed. Reg. at 22,268) and that they "made modifications in the final rule to better incorporate common principles of the *Rapanos* plurality and concurring opinions . . ." (*id.* at 22,273).  For example, the Agencies noted that the *Rapanos* plurality and Justice Kennedy's concurrence both support that a CWA jurisdictional "determination must be made using a basic two-step approach that considers (1) the connection of the wetland to the tributary; and (2) the status of the tributary with respect to downstream [TNWs]."  *Id.* at 22,267.  Both opinions "also agreed that the connection between the wetland and the tributary must be close."  *Id.*

With respect to Justice Kennedy's concurrence, the Agencies explained that the NWPR "is informed in several key aspects by Justice Kennedy's opinion" and that "the Agencies now appropriately recognize some of the limiting principles articulated within his concurring opinion."  *Id.*  For example, the Agencies noted that they "analyzed the text, structure, and legislative history of the CWA in light of Supreme Court guidance and conclude that this final rule incorporates important aspects of Justice Kennedy's opinion, together with those of the plurality, to craft a clear and implementable definition [of a tributary] that stays within their statutory and constitutional authorities."  *Id.* at 22,291.  The Agencies also concluded that the exclusion of ephemeral features in the NWPR "addresses Justice Kennedy's concern that speculative and insubstantial connections may not be sufficient to establish jurisdiction."  *Id.* at 22,278.  To support their clarification in the NWPR that physical indicators of flow, absent verification of actual flow, may not

1   accurately represent the flow classifications required for jurisdictional tributaries, the

2   Agencies cited to Justice Kennedy's concerns that the tributary definition considered in

3   *Rapanos*, which was based in part on a water possessing an "ordinary high water mark,"

4   "seems to leave wide room for regulation of drains, ditches, and streams remote from any

5   navigable-in-fact water and carrying only minor water volumes towards it." *Id.* at 22,292

6   (citing *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring in the judgment)).

7   The NWPR thus clearly used the limiting principles from both the *Rapanos*

8   plurality and Justice Kennedy's concurrence to define the scope of jurisdiction under the

9   CWA.  Because the rule is not solely based on or limited by the plurality's jurisdictional

10   test, Plaintiffs' argument that the NWPR is not an allowable interpretation of the CWA

11   because a majority of the *Rapanos* justices (Justice Kennedy plus the four dissenting

12   justices) rejected the plurality decision is not relevant and is not a legitimate legal basis

13   for challenging the validity of the rule.

14   Plaintiffs' argument also fails because "it is suspect to attempt to cobble together a

15   holding [under *Marks v. United States*, 430 U.S. 188, 193 (1977)] from the concurrence

16   and the dissent."  *Wheeler*, 467 F. Supp. 3d at 874.  The argument should be further

17   rejected because "even if the *Rapanos* dissent and concurrence can be read together for

18   the proposition that the *Rapanos* plurality's articulation of the maximum permissible

19   reach of the statute is an improper construction, a holding that the Agencies *must* construe

20   the statute more broadly is a bridge too far." *Id.* (emphasis in original).

21   Finally, Plaintiffs' arguments are without merit because there is no suggestion or

22   holding from *Rapanos* that Agencies cannot consider the plurality decision.  For example,

23   in an opinion issued shortly after *Rapanos*, the Ninth Circuit adopted Justice Kennedy's

24   concurrence as controlling, reasoning that his concurrence reflected the narrowest ground

25   that could gain a majority in subsequent cases.  *N. Cal. River Watch v. City of*

26   *Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007).  In 2011, the Court backtracked,

27   noting, "[w]e did not, however . . . foreclose the argument that Clean Water Act

28

1    jurisdiction may also be established under the plurality's standard." *N. Cal. River Watch*

2    *v. Wilcox*, 633 F.3d 766, 769 (9th Cir. 2011).

3        More recently, the Ninth Circuit clarified that its prior statement that Justice

4    Kennedy's significant nexus test is controlling was limited to jurisdictional considerations

5    of wetlands. *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 748 (9th Cir. 2018).

6    Based on that clarification, the court used concepts from Justice Scalia's plurality opinion

7    to find that the County of Maui discharged pollutants (treated sewage) from a point source

8    (four underground injection wells) to a navigable water (the Pacific Ocean). *Id.* at 749.

9        The Supreme Court likewise looks to Justice Scalia's plurality when seeking

10   guidance from *Rapanos* on the scope and application of the CWA.  In *Cty. of Maui v.*

11   *Hawaii Wildlife Fund,* 140 S. Ct. 1462, 1475 (2020), the majority opinion cited

12   approvingly to Justice Scalia's plurality opinion with respect to the meaning of language

13   from the CWA regarding discharge of pollutant "from any point source."  Justice Scalia's

14   plurality opinion from *Rapanos* clearly is a key source from which to obtain guideposts on

15   the meaning of the CWA.

16           **4.    The Agencies in the NWPR addressed water quality and
                    potential water pollution of downstream waters consistent with
17                  the CWA and states' rights.**

18       Contrary to Plaintiffs' assertions (Plaintiffs Br. 17-18), the NWPR considered

19   impacts of the new definition on water quality of downstream waters and continued to

20   protect against water pollution at the source by clarifying that if even if a water feature

21   does not meet the definition of WOTUS, *it can still be regulated* under the CWA as a

22   point source if it contributes pollutants to downstream waters. *See, e.g.*, 85 Fed. Reg. at

23   22,288 ("an ephemeral feature may convey a discharge of pollutants from a point source

24   to a [WOTUS]"); *id.* at 22,297 ("Either [a ditch] is a [WOTUS] that subjects a discharger

25   to sections 402 and 404 permitting requirements for directed discharges into the ditch, or,

26   if it is non-jurisdictional but conveys pollutants to downstream jurisdictional waters, it

27   may be a point source that [is subject] to section 402 permitting requirements."); *id.* at

28   22,319 ("The Agencies believe that a CWA section 402 permittee currently discharging to

1    a jurisdictional water that becomes non-jurisdictional under this final rule would likely

2    remain subject to the requirements of the Act. . . .   The Agencies view ephemeral features,

3    such as arroyos or ditches, as potential conveyances of discharges of pollutants from point

4    sources subject to NPDES permitting requirements.").  In lieu of identifying marginal

5    water features as WOTUS (*e.g.*, dry washes and isolated wetlands), an action that is

6    clearly beyond the limits of the CWA and Supreme Court precedent, the Agencies in the

7    NWPR ensured protection of downstream water quality by clarifying that discharges into

8    such water features could still be subject to CWA jurisdiction as regulated point sources if

9    discharges from such features reached downstream waters.

10           The Agencies also evaluated water quality in the administrative record as part of its

11   *Resource and Programmatic Assessment for the [NWPR]: Definition of [WOTUS]* (Doc.

12   ID EPA-HQ-OW-2018-0149-11573) (Jan. 23, 2020), https://bit.ly/3dV429x.  In the

13   Programmatic Assessment the Agencies determined that "[r]egardless of the extent of

14   jurisdiction of the CWA, state and tribal water quality standards can provide coverage for

15   all types of waters" including non-WOTUS waters.  *Id.* at 60.  Consequently, the Agencies

16   concluded that the NWPR would not change the development or scope of water quality

17   standards under state or tribal laws.  *Id.*  The Agencies also considered other CWA

18   programs and potential impacts to water quality, including impaired waters identification

19   and development of Total Maximum Daily Loads, Section 402 and Section 404

20   permitting, and Section 401 certification.  *Id.* at 61-92.

