Stuart C. Gillespie (CO Bar No. 42861) *(admitted pro hac vice)*
Alexandra O. Schluntz (MA Bar No. 704320) *(admitted pro hac vice)*
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 996-9616
sgillespie@earthjustice.org
aschluntz@earthjustice.org

Janette K. Brimmer (WA Bar No. 41271) *(admitted pro hac vice)*
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
jbrimmer@earthjustice.org

*Counsel for Plaintiffs Pascua Yaqui Tribe, Quinault Indian Nation,*
*Menominee Indian Tribe of Wisconsin, Tohono O'odham*
*Nation, Fond du Lac Band of Lake Superior Chippewa,*
*and Bad River Band of Lake Superior Chippewa*

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA AT TUCSON

| | |
|---|---|
| Pascua Yaqui Tribe, *et al.*,<br>　　　　　Plaintiffs,<br>　　　v.<br><br>United States Environmental Protection Agency, *et al.*,<br>　　　　　Defendants,<br>and<br><br>Arizona Rock Products Association, *et al.*,<br>　　　　　Intervenors-Defendants,<br>and<br><br>Chantell Sackett; Michael Sackett,<br>　　　　　Intervenors-Defendants.<br>_____ | Case No. 4:20-cv-00266-RM<br><br>Assigned Judge: Rosemary Márquez<br><br>**PLAINTIFFS' REPLY/RESPONSE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................. 1

ARGUMENT ................................................................................................... 2

I.    THE NAVIGABLE WATERS RULE VIOLATES THE CLEAN
WATER ACT................................................................................ 2

    A.    The Navigable Waters Rule Contravenes The Clean Water
Act's Objective To Restore And Maintain The Integrity Of
The Nation's Waters............................................................ 2

    B.    The Navigable Waters Rule Relies On An Interpretation Of
Waters Of The U.S. Rejected By Five Justices In *Rapanos*. ............ 7

    C.    The Ninth Circuit Has Already Rejected Intervenors'
Attempts to Disregard the Controlling Rule of Law in
*Rapanos*. ........................................................................ 10

    D.    The Navigable Waters Rule Unlawfully Reads Section 101(b)
To Undermine The Act's Objective To Maintain And Restore
The Integrity Of The Nation's Waters. ................................... 15

    E.    The Sacketts' Extreme Arguments Mischaracterize The
Statute And Supreme Court Precedent.................................... 17

II.    INDUSTRY'S ARGUMENTS DO NOT ADDRESS THE
FUNDAMENTAL FAILURES OF THE AGENCIES UNDER THE
ADMINISTRATIVE PROCEDURE ACT. .................................... 18

    A.    Industry Failed To Show Where The Agencies Considered
The Harm To Downstream Waters Of The U.S. Identified By
The SAB. ........................................................................ 19

    B.    The Agencies Largely Ignored The Science Report. ................ 24

    C.    The Law Requires More Explanation Of The Agencies'
Change In Position Than Endless Repetition of "Science
Does Not Dictate." ............................................................ 26

    D.    Industry Fails To Explain Away The Inconsistencies And
Inherent Arbitrariness In The Navigable Waters Rule.............. 27

    E.    The Agencies Violated Their Own Policies By Ignoring An
Important Aspect Of The Problem: Environmental Justice......... 30

III.   THE WASTE TREATMENT EXCLUSION AND ITS
EXPANSION ARE OUTSIDE THE LAW REGARDLESS OF THE
AGENCIES' PERPETUATION OF THE VIOLATION. .......................... 32

IV.   THE SACKETTS' CONSTITUTIONAL ARGUMENTS ARE
MERITLESS. ........................................................................ 34

    A.   Under The Commerce Clause, The Federal Government Has
The Power To Regulate Nonnavigable Waters When
Necessary To Protect Navigable Waters. ........................................ 35

    B.   The Clean Water Act Satisfies The Nondelegation Doctrine
By Providing An Intelligible Principle. ............................................. 36

V.   THE PROPER REMEDY IS VACATUR OF THE NAVIGABLE
WATERS RULE. .................................................................... 37

    A.   The Serious Errors In The Navigable Waters Rule Weigh
Heavily In Favor Of Vacatur. ............................................................. 38

    B.   Remand Without Vacatur Would Cause Significant
Disruptive Consequences, Including Irreparable Harm To The
Tribes. ................................................................................................. 39

        1.   Leaving the Navigable Waters Rule in place will cause
severe, irreversible harm in violation of the Clean
Water Act. .............................................................................. 40

        2.   The Agencies and Industry fail to identify any
disruptive consequences caused by vacating the
Navigable Waters Rule and returning to the status quo. ........ 43

VI.   THE COURT SHOULD GRANT THE TRIBES' MOTION TO
COMPLETE THE RECORD AND REJECT INDUSTRY'S
MOTION TO STRIKE. ............................................................ 44

CONCLUSION ................................................................................ 46

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Alexander v. Choate*,
   469 U.S. 287 (1985)..................................................................................... 11

*All. for the Wild Rockies v. U.S. Forest Serv.*,
   907 F.3d 1105 (9th Cir. 2018) ..................................................................... 41

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................... 38, 39

*AquAlliance v. U.S. Bureau of Reclamation*,
   312 F. Supp. 3d 878 (E.D. Cal. 2018)......................................................... 43

*Asarco, Inc. v. EPA*,
   616 F.2d 1153 (9th Cir. 1980) ..................................................................... 46

*Bay.org v. Zinke*,
   1:17-cv-01176 LJO-EPG, 2018 WL 3965367, at *9 (E.D. Cal. Aug. 16,
   2018) ............................................................................................................ 46

*Cal. Cmties. Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) ....................................................................... 40

*California v. Wheeler*,
   467 F. Supp. 3d 864, 874 (N.D. Cal. 2020) ................................................ 10

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
   409 F. Supp. 3d 738 (D. Ariz. 2019) ........................................................... 42

*Chevron, U.S.A., Inc. v Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)....................................................................................... 3

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigration*,
   981 F.3d 742 (9th Cir. 2020) ....................................................................... 21

*City of Arcadia v. EPA*,
   411 F.3d 1103 (9th Cir. 2005) ..................................................................... 16

*City of Milwaukee v. Illinois and Michigan*,
   451 U.S. 304 (1981)..................................................................................... 16

*Cnty. of Maui v. Hawai'i Wildlife Fund*,
    140 S. Ct. 1462 (2020) ............................................................... 1, 3, 6, 14

*Colorado v. EPA*,
    445 F. Supp. 3d 1295 (D. Colo. 2020), *rev'd on other grounds*, 989 F.3d
    874 (10th Cir. 2021) .................................................................... 7

*Conservation Law Found. of New England, Inc. v. Clark*,
    590 F. Supp. 1467 (D. Mass. 1984) .......................................... 31

*Crowell v. Benson*,
    285 U.S. 22, 62 (1932) .............................................................. 35

*Ctr. for Food Safety v. Vilsack*,
    734 F.Supp.2d 948 (N.D. Cal. 2010) ...................................... 39-40

*Ctr. For Native Ecosystems v. Salazar*,
    795 F. Supp. 2d 1236 (D. Colo. 2011) ..................................... 39

*Cuomo v. Clearing House Ass'n*,
    557 U.S. 519 (2009) .................................................................. 14-15

*Env't Def. Ctr., Inc. v. EPA.*,
    344 F.3d 832 (9th Cir. 2003) .................................................... 36-37

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................. 26

*Gen. Chem. Corp. v. United States*,
    817 F.2d 844 (D.C. Cir. 1987) .................................................. 30

*Georgia v. Wheeler*,
    418 F. Supp. 3d 1336 (S.D. Ga. 2019) .................................... 3-4, 44

*Humane Soc'y v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) .................................................. 39

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) .................................................................. 18

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ............................................................... 34-35

iv

*J.W. Hampton, Jr. & Co. v. United States,*
   276 U.S. 394, 409 (1928) ............................................................................ 37

*Kaiser Aetna v. United States,*
   444 U.S. 164 (1979) .................................................................................... 35

*Kholi v. Wall,*
   582 F.3d 147 (1st Cir. 2009), *aff'd,* 562 U.S. 545 (2011) .......................... 14

*Leslie Salt Co. v. United States,*
   55 F.3d 1388 (9th Cir. 1995) ...................................................................... 37

*Marks v. United States,*
   430 U.S. 188 (1977) ........................................................................ 11, 12, 13

*Mercado-Zazueta v. Holder,*
   580 F.3d 1102 (9th Cir. 2009), *abrogated on other grounds by Holder v.*
   *Martinez Gutierrez,* 566 U.S. 583 (2012) .................................................. 15

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
   526 U.S. 172 (1999) .................................................................................... 36

*Mistretta v. United States,*
   488 U.S. 361, 377 (1989) ............................................................................ 37

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983) ........................................................................................ 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .............................................................................*passim*

*N. Cal. River Watch v. Wilcox,*
   633 F.3d 766 (9th Cir. 2011) ...................................................................... 13

*Nat. Res. Def. Council, Inc. v. Callaway,*
   392 F. Supp. 685 (D.D.C. 1975) ................................................................ 17

*Nat. Res. Def. Council, Inc. v. Pritzker,*
   828 F.3d 1125 (9th Cir. 2016) ............................................................. 19, 21

*Nat. Res. Def. Council v. Wheeler,*
   955 F.3d 68 (D.C. Cir. 2020) ............................................................... 43-44

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*,
    545 U.S. 967 (2005) ................................................................................. 14

*Nat'l Fam. Farm Coal. v. EPA*,
    960 F.3d 1120 (9th Cir. 2020) ................................................................... 41

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................. 36

*Northern California River Watch v. City of Healdsburg*,
    496 F.3d 993 (9th Cir. 2007) ............................................................ *passim*

*Nw. Coal. for Alts. to Pesticides v. EPA*,
    544 F.3d 1043 (9th Cir. 2008) ................................................................... 19

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ............................................................... 26, 27

*Oklahoma ex rel. Phillips v Guy F. Atkinson Co.*,
    313 U.S. 508 (1941) ................................................................................. 35

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) ............................................... 37-38, 39, 40-41

*Puget Soundkeeper All. v. Wheeler*,
    No. C15-1342-JCC, 2018 WL 6169196 (W.D. Wash. Nov. 26, 2018) ...................... 44

*Rapanos v. United States*,
    547 U.S. 715 (2006) ............................................................................ *passim*

*Sackett v. EPA*,
    No. 08-cv-00185 (D. Idaho Mar. 31, 2019), ECF No. 120 ........................ 35

*S.C. Coastal Conservation League v. Regan*,
    No. 2:20-cv-1687 (D.S.C. July 14, 2021) ................................................ 44

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ..................................................................................... 5

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of
    Engineers*,
    531 U.S. 159 (2001) ................................................................................. 14

vi

*Texas v. EPA*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ........................................ 44

*Treacy v. Newdunn Associates, LLP*,
    344 F.3d 407 (4th Cir. 2003) .................................................... 36

*United States v. Ashland Oil & Tranp. Co.*,
    504 F.2d 1317 (6th Cir. 1974) .................................................. 35

*United States v. Bailey*,
    571 F.3d 791 (8th Cir. 2009) .................................................... 13

*United States v. Clark*,
    617 F.2d 180 (9th Cir. 1980) .................................................... 12

*United States v. Cundiff*,
    555 F.3d 200 (6th Cir. 2009) ...................................................... 9

*United States v. Davis*,
    825 F.3d 1014 (9th Cir. 2016) (en banc) ........................... 11, 12

*United States v. Deaton*,
    332 F.3d 698 (4th Cir. 2003) .............................................. 18, 35

*United States v. Gerke Excavating, Inc.*,
    464 F.3d 723 (7th Cir. 2006) .................................................... 13

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ................................................................. 11

*United States v. Martinez-Flores*,
    428 F.3d 22 (1st Cir. 2005) ...................................................... 37

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985) ................................................ 17, 18, 35, 37

*United States v. Robertson*,
    875 F.3d 1281 (9th Cir. 2017), *vacated as moot*, 139 S. Ct. 1543 (2019),
    773 F. App'x 391 (9th Cir. 2019) ......................................... 11-12

*United States v. Robison*,
    505 F.3d 1208 (11th Cir. 2007) ................................................ 13

*Upstate Forever v. Kinder Morgan Energy Partners*,
　　887 F.3d 637 (4th Cir. 2018), *vacated on other grounds*, 140 S. Ct. 2736
　　(2020) .................................................................................................... 18

*Vasquez v. Hillery*,
　　474 U.S. 254 (1986) ............................................................................... 11

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
　　-- F.4th --, 2021 WL 3354747 (D.C. Cir. 2021) .................................... 30-31

*W. Watersheds Project v. Kraayenbrink*,
　　632 F.3d 472 (9th Cir. 2011) .................................................................. 21

*Whitman v. Am. Trucking Ass'ns*,
　　532 U.S. 457 (2001) ............................................................................ 36, 37

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................... 17, 30, 37, 39

33 U.S.C. § 1251(a) ............................................................................... *passim*

33 U.S.C. § 1251(b) ............................................................................... 15, 16

33 U.S.C. § 1311(a) ...................................................................................... 20

33 U.S.C. § 1313(c)(2)(a) ............................................................................ 20

33 U.S.C. § 1341 .......................................................................................... 16

33 U.S.C. § 1342(b) ..................................................................................... 16

33 U.S.C. § 1344(g) ..................................................................................... 16

33 U.S.C. § 1362(7) ..................................................................................... 19

33 U.S.C. § 1362(12) ................................................................................... 17

33 U.S.C. § 1370 ..................................................................................... 16, 17

**Other Authorities**

40 C.F.R. 230.1(a) ......................................................................................... 4

Definition of "Waters of the United States, 84 Fed. Reg. 56,626 (Oct. 22, 2019) .................................................................................................... 31