21           The Agencies further addressed water quality and potential water pollution of

22   downstream waters in the NWPR by acknowledging that states and Tribes can regulate

23   more waters or regulate the same waters more stringently and that "State [and Tribal]

24   governments may be able to find more efficient ways of managing local resources than the

25   Federal government."  85 Fed. Reg. at 22,334; *see also id.* at 22,270; *RTC*, Attachment 11

26   at 16, 31, 33, 55, 60-61, 70 (Doc. ID EPA-HQ-OW-2018-0149-11574),

27   https://bit.ly/3hnsHG6 ("Under this rule, the agencies do not view the definition of

28   [WOTUS] as conclusively determining which of the nation's waters warrant

environmental protection and which do not; rather, the agencies interpret the definition as drawing the boundary between those waters subject to federal requirements under the CWA and those waters that States and Tribes are free to manage under their independent authorities.").  Thus, the Agencies did not ignore protection of water quality and envisioned the likelihood that states and Tribes would exercise their authority to fill any potential regulatory gaps consistent with the "environmental federalism" goals of the CWA.  NWPR, 85 Fed. Reg. at 22,334.  In fact, the State of Arizona has acted to fill any potential regulatory gaps with the NWPR.  In 2021, the Arizona Department of Environmental Quality obtained authority from the Arizona legislature to regulate and protect waters that are no longer covered by the NWPR in order to ensure protection of public health and the environment.  *See* H.R. 2651, 55th Leg., 1st Session (Az. 2021), https://bit.ly/3wtiIDw, https://bit.ly/3hIEihK.  Likewise, the Tohono O'Odham Nation has adopted a Water Quality Code that prohibits the "discharge [of] any pollutant into the waters of the Nation which causes an imminent and substantial endangerment to the health and welfare of persons or the natural environment."  Tohono O'Odham Nation, Water Quality Code, §§ 1, 5.B (2001), https://bit.ly/36sZ7IR.  The Code defines "waters of the Nation" as "all waters which originate in or flow in, into or through the lands of the Nation, or which are stored on the land of the Nation, whether found on the surface or underground."  *Id.* § 5.H.

Based on the above, the NWPR does *not* thwart the objective of the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" as suggested by Plaintiffs.  Plaintiffs Br. 21.  Rather, as noted above, the Agencies fully considered water quality and prevention of pollution at its source in adopting the NWPR, including ensuring that discharges from excluded features into downstream jurisdictional water would be regulated under the CWA, thereby protecting water quality consistent with the scope of federal jurisdiction under the CWA, while at the same time recognizing that States and Tribes can regulate more water features or the same waters

1  more aggressively consistent with the congressional policy under Section 101(b) of the

2  Act (33 U.S.C. § 1251(b)).

3          **5.**        **The NWPR properly relies on Section 101(b) of the CWA.**

4        Plaintiffs argue that the NWPR relies too heavily on the express congressional

5  policy in Section 101(b) of the CWA that states have the primary role in regulating water

6  and land resources.  Plaintiffs Br. 24-26.  They suggest that Section 101(b) merely assigns

7  to states the primary responsibility to implement the federal requirements of the CWA.

8  Plaintiffs Br. 25.  This suggestion is based on a misunderstanding and misreading of the

9  language of the statute, the statute's history, and Supreme Court guidance.  For example,

10 the CWA's permit requirements are limited to only certain categories of discharges to

11 "navigable waters."  Consequently, not only do states have the ability to implement the

12 federal CWA permitting programs in lieu of the Agencies, the CWA envisions that there

13 will be water and land features and discharges to such features that will *not* be regulated

14 under the CWA but that will be left to be regulated, as deemed necessary, by individual

15 states.

16       Further, as recognized by the *Rapanos* plurality, the "statement of policy" by

17 Congress "to recognize, preserve, and protect the primary responsibilities and rights of the

18 States to prevent, reduce, and eliminate pollution, [and] to plan the development and use .

19 . . of land and water resources . . ." was included in the CWA as enacted in 1972.

20 *Rapanos*, 547 U.S. at 737.  The CWA did *not* include language creating certain roles for

21 states in the CWA permitting programs until the 1977 amendments.  91 Stat. 1567, Pub.

22 L. No. 95-217 (1977).  Based on this statutory history, the *Rapanos* plurality concluded

23 that the statement of policy in the 1972 Act "plainly referred to something beyond the

24 subsequently added state administration program[s] . . ."  547 U.S. at 737; 85 Fed. Reg. at

25 22,270.

26       In *SWANCC*, the Supreme Court also clarified that allowing the Corps to claim

27 federal jurisdiction over isolated ponds would "raise significant constitutional and

28 federalism questions" "result[ing] in a significant impingement of the States' traditional

and primary power over land and water use.  531 U.S. at 174 (citation omitted).  The Court cited to Section 101(b) to support its holding and observed that "[r]ather than expressing a desire to readjust the federal-state balance in this manner, Congress chose to recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources."  *Id.* (quoting 33 U.S.C. § 1251(b)).

Ultimately, the Agencies reasonably concluded that proper recognition of the Tenth Amendment and the policy in Section 101(b) in accordance with the principles outlined in *SWANCC* supports excluding ephemeral features and isolated wetlands from CWA jurisdiction.  Consistent with the holding and rationale in SWANCC, the Agencies reasonably concluded that regulation of such dry-land or isolated features, if deemed necessary, should be left to states and Tribes.

In summary, the Tenth Amendment, the CWA text and history, and Supreme Court guidance clarify that the Agencies, in adopting the NWPR, properly relied on the "statement of policy" in Section 101(b) that states have primary authority of land and water resources.

### B.   The Agencies provided a reasonable and reasoned justification for the NWPR and the Repeal Rule based on science and public policy.

In promulgating the rules, the Agencies reasonably supported their belief that they can better carry out their functions—*i.e.*, that CWA permitting can more consistently, predictably, and efficiently be administered nationwide—if the enjoined and potentially unconstitutional 2015 Rule was repealed and a different WOTUS definition was enacted that provided greater clarity and predictability.  The Repeal Rule and the NWPR were the result of notice-and-comment rulemakings consistent with the APA requirements.  Therefore, the resulting regulation must be upheld so long as the Agencies express "good reasons for it, and that the agency *believes* it to be better."  *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

1    The preamble to the Repeal Rule documented the "reasoned explanation" for

2 repealing the 2015 Rule under the APA and relevant court guidance.  84 Fed. Reg. at

3 56,631-32.  It outlined the legal challenges to the 2015 rule that had occurred or were

4 occurring in federal circuit and district courts.  *Id.* at 56,628-30.  It included an extensive

5 discussion of applicable Supreme Court precedent and relevant principles and

6 considerations.  *Id.* at 56,635-39.  It contained over 20 pages detailing the multiple

7 reasons for repealing the 2015 Rule.  *Id.* at 56,639-59.  The reasons included: (1) the 2015

8 Rule misapplied and inappropriately expanded Justice Kennedy's significant nexus

9 standard (*id.* at 56,640-53); (2) the 2015 Rule did not adequately consider and accord due

10 weight to Section 101(b) of the CWA (*id.* at 56,653-55); and (3) the 2015 Rule raised

11 significant constitutional questions relating to the scope of CWA authority (*id.* at 56,655-

12 56).