Navigable Waters Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................. *passim*

Exec. Order. No. 12,898, 59 Fed. Reg. 7,629 (Feb. 16, 1994)................................. 30

H.R. 2691, 55th Leg., 1st Session (Az. 2021) .......................................... 6, 24

H.R. Rep. No. 92-911 (1972) ...................................................................... 17

S. Rep. No. 92-414, *reprinted in* 1972 U.S.C.C.A.N. (Oct. 28, 1971) ............ 16

Tohono O'odham Nation, Water Quality Code, § 1, 5.C (2001) ................... 6, 7

123 Cong. Rec. 39,209 (1977).................................................................... 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTRODUCTION

For decades, the Environmental Protection Agency ("EPA") and Army Corps of Engineers ("Corps") (collectively, the "Agencies") broadly applied the Clean Water Act to protect the integrity of "the Nation's waters," which included many types of waters from the mightiest rivers to the most hidden springs, rare wetlands, and desert streams that convey thundering torrents of water during monsoon rains.  As the Nation's top scientists have made clear, each of those waters is critical to the chemical, physical, and biological integrity of the Nation's waters.  Each of those waters is equally critical to the health and wellbeing of Plaintiffs Pascua Yaqui Tribe, Tohono O'odham Nation, Quinault Indian Nation, Menominee Indian Tribe of Wisconsin, Fond du Lac Band of Lake Superior Chippewa, and Bad River Band of Lake Superior Chippewa ("Tribes").  Yet, under the direction of the Trump Administration, the Agencies abruptly reversed course, excluding entire categories of waters—including every ephemeral stream in the desert Southwest—from the Clean Water Act's protections, by ignoring the science and relying on an interpretation that five justices of the Supreme Court unambiguously rejected.

Confronted with the law and facts, the Agencies concede the case, candidly acknowledging "substantial and legitimate" concerns about the lawfulness of the Navigable Waters Protection Rule ("Navigable Waters Rule"), including whether the striking rollback of Clean Water Act protections complies with the objective of the Act— to protect the integrity of the Nation's waters.  Fox Decl. & Pinkham Decl. ¶ 13, ECF Nos. 72.1 & 72.2 (citing *Cnty. of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462, 1468-69 (2020)).  The repeal of the Obama Administration's Clean Water Rule ("Repeal Rule") suffers from many of the same deficiencies.  The Agencies also provided the Court with a detailed analysis showing that the Navigable Waters Rule is causing "significant, actual environmental harms" and disproportionately affecting tribes. *Id.* ¶

17.  These findings confirm the fatal errors in the Rules and the need for vacatur to ensure against serious, irreversible damage.

Nothing in Intervenors' cross-motions for summary judgment rehabilitates the Rules.  Business-Intervenors ("Industry") rely on a series of misplaced arguments that sidestep the legal flaws in the Rules and paper over the Agencies' failure to consider important parts of the problem, including the unrefuted scientific record.  The Sackett-Intervenors ("Sacketts") do not engage with *any* part of the scientific record.  Instead, they rely on a series of extreme legal arguments that mischaracterize the Clean Water Act and Supreme Court precedent.  The Court should therefore deny Intervenors' cross-motions, vacate the Rules, and remand to the Agencies.

ARGUMENT

I.   THE NAVIGABLE WATERS RULE VIOLATES THE CLEAN WATER ACT.

The Navigable Waters Rule is incompatible with the sole congressional objective of the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The Navigable Waters Rule also adopts an interpretation of the Act that was unambiguously rejected by five justices of the Supreme Court as contrary to the Act's text, purpose, and structure.  Confronted with these fatal errors, Intervenors mischaracterize the Clean Water Act, misread Supreme Court precedent, and rely on arguments already rejected by the Ninth Circuit.

A.   The Navigable Waters Rule Contravenes The Clean Water Act's Objective To Restore And Maintain The Integrity Of The Nation's Waters.

The Navigable Waters Rule relies on an impermissible interpretation of the Clean Water Act to strip protections from millions of stream miles and wetland acres that are integral to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  This sweeping rollback is inconsistent with the Clean Water Act's objective, as made clear by the Supreme Court in *Rapanos* and the Scientific Advisory Board's ("SAB") findings.  Tribes' Mem. Supp. Mot. Summary

2

Judgment 20-24, ECF No. 48; *see also Rapanos v. United States*, 547 U.S. 715 (2006); Science Advisory Board Draft Letter 1 (Oct. 16, 2019), Ex. 99, ECF No. 63.8.  The Court should therefore reject the Navigable Waters Rule as an unreasonable interpretation of the Clean Water Act.  *See Cnty. of Maui*, 140 S. Ct. at 1468, 1477 (rejecting interpretations of the Clean Water Act that posed "consequences that are inconsistent with major congressional objectives, as revealed by the statute's language, structure, and purposes").

The Agencies identify "substantial" concerns with the "lawfulness of aspects of the [Navigable Waters Rule] and the harmful effects of the [Rule] on the nation's waters."  ECF Nos. 72.1 & 72.2 ¶ 8; *see also id.* ¶ 10.  Specifically, they acknowledge that "consideration of the effects of a revised definition of 'waters of the United States' on the integrity of the nation's waters is a critical element in assuring consistency with the statutory objective of the [Clean Water Act]." *Id.* ¶ 13 (citing *Cnty. of Maui*, 140 S. Ct. at 1468-69).  Yet, the Agencies concede that the Navigable Waters Rule "did not appropriately consider the effect of the revised definition of 'waters of the United States' on the integrity of the nation's waters" and express "concern over the loss of waters protected by the [Clean Water Act]."  *Id.* ¶ 10.  That oversight is "particularly significant in arid states," like Arizona, where the Navigable Waters Rule has stripped protections from thousands of streams.  *Id.* ¶ 16.  The resultant loss of protection threatens "cascading and cumulative downstream effects . . . including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity."  *Id.* ¶ 20.  These adverse effects thwart the objective of the Clean Water Act, demonstrating that the Navigable Waters Rule is unreasonable and must be rejected.  *See Chevron, U.S.A., Inc. v Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-45 (1984).

The Rosemont Mine further demonstrates how the Navigable Waters Rule does "not allow[] federal jurisdiction where a water significantly affects the . . . integrity" of navigable waters, an "absurd" result "inconsistent with the text and purpose of the [Clean

Water Act].” *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1369 (S.D. Ga. 2019).
Rosemont proposes to bury the intricate network of streams on the mine site under 1.9
billion tons of waste rock and tailings.  Following a comprehensive analysis, the EPA
found that the proposed discharge would not only destroy those streams, but also cause
significant degradation to the physical, chemical, and biological integrity of downstream
waters in violation of the Clean Water Act.  EPA, Env't Consequences of the Proposed
Rosemont Copper Mine 1 (Oct. 5, 2017, rev. Nov. 30, 2017), ECF 26.1, Ex. A.  Yet, the
Corps blindly applied the Navigable Waters Rule to exclude all ephemeral streams on the
site from the Clean Water Act's protections—an unreasonable approach that contravenes
the Act's purpose.  *See* Corps, East Area Approved Jurisdictional Determination (Mar.
24, 2021), ECF No. 31.1.

　　　　Industry nonetheless attempts to ignore the problem, claiming with little
foundation that water features excluded by the Navigable Waters Rule could nonetheless
be regulated under the Clean Water Act as point sources.  Industry Mem. Supp. Cross-
Mot. Summ. Judgment 17-20, ECF No. 80.  That is misleading.  By categorically
excluding ephemeral streams from the definition of "waters of the United States," the
Navigable Waters Rule removes federal regulatory protections that are indisputably key
to implementing the Act.  For example, federal permits are no longer required under
Section 404 before filling or destroying excluded waters, such as the thousands of miles
of ephemeral streams in the desert Southwest.  The Navigable Waters Rule thus
eliminates a whole suite of regulatory requirements under the 404 program that were
adopted by the Agencies to "restore and maintain the chemical, physical, and biological
integrity of waters of the United States through the control of discharges of dredged or
fill material."  40 C.F.R. 230.1(a).  The Rosemont Mine is just one example of the
inadequacies in Industry's false argument.  There, EPA demonstrated that the discharge
of fill for the mine would cause unacceptable adverse effects to the integrity of the
Nation's waters—effects that would not be addressed by the Section 401 certification

from the State.  *See* ECF No. 26.1, Ex. A, at 18-19.

Next, Industry claims with scant foundation that States can use their regulatory authority to "provide coverage for all types of waters," including those excluded from the Clean Water Act.  ECF No. 80, at 18.[1]  In support of this contention, Industry relies on the Agencies' Resource and Programmatic Assessment, claiming that it shows that States and Tribes will protect water quality "regardless of the extent of jurisdiction of the [Clean Water Act]."  *Id.* (quoting Ex. 117, at 60).  The argument is doubly flawed.  First, the Agencies expressly disclaimed reliance on the Resource and Programmatic Analysis in formulating the Navigable Waters Rule.  85 Fed. Reg. 22,250, 22,332, 22,335 (Apr. 21, 2020) ("[T]he final rule is not based on the information in the [A]gencies' economic analysis or resource and programmatic assessment.").  Industry's reliance on the Resource and Programming Analysis is thus sorely misplaced.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which . . . [the] action was based.").

Second, the record shows that States cannot fill the significant regulatory gap created by the Navigable Waters Rule.[2]  To the contrary, the Agencies admit that States have *weakened* their own clean water protections in response to the Navigable Waters Rule, further exacerbating the regulatory void created by the Navigable Waters Rule.  *See* EPA & Corps, Mem. Record 4 (June 8, 2021), ECF No. 87.2; *see also infra* Sections I.D,

---

[1] Quoting *Res. & Program. Assessment for the [Rule]: Definition of [WOTUS]* 60 (Jan. 23, 2020), Ex. 117, filed with this brief as part of Tribes' Supplemental Excerpts of Record.  The Supplemental Index to the Excerpts includes the official record citation.  The Tribes will cite to the Excerpts as "Ex. _" and will include the ECF number for Excerpts initially filed with the Tribes' Motion for Summary Judgment.

[2] The same document quoted by Industry explains that twenty-nine states have laws that either require state regulations to parallel Clean Water Act regulations or require extra steps or findings before state regulations may protect waters beyond federal requirements.  *See* Ex. 117, at 46 (explaining how thirteen states required their regulations to parallel federal standards and sixteen additional states required extra steps or findings for state regulations to exceed federal requirements).

II.A.  Confirming that point, EPA identified specific projects proceeding "without any regulation or mitigation from federal, state, or tribal agencies."  ECF Nos. 72.1 & 72.2 ¶ 18.

In defiance of these facts, Industry falsely asserts that Arizona recently passed legislation to "regulate and protect waters that are no longer covered by the [Navigable Waters Rule]."  ECF No. 80, at 19.  That is not true: Arizona's legislation (H.B. 2691) *excludes* ephemeral streams, except for a few reaches along the state's major rivers.  H.R. 2691, 55th Leg., 1st Session (Az. 2021) at p. 23, lines 14-15.[3]  The legislation highlights the regulatory void created by the Navigable Waters Rule for thousands of miles of ephemeral streams in Arizona—a regulatory "loophole[] that undermine[s] the statute's basic federal regulatory objectives."  *Cnty. of Maui*, 140 S. Ct. at 1477 (rejecting construction that would preclude EPA from regulating discharges to groundwater that reach navigable waters).

Industry claims, again wrongly, that the Tohono O'odham Nation can prevent the harms caused by the Navigable Waters Rule by regulating "more water features" under its Water Code.  ECF No. 80, at 19.  But the Water Code is limited to waters on the Tohono O'odham Nation, giving the Nation no way to protect itself where it has interests and rights off reservation (as is the case with many of the Tribes who have off-reservation treaty rights) and no way to protect itself from the elimination of protections upstream of the Nation's waters.  Again, the Rosemont Mine site is a pointed example, where the Nation has significant interests, but lacks jurisdiction.  *See* Tohono O'odham Nation, Water Quality Code, § 1, 5.C (2001).[4]  Furthermore, the Code, by its terms, does *not* "comprehensively regulate water quality and the discharge of pollutants within the

---

[3] The legislation is available through the Arizona State Legislature's webpage at https://www.azleg.gov/legtext/55leg/1R/laws/0325.pdf.

[4] The interim Water Code is available at https://www.tolc-nsn.org/docs/Title25ch5.pdf.

Tohono O'odham Nation." *Id.* at p. 3, lines 20-23.[5]  EPA thus acknowledged that "tribes lack the authority and the resources to independently regulate surface waters within and upstream of their reservations."  ECF Nos. 72.1 & 72.2 ¶ 19.  A tribe's ability to regulate waters on reservation in no way fills the nationwide regulatory gap created by the Navigable Waters Rule.