13    Turning to the NWPR, the Agencies carefully analyzed relevant Supreme Court

14 decisions on the scope of CWA jurisdiction and explained how the NWPR complied with

15 these decisions in contrast to the legal deficiencies of past definitions.  *E.g.*, 85 Fed. Reg.

16 at 22,255-57, 22,263-72.  In particular, the Agencies outlined and analyzed the numerous

17 legal infirmities and constitutional overreaching of the 2015 Rule, including a discussion

18 of numerous district court opinions finding various fatal flaws with the 2015 Rule.  *E.g.*,

19 *id.* at 22,257-59, 22,271-72.  The Agencies included a well-reasoned and rational

20 explanation of the NWPR's exclusion of ephemeral streams and isolated wetlands.  *E.g.*,

21 *id.* at 22,280 (isolated wetlands), 22,287-88 (ephemeral exclusion), 22,291-92 (ephemeral

22 exclusion), 22,308-15 (isolated wetlands), 22,319 (ephemeral exclusion).  The Agencies

23 explained how the NWPR and its definition of WOTUS considered and incorporated

24 relevant science, including concepts from the *Connectivity Report*, within the legal limits

25 created by the CWA and applicable Supreme Court precedent.  *E.g.*, i*d.* at 22,261, 22,288,

26 & 22,314.  The Agencies included a comprehensive summary of the main elements of the

27 NWPR's definition of WOTUS that spanned over 50 pages.  *Id.* at 22,273-329.  The

28 extensive analyses contained in the preamble is further supplemented by over 500 pages

22

1  of responses to comments.  *The Navigable Waters Protection Rule – Public Comment*

2  *Summary Document* (Attachments 1 to 13) ("*RTC*") (Doc. ID EPA-HQ-OW-2018-0149-

3  11574), https://bit.ly/3hnsHG6.  The Agencies clearly complied with their obligations

4  under the APA.

5        Not only are the Repeal Rule and the NWPR consistent with the CWA, APA, and

6  applicable court precedent, the NWPR's definition of WOTUS was well-reasoned, well-

7  supported, and should be upheld.

8              **1.    The Agencies fully acknowledged and addressed the scientific**
               **record, including opinions from the SAB, in the Repeal Rule and**
9              **NWPR.**

10       With regard to the NWPR's definition of "tributary" and exclusion of ephemeral

11  features and isolated wetlands, Plaintiffs' principal arguments relate not to the merits, but

12  rather to questions of administrative process and explanation.  According to Plaintiffs, the

13  "primary" defect in the Repeal Rule and NWPR was the Agencies' purported "failure . . .

14  to acknowledge and address" what they characterize as "voluminous science

15  demonstrating that ephemeral and intermittent waters and isolated wetlands are critical to

16  the chemical, physical, and biological integrity of traditional navigable waters."

17  Plaintiffs' Br. 27 (focusing on *Connectivity Report* supporting 2015 Rule).  But Plaintiffs'

18  contention that the "Agencies failed" to "acknowledge" or "consider" the scientific record

19  (*id.* at 29) is mistaken, and readily disproven by the record.  The Agencies did not ignore

20  the science.  On the contrary, they considered the available scientific record (together with

21  other information from the administrative record) and, exercising their discretion under

22  the CWA, drew jurisdictional lines that balance policy, scientific, legal, and

23  administrability considerations.  The mere fact that Plaintiffs would have preferred that

24  the Agencies draw jurisdictional lines differently does not mean that the process (or end

25  result) here was unlawful, arbitrary, or capricious.

26       Plaintiffs' lack-of-explanation arguments fail at the outset because the Agencies

27  *did* engage at length with the scientific record.  Contrary to Plaintiffs' suggestion that the

28  Agencies did not address "the scientific evidence" or "fail[ed] to consider the opinions of

their own experts at the [Science Advisory Board (SAB)]" (Plaintiffs' Br. 29), the Agencies in fact "engaged with the [SAB] during the development of the rule on several occasions." NWPR, 85 Fed. Reg. at 22,261. Indeed, the Agencies expressly considered the SAB's "draft commentary" on the proposed rule and ultimately issued a "Memorandum to the Record" confirming that the Agencies had both "fully participated with the SAB at their request" and had "address[ed] the relevant comments raised in the SAB's draft document." EPA, Memorandum to the Record from John Goodwin at 1 (Doc. ID EPA-HQ-OW-2018-0149-11589) (Jan. 22, 2020), https://bit.ly/2TCqD3P. The Agencies took account of the scientific record when "defin[ing] the flow classifications (perennial, intermittent, ephemeral) used throughout the regulation," including by crediting the "hydrological definition[s]" of those terms and their "specific meaning in the scientific community." NWPR, 85 Fed. Reg. at 22,274, 22,288. "The Agencies [again] relied on scientific principles" to "inform several other aspects of this final rule, including, for example, . . . the incorporation of inundation and flooding to create surface water connections" and "the use of the typical year concept that relies upon a large body of precipitation and other climatic data to inform what may be within a normal range for a particular geographic region." *Id*. at 22,228. Moreover, the Agencies clearly stated that they were using the *Connectivity Report* "to inform certain aspects of the revised definition of '[WOTUS],' such as recognizing the 'connectivity gradient' and potential consequences between perennial, intermittent, and ephemeral streams and downstream waters within a tributary system." *Id.*; *accord id.* (relying on the "connectivity gradient" to demonstrate "decreased 'probability that changes . . . will be transmitted to downstream waters at flow regimes less than perennial or intermittent'" (quoting SAB commentary)).

This clear evidence that the Agencies *did* consider and address both the SAB's "draft commentary" and the *Connectivity Report* is fatal to Plaintiffs' contention that the Agencies "failed" to acknowledge or address those materials in violation of the APA. Plaintiffs fare no better in recasting their arguments as matters of degree, insofar as they complain that the Agencies considered those documents only "briefly" or failed fully to

incorporate them into the Repeal Rule and the NWPR.  *See* Plaintiffs Br. 29.  When SAB presented the same criticism that the NWPR did not "fully incorporate the *Connectivity Report*," the Agencies reasonably responded by noting that, while they had relied on the *Connectivity Report* for certain concepts, they had appropriately "recognize[d] that science cannot dictate where to draw the line between Federal and State waters."  NWPR, 85 Fed. Reg. at 22,261; *see id.* at 22,271 (explaining that, "[w]hile science informs [the Agencies'] interpretation of the definition of [WOTUS], science cannot dictate where to draw the line between Federal and State or tribal waters, as those are *legal* distinctions that have been established within the overall framework and construct of the CWA" (emphasis added)).  Indeed, on this critical point for Plaintiffs' argument, the Agencies relied on the same conclusion they had reached in finalizing the 2015 Rule:  *i.e.*, that science alone cannot define the jurisdictional boundaries of WOTUS.  2015 Rule, 80 Fed. Reg. at 37,060 ("science does not provide bright line boundaries with respect to where 'water ends' for purposes of the CWA" and "the Agencies' interpretation of the CWA is informed by the [Connectivity] Report and the review and comments of the SAB, but not dictated by them").  *But contra* Plaintiffs Br. 28 (suggesting that *Connectivity Report* dictates what features "should be categorically considered jurisdictional").