B.   The Navigable Waters Rule Relies On An Interpretation Of Waters Of The U.S. Rejected By Five Justices In *Rapanos*.

The Navigable Waters Rule is unabashedly based on Justice Scalia's plurality opinion in *Rapanos*; indeed, the Agencies "self-consciously intended to take the plurality opinion . . . , flesh out the details, and make it the new law of the land."  *Colorado v. EPA*, 445 F. Supp. 3d 1295, 1311 (D. Colo. 2020), *rev'd on other grounds*, 989 F.3d 874 (10th Cir. 2021).  But five justices of the Court unambiguously rejected the plurality's "relatively permanent waters" test as an impermissible construction of the Act, foreclosing the Agencies' attempt to make that losing interpretation the law of the land under the guise of a new rulemaking.  *See id.*; *see also* ECF No. 48, at 18-20.  The Court should therefore vacate the Navigable Waters Rule as "inconsistent with the Act's text, structure, and purpose."  *Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring); *see id.* at 800 (Stevens, J., dissenting).

Industry does not dispute that five justices in *Rapanos* rejected the plurality's "relatively permanent waters" test for excluding waters from the Act's jurisdiction.  Rather, Industry argues that the Agencies had nearly unlimited discretion in crafting the

---

[5] Other Tribes are similarly situated.  For example, important cultural and historic resources for the Menominee Tribe are located along the Menominee River, which is not on the Menominee Reservation.  Reiter Decl. ¶ 3, ECF No. 48.4.  Many polluting and wetland-destroying mining activities occur off the Fond du Lac Reservation, upstream, and in areas where the Fond du Lac Band has treaty rights to hunt, fish, and gather.  Howes Decl. ¶¶ 5, 10-12, ECF No. 48.2.  The entirety of the Chehalis River basin is off the Quinault Reservation but the Quinault Nation retains critically-important treaty right to fish the Chehalis.  James Decl. ¶ 3, ECF No. 48.3.

Navigable Waters Rule, because *Rapanos* does not dictate what the agencies *must* regulate.  ECF No. 80, at 13.  The argument fails, because even if *Rapanos* did not dictate what the Agencies must regulate, five justices made plain what the Agencies must *not* do: limit the Act's reach to only "relatively permanent" waters and those with "continuous" surface connections to navigable waters.  *See* ECF No. 48, at 18-20.  Yet, the Navigable Waters Rule does just that, *see* 85 Fed. Reg. at 22,271, 22,309-11, plainly contravening the Clean Water Act.

Industry cannot sidestep *Rapanos* by claiming that the Navigable Waters Rule is "not solely based on or limited by the plurality's jurisdictional test."  ECF No. 80, at 15. The Navigable Waters Rule itself defies this assertion by expressly incorporating both of the plurality's severe limitations on the Clean Water Act's protection of waters.  As to tributaries, the Navigable Waters Rule's categorical exclusion of ephemeral streams (and likely some intermittent streams based on permanence or frequency of surface flows) wholly embraces the plurality's "relatively permanent" flow requirement.  85 Fed. Reg. at 22,288-89 (defining tributary based on "*Rapanos* plurality's position that 'the waters of the United States' include only relatively permanent, standing, or flowing bodies of waters").  As to wetlands, the Navigable Waters Rule invokes the plurality's surface connection requirement, 85 Fed. Reg. at 22,279 (defining "'adjacent wetlands' to include . . . wetlands . . . [with] certain regular hydrologic surface connections to [jurisdictional waters]"), and ignores the five-justice view that such a requirement is "inconsistent with the Act's text, structure, and purpose," *Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring); *see id.* at 804 (Stevens, J., dissenting) (finding continuous surface connection requirement "arbitrary").  In short, the Navigable Waters Rule's central thesis—that the term "waters of the United States" encompasses only "relatively permanent flowing and standing waterbodies" and waters with "a specific surface water connection" to such waters, 85 Fed. Reg. at 22,273—was rejected by five Justices as lacking any "support in the language and purposes of the Act or in our cases interpreting

it." *Rapanos*, 547 U.S. at 768 (Kennedy, J., concurring); *id*. at 800 (Stevens, J., dissenting).

Equally misplaced is Industry's argument that the Navigable Waters Rule synthesized the opinions of the *Rapanos* plurality and Justice Kennedy.  ECF No. 80, at 15.  These opinions are mutually incompatible, as made clear by the fact that five justices explicitly rejected every material aspect of the plurality's jurisdictional test.  For example, Justice Kennedy rejected the requirement of "permanent standing water or continuous flow" because it "makes little practical sense in a statute concerned with downstream water quality" and would arbitrarily exclude "torrents thundering at irregular intervals through otherwise dry channels."  *Rapanos*, 547 U.S. at 769 (Kennedy, J., concurring).  Similarly, Justice Kennedy noted that wetlands separated by land from another waterway can be vital to it: if such a wetland is destroyed, "floodwater, impurities, or runoff that would have been stored or contained in the wetlands" could instead "flow out to major waterways."  *Id*. at 775.  The very absence of a hydrological connection could thus make protection of the wetland critical.  *Id*.  Justice Kennedy went on to observe that isolated wetlands may be protected by the Act, singly or in combination with similarly situated wetlands, as they can significantly affect other covered waters "more readily understood as 'navigable'", and that the Corps may properly determine that proximity, volume of flow (annually or on average), or other relevant considerations may form the foundation for protecting a wetland under the Act. *Id*. at 780.  Courts have thus concluded that "there is quite little common ground between Justice Kennedy's and the plurality's conceptions of jurisdiction under the Act, and both flatly reject the other's view."  *United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009).  There is no way to disguise the fact that the Navigable Waters Rule applies a jurisdictional test—the "relatively permanent flow" requirement postulated by the

9

plurality opinion in *Rapanos*—that was unambiguously rejected by five justices.[6]

The Navigable Waters Rule does not "address[] Justice Kennedy's concern," contrary to Industry's characterization. ECF No. 80, at 15 (quoting 85 Fed. Reg. at 22,291). Industry argues that the Navigable Waters Rule's exclusion of ephemeral features addresses Kennedy's concerns about regulating tributaries based on the presence of an "ordinary high-water mark." *Id.* at 15-16. But that assertion is entirely backwards. Justice Kennedy raised concerns only about regulating tributaries based *solely* on the presence of an ordinary high-water mark.[7] *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring). He did not object wholesale to its use as an indicator, a scientifically-supported concept. He did expressly *reject* the categorical exclusion of ephemeral streams, the specific thing the Navigable Waters Rule does. *Id.* at 769.

C.   <u>The Ninth Circuit Has Already Rejected Intervenors' Attempts to Disregard the Controlling Rule of Law in *Rapanos.*</u>

Intervenors argue that the Court should simply ignore the fact that five justices in *Rapanos* rejected the Navigable Waters Rule's relatively permanent waters test. ECF No. 80, at 16. In Industry's view, this controlling point of law is of no import because it represents a "suspect attempt to cobble together a majority from the concurrence and dissent." *Id.* (quoting *California v. Wheeler*, 467 F. Supp. 3d 864, 874 (N.D. Cal. 2020)); *see also* Sacketts' Mem. Supp. Cross-Mot. Summ. Judgment 12-13, ECF No. 77.1. The

---

[6] While Intervenors claim that unspecified aspects of the Rule's "tributary" definition "incorporate[] important aspects of Justice Kennedy's opinion, together with those of the plurality," ECF No. 80, at 15 (quoting 85 Fed. Reg. at 22,291), they selectively quote from the Rule's preamble while ignoring the sentence immediately following the selective quote in the preamble that, in fact, adopts the *plurality's* requirement of "relatively permanent flow" for jurisdictional tributaries and rejects Justice Kennedy's interpretation. 85 Fed. Reg. at 22,291.

[7] The record supports regulating tributaries where there are three characteristics: bed, bank, and high-water mark. "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" ("Science Report"), Ex. 100, ECF Nos. 64-64.2, at ECF No. 64.1, 3-45 to 3-46.

argument not only ignores Supreme Court precedent, it has been rejected by the Ninth Circuit.

A long line of Supreme Court cases reaffirm the principle that points of law embraced by any five Justices—including those in dissent—are binding law.  *See* ECF No. 48, at 19 & n.6 (collecting cases).  For example, in *Vasquez v. Hillery*, 474 U.S. 254 (1986), the Court treated as "precedent[]" the views of a three-justice plurality plus "[t]wo additional Justices [who] dissented from the judgment" in a prior case.  *Id.* at 261 n.8.[8]  That is precisely what happened in *Rapanos*, where the four dissenters explicitly agreed with Justice Kennedy on a point of law—that the plurality's interpretation of "waters of the United States" is impermissible—even though they disagreed with Justice Kennedy's judgment of reversal.

Industry also ignores Ninth Circuit precedent, which has "considered dissenting opinions when interpreting fragmented Supreme Court decisions."  *United States v. Davis*, 825 F.3d 1014, 1024 (9th Cir. 2016) (en banc) (discussing *Marks v. United States*, 430 U.S. 188 (1977)).  For example, the Ninth Circuit recently applied the *Marks* doctrine to determine the controlling rule of law in *Rapanos*.  *See United States v. Robertson,* 875 F.3d 1281 (9th Cir. 2017), *vacated as moot*, 139 S. Ct. 1543 (2019) (mem.), 773 F. App'x 391 (9th Cir. 2019).[9]  Based on that analysis, the court confirmed

---

[8] *See also United States v. Jacobsen*, 466 U.S. 109, 115-17 (1984) (holding that the claim before it "must be tested" against the "standard [that] was adopted by a majority of the Court in" a prior fractured opinion—a majority comprised of two Justices opining for the Court and four dissenters); *Alexander v. Choate*, 469 U.S. 287, 293 & n.8 (1985) (ascertaining that the "holding" of a prior fractured decision was a rule of law embraced by four concurring Justices and three dissenters); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 17 (1983) (affirming a lower court's "recogni[tion] that the four dissenting Justices and Justice BLACKMUN formed a majority [in a prior case] to require application of [a legal test they agreed on]." (emphasis in original)).

[9] Mr. Robertson died while his petition for certiorari was pending in the Supreme Court. For that reason, without considering the merits, the Supreme Court granted the petition, vacated the judgment, and remanded to the Ninth Circuit for consideration of mootness. *See* 139 S. Ct. 1543 (2019); 773 F. App'x 391.  *Robertson*'s reasoning is still

that Justice Kennedy's opinion was the narrowest opinion on which five justices agreed. *Id.* at 1291-92. The court thus concluded that Justice Kennedy's opinion was the controlling rule of law, as the court had previously held in *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007).

The Sacketts, with no foundation, astonishingly urge this Court to overturn *Healdsburg*, claiming that it "is no longer precedent in the Ninth Circuit." ECF No. 77.1, at 25. For this striking proposition, the Sacketts argue that *Healdsburg's* reasoning falls "well short of the *Marks* analysis required" by the Ninth Circuits' subsequent decision in *United States v. Davis*, 825 F.3d 1014. ECF No. 77.1, at 26. That is incorrect. *Healdsburg* adopted Justice Kennedy's *Rapanos* standard because it provided the narrowest ground "to which a majority of the Justices would assent if forced to choose in almost all cases." *Healdsburg*, 496 F.3d at 999. This is an analysis, as *Davis* requires, of the various Justices' reasoning.

Contrary to the Sacketts' argument, *Davis* did not forbid consideration of dissents while engaging in the *Marks* analysis. *See* ECF No. 77.1, at 18; *see also Davis*, 825 F.3d at 1025. In fact, the Ninth Circuit rejected the Sacketts' very argument in *Robertson*, 875 F.3d at 1292. There, the court explained, "[b]oth the plurality and Justice Kennedy's opinions can be viewed as subsets of Justice Stevens's dissent because both narrow the scope of federal jurisdiction." *Id.* Because "Justice Kennedy's concurrence fits within the dissent, and [] narrows federal authority less than the plurality's decision," it is the controlling opinion under *Marks*. *Id.*

Indeed, it is the Sacketts who misapply the "narrowest-grounds" test set forth in *Marks*. In their view, the plurality opinion is the narrowest grounds in *Rapanos* because

persuasive and confirms that *Rapanos* rejected the relatively permanent waters test at the core of the Rule. *See United States v. Clark*, 617 F.2d 180, 184 n.4 (9th Cir. 1980) (explaining that if the reasoning in a vacated decision was not invalidated, it may be adopted in later cases).

it is the *most* restrictive of Clean Water Act jurisdiction.  ECF No. 77.1, at 20-21.  But that is exactly backwards.  The narrowest holding for the purposes of *Marks* is the one that changes the status quo the least, thereby restraining the Corps' authority the *least*. *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) ("The issue becomes whether the definition of 'navigable waters' in the plurality or concurring opinions in *Rapanos* was less far-reaching (i.e., less-restrictive of [Clean Water Act] jurisdiction).");  *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724-25 (7th Cir. 2006) (concluding Justice Kennedy's "test is narrower (so far as reining in federal authority is concerned) than the plurality's in most cases").  The Ninth Circuit recognized that Justice Kennedy's significant nexus-test "provides the controlling rule of law" in *Rapanos*.  *See Healdsburg*, 496 F.3d at 999-1000.

The Sacketts fail to cite a single decision limiting Clean Water Act jurisdiction to the *Rapanos* plurality opinion alone.  Indeed, no court of appeals, including the Ninth Circuit, has interpreted *Rapanos* to limit the Agencies' authority to act only in accordance with the plurality opinion.  *See* ECF No. 48, at 6-7 (collecting cases analyzing *Rapanos*).[10]  Rather, courts have *rejected* the Sacketts' argument "that the controlling jurisdictional test is stated in the plurality opinion."  *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009).