Similarly, the Agencies fully considered and addressed the *Connectivity Report* in the Repeal Rule but again clarified that "[t]he conclusions in this report, while informative, cannot be dispositive in interpreting the statutory reach of [WOTUS]." Repeal Rule, 84 Fed. Reg. at 56,652.  Rather, "[t]he definition of [WOTUS] must be grounded in a legal analysis of the limits on CWA jurisdiction that Congress intended by use of the term 'navigable waters,' and a faithful understanding and application of the limits expressed in Supreme Court opinions interpreting that term." *Id.*  Using these principles, and the recognition in the *Connectivity Report* (at 1-4) that the degree of connectivity among water features "varies along a continuum from highly connected to highly isolated", the Agencies concluded in the Repeal Rule that the 2015 Rule resulted in a "tributary" definition that included certain "remote and insubstantial" channels "that

1   eventually may flow into TNWs" as well as a broad "adjacent" waters definition that

2   included all "wetlands [and waters that] lie alongside" such channels in direct tension with

3   Justice Kennedy's opinion in *Rapanos*.  84 Fed. Reg. at 56,652-53 (quoting *Rapanos*, 547

4   U.S. at 778 (Kennedy, J., concurring)).

**2.**     **The Agencies properly balanced scientific, policy, and legal considerations in promulgating the Repeal Rule and NWPR.**

7        Contrary to Plaintiffs' assertions, there is no requirement that the Agencies

8   consider *only* science.  Indeed, it would be unlawful for the Agencies to do so in disregard

9   of statutory language, structure, and precedent.  *Rapanos*, 547 U.S. at 778 (Kennedy,

10  J.,concurring) ("It is true, as the plurality indicates, that environmental concerns provide

11  no reason to disregard limits in the statutory text . . ."); 85 Fed. Reg. at 22,271 ("The

12  Agencies are precluded from exceeding their authority under the CWA to achieve specific

13  scientific, policy, or other outcomes.").  Even the authors of the *Connectivity Report*

14  correctly noted that because the report is a technical review of available connectivity

15  information, the report should *not* be used to draw lines or address the legal question of

16  what should be jurisdictional under the statute.  EPA, *Connectivity Report* at ER-1, 1-1,

17  and 1-14.  Nevertheless, the Plaintiffs claim that the NWPR is arbitrary and capricious

18  because the Agencies did not follow every aspect of the *Connectivity Report* and allege

19  that the Agencies did not address scientific concerns.  Plaintiffs Br. 26-32.

20       Although Plaintiffs laud the *Connectivity Report* as being comprehensive

21  (Plaintiffs Br. 27), the conclusions in the report that all surface features have hydrological

22  connectivity, no matter how distant, are not particularly relevant to interpreting the

23  jurisdictional limits imposed by the CWA.  Congress understood hydrologic connectivity

24  when it promulgated the CWA, but declined to extend federal jurisdiction under the CWA

25  to the outermost limits of hydrological connectivity, no matter how tenuous.  The

26  *Connectivity Report*'s conclusions regarding the potential connectivity of water features

27  also are directly at odds with Supreme Court guidance in *Rapanos*, in particular Justice

28  Kennedy's limiting guidance that "mere hydrologic connection should not suffice in all

26

cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." 547 U.S. at 784 (Kennedy, J., concurring).

In differentiating between jurisdictional and non-jurisdictional waters, the Agencies began the Repeal Rule and NWPR rulemaking processes from the same core premise that served as the backdrop for the prior rulemaking efforts: that "connectivity" exists on a gradient, and thus the mere existence of scientific evidence of some form or degree of connectivity between physical features in aquatic systems cannot—without more—serve as the dividing line between state and federal jurisdiction. *See* NWPR, 85 Fed. Reg. at 22,271 (citing "gradient" conclusion from EPA, Letter to Gina McCarthy, *SAB Review of the Draft EPA Report Connectivity of Streams and Wetlands to Downstream Waters:  A Review and Synthesis of the Scientific Evidence* at 3 (Oct. 17, 2014)).  Put differently, the Agencies concluded that simply asserting that all water systems are connected to each other in some fashion—the crux of Plaintiffs' argument here—is not determinative in delineating federal jurisdiction under the CWA. *Cf. Cty. of Maui*, 140 S. Ct. at 1470 ("Virtually all water, polluted or not, eventually makes its way to navigable water.").  The Agencies instead recognized that the scope of federal jurisdiction under the Act is a complex issue that required the Agencies to "balance[] science, policy, and the law when crafting the proposed rule."  NWPR, 85 Fed. Reg. at 22,228.  Even the 2015 Rule preferred by Plaintiffs acknowledged that "[t]he science demonstrates that waters fall along a gradient of chemical, physical, and biological connection to traditional navigable waters" and that the Agencies must therefore decide "where along that gradient to draw lines of jurisdiction under the CWA" by "rely[ing], *not only on the science*," but also their technical expertise, policy discretion, and legal analysis.  2015 Rule, 80 Fed. Reg. at 37,057 (emphasis added).

While science does not dictate CWA jurisdiction, the Agencies' approach in the NWPR nevertheless aligns with the scientific principles detailed in the *Connectivity Report*, which explains that hydrologic connectivity occurs along a gradient and that some

27

1  waters have more impact on downstream waters than others as noted by Justice

2  Kennedy's opinion in *Rapanos*.  Using these scientific principles from the *Connectivity*

3  *Report*, the Agencies properly documented and concluded that some waters (*e.g.*,

4  perennial and intermittent streams) have a stronger influence on downstream waters than

5  others (*e.g.*, isolated wetlands and ephemeral drainages).  *See, e.g.,* NWPR, 85 Fed. Reg.

6  at 22,271, 22,288.  Significantly, the Agencies recognized that the *Connectivity Report*

7  can only be used to inform—rather than disregard—the CWA's jurisdictional limits.

8      The science does not and cannot tell us that the mere fact that a water might have

9  *some* influence on downstream waters is a sufficient basis to assert federal jurisdiction

10  under the CWA.  That is a legal and policy question to be determined "within the overall

11  framework and construct" of the CWA.  *Id.* at 22,261, 22,271, 22,288, 22,308, 22,314.

12  The Agencies have appropriately construed the CWA to avoid raising significant

13  constitutional questions by defining WOTUS in the NWPR in a way that excludes

14  ephemeral and isolated features, unless they contribute pollutants to downstream waters.

15  Contrary to Plaintiffs' assertions, the science establishes that ephemeral features and

16  isolated wetlands have limited chemical, physical, and biological effects on downgradient

17  waters.  *See, e.g.*, *id.* at 22,288 (discussing connectivity gradient concept and explaining

18  the decreased possibility that ephemeral drainages will impact downstream waters when

19  compared to perennial and intermittent streams); *id.* at 22,314 (explaining how

20  connections become less obvious as the distance between wetlands and flowing waters

21  increases).  And, as noted above, the NWPR is consistent with various case-by-case

22  analyses in Arizona, where the science has proven that ephemeral waters are not subject to

23  CWA jurisdiction.[3]

24      In short, in promulgating the Repeal Rule and NWPR, the Agencies acknowledged

25  the key bodies of evidence in the administrative record, and carefully identified and

26  explained the basis for their factual, legal, and policy judgments.  Plaintiffs plainly would

27  have preferred that the Agencies weigh the various scientific, policy, and legal

28

---

[3] *See* Section II.D, *supra*.