Intervenors' reliance on other Supreme Court cases is similarly misplaced.  First, faced with unanimous authority against their position, Intervenors suggest that the Supreme Court recently determined in *County of Maui v. Hawai'i Wildlife Fund* that the

---

[10] Industry incorrectly asserts that the Ninth Circuit "backtracked" from its holding that Justice Kennedy provides the controlling opinion in *Rapanos*.  ECF No. 80, at 16 (citing *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 769 (9th Cir. 2011)).  But *Wilcox* held that Justice Kennedy's standard is "'controlling,'" *and* noted that *Healdsburg* did not "foreclose the argument that Clean Water Act jurisdiction may *also* be established under the plurality's standard," leading to an even more expansive outcome for Clean Water Act jurisdiction.  *Wilcox*, 633 F.3d at 781 (quoting *Healdsburg*, 496 F.3d at 999-1000) (emphasis added).

*Rapanos* plurality is controlling.  *See* ECF No. 77.1, at 14; ECF No. 80, at 17. But *Maui* did not even address the meaning of "waters of the United States," much less decide that the *Rapanos* plurality controls.  Rather, the *Maui* majority opinion cited the *Rapanos* plurality only once, to support its interpretation of an entirely different phrase in the Clean Water Act.  *See Cnty. of Maui*, 140 S. Ct. at 1475.[11]

Second, Industry cites *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), but nothing in that case precludes the Agencies' authority to regulate wetlands and streams that have significant chemical, physical, and biological connections to navigable waters and thus are not "isolated."  ECF No. 80, at 20-21; *see Rapanos*, 547 U.S. at 766-67 (Kennedy, J., concurring) (noting that a significant nexus was lacking between ponds at issue in *SWANCC* and navigable waters).  *SWANCC* therefore does not alter the fact that the Navigable Waters Rule unreasonably interpreted the statute as categorically excluding these critically important wetlands and streams.

Third, Industry cites *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), in passing, but entirely fails to address the Tribes' argument that it is of no assistance in this case.  ECF No. 80, at 13; *see* ECF No. 48, at 19-20.  Nothing in *Brand X* negates the basic principle, applicable here, that a court must reject an agency's *unreasonable* interpretation of a statute.  *See Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 525-31, 528 n.2 (2009) (applying case law and "normal principles of construction" to conclude that agency's interpretation of statute was unreasonable and explaining that *Brand X* argument "misses the point"); *Mercado-*

---

[11] The other cases relied on by the Sacketts cited the *Rapanos* plurality opinion for reasons that have nothing to do with the meaning of "waters of the United States."  ECF 77.1, at 14-16.  The "mere fact" that the Supreme Court has cited the *Rapanos* plurality opinion "approvingly for one point does not imply [its] wholesale acceptance of each and every proposition" for which that opinion stands.  *Kholi v. Wall*, 582 F.3d 147, 152 n.5 (1st Cir. 2009), *aff'd*, 562 U.S. 545 (2011).

*Zazueta v. Holder*, 580 F.3d 1102, 1112-13 (9th Cir. 2009) ("While agencies retain discretion to fill ambiguous statutory gaps, it does not follow that an agency may repeatedly put forward an interpretation that we already have examined under *Chevron* and found unreasonable at its second step."), *abrogated on other grounds by Holder v. Martinez Gutierrez*, 566 U.S. 583 (2012).  Because five justices squarely rejected the relatively permanent waters test as an unreasonable interpretation of the Clean Water Act, the Court should reject the Agencies' attempt to adopt that impermissible interpretation under the guise of a rulemaking.

        D.     <u>The Navigable Waters Rule Unlawfully Reads Section 101(b) To Undermine The Act's Objective To Maintain And Restore The Integrity Of The Nation's Waters.</u>

The Navigable Waters Rule relies heavily on Section 101(b) of the Clean Water Act, 33 U.S.C. 1251(b), to *revoke* protections for streams and wetlands that significantly affect the integrity of navigable waters, claiming that this approach preserves states' "primary responsibilities and rights."  85 Fed. Reg. at 22,269-70.  But the text, structure, purpose, and history of the Clean Water Act show that sections 101(a) and 101(b) are in harmony.  ECF No. 48, at 24-26.  Section 101(a) sets out the Act's sole objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and section 101(b) sets out specific functions for the states to perform to achieve that objective.  33 U.S.C. §§ 1251(a)-(b).  Nothing in the Act suggests that Congress enacted section 101(b) as an exception to the Act's water quality objective, carving out huge swaths of the nation's streams and wetlands from the Act's regulatory protections.

Industry, however, tries to read into Section 101(b), a sweeping exclusion from the Act's water quality objective, asserting that Section 101(b) "envisions" that waters "will be left to be regulated, as deemed necessary, by individual states."  ECF No. 80, at 20.  That is wrong.  Section 101(b) refers to states' "primary responsibilities and rights" to protect "waters of the United States" by playing a lead role in *administering* the Act.  *See*

S. Rep. No. 92-414 at 7-8, *reprinted in* 1972 U.S.C.C.A.N. at 3472 (Oct. 28, 1971) ("The States . . . have the primary responsibility and right to implement [the statute's] goal" of protecting water quality.); 33 U.S.C. § 1251(b) (declaring the "policy of Congress" that states "implement the permit programs"); *see also id*. §§ 1342(b), 1344(g).  Section 101(b) also reflects state authority to set water quality standards for "waters of the United States" within that state's borders, and to impose *additional or more stringent* pollution limitations than the statute requires. *See* 33 U.S.C. § 1370; *City of Arcadia v. EPA*, 411 F.3d 1103, 1106 (9th Cir. 2005) (states' role in setting water quality standards reflects section 101(b)'s policy that "States remain at the front line in combating pollution").  Congress did not therefore grant the Agencies unfettered discretion to exclude waters under section 101(b), much less in a way that significantly diminishes the integrity of navigable waters—as the Agencies have done here in the Navigable Waters Rule.

In fact, Industry's reading of Section 101(b) would thwart the Act's objective of protecting the integrity of navigable waters, because states are unwilling or unable to fill the gap in lost federal protections.  *See supra* Sections I.A, II.A.  Congress thus enacted the Clean Water Act to *replace* the previously ineffective patchwork of state laws with a strong national floor of federal water pollution controls.  *See* ECF No. 48, at 2-3; *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 318 (1981).  That history defies Industry's attempt to use section 101(b) to undermine water quality protections.

Industry also relies heavily on the *Rapanos* plurality's assertion that Congress' policy in section 101(b) "refer[s] to something beyond the . . . state administration program" because Congress announced that policy in 1972 but did not establish the state administrative programs until the 1977 amendments to the Act.  547 U.S. at 737.  That argument overlooks that Congress set out in the 1972 Act exactly how it envisioned the states' role in protecting water quality.  For example, the 1972 Act granted states veto power over federally licensed or permitted projects threatening state water quality.  *See* 33 U.S.C. § 1341.  It gave states the authority to impose stricter water pollution standards

than those required by the Act. *See* 33 U.S.C. § 1370.  And it largely reserved to states responsibility for containing pollution from nonpoint sources, by excluding them from permitting requirements.  *See* 33 U.S.C. § 1362(12) (defining Clean Water Act regulated discharges as from point sources).

If anything, Congress amended the Act in 1977 to show how its policy in section 101(b) would be carried out—by having states administer certain of the Act's functions. Indeed, the 1977 amendments "retain[ed] the comprehensive jurisdiction over the Nation's waters exercised in the 1972 [Act]."  *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) (quoting 123 Cong. Rec. 39,209 (1977)). Section 101(b) does not therefore exclude integral waters from the Act's regulatory protections, contrary to the approach taken in the Navigable Waters Rule.

Because the Agencies' interpretation is unreasonable and inconsistent with the Clean Water Act, it must be set aside as "not in accordance with law."  5 U.S.C. § 706(2)(A).

E.   The Sacketts' Extreme Arguments Mischaracterize The Statute And Supreme Court Precedent.

The Sacketts' legal theory is based on the premise that the Clean Water Act applies only to "navigable-in-fact" waters and their abutting wetlands.  ECF 77.1, at 1, 8-9.  That cramped reading of the statute was rejected more than 45 years ago, *Nat. Res. Def. Council, Inc. v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975), because it is inconsistent with the Act's text and legislative history, which shows that Congress intended for "waters of the United States" to be interpreted broadly.  *See* H.R. Rep. No. 92-911 at 76-77 (1972) (directing the "broadest possible" definition of "navigable waters" of the United States, distinct from earlier narrower interpretations); *see also* ECF No. 48, at 17-18.

The Sacketts' navigable-in-fact theory was again squarely rejected by the Supreme Court over 35 years ago.  *See Riverside Bayview*, 474 U.S. at 133 ("[T]he Act's definition

of 'navigable waters' as 'the waters of the United States' makes it clear that the term 'navigable' as used in the Act is of limited import," and that "Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes").  The Court has repeatedly reaffirmed that the term "'navigable waters' . . . has been construed expansively to cover waters that are not navigable in the traditional sense."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 486 n.6 (1987).[12]

## II.   INDUSTRY'S ARGUMENTS DO NOT ADDRESS THE FUNDAMENTAL FAILURES OF THE AGENCIES UNDER THE ADMINISTRATIVE PROCEDURE ACT.

Industry's arguments paper over the gaping failures of the Agencies to consider important parts of the problem such as the Rules being divorced entirely from science, the harms to waters of the U.S. that the SAB said the Navigable Waters Rule will cause, the arbitrariness of the Agencies' unexplained about-face on protecting waters of the U.S. coupled with inconsistencies in the Agencies' actions, and the complete failure to assess and consider the disproportionate negative impacts of the Rules on tribes.[13]  It is the

---

[12] *See also, e.g.*, *Rapanos*, 547 U.S. at 731 (plurality opinion) ("[T]he Act's term 'navigable waters' includes something more than traditional navigable waters."); *id.* at 779 (Kennedy, J, concurring) (Act extends to non-navigable waters with a "significant nexus" to navigable waters); *id.* at 805-06 (Stevens, J., dissenting) (Act extends to wetlands "bordering, contiguous, or neighboring" other "waters of the United States"); *accord Upstate Forever v. Kinder Morgan Energy Partners*, 887 F.3d 637, 643 (4th Cir. 2018) ("'Congress chose to define the waters covered by the Act broadly'" beyond "waters that are navigable-in-fact" (quoting *Riverside Bayview*, 474 U.S. at 133)), *vacated on other grounds*, 140 S. Ct. 2736 (2020) (mem.); *United States v. Deaton*, 332 F.3d 698, 709 (4th Cir. 2003) (Congress' "choice of the expansive phrase 'waters of the United States' indicates an intent to 'regulate at least some waters that would not be deemed "navigable" under the classical understanding of that term.'" (quoting *Riverside Bayview*, 474 U.S. at 133)).

[13] The Tribes address themselves to the Industry arguments in this section of the brief, because the Sacketts' argument on the APA is that, given the Sacketts' position on the law, any "alleged deficiencies in the rulemaking" are not germane to the exclusion of abutting wetlands from the protections of the Clean Water Act.  ECF No. 77.1, at 33.

Agencies' obligation to examine the data before them and thereafter demonstrate a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Nw. Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1047-48 (9th Cir. 2008). Yet here, the Agencies, and now Industry, fail to demonstrate that required examination of facts and to make that rational connection. Such a demonstration would be impossible because the Agencies did not, in fact, examine the facts; listen or respond to their experts; or explain any connection, much less a rational one, between facts (the few that were "found") and choices the Agencies made.

A. Industry Failed To Show Where The Agencies Considered The Harm To Downstream Waters Of The U.S. Identified By The SAB.

Industry takes the same blinkered approach as did the Agencies when it reiterates, repeatedly, that "science cannot dictate" or that science does not matter and is irrelevant to a determination of which of the Nation's waters will be protected under the Clean Water Act. That approach is directly contrary to the basic administrative principle that Agencies cannot disregard their own experts. *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016). Further, in disregarding the opinion of their own experts, the Agencies failed to consider a relevant factor—namely whether the Navigable Waters Rule protects and restores the chemical, biological and physical integrity of those waters of the U.S. Finally, casting aside the opinion of their own experts means the Agencies also cast aside the express directions of Congress that all waters of the U.S. are considered navigable waters of the U.S., 33 U.S.C. § 1362(7), and that the chemical, biological and physical integrity of those waters of the U.S. must be protected and restored.[14] *Id.* §1251(a).

_____

The Sacketts therefore offered little in response to the Tribes' arguments regarding the APA.

[14] Congress also directed that standards of cleanliness must be set to protect *all* uses of all waters of the U.S. including for public health, recreation, fishing and wildlife, and that all

The SAB unequivocally informed the Agencies that the Navigable Waters Rule will in fact *decrease protection* of the chemical, physical, and biological integrity of the Nation's waters in direct contradiction to Congress' express direction in the Act.  Ex. 1, at 2, ECF No. 48.6.  The SAB told the Agencies that the Navigable Waters Rule "*does not provide a scientific basis in support of its consistency with the objective of restoring and maintaining 'the chemical, physical and biological integrity' of these waters.*"  *Id.* (emphasis added); *see also* Ex. 99, at 2, ECF No. 63.8.  The failure to consider that crucial issue—the sole objective of the Clean Water Act—and disregard for the contrary evidence presented by the SAB is arbitrary and capricious.  *See State Farm*, 463 U.S. at 43 (action is arbitrary if agency fails to consider "an important aspect of the problem" or "runs counter to the evidence").