1    considerations differently and adopt different jurisdictional dividing lines in certain

2    respects.  But they have not shown that the Agencies' explanation fell short of the

3    minimum requirements in the APA, particularly given the deference to which Agencies

4    are entitled in reconciling and weighing the various factors involved in establishing

5    boundaries of WOTUS.  A court conducting arbitrary-or-capricious review "is not

6    empowered to substitute its judgment for that of the agency" and is instead limited to

7    "consider[ing] whether the decision was based on a consideration of the relevant factors

8    and whether there has been a clear error of judgment."  *Citizens to Preserve Overton*

9    *Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Transp. Div. of the Int'l Ass'n of Sheet*

10   *Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1178 (9th Cir.

11   2021) (standard of review under APA is "narrow"; reviewing court "is not to substitute its

12   judgment for that of the agency" (internal quotation marks omitted)).  Here, the Agencies

13   considered all "relevant factors," including scientific evidence in the administrative

14   record, and reasonably explained the jurisdictional lines drawn, including the definition of

15   "tributaries" and the treatment of ephemeral features and isolated wetlands.

16              **3.      Plaintiffs' tributary arguments conflict with the Act, Supreme**
                          **Court precedent, and the scientific and administrative record.**
17

18              Although Plaintiffs' arguments focus largely on purported deficiencies in

19   explanation, they also contend briefly that it was arbitrary and capricious for the Agencies

20   not to assert federal jurisdiction over all "tributaries" (as defined in the 2015 Rule),

21   including apparently all ephemeral features in the arid West.  Plaintiffs Br. 22-23.  In

22   particular, Plaintiffs make the sweeping assertion that—apparently as a matter of law—

23   "all tributaries . . . must be protected as waters of the [United States]."  Plaintiffs Br. 21.

24   Although they do not (and cannot) cite statutory text constraining the Agencies' discretion

25   in this regard, Plaintiffs argue that ephemeral features have a strong influence on the

26   integrity of downstream waters and are chemically and biologically integrated with

27   navigable-in-fact waters (*i.e.,* TNWs).  *See* Plaintiffs Br. 21-23.  In effect, Plaintiffs argue

28   that "the science" *requires* the agency to assert federal jurisdiction over large swaths of

                                              29

1    the arid West because, in their view, *all* ephemeral features in which water may

2    occasionally flow are "critically important" to the Nation's waters.  *Id.* at 22, 28-29.

3         This Court has numerous pathways by which to reject Plaintiffs' maximalist

4    argument, without needing to take sides in any battle of experts, never mind attempting to

5    draw jurisdictional lines in the first instance (as Plaintiffs effectively invite the Court to

6    do).  To begin, Plaintiffs' argument suffers from the same fundamental defect as its other

7    science-based contentions: as the Agencies have long recognized, the definition of

8    WOTUS must be grounded in a legal analysis of limits on statutory jurisdiction and other

9    policy, administrability, and related concerns; "science cannot dictate where to draw the

10   line between Federal and State waters."  NWPR, 85 Fed. Reg. at 22,261.  Accordingly, the

11   Agencies considered, in addition to the scientific record, statutory limits on their authority

12   (including the statutory text and structure), *id.* at 22,283-89; the Act's reference to

13   "navigable" waters and respect for the role of states, *id.* at 22,270; EPA, *RTC*, Attachment

14   1 at 64-68, 114-15 (Doc. ID EPA-HQ-OW-2018-0149-11574), https://bit.ly/3hnsHG6;

15   and longstanding concerns about a lack of "clarity and predictability for regulators and the

16   regulated community," NWPR, 85 Fed. Reg. at 22,264-65.

17        Applying this framework, the Agencies concluded with respect to ephemeral

18   features that "a mere hydrologic connection cannot provide the basis for CWA

19   jurisdiction" because "the bodies of water must be . . . 'relatively permanent' (*i.e.*,

20   perennial or intermittent)" and must "contribute surface water flow to a traditional

21   navigable water . . . in a typical year" to be jurisdictional.  *Id.* at 22,289 (quoting *Rapanos*,

22   547 U.S. at 732).  The Agencies viewed this dividing line as "the most faithful way of

23   interpreting . . . CWA authority over a water."  85 Fed. Reg. at 22,271.  The Agencies'

24   explanation is thorough, well-reasoned, and amply supported by the record.  It provides a

25   sufficient basis for the Court to reject Plaintiffs' maximalist position that the science

26   compels their preferred policy outcomes.

27        In any event, even putting aside its other legal flaws, Plaintiffs' cursory argument

28   that "the science" compels the Agencies to assert jurisdiction over all ephemeral features

1    is contravened by the administrative and scientific record.  Notwithstanding Plaintiffs'

2    cherry-picked citations to a few examples from the *Connectivity Report*, the record in fact

3    contains substantial evidence undercutting Plaintiffs' characterizations of tributaries and

4    ephemeral features in the arid Southwest.  Contrary to Plaintiffs' sweeping and categorical

5    assertions, the record shows that ephemeral features in truly arid ecosystems (including

6    portions of the American Southwest) are a unique hydrological environment, and cannot

7    be equated with more water-rich systems (including the few un-representative examples in

8    Plaintiffs' brief, such as the Rio Grande and San Pedro Rivers).  *See, e.g.*, Comments of

9    Arizona Mining Ass'n at 5-6 (Doc. ID EPA-HQ-OW-2018-0149-4811) (Apr. 15, 2019),

10   http://bit.ly/3alZ1pE; Comments of Arizona Farm Bureau at 15 (Doc. ID EPA-HQ-OW-

11   2018-0149-4756) (Apr. 15, 2019), https://bit.ly/2UGyT32.

12          Business-Intervenors do not cite this record material to suggest that this Court

13   could or should attempt to weigh or balance scientific evidence in the first instance.  Far

14   from it.  Wading into those kinds of disputes would exceed this Court's role under the

15   APA.[4]  It suffices to observe that the existence of this substantial evidence in the

16   administrative record—ignored by Plaintiffs—readily disproves Plaintiffs' maximalist

17   suggestion that "the science" compelled the Agencies to draw an extreme jurisdictional

18   line.

19                    **4.      The Agencies acknowledged and fully explained their change in
                              position and provided a reasoned explanation for the change.**

20

21          Plaintiffs separately argue that the Agencies failed to acknowledge or explain a

22   change of position with respect to ephemeral features and isolated wetlands.  *See* Plaintiffs

23   Br. 32-34 (discussing *Fox Television Stations*, 556 U.S. 502 (2009)).  Again, that

---

24   [4] An agency's "discretion to issue regulations is," of course, "left in the first instance to the

25   [agency], not the federal courts."  *Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 159
     (D.C. Cir. 2007); *accord Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring); *Johnson v.*

26   *Shalala*, 2 F.3d 918, 922 (9th Cir. 1993) (noting the importance of allowing the agency to "apply
     [its] expertise in administering its own regulations" in the first instance); *Brown-Hunter v. Colvin*,

27   806 F.3d 487, 492 (9th Cir. 2015) (reviewing court must be "[e]ver mindful of [its] duty not to

28   substitute [its] own discretion for that of the agency"); *Andrade v. Lauer*, 729 F.2d 1475, 1484
     (D.C. Cir. 1984).