Nowhere do the Agencies address the SAB's sharp criticisms in the final Navigable Waters Rule, instead simply repeating that 'science does not dictate' Clean Water Act jurisdiction.  Yet, in its discussion and opinion regarding the impact of the Navigable Waters Rule on the chemical, physical, and biological integrity of the Nation's waters, the SAB specifically said that science in fact does dictate jurisdiction because science informs where and how the integrity of the Nation's waters is affected.  Ex. 99, at 2-3, ECF No. 63.  That tracks the Clean Water Act itself, which instructs that its purpose and intent is to restore and protect the chemical, physical, and biological integrity of the Nation's waters, a necessarily scientific endeavor.  The Act plainly regulates standards for, and activities that will affect, the integrity of the Nation's waters.  In order to actually do that, one must assess the impact on that integrity that comes from upstream.  Five justices in *Rapanos* underscored the importance of evaluating the science to determine the appropriate scope of Clean Water Act jurisdiction.  Even Justice Scalia, the Agencies' polestar for the rulemaking, discussed connectivity of waters to navigable waters and

discharges of all pollutants to the waters of the U.S. are prohibited.  *Id.* §§ 1311(a), 1313(c)(2)(A).

made distinctions based on science such as length and duration of flows.  *See Rapanos*, 547 U.S. at 732-33, 739, 745.  The SAB used those same assessments to show how the Navigable Waters Rule's categorical exclusions of waters contravenes the sole objective of the Clean Water Act.  The Agencies' refusal to engage on the fundamental criticisms of their own experts is inherently arbitrary and capricious.  *Pritzker*, 828 F.3d at 1139 (agency decision in conflict with own experts is arbitrary and capricious); *see W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492-93 (9th Cir. 2011).

Industry relies on a single memorandum in the record to claim that the Agencies considered the SAB's concerns.  ECF No. 80, at 24 (citing Mem. To The Record From John Goodin, Ex. 119).  But the document, and especially its attachment, Mem. From Alison Cullen, Ex. 118, actually show that the Agencies *dismissed* the SAB's concerns based on the flawed premise that science can't dictate Clean Water Act jurisdiction because it is a "legal and policy" choice, apparently made in a vacuum.  As such, the Agencies did *not* substantively examine and respond to the SAB's assertion that the Navigable Waters Rule will cause harm (through decreased protections) to the chemical, physical, and biological integrity of the Nation's waters nor explain the support, record or legal, for their contrary position.  The documents cited by Industry thus expose the errors in the Navigable Waters Rule and prove the Tribes' point.  *See* Exs. 118, 119; *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigration*, 981 F.3d 742, 760 (9th Cir. 2020) ("[M]aking some mention of evidence but then coming to a contrary, 'unsupported and conclusory' decision 'add[s] nothing to [an] agency's defense of its thesis except perhaps the implication that it was committed to its position regardless of any facts to the contrary.'").

Industry also overlooks the detailed concerns raised by the SAB, which are addressed nowhere in the record.  The SAB repeatedly queried the EPA during the spring of 2019 about the Agencies' disregard of the Science Report and its conclusions that tributaries and wetlands, including all ephemeral tributaries, especially in the Southwest,

and wetlands not immediately abutting on the surface in all years, affect the chemical, physical, and biological integrity of downstream navigable waters. *See generally* Ex. 118. Specifically, the SAB pointed out that the science had conclusively demonstrated that ephemeral streams, even in the wetter Northeastern portions of the U.S., "are the cumulative source of approximately 60% of the total mean annual flow" to all streams and rivers. *Id.* at B-1 (citing the Science Report, Ex. 100, ECF Nos. 64-64.2). The SAB continued by noting that ephemeral streams draining a watershed over a given year or multiple years "can have substantial consequences on the integrity of the downstream waters," the very thing Congress directed be protected under the Act. *Id.* Therefore, the SAB asked EPA to explain the scientific basis for the categorical exclusion of ephemeral streams, "given their demonstrated importance to the chemical, physical, and biological integrity of the Nation's waters." *Id.* at A-2, B-1.[15] EPA did not provide any scientific rationale in response. Nor did EPA argue with the science. Rather, EPA simply stated that the Navigable Waters Rule was "informed by" science (without citing how or by what). *Id.* at A-2, B-1. To comply with the APA, though, the Agencies needed to *explain* how their conclusion had scientific support and how they addressed the SAB's findings. Instead, EPA provided no analysis or response of any kind to the assertions that ephemeral streams have a significant influence on the downstream chemical, physical, and biological integrity of navigable waters, the protection of which is the sole purpose, intent, and direction of Congress in passing the Clean Water Act.[16]

---

[15] The SAB similarly asked EPA to "explain the scientific basis for excluding from jurisdiction waters that had a significant nexus with a traditional waterway." *Id.* at A-4 and B-6. EPA similarly shrugged off the question and did not answer it other than to say jurisdiction is a legal distinction, not a scientific one. *Id.*

[16] *See also* Ex. 118, at B-4 to B-5. The SAB asked EPA the scientific basis for no longer including adjacent wetlands contrary to the Science Report, and EPA dodged the question by simply asserting that they are included. But EPA failed to acknowledge (much less address) that the Science Report defined adjacency much more broadly than does the Navigable Waters Rule. The EPA simply chose to disregard the real question and cited, yet again, that the rule is based in legal rationales, not scientific ones. *Id.*

Moreover, as the SAB recognized and pointed out to the Agencies, the science shows that the Navigable Waters Rule is contrary to the law in that it will decrease protections for the chemical, physical, and biological integrity of downstream navigable waters of the U.S. *See infra* Section II.B. The Agencies recognize and admit that they failed to examine the magnitude and import of that decrease in protections to downstream waters. ECF Nos. 72.1 & 72.2 ¶ 20. It was and is arbitrary and nonresponsive to the concerns of the experts for EPA to simply respond (and Industry to argue) that Clean Water Act jurisdiction is driven by legal, not scientific, considerations. That response leaves the law unfulfilled and arbitrarily so.

Industry is incorrect when it claims that the "crux" of the Tribes' argument is that "all water systems are connected." ECF No. 80, at 27. Nowhere do the Tribes assert as much. Rather, the Tribes argue, as did the SAB, that water connections can and do affect downstream navigable waters' chemical, physical, and biological integrity. The Tribes further argue that in order to comply with Congress' direction in the Act, that effect must be examined and upstream waters cannot be categorically excluded without that examination.[17] Jurisdiction under the Clean Water Act cannot rationally be divorced from science. To turn a blind eye to the science that informs that assessment is to act arbitrarily and to fail to ground the rule in the law, despite the Agencies' repeated, but empty, claims to doing so.

Finally, Industry points to EPA's repeated references to "balanc[ing]" interests or "balanc[ing]" considerations of polluters and state control of "their" waters in determining jurisdiction as somehow supportive of a rule that, according to Agency

---

[17] The Agencies agree and admit that the required examination of negative downstream effects from the Navigable Waters Rule has not been done and must be done. ECF Nos. 72.1 & 72.2 ¶ 20. While that is an important admission, it is not necessary for the Court to find in the Tribes' favor on this point as the record is already replete with evidence that the Agencies failed to consider this critically important aspect of the problem. *See* ECF No. 48, at 26-32.

experts, fails to protect the integrity of the Nation's waters.  ECF No. 80, at 2, 14, 23, 26-27; *see* Ex. 118, at 2, A-2, B-2, B-3.  This argument is hollow and incorrect.

First, nothing in the Clean Water Act allows the Agencies to "balance" a water of the U.S. out from under Clean Water Act protections.  Congress' direction is clear that the integrity of *all* the Nation's waters is to be protected by the requirements of the Act.  *See supra* Section I.E.

Second, the argument that these waters will simply be protected by states is, in many cases, false, including in Arizona.[18]  *See supra* Sections I.A., I.D.  A significant number of states ban their regulatory agencies from regulating any waterbody more stringently than federal law or erect significant barriers to regulating more stringently than the federal requirements, allowing more stringent regulation only if a regulating agency can demonstrate the substantial need and economic worth (or lack of economic impact) of a proposal, including often requiring legislative approval ahead of time.  Arizona is one of those states.  *See* H.R. 2691, 55th Leg., 1st Session (Az. 2021); *see also* Ex. 117, at 45-46 (describing state limitations on regulations that go beyond federal law).  Many other states do not have a state structure or laws for regulating the dredging or filling of waters, relying entirely on the federal laws.  Ex. 117, at 46.  In the name of so-called "balance" or claimed "recognition" of states' ability to regulate "their own" waters, the Navigable Waters Rule has kicked waters out of the Clean Water Act and left them to be unregulated and thereby destroyed.

B.     The Agencies Largely Ignored The Science Report.

The Tribes documented, in great detail, the Agencies' failure to consider the undisputed findings in the Science Report, Ex. 100, ECF Nos. 64-64.2.  Industry attempts to sidestep this failure based on a series of misleading arguments.

---

[18] This argument also glosses over history and one of the factors that motivated Congress to pass the Clean Water Act: the repeated failures of states to do the job of protecting water themselves.  *See supra* Section I.D.

Industry first attempts to mischaracterize the issue, claiming that it was not required to "follow every aspect of the *[Science] Report*." ECF No. 80, at 26. But that is not the Tribes' argument. Rather, the Tribes argue that the Agencies were required to explain how the Navigable Waters Rule—including the decision to categorically exclude waters, such as ephemeral streams—had a reasonable foundation in the Science Report. It does not: the Navigable Waters Rule is unsupported by and contrary to the Science Report, rendering it arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary if it "runs counter to the evidence").

Industry cites a few examples of where the Agencies mentioned the Science Report in a vain attempt to fill the overwhelming void of analysis concerning the impact that the Navigable Waters Rule's extensive decreases in protections would have on the integrity of the Nation's waters.[19] ECF No. 80, at 24. Those small bits only serve to highlight that the Agencies largely ignored the overwhelming bulk of science demonstrating how ephemeral streams and wetlands, although not necessarily connected at all times on the surface, have a substantial and critical impact on the downstream chemical, physical, and biological integrity of the Nation's waters. And the Agencies did so without once citing to competing science that demonstrates otherwise (because there is none).[20] This one-sided analysis is arbitrary because it only considers science when it

---

[19] Industry uses the phrase "cherry-pick[]" to refer to the Tribes' examples and discussion of ephemeral bodies of water that have significant impacts on downstream waters of the U.S. ECF No. 80, at 31. But the Tribes' references and examples come straight from the Science Report itself and the examples that the Science Report found compelling and indicative. Industry correspondingly refers only to its own comment letters opposed to regulation. *Id.*

[20] Industry also continues to push the "connectivity gradient" concept as supporting cutting large numbers of waters out of Clean Water Act protections, ECF No. 80, at 24, 27, despite the fact that the SAB itself calls the Agencies' citation to the connectivity gradient a mischaracterization and misuse of the concept. Ex. 9, at 3, ECF No. 49.5. The SAB instructs that, while there is a connectivity gradient, the Agencies must consider streams' cumulative and aggregate effects in order to truly understand the impacts on downstream navigable waters. *Id.*

supports the Agencies' action, ignoring the overwhelming evidence to the contrary.

C.    The Law Requires More Explanation Of The Agencies' Change In Position Than Endless Repetition of "Science Does Not Dictate."

Under the APA, an agency must base its decision on the record as a whole and, when the agency does an abrupt about-face as it did here, it has an obligation to explain to the public, to the SAB, and to this Court precisely how and why its decision to disregard earlier science and the advice of its own experts is supported by the record and by the law.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968-69 (9th Cir. 2015).  The agency must display awareness and acknowledge that it is changing position; it must explain the rationale for the change; it must show good reasons for the new position; and where the new rule rests on findings which contradict those which underlay its prior position, the agency must provide a more detailed justification for how and why that contradiction is not arbitrary and capricious.  *Fox Television Stations, Inc.*, 556 U.S. at 515; *Organized Vill. of Kake*, 795 F.3d at 968-69.  The Agencies failed here.

Industry repeatedly argues that the Agencies need not rely on science to draw the Navigable Waters Rule's jurisdictional lines because it is solely a legal and policy decision.  ECF No. 80, at 30 (citing 85 Fed. Reg. at 22,271).  Even apart from the flaws in the Agencies' legal analysis, *see supra* Section I, the problem with this argument is evident.  As the Agencies now recognize, ECF Nos. 72.1 & 72.2 ¶ 11, the governing statute has the sole objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), a legal objective inherently based in scientific fact and analysis.  The Agencies had a duty to address the substantial body of science demonstrating the chemical, physical, and biological connections of waters head-on, as the APA requires.  Rather than utilize their expertise to explain their departure from prior conclusions and policy, the Agencies sidestepped scientific analysis entirely.

Industry attempts to distinguish this case from the situation in *Village of Kake* by claiming the Agencies made a new record here. ECF No. 80, at 33. The record here still includes the Science Report, all of the published science supporting it since its publication, and all of the SAB comments, questions, and criticisms. Those facts remain unchanged and, as in *Village of Kake*, the Agencies have failed to provide a record-based explanation of how this same record supports a completely different result. The only explanation, over and over, is that the science doesn't matter, only the law does. But the law too is unchanged, including the case law. It requires protection of downstream integrity and the science and experts are clear: it is therefore necessary to protect upstream integrity, including ephemeral streams and non-abutting wetlands, to comply with that legal directive.