1   contention is contradicted by the record.  The Agencies expressly acknowledged that the

2   Repeal Rule and NWPR reflected a different position than the one adopted in the 2015

3   Rule.  *See, e.g.*, NWPR, 85 Fed. Reg. at 22,257-59 (discussing 2015 Rule at length); *id.* at

4   22,260 (discussing the "four primary reasons" why the 2015 Rule was repealed, including

5   its failure to acknowledge "the legal limits on the scope of the [Agencies'] authority,"

6   adverse judicial decisions, and its various "procedural errors").  The Agencies also

7   explicitly acknowledged that they were changing their position on the question of whether

8   "ephemeral" streams were jurisdictional (*see* NWPR, 85 Fed. Reg. at 22,257 n.13, 22,270,

9   22,278 (noting that, while the "2015 Rule did not delineate jurisdiction specifically based

10  on categories" such as "ephemeral," the Agencies were now determining that "ephemeral

11  features . . . are not jurisdictional" because this "categorical[]" exclusion would "provide[]

12  clarifying value for members of the regulated community" and was the best reading of the

13  Clean Water Act)).

14          In contending otherwise, Plaintiffs suggest that the Repeal Rule and NWPR were

15  "in direct conflict" with the *Connectivity Report* or otherwise demonstrated a "'disregard'

16  for the Agencies' prior factual findings."  Plaintiffs Br. 33.  This argument fails for the

17  same reason explained above—*i.e.*, that science alone "cannot dictate where to draw the

18  line between Federal and State or tribal waters," and thus it is unavailing to characterize

19  the jurisdictional lines drawn in prior rulemaking efforts as "factual findings" in the

20  legally relevant sense.  85 Fed. Reg. at 22,271.  Rather, the Agencies must instead draw

21  jurisdictional lines by reference to certain legal and policy judgments.  *Id.*  Even the SAB

22  "recognized that [t]he [*Connectivity Report*] is a science, *not policy*, document."  *Id.* at

23  22,288 (emphasis added).  As explained above, the Agencies considered the *Connectivity*

24  *Report* and other scientific evidence before reaching a different *policy* judgment in the

25  Repeal Rule and NWPR.  As noted above, *Fox Television Stations* requires only that the

26  agency acknowledge and explain a change of position, and "show that there are good

27  reasons for the new policy"; it does not require any demonstration that "the reasons for the

28

32

new policy are *better* than the reasons for the old one."  556 U.S. at 515.  Here the Agencies amply discharged that obligation.

Further, under the reasoned explanation test, "an agency may justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).  Both the Repeal Rule (84 Fed. Reg. at 56,639-59) and the NWPR (85 Fed. Reg. at 22,255-59, 22,263-72) carefully documented why the conclusions in the *Connectivity Report* and the resulting definition of WOTUS in the 2015 Rule were impermissibly broad and conflicted with the text and structure of the CWA and with Supreme Court guidance.  This is not just a "good reason" for the repeal of the 2015 Rule and the adoption of the NWPR, adherence to applicable law and precedent mandated the change in position.

Plaintiffs' citation to *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) is *not* relevant or applicable.  Plaintiffs Br. 33-34.  In contrast to the situation in *Organized Village of Kake*, which focused on two different agency records of decision ("RODs") relating to management of the Tongass National Forest, here we have competing regulatory definitions of WOTUS under the CWA that implicate constitutional issues and prior Supreme Court precedent.  In this matter, contrary to the Department's actions in *Organized Village of Kake*, the Agencies did not disregard prior factual findings or fail to provide a reasoned explanation for its change in policy.  Rather, the Agencies acknowledged their prior findings and then more appropriately applied those findings within the correct framework of the CWA and applicable Supreme Court precedent.  The Agencies also meticulously explained the reasons why it changed its application of the prior findings to ensure conformance with limits on federal jurisdiction reflected in the statutory text and Supreme Court decisions.  And, unlike the situation in *Organized Village of Kake* where the subsequent ROD or agency action was based on "precisely the same record" (795 F.3d at 967), here the Agencies developed a new record and also considered new evidence and information submitted during the public comment period

that supported excluding ephemeral drainages and isolated wetlands and maintaining the longstanding exclusion for waste treatment systems.

### 5. The Agencies consistently addressed ephemeral features in the NWPR.

Plaintiffs identify several "[s]pecific examples" from the NWPR which, in their view, show that the Agencies' treatment of ephemeral features was purportedly "internally inconsistent." Plaintiffs Br. 34. Far from demonstrating "arbitrary" agency action, these examples underscore that the Agencies responded reasonably to longstanding concerns about severe difficulty in "implement[ing]" prior rules, and drew reasonable, science-based, and administrable lines delineating federal and state jurisdiction. NWPR, 85 Fed. Reg. at 22,290. For example, Plaintiffs complain that it was "internally inconsistent" for the Agencies to conclude that "an arid-region stream that 'flows only in direct response to rainfall' will not be jurisdictional even if it flows in a 'relatively continuous' manner," while at the same time the Agencies asserted federal jurisdiction over perennial and intermittent streams with continuous flow. Plaintiffs Br. 34-35. But Plaintiffs misread the NWPR. What the Agencies actually said is that a feature could qualify as "ephemeral" notwithstanding "relatively continuous" flows, so long as those flows are "a result of multiple, individual storms during the monsoon season." NWPR, 85 Fed. Reg. at 22,276 (emphasis added). That is simply an elaboration and clarification of the Agencies' differentiating line between "ephemeral" and "intermittent" streams, based on whether flows exist absent precipitation. There is nothing "arbitrary" about this approach; on the contrary, the Agencies explained that they "relied on scientific principles" in determining how to "define the flow classifications (perennial, intermittent, ephemeral) used throughout the regulation." *Id.* at 22,288.

Plaintiffs also find it "confus[ing]" that the NWPR states that, "if the arid stream sinks into the ground through the bottom or sides of the stream bed, then it *might* be protected if it is recharging groundwater." Plaintiffs Br. 35 (emphasis in original). But the Rule explains that, "when monsoon floodwaters locally recharge the riparian aquifer

1  through bank infiltration and supply sustained baseflow to streams in the arid West when

2  it is not raining or has not recently rained, such streams meet the rule's definition of

3  'intermittent' if they flow seasonally."  NWPR, 85 Fed. Reg. at 22,276 (emphasis added).

4  Phrased differently, an arid stream that recharges groundwater will be classified as

5  "intermittent" if it supplies sustained flow in a manner that is not dependent on

6  precipitation; if the flows are dependent on precipitation, then the stream is instead

7  "ephemeral."  The Agencies reasonably drew an administrable line, based on science and

8  prior case law, between "intermittent" and "ephemeral" features.  *See id.* at 22,271-74.