> D.   Industry Fails To Explain Away The Inconsistencies And Inherent Arbitrariness In The Navigable Waters Rule.

Industry's attempts to explain away inconsistencies and incoherencies in the Navigable Waters Rule simply highlight its arbitrary and results-driven nature. Further, the Industry-cited memos regarding discussions between EPA and the SAB highlight additional inconsistencies.

First, Industry tries to tackle the Agencies' statement that all perennial and intermittent flow streams—with 'relatively continuous flow'—are jurisdictional, except if they are an arid-region stream and the 'relatively continuous flow' is in response to precipitation. ECF No. 80, at 34-35 (citing 85 Fed. Reg. at 22,276). Then, apparently, the stream is not protected. *Id.* Again, the Tribes are unaware of sources of water on the planet other than precipitation—rain and snow.[21] The Agencies give no rationale nor record support for why streams west of the 100th meridian are not protected even if relatively continuous from rains, but those in the east will be. Industry's non-helpful explanation is that the Tribes misunderstand the Agencies; that what the Agencies meant

---

[21] Even groundwater was originally rain and/or snow.

was streams with relatively continuous flow might still be considered "ephemeral" and excluded from Clean Water Act protection if they are in the arid regions of the country. *See id.* The Tribes understand this about the Navigable Waters Rule very well and it is this type of inconsistency that appears to be driven by results, not the record. It is the hallmark of an arbitrary rule.

Second, Industry tries to explain away the inconsistency regarding groundwater-fed streams in the west. The Navigable Waters Rule provides that if an arid stream is ephemeral—that is, it does not have perennial or intermittent flow (which apparently includes relatively continuous streams that are continuous because of rain storms)—it is not protected under the Act…except it *might* be protected if the stream's lack of perennial or intermittent flow is because the water sinks through the bottom or sides of the arid, ephemeral streambed into the ground *and* it is thereby recharging groundwater. *Id.* This language also appears to mean that if the water in a stream flows only part of the year from rain and recharges downstream navigable waters during that time, it is not protected under the Clean Water Act; but if it can be determined that it is recharging groundwater, then it is. Industry tries to help the Agencies out with an explanation that essentially repeats the confusing part: "an arid stream that recharges groundwater will be classified as 'intermittent' [even if there is no surface flow in a typical year] if it supplies sustained flow in a manner that is not dependent on precipitation; if the flows are dependent on precipitation, then the stream is instead 'ephemeral.'" *Id.* Industry's explanation appears to be that if a stream that does not have perennial or intermittent flow somehow, without relying on precipitation, provides flow that "recharges" groundwater through its bottom or sides, then that ephemeral stream will be declared "intermittent" and protected. But if the recharge to groundwater is from rain, then the stream that is sending that rainwater into the groundwater is still ephemeral and not protected. This makes absolutely no

sense.[22]

Additional evidence of the inconsistent and arbitrary nature of the Navigable Waters Rule appears in EPA's spring 2019 responses to SAB questions, cited by Industry in its brief. One SAB question asked EPA whether temporal variability could cause tributaries to come "in and out" of jurisdiction; that is, if flows dried up or increased thereby moving a water body in or out of perennial flow or adjacent status, would that change jurisdiction? Ex. 118, at A-3. EPA answered that the Corps is primarily responsible for making jurisdictional determinations and that those decisions last for five years. *Id.* After five years, EPA thought it possible that a new jurisdictional determination would produce a different result. *Id.* This is preposterous. One does not later 'find jurisdiction' over a wetland that was destroyed five years earlier by a mine or over a tributary stream that was paved with suburban development, nor recover a tributary stream (and the waters downstream of it) that received unregulated pollutant discharges for the five years. EPA's response to the SAB's question is nonsensical, unreasoned, and arbitrary.

The SAB also asked EPA how volumetric differences in flow should be addressed when defining waters of the U.S. *Id.* EPA responded that volume didn't matter, even if there is great variability in volume. The only thing that mattered was perennial/intermittent flow, large or small, that reaches navigable waters in a typical year (and apparently not driven by precipitation). *Id.* This is precisely the situation that Justice Kennedy, joined by the four dissenting justices, identified as a concern with Justice Scalia's constrained approach: the Navigable Waters Rule protects the "merest trickle" if it happens to be lucky enough to be on the wet eastern seaboard and flows year

---

[22] In addition to being highly arbitrary, these inconsistencies in the Navigable Waters Rule and the Agencies' and Industry explanations for them give the lie to the repeated claims of the Agencies that they threw out science in favor of "clarity" or a "predictable regulatory framework." *See* Ex. 118, at 2-3; ECF No. 80, at 30. Nothing about these provisions in the Rule or Industry's attempt to explain them is clear or predictable.

round, but leaves "torrents thundering" that sustain a downstream river in the arid west for a whole year unprotected, because they are unlucky enough to be an ephemeral stream west of the 100th Meridian and flow only part of the year in response to rain. *See Rapanos*, 547 U.S. at 769 (Kennedy, J., concurring).

While a court will not impose its opinion of what may be "best" over that of an agency, an "internally inconsistent and inadequately explained" agency action is arbitrary and capricious, *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987), and as such it must be reversed under the APA and the factors outlined in *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43. These examples are not simple 'misunderstanding' of the Navigable Waters Rule. Rather, they reveal the Navigable Waters Rule to be inconsistent, not reasoned, inadequately explained, and based upon something other than the record and the law. The Navigable Waters Rule must be reversed.

E.   The Agencies Violated Their Own Policies By Ignoring An Important Aspect Of The Problem: Environmental Justice.

Executive Order 12,898 made federal agencies responsible for "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." Exec. Order. No. 12,898, 59 Fed. Reg. 7,629 (Feb. 16, 1994). Industry argues that the Order does not create a new right to judicial review. ECF No. 80, at 37-38. However, Industry misconstrues the Tribes' argument. The Tribes do not look to the Order for a cause of action. Rather, the Tribes argue that the Agencies have violated section 706(2)(A) of the Administrative Procedure Act by arbitrarily and capriciously disregarding their own policies and thus entirely failing to consider an important aspect of the problem: the Rules' disproportionate impacts on minority and low-income populations, and indigenous peoples. *See* ECF No. 48, at 37-39; *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, -- F.4th --, 2021 WL 3354747, at *5 (D.C. Cir. 2021) (finding agency's environmental justice analysis

arbitrary and capricious under the APA, pursuant to Executive Order 12,898);
*Conservation Law Found. of New England, Inc. v. Clark*, 590 F. Supp. 1467, 1477 (D.
Mass. 1984) ("Plaintiffs . . . do not seek a private right of action under the executive
orders.  Rather, their right of action, undisputed by the defendants, arises under the
APA.").

Industry also claims that the Agencies adequately considered environmental
justice impacts in the rulemakings, pointing only to the Agencies' bald assertions that the
Rules would not result in disproportionate harms.  ECF No. 80, at 37.  But they fail to
acknowledge the flawed rationale for that assertion.  In the rulemakings, the Agencies
concluded that because the Repeal Rule was a return to the pre-2015 regime and because
the Navigable Waters Rule does not establish any specific regulatory requirements, the
Rules simply cannot result in disproportionate impacts.  *See* Definition of "Waters of the
United States," 84 Fed. Reg. 56,626, 56,666 (Oct. 22, 2019); Ex. 120, at 30-31.  That
conclusion is preposterous on its face.  The Rules do not create new regulatory
requirements because they instead *eliminate* requirements, thereby stripping vital
protections from watersheds across the country.  By neglecting to even consider that far-
reaching regulatory rollbacks might disproportionately impact indigenous peoples, the
Agencies "failed to consider an important aspect of the problem."  *State Farm*, 463 U.S.
at 43.

Had the Agencies properly conducted an environmental justice analysis, they
would have discovered, at a minimum, that the Rules disproportionately harm indigenous
peoples.  In fact, the Agencies now recognize that tribes "will disproportionately suffer
from the reduction in protections."  ECF Nos. 72.1 & 72.2 ¶ 19.  Water carries particular
importance in the Tribes' ways of life, providing sustenance, economic vitality, and
spiritual and cultural values.  *See* ECF No. 48, at 37-38; *see generally* Nunez, Howes,

James, Reiter, & Vega Decls, ECF Nos. 48.1-48.5.[23]  These values are unique to the Tribes.  As such, any harms caused by the Rules are amplified many times over with respect to the Tribes and other indigenous peoples.  Some tribes, for example, rely heavily upon the ephemeral waters that the Rules targeted for exclusion—as the Agencies were well aware.  *See* Ex. 120, at 31.  Yet, while recognizing that the Navigable Waters Rule "has tribal implications," the Agencies summarily declared that because some waters may be protected by non-federal laws, there could be no adverse impacts.  *Id.*  The Agencies' abdication of duty does nothing to address the documented disproportionate harms to Tribes directly resulting from the Rules.  *See supra* Sections I.A., I.D., II.A.

The Agencies therefore acted arbitrarily and capriciously by failing to apply Executive Order 12,898 and their own internal policies, and instead blatantly ignoring the environmental justice issues arising as a result of these rulemakings.

III.   THE WASTE TREATMENT EXCLUSION AND ITS EXPANSION ARE OUTSIDE THE LAW REGARDLESS OF THE AGENCIES' PERPETUATION OF THE VIOLATION.

Industry's characterization of the waste treatment exclusion as a valid, unchanged, and practical 'business as usual' exclusion of industrial ponds from the protections of the Clean Water Act is not accurate.

First, the Ninth Circuit has not "recognized" and certainly has not ruled on or validated the impoundment and use of waters of the U.S. for the treatment of waste and the subsequent exclusion of those waters from Clean Water Act protections.  In *Healdsburg*, the court applied *Rapanos* to determine whether a pond, containing wetlands that abutted other wetlands that were adjacent to a river, was protected as a water of the U.S. under the Clean Water Act, which would require the City to submit to regulation and control of its discharge of sewage into the pond  that ultimately seeped from the pond into

---

[23] Nunez Decl., ECF No. 48.1 ¶ 23, 27, references Exhibits A-E.  Those exhibits are provided to the Court at ECF Nos. 26.1 and 31.1.

wetlands and the river.  496 F.3d at 995.  The pond had been created as many mine

tailings, coal ash, and other industrial waste ponds were and still are: by digging out

areas, often wetlands, often adjacent to water bodies, that fill with water. [24]  *Id.* at 996.

The court found the pond to be a protected water of the U.S.—part of a larger wetland,

adjacent to the river—applying Justice Kennedy's significant nexus test.  *Id.* at 999-1000.

The defendant attempted to then argue that even if the pond is a water of the U.S., it is

exempt from protection as part of a larger overall "waste treatment system."  *Id.* at 1001.

While it is true that the Ninth Circuit restated the existence of the waste treatment

exclusion and what it covered, it did not and was not called upon to address whether that

exclusion itself is contrary to the Clean Water Act.  *Id.* at 1001-02.  Further, the court

addressed an earlier version of the waste treatment exclusion than is included in the

Navigable Waters Rule.  *See id.*  Ultimately, the court found that while the pond may be

*part* of an overall waste treatment system, it did not fall within the exclusion from the

protections and regulations of the Clean Water Act.  *Id.* at 1002.

The most important lesson from *Healdsburg* is the court's finding that a pond, part

of larger wetland complex adjacent to a river, was not included in the waste treatment

exemption *even if utilized as part of the larger waste system*.  Today, under the Navigable

Waters Rule's changes to the exclusion, that may be different.  That is because the

Navigable Waters Rule includes a new, much more sweeping definition of what

constitutes a waste treatment system subject to the exclusion from the Clean Water Act.

---

[24] In other examples, ponds are made by impounding a wet area and letting it fill with
water.  The Minntac Mine in Northern Minnesota is an example where wetland
headwaters to two rivers, one that included wild rice (Manoomin) resources protected by
treaty, important for the Fond du Lac Band, were dug out and made into a mine tailings
waste pond.  That mine waste pond was designed to seep pollutants into the two rivers
and has been doing so for decades with disastrous results for Manoomin and aquatic
resources.  *See* ECF No. 48.2 ¶ 11; Brief for Fond du Lac Band of Lake Superior
Chippewa as Amicus Curiae Supporting Respondents at 13-19, *Cnty. of Maui v. Haw.
Wildlife Fund*, 140 S. Ct. 1462 (2020) (No. 18-260), 2019 WL 3494039 (describing
Minntac situation).

Now, in addition to allowing these systems to be created in waters of the U.S. and thereafter excluded from protection (as a result of the 1980 suspension and then the recent renewal and expansion of that suspension), the Navigable Waters Rule expands that damage to include anything and everything that might be associated with the waste "system," possibly like the pond in *Healdsburg*. Presumably, the industries that rely on convincing the Corps to allow them to dig out a wetland or impound a water of the U.S. to dump waste realized that cases like *Healdsburg* stood in the way of wholly stripping waters used as waste dumps from Clean Water Act protections; the expanded definition in the Navigable Waters Rule aims to remove that impediment to waste dumps in waters of the Nation. This is contrary to the Act.