9  Plaintiffs have identified nothing arbitrary about that choice.

10       Plaintiffs also claim it is a contradiction that "subterranean rivers" are protected as

11  jurisdictional when, in contrast, water from dry desert drainages that migrates

12  underground is not.  Plaintiffs Br. 36.  Plaintiffs' argument is based on a misunderstanding

13  of basic hydrogeologic principles.  Subterranean rivers, as explained by the Agencies, are

14  rivers that flow at least for some portion of their length in underground channels that

15  "occur as a result of unique geologic formations, such as sink holes and lava tubes" and

16  then later resurface.  85 Fed. Reg. at 22,279.  In contrast, water in dry desert drainages

17  that infiltrates into the soil becomes groundwater, which is water held underground in

18  rock and soil pore spaces.  In fact, this distinction is consistent with Arizona's Water

19  Code, which defines groundwater as "water under the surface of the earth" but clarifies

20  that the term does *not* include "water flowing in underground streams with ascertainable

21  beds and banks."  A.R.S. § 45-101(5).  There is nothing contradictory with treating

22  subterranean rivers different from groundwater.

         **6.**     **Plaintiffs' challenges to the Repeal Rule and NWPR boil down to policy disagreements.**

25       The majority of Plaintiffs' challenge to the NWPR and Repeal Rule stems from

26  policy dissatisfactions with the new rule and their preference for the unlawfully broad

27  approach in the 2015 Rule.  While it is clear that the NWPR is different from the pre-2015

28  regulatory approach reinstated by the Repeal Rule and the broad approach attempted to be

promulgated under the 2015 Rule, to change a policy, an agency must merely provide "a satisfactory explanation for its action." *Fox Television Stations*, 556 U.S. at 513. The Agencies have satisfied this test and the NWPR should be upheld.

A federal district court in California recently evaluated "policy dissatisfactions" with the NWPR that mirror those being claimed by Plaintiffs. *Wheeler*, 467 F. Supp. 3d at 864. In the process of denying a motion for a preliminary injunction against the NWPR, the court observed that "[i]n the absence of precedent construing what *must* be included as [WOTUS], plaintiffs are left with little more than policy arguments that the narrowness of the NWPR serves poorly to carry out the objectives of the CWA", and, "[a]s compelling as those arguments may be, they do not provide a sufficient basis for a court to substitute its judgement for the policy choices of the Agency." *Id.* at 874 (emphasis in original).

In rejecting the movants' claim that the NWPR is arbitrary and capricious because the Agencies did not adequately justify their changes in policy and discounted scientific evidence used to support the 2015 Rule, the court noted that the requirement under the APA "is only that Agencies must *explain* the basis for their change, and defendants have adequately done so here." *Id.* (emphasis in original). The court further noted that

> Plaintiffs' arguments that the Agencies disregarded the scientific evidence they previously had gathered is ultimately a policy disagreement as well. The Agencies have articulated reasons they contend the science does not compel a different result, but the real difference in opinion is whether the statute clearly compels the Agencies to extend federal regulation to the broadest permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for water quality the science suggests might be achievable. Because the Agencies may reasonably conclude they have no such statutory duty, discounting evidence of possible benefits is not plainly arbitrary or capricious.

*Id.* at 875-76 (emphasis in original).

Plaintiffs' policy disagreements with the Repeal Rule and the NWPR suffer from the same deficiencies and all should be summarily rejected. Moreover, none of Plaintiffs' disagreements (and related arguments) represent any type of arbitrary or capricious action on part of the Agencies.

1

### C.    Plaintiffs' environmental justice claims are meritless and nonjusticiable.

2

3      Executive Order 12,898 requires federal agencies to "identify[] and address[], as

4    appropriate, disproportionately high and adverse human health or environmental effects of

5    its programs, policies, and activities on minority populations and low-income

6    populations."  Exec. Order No. 12,898 § 1-101, 59 Fed. Reg. 7,629 (Feb. 16, 1994).

7    Executive Order 12,898 also provides that the order "shall not be construed to create any

8    right to judicial review involving the compliance or noncompliance of the United States,

9    its agencies, its officers, or any other person with this order."  *Id.* § 6-609, 59 Fed. Reg. at

10   7,633.

11     Although Plaintiffs allege that the Repeal Rule and NWPR fail to address

12   environmental justice (Plaintiffs Br. 39), the rulemaking record suggests otherwise.  The

13   record documents that the Agencies conducted a separate environmental justice analysis

14   under both the Repeal Rule and NWPR and reasonably concluded that neither rule would

15   have any disproportionately adverse effects on minority or low-income populations.  *See,*

16   *e.g.*, 84 Fed. Reg. at 56,666 (documenting Agencies' environmental justice analysis and

17   finding that because the Repeal Rule would simply recodify the pre-2015 regulations and

18   thereby "maintain the longstanding regulatory framework that was in place nationwide for

19   many years prior to the promulgation of the 2015 Rule", the rule would not have any

20   disproportionately adverse effects on minority or low-income populations or indigenous

21   peoples); EPA, *RTC*, Attachment 13 at 30-31 (Doc. ID EPA-HQ-OW-2018-0149-11574),

22   https://bit.ly/3hnsHG6 (documenting Agencies' environmental justice analysis and finding

23   that because the NWPR is a definitional rule (*i.e.,* the final rule does not itself establish

24   any specific regulatory requirements) the rule would not have any disproportionately

25   adverse effects on minority or low-income populations or indigenous peoples (this was the

26   same conclusion reached under the 2015 Rule)).

27     While it is clear in the record that the Agencies fully satisfied the environmental

28   justice review requirements under Executive Order 12,898, the Ninth Circuit has held that

37

1    the order does *not* create a right to judicial review for alleged noncompliance.  *Morongo*

2    *Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998); *accord Protect Our*

3    *Communities Found. v. Salazar*, No. 12CV2211-GPC PCL, 2013 WL 5947137, at *15

4    (S.D. Cal. Nov. 6, 2013), *aff'd sub nom.*, *Backcountry Against Dumps v. Jewell*, 674 F.

5    App'x 657 (6th Cir. 2017) ("It does not appear the Ninth Circuit allows a cause of action

6    under Executive Order 12898 even if brought under the APA.").  Ultimately, there is no

7    legal basis or cause of action related to Plaintiffs' environmental justice allegations and

8    they should be rejected.

9           **D.    The waste treatment system exclusion is lawful and serves important**
             **policy purposes.**
10

11          The NWPR continues the Agencies' exclusion for waste treatment systems

12   ("WTS") that has "been expressly included in regulatory text for decades."  85 Fed. Reg.

13   22,317.  This exclusion has been a key part of the Agencies' regulatory definition of

14   WOTUS since at least the early 1980s, including in the 2015 Rule.  Over the decades the

15   Agencies have provided explanations for the WTS exclusion and how it advances the

16   purposes of the CWA.  *See, e.g.*, 63 Fed. Reg. 51,164, 51,183 (Sept. 24, 1998) (explaining

17   suspension of language limiting WTS exclusion to manmade systems); 2015 Rule, 80 Fed.