Further, once a water of the U.S. is excluded from protection as part of a waste system, waters upstream of that once protected, but now excluded, water can also be cut off from protections. That is because tributaries to, and wetlands adjacent to, that now destroyed and excluded waterbody will no longer flow to a protected water of the U.S. The waste treatment exclusion can set off a chain reaction of unprotected water for the purposes of created water waste dumps for some of the most-polluting industries. This is the very antithesis of the Clean Water Act and is one of the reasons Congress passed the Act. The waste treatment exclusion violates the law and must be reversed.

IV.    THE SACKETTS' CONSTITUTIONAL ARGUMENTS ARE MERITLESS.

The Sacketts argue that federal authority over non-abutting wetlands is prohibited by (1) the Commerce Clause and Tenth Amendment and (2) the nondelegation doctrine. ECF No. 77.1, at 28. These arguments are entirely meritless. The law is clear: the Commerce Clause's authority extends to nonnavigable waters when necessary to protect navigable waters. Further, the Clean Water Act satisfies the nondelegation doctrine by providing the Act's purpose as an intelligible principle.[25]

---

[25] Because there is no "serious doubt" concerning the Act's constitutionality, the canon of constitutional avoidance does not apply. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842

A.   <u>Under The Commerce Clause, The Federal Government Has The Power To Regulate Nonnavigable Waters When Necessary To Protect Navigable Waters.</u>

"It has long been settled that Congress has extensive authority over this Nation's waters under the Commerce Clause." *Kaiser Aetna v. United States*, 444 U.S. 164, 173 (1979). Indeed, the Supreme Court has recognized that Congress's powers under the Commerce Clause extend beyond waters that meet the traditional tests of navigability. *Riverside Bayview*, 474 U.S. at 133. Congress's extensive authority includes "the authority to regulate nonnavigable waters when . . . necessary to achieve Congressional goals in protecting navigable waters." *Deaton*, 332 F.3d at 707; *see also Oklahoma ex rel. Phillips v Guy F. Atkinson Co.*, 313 U.S. 508, 525 (1941) (concluding that Commerce Clause powers extend to treating watersheds as a key to flood control on navigable streams). Here, Congress's purpose was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of that purpose, Congress has the power to protect wetlands and streams if their degradation would affect the integrity of navigable waters.

The Sacketts' argument would make a mockery of Congress's commerce power by allowing navigable waters to become "mere conduit[s] for upstream waste." *United States v. Ashland Oil & Tranp. Co.*, 504 F.2d 1317, 1326 (6th Cir. 1974). The problem is readily apparent when considering wetlands like those on the Sacketts' property. EPA has determined that the Sacketts' wetland—located just 300 feet from a navigable lake— has "significant physical and biological impacts on [the lake]," affecting water quality and fish and wildlife species. Order at 22, 24–27, *Sackett v. EPA*, No. 08-cv-00185 (D. Idaho Mar. 31, 2019), ECF No. 120. Destruction of that wetland will have a negative effect on the lake by removing aquatic habitat connected to the lake, decreasing water retention and filtration of waters around the lake, and changing the hydrology of the

(2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)); *see* ECF No. 77.1, at 28, 29 n.10.

1    system.

2        Congressional power to regulate upstream nonnavigable waters such as the

3    Sacketts' wetlands, to protect the chemical, physical and biological integrity of the

4    Nation's waters, is an "unremarkable interpretation" of Congress' authority, upheld by

5    the courts.  *See Treacy v. Newdunn Associates, LLP*, 344 F.3d 407, 416-17 (4th Cir.

6    2003).  Federal regulation of certain nonnavigable waters does "not raise . . . Commerce

7    Clause concerns."  *Rapanos*, 547 U.S. at 782 (Kennedy, J., concurring); *see also id.* at

8    803 (Stevens, J., dissenting) (noting that Commerce Clause concerns are "plainly not

9    warranted" where wetlands were adjacent to tributaries of navigable waters, "play[ing]

10   important roles in the watershed").  As a result, there is also no Tenth Amendment

11   violation.  *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is

12   delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any

13   reservation of that power to the States."); *see also Minnesota v. Mille Lacs Band of*

14   *Chippewa Indians*, 526 U.S. 172, 204 (1999) (holding that states' authority to regulate

15   natural resources is shared with the federal government when the federal government

16   exercises one of its powers).

17       B.    The Clean Water Act Satisfies The Nondelegation Doctrine By Providing
             An Intelligible Principle.

18

19       The Sacketts' argument that the nondelegation doctrine limits federal regulation of

20   adjacent wetlands, ECF No. 77.1, at 31, fails for two reasons.  First, nondelegation issues

21   are irrelevant to the question of the Agencies' interpretation of a statute.  "[T]he Supreme

22   Court [has] rejected the notion that an agency has the power to interpret a statute so as to

23   either save it from being, or transform it into, an unconstitutional delegation."  *Env't Def.*

24   *Ctr., Inc. v. EPA.*, 344 F.3d 832, 876-77 (9th Cir. 2003) (citing *Whitman v. Am. Trucking*

25   *Ass'ns*, 532 U.S. 457, 473 (2001)).  To raise a nondelegation challenge, the Sacketts

26   would need to challenge the Clean Water Act itself, which they have failed to do.  *See id.*

27   at 877 ("The relevant question is not whether EPA's interpretation is unconstitutional, but

28

whether the statute itself is unconstitutional—a challenge Industry Petitioners do not raise.").

Second, even if this were the proper avenue for the Sacketts to raise their nondelegation arguments, those arguments fly in the face of decades of precedent interpreting the Clean Water Act and the term "waters of the United States."  When Congress has the authority to make a decision, it may delegate that power to an agency, so long as Congress provides an "intelligible principle" to guide the agency's discretion. *Whitman*, 531 U.S. at 472 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)).  This doctrine is "extraordinarily difficult to violate."  *United States v. Martinez-Flores*, 428 F.3d 22, 27 (1st Cir. 2005); *see also Whitman*, 531 U.S. at 474 (noting that the Supreme Court has only twice found a statute to be lacking an "intelligible principle," both times in 1935).

Here, the Act's stated purpose establishes the "determinate criterion" to guide the Agencies.  *Env't Def. Ctr., Inc.*, 344 F.3d at 877 (rejecting nondelegation challenge to another section of the Clean Water Act).  The Act was intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  And with respect to defining "waters of the United States," the Act's "underlying policies" offer "more than the mere 'intelligible principle' required to uphold a delegation of legislative power."  *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1396 n.3 (9th Cir. 1995) (citing *Mistretta v. United States*, 488 U.S. 361, 377 (1989)).  Indeed, the Supreme Court itself has found that "waters of the United States" should be construed broadly, *Riverside Bayview*, 474 U.S. at 133.  The Clean Water Act thus satisfies the nondelegation doctrine.

V.   THE PROPER REMEDY IS VACATUR OF THE NAVIGABLE WATERS RULE.

Vacatur is the ordinary remedy when an agency violates the law.  5 U.S.C. § 706(2)(A).  The Ninth Circuit only leaves an invalid rule in place in "limited

circumstances," such as to prevent serious environmental harm.  *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).  To determine whether such rare circumstances exist, courts assess (1) the "seriousness of the agency's errors" and (2) "the disruptive consequences" of vacatur.  *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  Both factors, weigh heavily in favor of vacating the Rules in this case.  First, the Navigable Waters Rule violates the Clean Water Act and APA, as detailed above.  Because these legal errors so pervade the Navigable Waters Rule's provisions, there is no realistic possibility that the flaws can be corrected without altering the Navigable Waters Rule.  Tribes' Mem. Opp'n Mot. Remand 4-7, ECF No. 74.  Second, vacating the Navigable Waters Rule would not cause significant disruptions—it would simply reinstate the status quo while ensuring against irreversible harm caused by leaving the Navigable Waters Rule in place.  *Id.* at 7-11.

The Agencies "share" these concerns and confirm that the Navigable Waters Rule is "causing significant, ongoing, and irreversible environmental damage."  Tribes' Mem. Supp. Mot. Accelerate Briefing 1, ECF No. 76 (quoting Email from Karen Gude, EPA (June 9, 2021), ECF No. 74.1, Ex. A).  Yet, they request a remand *without* vacatur, not to protect the environment, but to continue applying it at a breathtaking rate to strip Clean Water Act protections.  Industry also opposes vacatur, not to protect the environment, but to continue profiting from the Navigable Waters Rule's illegal rollback of critical Clean Water Act protections at incalculable expense to the Tribes and environment.  That perverse request would ensure harm to the Tribes and environment for years to come—a result that underscores the need for vacatur.

A.   <u>The Serious Errors In The Navigable Waters Rule Weigh Heavily In Favor Of Vacatur.</u>

The errors in the Navigable Waters Rule are serious, as acknowledged by the Agencies themselves.  The Navigable Waters Rule adopts an impermissible interpretation

of the Clean Water Act that was unambiguously rejected by five justices of the Supreme Court and contravenes the Act's objective.  Furthermore, the Agencies failed to provide a rational basis for eliminating Clean Water Act protections.  They ignored the science, arbitrarily reversed prior factual findings, relied on inconsistent positions, and failed to assess the disproportionate impacts of the Navigable Waters Rule on Tribes.  These errors so saturate the Rules that the Agencies concede the case on the merits.  There is thus no "serious possibility that [they] will be able to substantiate [their] decision on remand," demonstrating that vacatur is warranted. *Allied-Signal*, 988 F.2d at 151; *Pollinator Stewardship Council*, 806 F.3d at 532 ("These "fundamental flaws . . . make it unlikely that the same rule would be adopted on remand.").

Courts have rejected the Sacketts' misplaced contention that notice and comment is required prior to vacating a rule.  Sacketts' Opp'n Remand 16, ECF No. 84.  That obligation does not apply to the Court, which must "set aside" agency action found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1240 (D. Colo. 2011) (quoting 5 U.S.C. 706(2)(A)).  Furthermore, the Sacketts' argument would turn the law on its head, allowing the Agencies to continue applying an unlawful Rule that violates the Clean Water Act and APA.  The Tribes' motion for summary judgment is fully briefed and exposes numerous substantive errors in the Rules under the APA and Clean Water Act, any one of which warrants vacatur of the Navigable Waters Rule.

B.    Remand Without Vacatur Would Cause Significant Disruptive Consequences, Including Irreparable Harm To The Tribes.

Neither the Agencies nor Industry have demonstrated that this is one of the "rare circumstances" where the Court should allow the Agencies to continue violating the law. *See Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n. 7 (9th Cir. 2010).  They present no evidence showing that the invalid Rules need to be left in place to prevent "serious irreparable environmental injury," *Ctr. for Food Safety v. Vilsack*, 734 F.Supp.2d 948,

39

951 (N.D. Cal. 2010), or avoid "economically disastrous" consequences.  *Cal. Cmties.*
*Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012).  To the contrary, the evidence
shows that leaving the Rules in place will (1) increase the risk of irreversible harm and
(2) create legal turmoil.  Vacatur is thus essential to safeguard the environment and
preserve the status quo by reinstating the regulatory definition of "waters of the United
States" that predated the Navigable Waters Rule's effective date.

> 1.   *Leaving the Navigable Waters Rule in place will cause severe,*
>      *irreversible harm in violation of the Clean Water Act.*

The Tribes documented the severe, irreversible harms caused by the Navigable
Waters Rule's exclusion of Clean Water Act protections.  ECF No. 74, at 7-9; *see also*
ECF No. 76, at 2-4; ECF Nos. 72.1 & 72.2.  The numbers are irrefutable: in the past year
alone, the Agencies have assessed 40,211 aquatic resources under the Navigable Waters
Rule, the vast majority of which (76%) were deemed non-jurisdictional and thus
excluded from Clean Water Act protections.  ECF No. 87.2, at 2-3.  This sweeping
rollback is particularly extreme in Arizona, where 99.6% of streams were found non-
jurisdictional under the Navigable Waters Rule.  *Id.* at 3.

The Navigable Waters Rule is already causing "significant, *actual* environmental
harm," according to the Agencies' analysis of "specific projects" that are no longer
subject to Clean Water Act protections.  ECF Nos. 72.1 & 72.2 ¶ 17 (emphasis added).
While the Agencies have indicated their intent to commence a new rulemaking, they still
have not provided a timeline for repealing the Navigable Waters Rule and preventing
further irreversible harms.  Instead, they continue to apply the Navigable Waters Rule at a
breathtaking rate, locking in years' worth of environmental damage that contravenes the
Clean Water Act.  *See* Tribes' Reply Supp. Mot. Accelerate 1-7, ECF No. 87.

Industry opposes vacatur on the grounds that the Tribes have failed to establish
any harm from the Navigable Waters Rule.  ECF No. 80, at 11.  But the argument is
entirely backwards: *Industry* bears the burden of demonstrating that "vacating a faulty

rule could result in possible environmental harm." *Pollinator Stewardship Council*, 806 F.3d at 532. Yet, it fails to demonstrate any environmental harm from vacating the Navigable Waters Rule that "overcomes the presumption of vacatur." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1122 (9th Cir. 2018).

Industry's argument also misstates the standard for vacatur, claiming without legal support that the Tribes must identify a "specific imminent or tangible harm" to justify vacatur. But courts assess whether leaving a flawed rule in place "risks more potential environmental harm than vacating it." *Pollinator Stewardship Council*, 806 F.3d at 532; *Nat'l Fam. Farm Coal. v. EPA*, 960 F.3d 1120, 1144-45 (9th Cir. 2020) (considering whether leaving the decision in place "would risk environmental harm"). The Tribes have readily satisfied that standard; the Agencies' own data shows that the Navigable Waters Rule is already causing irreversible damage.