18   Reg. at 37,097.

19          The Ninth Circuit recognized the WTS exclusion in *N. Cal. River Watch v. City of*

20   *Healdsburg*, 496 F.3d 993 (9th Cir. 2007) and explained that "[t]he [WTS] exemption was

21   intended to exempt either water systems that do not discharge into [WOTUS] or waters

22   that are incorporated in an NPDES permit as part of a treatment system."  *Id.* at 1001

23   (citations omitted).  The Court also noted that "[t]he exception was meant to avoid

24   requiring dischargers to meet effluent discharge standards for discharges *into* their own

25   closed system treatment ponds" but that CWA regulations would still apply to "discharges

26   *from* treatment ponds."  *Id.* at 1002 (citations omitted, emphasis in original); *see also Ohio*

27   *Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 556 F.3d 177, 209-16 (4th Cir. 2009)

28

1   (upholding the Agencies' authority to determine that WTS do not need to be regulated as

2   WOTUS).

3         Consistent with the explanation of the scope and intent of the WTS exclusion from

4   the Ninth Circuit, the WTS exclusion is critical to the ongoing operation of many

5   regulated entities and advances the purposes of the CWA, because these treatment

6   systems function to protect water quality adjacent to and downstream of industry

7   operations.  *See, e.g.*, Comments of the Home Builders Association of Central Arizona at

8   15-16 (Doc. ID EPA-HQ-OW-2018-0149-6833), (Apr. 15, 2019), https://bit.ly3r7ibWI;

9   Comments of Waters Advocacy Coalition at 28 (Doc. ID EPA-HQ-OW-2018-0149-

10   6849), (Apr. 15, 2019), https://bit.ly/3efHvEO.  It does not make sense to apply water

11   quality standards to a water feature that is used to treat wastewater under a permit issued

12   under the CWA.   *See, e.g.*, Comments of the National Stone, Sand & Gravel Ass'n at 8

13   (Doc. ID EPA-HQ-OW-2018-0149-4541), (Apr. 15, 2019), https://bit.ly/3egHWi1.

14   Furthermore, water quality remains protected as Section 404 permitting will be triggered

15   if such systems are originally constructed in jurisdictional waters, and, if such systems

16   discharge to downstream jurisdictional waters they will be subject to permitting under

17   Section 402 of the CWA and the associated requirements to ensure compliance with

18   applicable surface water quality standards in such downstream waters.

19         The NWPR continued the longstanding WTS exclusion with only minimal

20   clarifying changes to the exclusion.  85 Fed. Reg. at 22,324-25.  The Agencies clarified

21   that the exclusion will "apply only to [WTS] constructed in accordance with the

22   requirements of the CWA and to all [WTS] constructed prior to the 1972 CWA

23   amendments."  *Id.* at 22,235.  The Agencies also included a definition of WTS in the

24   NWPR to "clarify which waters and features are considered part of a waste treatment

25   system and therefore excluded."  *Id.* at 22,324; *see also* 45 Fed. Reg. 33,298 (May 19,

26   1980) ("The scope of [WTS] exemption is not limited to treatment ponds or lagoons.").

27

28

1

2

**1.      The WTS exclusion is a permissible and reasonable interpretation of the CWA.**

3      Plaintiffs argue that the WTS exclusion is not a permissible interpretation of the

4   CWA.  Plaintiffs Br. 42-45.  This is incorrect for several reasons.  For example, the

5   exclusion clearly falls within the Agencies' authority to determine the scope of the

6   ambiguous phrase WOTUS from the CWA.  As held by the Fourth Circuit in *Ohio Valley*,

7   Congress chose to define "navigable waters" as WOTUS, a term that is "sufficiently

8   ambiguous to constitute an implied delegation of authority to the Corps" to determine its

9   scope. 556 F.3d at 212 (quoting *United States v. Deaton*, 332 F.3d 698, 709 (4th Cir.

10   2003)).  The court went on to hold that the Corps acted lawfully and consistently with the

11   CWA in finding that "stream segments, together with the sediment ponds to which they

12   connect [for containment and treatment of wastewater], are unitary '[WTS],' not

13   [WOTUS]." *Id.* at 209.

14      The exclusion also promotes the goals of the CWA by requiring facilities with

15   WTS "to comply with the CWA by obtaining a section 404 permit for new construction in

16   [WOTUS], and a section 402 permit for discharges from the [WTS] into [WOTUS]." 85

17   Fed. Reg. at 22,325; *see also* EPA, *RTC*, Attachment 10 at 58, 61 (Doc. ID EPA-HQ-OW-

18   2018-0149-11574), https://bit.ly/3hnsHG6.  The process to obtain a Section 404 permit

19   from the Corps is rigorous and if the Agencies conclude that a WTS should not be

20   constructed in jurisdictional waters, they can deny permit coverage.  The WTS exclusion

21   is a necessary component of the CWA permitting system because it allows regulated

22   facilities (including many facilities that pre-dated the 1972 amendment to the CWA) the

23   ability to collect and treat water on-site prior to discharge in accordance with CWA

24   permits without having the system being considered a jurisdictional WOTUS.  The WTS

25   exclusion does not create, as Plaintiffs suggest, "unregulated dumping of waste" into

26   WOTUS.  Plaintiffs Br. 42.  Instead, WTS are heavily regulated and have long served as

27   part of the Agencies' reasonable and lawful approach to facilitating responsible pollution

28   control strategies.

1       In summary, the Plaintiffs are seeking through its challenge of the NWPR to

2 overturn a longstanding regulatory exclusion from the definition of WOTUS using dated

3 arguments that have already been explained by the Agencies to have no justification or

4 basis.  Plaintiffs' position would create serious implementation issues and provide no

5 further protection to downstream water quality.  Plaintiffs' position is without any

6 legitimate basis and should be rejected.

7 **IV.**    **MOTION TO STRIKE**

8       Pursuant to LRCiv. 7.2(m)(2), Business-Interveners move to strike Exhibits 1-8

9 that Plaintiffs filed with the Court to support their Motion for Summary Judgment (Doc.

10 48, Exhibits 1-8) because those documents are not part of the administrative record;

11 introduce information outside the scope of the administrative record; and were not

12 submitted to the Court pursuant to the procedure set forth in the Court's scheduling

13 orders.  *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Thompson v. U.S. Dep't of*

14 *Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

15 **V.**    **CONCLUSION**

16       For the foregoing reasons, Business-Intervenors request the Court enter summary

17 judgment in their favor on all claims asserted by Plaintiffs and deny Plaintiffs' motion for

18 summary judgment on all claims.

19       RESPECTFULLY SUBMITTED this 13th day of July, 2021.

20                            GALLAGHER & KENNEDY, P.A.

21

22

                          By: */s/ Bradley J. Glass*

23                              D. Lee Decker

24                              Bradley J. Glass

                             Stuart S. Kimball

25                              2575 East Camelback Road

26                              Phoenix, Arizona  85016-9225

27                              Attorneys for Business-Intervenors-

28                              Defendants

1

2

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the word count in this document is 13,939 words compiled by

Microsoft Word.

5

6

*/s/ Bradley J. Glass*

Bradley J. Glass

7

8

## **CERTIFICATE OF SERVICE**

9

10

I hereby certify that on July 13, 2021, I electronically transmitted the foregoing to

the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

11

Electronic Filing to all CM/ECF registrants.

12

13

*/s/ Bradley J. Glass*

Bradley J. Glass

14

8586213v1/21054-0011

15

16

17

18

19

20

21

22

23

24

25

26

27

28