Industry nonetheless tries to deny these harms, claiming that the Tribes and Agencies' concerns are "unfounded" because they fail to identify any waters that lost protections under the Navigable Waters Rule. Industry Opp'n Mot. Accel. 2, ECF No. 86. That assertion simply ignores the analysis provided by the Agencies, which identifies *at least* 333 projects that required Clean Water Act section 404 permits prior to the Navigable Waters Rule, but no longer do after the Navigable Waters Rule. ECF No. 72.1 & 72.2 ¶ 15; ECF No. 87.2, at 3. That analysis squarely refutes Industry's false attempt to "suggest[]" that the Navigable Waters Rule did not strip protections for thousands of miles of streams and wetlands. Industry Resp. Remand 12, ECF No. 85.

The Rosemont Mine is a clear example of how the Navigable Waters Rule stripped waters of Clean Water Act protections. ECF No. 74, at 7-8. There, the Agencies and mining company agreed for over a decade—that is under every prior regulatory regime, including the 2008 *Rapanos* Guidance, Ex. 102, ECF No. 64.4—that the mine site contained jurisdictional waters of the United States. *See* Tribes' 2d Not. Supp. Info. 2, ECF No. 31. Yet, under the Navigable Waters Rule, the Agencies categorically

excluded all ephemeral streams on the site from Clean Water Act protection—a striking reversal that threatens irreparable harm to the Tohono O'odham Nation and Pascua Yaqui Tribe, who have relied on the sites' life-giving waters for thousands of years.  Nunez Decl. Supp. Opp'n Abeyance ¶¶ 8-11, ECF No. 26.1.

Despite the very real threat posed by the Rosemont Mine, Industry dismisses the Tribes' concerns as "speculative."  ECF No. 86, at 5.  That assertion simply ignores the facts on the ground.  The Rosemont Mine would destroy some of the highest quality streams and ecosystems in the desert Southwest, causing unacceptable adverse impacts in violation of the Clean Water Act.  ECF No. 26.1, Ex. A.[26]  Despite these consequences, the Corps hastily issued an AJD that relies on the Navigable Waters Rule to strip the site of Clean Water Act protections.  *See* ECF No. 74, at 7-8.  That AJD is effective immediately, and the Corps insists that it will stand by that analysis for five years, regardless of any forthcoming rulemaking.  *Id.* at 8.  While the Tribes prevailed in a separate lawsuit against the mine, *see Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 409 F. Supp. 3d 738 (D. Ariz. 2019), Rosemont has sought an appeal in that case, anticipates a ruling "in the second half of 2021," and plans to proceed because it "does not require a Section 404 Water Permit" based on the AJD.  Hudbay, Mgmt.'s Discussion & Analysis 8 (May 11, 2021), ECF No. 87.5.

Unable to deny the harms facing the Tribes, Industry relies on a series of misleading arguments that only underscore the extent of harm caused by the Navigable Waters Rule's rollback of Clean Water Act protections.  First, Industry asserts that water

---

[26] The Mine would also desecrate hundreds of burial sites and forever ruin these traditional cultural lands.  ECF No. 26.1 ¶ 8.  The U.S. Forest Service explained that the damage to cultural resources would be "severe, irreversible, and irretrievable;" the proposed Rosemont Mine "would destroy [the Tribes'] historical and cultural foundation, diminishing the tribal members' sense of orientation in the world, and destroy part of their heritage."  *Id.* ¶ 10 (quoting *Final Env't Impact Statement for the Rosemont Copper Project Vol. 3*, U.S. Forest Serv. 1036-37 (Dec. 2013), https://rosemonteis.us/files/final-eis/rosemont-feis-vol-3.pdf).

features excluded by the Navigable Waters Rule could nonetheless be regulated under the Clean Water Act as point sources.  ECF No. 86, at 5.  That is disingenuous, as explained above, because the Navigable Waters Rule removes federal regulatory protections that are indisputably key to implementing the Act.  *See supra* Section I.A.

Second, Industry argues that States can use their regulatory authority to "provide coverage for all types of waters," including those excluded from the Clean Water Act. ECF No. 80, at 18.  But the record shows that States cannot fill the significant regulatory gap created by the Navigable Waters Rule; indeed, the regulatory gap is only getting larger.  *See supra* Sections I.A., I.D., II.A.

Third, Industry claims that the Tohono O'odham Nation can prevent the harms caused by the Navigable Waters Rule by regulating "more water features" under its Water Code.  ECF No. 80, at 19.  But that assertion is sorely misplaced.  *See supra* Section I.A.  EPA thus further warned its Tribal Partners that the Navigable Waters Rule is "causing significant, ongoing, and irreversible environmental damage."  ECF No. 74.1, Ex. A, at 1.

> 2. *The Agencies and Industry fail to identify any disruptive consequences caused by vacating the Navigable Waters Rule and returning to the status quo.*

Vacatur would simply reinstate the status quo—i.e., the regulation defining "waters of the United States" that predated the Navigable Waters Rule's effective date. ECF No. 74, at 10.  Neither the Agencies nor Industry have demonstrated how a return to the that regulatory regime from 1986—supplemented by the *Post-Rapanos* guidance— causes serious disruptive consequences that outweigh the irreparable harm to the Tribes, overcome the serious flaws in the Navigable Waters Rule, and "warrant departure from the default of vacatur." *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 882 (E.D. Cal. 2018).

Industry simply asserts that vacatur would result in "regulatory uncertainty."  But

that is not a sufficient basis to avoid vacatur. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020). In fact, vacatur would reinstate the prior regulatory regime, thereby ensuring compliance with the purpose of the Clean Water Act—a point Industry does not dispute. *See Puget Soundkeeper All. v. Wheeler*, No. C15-1342-JCC, 2018 WL 6169196, at *7 (W.D. Wash. Nov. 26, 2018) (rejecting allegations of "regulatory uncertainty" where the "alleged disruptive consequences of vacatur do not contravene the purpose of the [Clean Water Act]").

Indeed, it is the unlawful Navigable Waters Rule itself that has created regulatory uncertainty by arbitrarily reversing decades of policy and capriciously stripping Clean Water Act protections. *See supra* Section II. While Industry touts the categorical exclusion of entire categories of waters based on "bright-line rules"—that is the *Rapanos* plurality's "relatively permanent waters" test—five justices unambiguously rejected that approach as contrary to the Clean Water Act. Allowing the Agencies to continue blindly implementing that unlawful Navigable Waters Rule would only increase regulatory uncertainty and legal turmoil, further demonstrating that vacatur is the appropriate remedy.[27]

## VI.   THE COURT SHOULD GRANT THE TRIBES' MOTION TO COMPLETE THE RECORD AND REJECT INDUSTRY'S MOTION TO STRIKE.

The Agencies must complete the record for two reasons: first, the Agencies

---

[27] Industry cites a recent order declining to vacate the Rule. *See* Order, *S.C. Coastal Conservation League v. Regan*, No. 2:20-cv-1687 (D.S.C. July 14, 2021). But the court provided no analysis or explanation for its order. Industry also cites two prior decisions declining to vacate the prior Clean Water Rule, but they are both readily distinguishable. In *Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019), the Court declined to vacate the Clean Water Rule due to the "serious possibility" that the Agencies would be able to resolve the notice-and-comment defects identified by Court with the Clean Water Rule. No such quick fix exists here given the serious flaws in the Rules. In *Georgia v. Wheeler*, 418 F. Supp. 3d at 1369, the Court declined to vacate the Clean Water Rule because it was not causing any harms and the Agencies intended to fix it. The exact opposite is occurring here where the Agencies continue to apply an admittedly unlawful Rule with severe consequences to the environment.

provided the Court with two artificially-segmented records, and second, the Agencies improperly excluded materials related to the Clean Water Rule.  ECF No. 48, at 45-49. Neither the Agencies, Industry, nor the Sacketts raise objections to the Tribes' first arguments concerning the artificially segmented records.  Accordingly, the Court should order the Agencies to complete the Navigable Waters Rule record with all materials considered for the Repeal.

As to the second argument, the Agencies must complete both Rules' records with the extensive scientific record supporting the Clean Water Rule because that entire record was before the Agencies for consideration.  *Id.* at 48–49.  Industry does not rebut either of these arguments; instead, it claims that the Tribes should have filed a separate motion to complete the record.  But there is no dispute that the documents are part of the record. Accordingly, the Tribes simultaneously filed a motion to complete with their motion for summary judgment, thereby conserving judicial resources.

Industry nonetheless moves to strike the Tribes' first eight exhibits (ECF Nos. 48.6-49.4) supporting their Motion for Summary Judgment.  ECF No. 80, at 41.  Industry argues that those documents, which are each included in the Agencies' Clean Water Rule record, are not part of the administrative record for the Rules that were designed to repeal and replace the Clean Water Rule.  That is incorrect: the records submitted by the Agencies in this case *erroneously* exclude Exs. 2-8 (among others).[28]  That is precisely why the Tribes seek an order compelling the Agencies to complete the record with Exhibits 2-8.  *See* ECF No. 48, at 46.  The Court should thus order completion of both Rules' records with the Clean Water Rule record and deny Industry's Motion to Strike.

Industry also asks this Court to ignore the Agencies' declarations, claiming that

---

[28] Ex. 1 contains the SAB's final comments, which the Agencies excluded from the administrative record despite receiving them well before final publication of the rule in the Federal Register.  As the Tribes explained previously, *see* ECF No. 48, at 13 n.5, the Tribes have provided the Court with a copy for reference, Ex. 1, ECF No. 48.6.  The draft comments are in the record.  Ex. 99, ECF No. 63.8.

the administrative record for the Navigable Waters Rule is "comprehensive and robust." ECF No. 85, at 5; *see also* ECF No. 86, at 4.  That is incorrect because the Agencies *failed* to analyze the effects of the Navigable Waters Rule on the chemical, physical, and biological integrity of the Nation's Waters, resulting in an *inadequate* administrative record and arbitrary rulemaking.  *See* ECF Nos. 72.1 & 72.2 ¶ 12 (citing 85 Fed. Reg. at 22,332, 22,335).  Due to that oversight, the Agencies provided the Court with a comprehensive analysis exposing the Navigable Waters Rule's impacts and identifying the "significant, actual environmental harms" caused by the Navigable Waters Rule, *id.* ¶ 17.  The Court may consider these extra-record materials showing that the Agencies failed to consider a relevant factor—namely, whether the Navigable Waters Rule complies with the Clean Water Act's sole objective to maintain the integrity of the Nation's waters.  *See Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) (holding that courts may supplement the administrative record to determine "whether the agency considered all the relevant factors or fully explicated" its decision); *Bay.org v. Zinke*, 1:17-cv-01176 LJO-EPG, 2018 WL 3965367, at *9 (E.D. Cal. Aug. 16, 2018) (supplementing record with extra-record materials that showed agency overlooked relevant factor).

CONCLUSION

For the foregoing reasons, the Tribes respectfully request that the Court vacate the Rules and remand to the Agencies.

DATED:  August 6, 2021

s/ Janette K. Brimmer
Janette K. Brimmer, WSBA # 41271
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
jbrimmer@earthjustice.org

Stuart C. Gillespie, CO # 42861
Alexandra O. Schluntz, MA # 704320
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 996-9616
sgillespie@earthjustice.org

*Counsel for Pascua Yaqui Tribe,
Quinault Indian Nation, Fond du Lac
Band of Lake Superior Chippewa,
Menominee Indian Tribe of Wisconsin,
Tohono O'odham Nation, and Bad River
Band of Lake Superior Chippewa*

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on this 6th day of August, 2021, I electronically filed the

3

foregoing **PLAINTIFFS' REPLY/RESPONSE IN SUPPORT OF MOTION FOR**

4

**SUMMARY JUDGMENT AND OPPOSITION TO CROSS-MOTIONS FOR**

5

6

**SUMMARY JUDGMENT** with the Clerk of the District Court using the CM/ECF

7

system, which will send notice of this filing by e-mail to all counsel of record.

8

Daniel Pinkston, CO #11423

9

999 18th Street,
South Terrace, Suite 370,

10

Denver, CO 80202
daniel.pinkston@usdoj.gov

11

Phone: (303) 844-1804

12

Facsimile: (303) 844-1350

13

*Attorney for Defendants*

14

Bradley J. Glass (022463)

15

Stuart S. Kimball (026681)
GALLAGHER & KENNEDY, P.A.

16

2575 East Camelback Road

17

Phoenix, Arizona  85016-9225
brad.glass@gknet.com

18

stuart.kimball@gknet.com
Phone: (602) 530-8000

19

Facsimile: (602) 530-8500

20

*Attorneys for Intervenors-Defendants*

21

*Arizona Rock Products Association et al.*

22

JAMES M. MANLEY, Ariz. Bar. No. 031820

23

Pacific Legal Foundation
3241 E Shea Boulevard, # 108

24

Phoenix, Arizona 85028

25

jmanley@pacificlegal.org
Telephone: (916) 419-7111

26

Facsimile: (916) 419-7747

27

28

ANTHONY L. FRANÇOIS, Cal. Bar. No. 184100*
CHARLES T. YATES, Cal. Bar No. 327704*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
afrancois@pacificlegal.org
cyates@pacificlegal.org
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

*Attorneys for Intervenors-Defendants
Chantell and Michael Sackett*

s/ Janette K. Brimmer