# EXHIBIT 1

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL SACKETT; CHANTELL SACKETT, | No. 19-35469 |
| *Plaintiffs-Appellants,* | D.C. No. 2:08-cv-00185-EJL |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator,[*] | OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted November 19, 2020
Submission Withdrawn December 1, 2020
Resubmitted August 9, 2021
Seattle, Washington

Filed August 16, 2021

---

[*] Michael S. Regan has been automatically substituted for former Administrator Steven L. Johnson. Fed. R. App. P. 43(c)(2).

2          SACKETT V. USEPA

Before:  Ronald M. Gould and Michelle T. Friedland,
Circuit Judges, and Jill A. Otake,** District Judge.

Opinion by Judge Friedland

**SUMMARY***

**Mootness / Environmental Law**

The panel affirmed the district court's summary
judgment in favor of the Environmental Protection Agency
("EPA") in an action brought by plaintiff landowners,
challenging an EPA compliance order that stated that
plaintiffs' property contained wetlands subject to protection
under the Clean Water Act ("CWA") and that directed them
to remove fill and restore the property to its natural state.

When the parties were briefing this appeal, in a letter to
plaintiffs, EPA abruptly withdrew its compliance order.  The
panel held that the EPA's withdrawal of the order did not
moot this case.  EPA's stated intention not to enforce the
amended compliance order or issue a similar one in the
future did not bind the agency, and EPA could potentially
change positions under new leadership.  In addition, the
letter did nothing to alter EPA's litigation position that it has
authority to regulate the plaintiffs' property.  Accordingly,
the panel could not conclude that it was "absolutely clear"

---

** The Honorable Jill A. Otake, United States District Judge for the
District of Hawaii, sitting by designation.

*** This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

that EPA would not either reinstate the amended compliance or issue a new one, and, therefore, this case was not moot. The panel rejected EPA's arguments to the contrary.

The panel next addressed the district court's refusal to strike a July 2008 Memo by EPA wetlands ecologist John Olson from the administrative record.  The Memo contained observations and photographs from Olson's visit to plaintiffs' property.  The panel held, pursuant to its review under the Administrative Procedure Act, that the district court did not abuse its discretion in permitting EPA to include the July 2008 Memo in the administrative record.

Turning to the entry of summary judgment on the merits, the panel held that, under *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir. 2007), Justice Kennedy's understanding of "significant nexus" in his concurring opinion in *Rapanos v. United States*, 547 U.S. 715 (2006), provided the governing standard for determining when wetlands are regulated under the CWA.  The panel rejected plaintiffs' arguments that *Northern California River Watch v. City of Healdsburg* was no longer law of the circuit.  Applying the significant nexus standard, the panel held that the requirements of the concurrence and the applicable regulations were satisfied here.  The panel concluded that EPA reasonably determined that plaintiffs' property contained wetlands.  It further determined that the record plainly supported EPA's conclusion that the wetlands on plaintiffs' property were adjacent to a jurisdictional tributary and that, together with a similarly situated wetlands complex, they had a significant nexus to Priest Lake, a traditional navigable water, such that the property was regulable under the CWA and the relevant regulations.

## COUNSEL

Anthony L. François (argued) and Damien M. Schiff, Pacific Legal Foundation, Sacramento, California, for Plaintiffs-Appellants.

Brian C. Toth (argued) and David Gunter, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jean E. Williams, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Karyn Wendelowski, Attorney, United States Environmental Protection Agency, Washington, D.C.; for Defendants-Appellees.

## OPINION

FRIEDLAND, Circuit Judge:

Plaintiffs Chantell and Michael Sackett purchased a soggy residential lot near Idaho's Priest Lake in 2004. They planned to build a home on the property, but the project became entangled in a regulatory dispute. Shortly after the Sacketts began placing sand and gravel fill on the lot, they received an administrative compliance order from the Environmental Protection Agency ("EPA"). The order stated that the property contained wetlands subject to protection under the Clean Water Act ("CWA"), and that the Sacketts had to remove the fill and restore the property to its natural state. Instead, the Sacketts sued EPA in 2008, contending that the agency's jurisdiction under the CWA does not extend to their property. The case has been winding its way through the federal courts ever since. When the parties were briefing this appeal, EPA abruptly withdrew its compliance order.

We first consider whether EPA's withdrawal of the compliance order, twelve years after it first issued, moots this case. We hold that it does not. We then decide whether jurisdiction under the CWA extends to the Sacketts' lot. We hold that it does and thus affirm the district court's grant of summary judgment in EPA's favor.

## I.

### A.

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act extends to all "navigable waters," defined as "waters of the United States, including the territorial seas," and it prohibits any person who lacks a permit from discharging pollutants, including rocks and sand, into those waters. *Id.* §§ 1311(a), 1362(6), (7), (12). If EPA finds that a violation is occurring, one of its enforcement options is to issue an administrative compliance order—as was issued to the Sacketts. *Id.* § 1319(a). A compliance order describes the nature of the violation and requires the recipient to cease the illegal discharge activity. *See id.* To enforce a compliance order, EPA may bring an enforcement action in federal district court. *Id.* § 1319(b).

Since the CWA was enacted, agencies and courts have struggled to identify the outer definitional limits of the phrase "waters of the United States," which in turn defines the scope of the federal government's regulatory jurisdiction under the CWA. The U.S. Army Corps of Engineers (the "Corps") first issued regulations defining "waters of the United States" in the 1970s, shortly after the CWA took effect. Initially, the Corps determined that the CWA covered only waters that were navigable in fact, *see* 39 Fed.

Reg. 12,115, 12,119 (Apr. 3, 1974), but the Corps later adopted different, broader interpretations that remained in effect at the time the Sacketts received the compliance order, *see* 42 Fed. Reg. 37,122, 37,144 (July 19, 1977); 51 Fed. Reg. 41,206, 41,250–51 (Nov. 13, 1986); 53 Fed. Reg. 20,764, 20,774 (June 6, 1988).

As relevant here, the regulations defined "waters of the United States" to include "wetlands" that are "adjacent" to traditional navigable waters and their tributaries. *See* 33 C.F.R. § 328.3(a)(1), (a)(5), (a)(7) (2008). "Wetlands" were defined as "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." *Id.* § 328.3(b). "Adjacent" was defined as "bordering, contiguous, or neighboring," and the regulations explicitly stated that "adjacent wetlands" included wetlands separated from other waters of the United States by artificial dikes or barriers. *Id.* § 328.3(c).[1]

---

[1] In the years since the challenged compliance order issued, EPA and the Corps have continued to revise the regulatory definition of "waters of the United States" under the CWA. In 2015, the agencies proposed the Clean Water Rule, 80 Fed. Reg. 37,054 (June 29, 2015). But implementation of the Clean Water Rule was stayed pursuant to multiple court challenges, and two courts eventually decided that the rule was "unlawful" and remanded it to the agencies. *See Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1372 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497, 504–06 (S.D. Tex. 2019). The agencies ultimately repealed the Clean Water Rule and reinstated the pre-2015 regulatory definition. *See* 84 Fed. Reg. 56,626, 56,659–60 (Oct. 22, 2019).

On January 23, 2020, EPA and the Corps promulgated yet another regulatory definition of "waters of the United States." *See* 85 Fed. Reg. 22,250, 22,273 (Apr. 21, 2020). The agencies, however, are currently

In several decisions, the Supreme Court has grappled with the proper interpretation of 33 U.S.C. § 1362(7)'s phrase "the waters of the United States."  In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), the Court held that the Corps' interpretation of that phrase as including wetlands that were not themselves navigable, but which "actually abut[ted] on" traditional navigable waterways, was "a permissible interpretation" of the CWA. *Id.* at 131–35.  Then, in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), the Court rejected the Corps' attempt to regulate isolated sand and gravel pits that "seasonally ponded," holding that the term "waters of the United States" does not include "nonnavigable, isolated, intrastate waters." *Id.* at 164, 172–174.

Finally, and most relevant here, in *Rapanos v. United States*, 547 U.S. 715 (2006), the Court vacated two decisions upholding the application of the CWA to wetlands connected to distant navigable waters via ditches or artificial drains. *Id.* at 757.  In his plurality opinion, Justice Scalia, joined by three other Justices, articulated one test for determining whether wetlands could be regulated under the CWA, *id.* at 739, while Justice Kennedy authored a concurrence articulating a different test, *id.* at 779–80.  The parties here

---

reevaluating that Rule, in keeping with President Biden's executive order Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021). *See Definition of "Waters of the United States": Rule Status and Litigation Update*, U.S. EPA, https://www.epa.gov/nwpr/def inition-waters-united-states-rule-status-and-litigation-update (last updated Apr. 23, 2021) ("Consistent with the Executive Order, EPA and the [Corps] are reviewing the [2020] Rule.").

dispute which *Rapanos* opinion controls whether EPA has jurisdiction over the Sacketts' lot.

**B.**

In 2004, the Sacketts purchased a 0.63-acre lot near Priest Lake, one of the largest lakes in Idaho. The property is bounded by roads to the north and south. To the north, across Kalispell Bay Road, lies the Kalispell Bay Fen, a large wetlands complex that drains into an unnamed tributary. That tributary feeds Kalispell Creek, which, in turn, flows southwest of the Sacketts' property and then empties into Priest Lake. To the south, across another road, is a row of homes fronting Priest Lake. The Sacketts' property is 300 feet from the lake.

In May 2007, having obtained building permits from their county, the Sacketts began backfilling the property with sand and gravel to create a stable grade. EPA and Corps officials soon visited the property and, believing the property contained wetlands that might be subject to the CWA, suggested that work stop absent a permit from the Corps.

Six months later, EPA issued the Sacketts a formal administrative compliance order. The order stated that the property contained wetlands subject to the CWA. It went on to explain that the Sacketts' placement of fill material onto half an acre of their property without a discharge permit constituted a violation of the CWA. The Sacketts were ordered to "immediately undertake activities to restore the Site" in keeping with a "Restoration Work Plan" provided by EPA, and they were given five months to complete the remediation. The order also informed the Sacketts that failure to comply could result in civil and administrative penalties of over $40,000 per day.

## C.

On April 28, 2008, shortly before the deadline for compliance, the Sacketts sued EPA, seeking declaratory and injunctive relief. The Complaint alleged that the agency's issuance of the compliance order was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), because it was premised on an erroneous assertion of jurisdiction under the CWA.[2]

On May 15, 2008, EPA and the Corps again inspected the site. EPA wetlands ecologist John Olson took field notes on the property and its surroundings, and he completed a seven-page jurisdictional determination ("JD"), in which he concluded that the Sacketts' lot contained wetlands subject to regulation under the CWA.

That same day, after Olson reported his findings to his superiors at the agency, EPA issued the Sacketts an amended compliance order that extended the dates for compliance but otherwise mirrored the original order. The amended order reiterated that the property contained wetlands subject to CWA regulation, that the Sacketts' discharge of fill material was pollution in violation of the CWA, and that their continued noncompliance could result in significant monetary sanctions. The amended compliance order "supersede[d] and replace[d]" the original compliance order.

Six weeks later, on July 1, 2008, Olson authored a memorandum (the "July 2008 Memo"), in which he memorialized his observations from the May site visit. The

---

[2] The Complaint also alleged violations of the Sacketts' substantive and procedural due process rights, but those claims were dropped in the Amended Complaint and are not at issue in this appeal. *See Sackett v. EPA*, 566 U.S. 120, 125 (2012).

memo contains photographs from the visit that depict flooded soils and wetland vegetation on the Sacketts' lot in areas not yet covered with fill. Two such photos are included in an appendix to this opinion.

EPA moved to dismiss the Sacketts' lawsuit, contending that the original compliance order was not "final agency action . . . subject to judicial review" under the APA.**[3]** 5 U.S.C. § 704. The district court granted the motion, and our court affirmed, concluding that the CWA precludes pre-enforcement judicial review of compliance orders. *See Sackett v. EPA*, 622 F.3d 1139, 1147 (9th Cir. 2010). But the Supreme Court granted certiorari and reversed, holding that the original compliance order constituted "final agency action" subject to judicial review under the APA. *Sackett v. EPA*, 566 U.S. 120, 131 (2012).

On remand, the Sacketts amended their Complaint to challenge the amended compliance order, and district court proceedings continued for seven more years. In March 2019, the district court entered summary judgment in EPA's favor, holding that the agency's issuance of the amended compliance order was not arbitrary or capricious. In the same order, the district court denied a motion by the Sacketts to strike from the administrative record the July 2008 Memo and materials referenced therein but also explained that summary judgment would have been appropriate even if those materials were not considered.

The Sacketts timely appealed both the grant of summary judgment and the denial of the motion to strike. Following

---

**[3]** Because the Sacketts filed their Complaint before the amended compliance order issued, only the original compliance order was at issue at this stage in the court proceedings.

an unsuccessful attempt at mediation, the Sacketts filed their
opening brief in December 2019.  After we granted EPA two
filing extensions for its opposition brief, the agency sent the
Sacketts a two-paragraph letter in March 2020, withdrawing
the amended compliance order issued twelve years prior.  In
the letter, the agency explained that "several years ago EPA
decided to no longer enforce the [order] against you."  The
letter assured the Sacketts that "EPA does not intend to issue
a similar order to you in the future for this Site."

EPA then moved to dismiss the appeal as moot.
According to the agency, its withdrawal of the amended
compliance order effectively granted the Sacketts complete
relief, which mooted the case.   The Sacketts disagreed,
explaining that the status of their property remains unsettled
and that EPA did not withdraw the 2008 JD, in which Olson
concluded that the agency has authority under the CWA to
regulate the Sacketts' property.[4]

## II.

### A.

We review de novo whether a case has become moot.
*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173
(9th Cir. 2002).  "A case that becomes moot at any point
during the proceedings is 'no longer a "Case" or
"Controversy" for purposes of Article III,' and is outside the

---

[4] In an unpublished order, a motions panel denied the motion to
dismiss without prejudice to EPA's renewing the argument in
opposition, which EPA did.  That prior ruling does not eliminate the need
for us to reassess this jurisdictional question.  *See Sanchez v. City of
Santa Ana*, 936 F.2d 1027, 1032 n.3 (9th Cir. 1990) (explaining that a
merits panel has an independent duty to determine whether it has
jurisdiction, even if a motions panel already ruled on the issue).

12          SACKETT V. USEPA

jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). A party asserting mootness "bears the heavy burden of establishing that there remains no effective relief a court can provide." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017). "'The question is not whether the precise relief sought at the time the case was filed is still available,' but 'whether there can be any effective relief.'" *Id.* (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1024 (9th Cir. 2015)).

The already "heavy burden" of establishing mootness is even heavier for EPA here because its mootness argument stems from its own voluntary conduct—namely its decision to withdraw the amended compliance order. When a defendant voluntarily ceases challenged conduct, mootness follows only "if subsequent events [make] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (emphasis added) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

In deciding whether EPA has met its burden of establishing that its letter withdrawing the amended compliance order mooted this case, our decision in *Porter v. Bowen*, 496 F.3d 1009 (9th Cir. 2007), is instructive. In *Porter*, the operators of websites that encouraged interstate "vote swapping" for the 2000 presidential election brought a § 1983 action against the California Secretary of State after the Secretary had threatened one of them with criminal prosecution. *Id.* at 1012. While the lawsuit was pending, doubts apparently arose about whether California law actually criminalized this activity, and the Secretary sent a

letter to the Speaker of the California State Assembly explaining that the State would not pursue prosecutions unless the state legislature clarified the relevant election laws. *Id.* at 1016.**5** The district court held that this letter from the Secretary rendered the plaintiffs' claim for prospective relief moot. *Id.*

We reversed, holding that the Secretary "fail[ed] to carry the 'heavy burden' of establishing that it is 'absolutely clear' that California will not threaten to prosecute the owners of [the websites] if they create vote-swapping websites in the future." *Id.* at 1017. We explained that the letter "d[id] not suggest that it [wa]s binding on the Secretary of State," and that a new Secretary of State who had since entered office "could initiate the prosecution of vote-swapping websites at her discretion." *Id.* Finally, we observed that "the Secretary has maintained throughout the nearly seven years of litigation . . . that [the Secretary] had the authority under state law to threaten [the plaintiffs] with prosecution," a position that the plaintiffs believed violated their rights. *Id.*

The Sacketts' situation is directly analogous. EPA's stated intention not to enforce the amended compliance order or issue a similar one in the future does not bind the agency, and EPA could potentially change positions under new leadership. Further, the letter did nothing to alter EPA's position throughout this litigation that it has authority to regulate the Sacketts' property. Indeed, during oral argument, counsel for the agency was unwilling to represent that the agency lacked authority over the property and, even after more than a decade of litigation, could not answer questions about whether the Sacketts could develop their land. The agency could have disavowed the JD, but it

---

**5** Presumably this would have required a statutory amendment.

declined to do so.  Accordingly, because we cannot conclude that it is "absolutely clear" that EPA will not either reinstate the amended compliance order (or issue a new one), this case is not moot.

EPA's arguments to the contrary are unavailing.  First, EPA contends that the "inscribed-by-hand, unsigned, never-issued" JD, which it refused to disavow, cannot be considered "final agency action."  But this is a red herring.  Even if the 2008 JD itself would not constitute "final agency action" required to bring an APA claim because it lacks the "hallmarks of APA finality," *see Sackett*, 566 U.S. at 126, that is beside the point.   The "final agency action" requirement was already satisfied by the original compliance order when the Sacketts filed this lawsuit, as the Supreme Court specifically held.  *Id.* at 131; *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Shell Oil Co.*, 602 F.3d 1087, 1091–92 (9th Cir. 2010) (explaining that "post-filing developments" do not defeat statutory requirements for jurisdiction "if jurisdiction was properly invoked as of the time of filing").  The question we now face is whether the agency can end the litigation by voluntarily withdrawing the challenged order.  As the Supreme Court has emphasized, whether a suit may be initiated and whether it may be terminated as moot are different inquiries.  *Cf. Laidlaw*, 528 U.S. at 190 ("[T]here are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.").

Accordingly, we conclude that the JD is relevant not because of its potential to serve as "final agency action," but rather because it demonstrates EPA's refusal to concede that it lacks the authority to regulate the Sacketts' land.  *See Fikre*

*v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (explaining that, when asserting mootness due to voluntary cessation, the government must "demonstrate that the change in its behavior is 'entrenched' or 'permanent'" (quoting *McCormack*, 788 F.3d at 1025)). As long as EPA avoids disclaiming authority to regulate the Sacketts' property, the core of this dispute is alive and well.

Second, EPA argues that the Sacketts already received "full relief" when the agency withdrew its amended compliance order. Again, we disagree. EPA's argument ignores the practical realities of the Sacketts' predicament. If we were to dismiss this case as moot, the Sacketts would not have prevailed in any meaningful sense; rather, they would be stuck in the same regulatory quagmire they have been in for the past thirteen years. As we have explained, nothing prevents the agency from reinstating the amended compliance order, issuing a new one, or possibly even pursuing another avenue of enforcement available to it under the CWA. Withdrawal of the amended compliance order, therefore, hardly affords the Sacketts "full relief." *See United States v. Tanoue*, 94 F.3d 1342, 1344 (9th Cir. 1996). By contrast, if we were to side with the Sacketts on the merits and grant the requested declaratory relief, they would finally be on solid ground when resuming construction.

The fact that the Sacketts' central legal challenge remains unresolved distinguishes this case from the authorities relied on by EPA. In *Oregon Natural Resources Council v. Grossarth*, 979 F.2d 1377 (9th Cir. 1992), for example, the plaintiffs challenged a proposed timber sale by the U.S. Forest Service, alleging in part that the Forest Service had failed to prepare a required Environmental Impact Statement ("EIS"). *Id.* at 1378. While the case was pending, the plaintiffs simultaneously pursued an

administrative appeal and prevailed, causing the Forest Service to halt the sale and order that an EIS be prepared. *Id.* We held that this intervening administrative order mooted the appeal. *Id.* at 1379–80. We reasoned that the Forest Service's cancellation of the sale and its decision to prepare an EIS "was not a voluntary cessation within the meaning of that doctrine, but was instead the result of [the plaintiffs'] successful administrative appeal. Accordingly, [the plaintiffs'] invocation of the voluntary cessation theory [wa]s misplaced." *Id.* at 1379. We further held that, even if the Forest Service's conduct could be considered voluntary cessation, the record contained "no basis on which we could form a 'reasonable expectation' that there [would] be a recurrence of the same allegedly unlawful conduct by the Forest Service in the future." *Id.*

The situation facing the Sacketts is distinguishable in both respects. EPA's decision to withdraw the amended compliance order was not the result of a judgment from an intervening administrative proceeding. The agency provided no explanation for why, "several years ago," it resolved not to enforce the amended compliance order against the Sacketts, but it appears to have been a voluntary agency decision. Moreover, there is evidence in the record from which we could form a "reasonable expectation" that the same allegedly unlawful conduct by EPA could recur, given that the agency apparently still believes it has authority under the CWA to regulate the Sacketts' property.

Third, to bolster its claim that the case is moot, EPA invokes the general presumption of good faith that the government traditionally enjoys in the context of mootness by voluntary cessation. *See Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("The government's change of policy presents a special

circumstance in the world of mootness. . . . [U]nlike in the
case of a private party, we presume the government is acting
in good faith."). But this presumption is by no means
dispositive. In *Fikre*, for example, a district court had
dismissed as moot a plaintiff's lawsuit challenging his
placement on the No Fly List after the FBI restored the
plaintiff's flying privileges during the litigation. *See*
904 F.3d at 1036–37. We reversed, and although we
acknowledged that the FBI benefitted from a presumption of
good faith, we explained that the "government must still
demonstrate that the change in its behavior is 'entrenched'
or 'permanent'" to moot a case. *Id.* at 1037–38 (quoting
*McCormack*, 788 F.3d at 1025). We observed that the FBI's
decision to remove the plaintiff from the list during the
litigation was "an individualized determination untethered to
any explanation or change in policy." *Id.* at 1039–40. We
held that, absent an "explanation of [its] reasons . . . the
government has not repudiated the decision to add [him] to
the No Fly List and maintain him there for approximately
five years." *Id.* at 1040. We further reasoned that "[b]ecause
there are neither procedural hurdles to reinstating [the
plaintiff] on the No Fly List . . . nor any renouncement by
the government of its . . . authority to do so, the voluntary
cessation doctrine applies . . . [and the plaintiff's] due
process claims are not moot." *Id.* at 1041.

Here, although we similarly presume EPA withdrew its
amended compliance order in good faith, the agency's
conduct prevents that presumption from carrying the day.
As explained, we are not confident that the agency has
permanently ceased attempting to regulate the Sacketts'
land. In addition, we note that, although EPA represents that
it resolved "several years ago" not to enforce the amended
compliance order, it informed the Sacketts of this
development only on the eve of EPA's filing deadline for its

opposition brief—a deadline we had already extended twice, in response to requests from the agency that had not mentioned any change in the agency's enforcement intentions. *Cf. id.* at 1040. If we are to take EPA's letter at face value, the agency caused the Sacketts to litigate cross-motions for summary judgment in the district court, participate in mediation, and then pursue this appeal *after* the agency had already concluded it would never enforce the challenged compliance order. Forcing the Sacketts to engage in years of litigation, under threat of tens of thousands of dollars in daily fines, only to assert at the eleventh hour that the dispute has actually been moot for a long time, is not a litigation strategy we wish to encourage.

Lastly, EPA argues that the new definition of "waters of the United States" it adopted in 2020, *see* 85 Fed. Reg. 22,250, 22,273 (Apr. 21, 2020), governs its authority over wetlands such that any judicial decision regarding the prior regulation "would be purely advisory." But the Sacketts' primary legal argument is that they "are entitled to prevail as a matter of law based on the unambiguous text of the [CWA] as interpreted by the *Rapanos* plurality, no matter what regulatory interpretation EPA adopts." Therefore, a decision resolving whether the Sacketts' interpretation of the CWA is correct will not be purely advisory.

At bottom, the central dispute in this case remains unresolved. The Sacketts are still, thirteen years later, seeking an answer to whether EPA can prevent them from developing their property. Accordingly, we hold that this case is not moot.

**B.**

Before turning to the merits, we address the district court's refusal to strike Olson's July 2008 Memo from the

administrative record.**[6]**  We review that ruling for abuse of discretion.  *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996).

A court reviews agency action under the APA by considering the "whole record" that was before the agency when it undertook the challenged action.  5 U.S.C. § 706; *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) (holding that "the focal point for judicial review" of whether agency action is arbitrary and capricious "should be the administrative record already in existence, not some new record made initially in the reviewing court").  The Sacketts contend that, because the July 2008 Memo postdated the amended compliance order, it was wrongly included in the administrative record.

We hold that the district court did not abuse its discretion in permitting EPA to include the July 2008 Memo in the administrative record.  Although the memo postdates the issuance of the amended compliance order by six weeks, it simply memorializes the observations and conclusions that Olson and a Corps official made during their May site visit and attaches other information available to EPA before the order issued.  Specifically, the memo consists of photos Olson took during the May site visit, historical aerial photos that Olson had examined "[p]rior to visiting the site," general maps of the area, Olson's observations from the May site

_____

**[6]** In the district court, the Sacketts moved to strike additional documents that were cited in the July 2008 Memo.  On appeal, however, the Sacketts only provide argument on why the July 2008 Memo itself should be stricken.  We therefore consider only whether that memo was appropriately included in the administrative record.  *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) ("The Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.").

visit, and descriptions of the "[e]cology and hydrology of the
Sackett wetland" based on observations made during that
site visit.  Thus, the memo does not contain the sort of "'post
hoc' rationalizations" that do not belong in an administrative
record.  *Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402, 419 (1971) (quoting *Burlington Truck Lines
v. United States*, 371 U.S. 156, 168 (1962)), *abrogated on
other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Indeed, the record shows that the July 2008 Memo
repeats the observations that informed the challenged agency
action.  Declarations from EPA officials establish that,
shortly after his site visit, Olson called EPA's Regional
Counsel to relay his findings and his conclusion that the
Sackett property contained wetlands subject to the CWA.
The Regional Counsel then relayed Olson's findings to
EPA's Office of Ecosystems, Tribal, and Public Affairs, and
recommended based on those findings that the Office issue
the amended compliance order.  Because the July 2008
Memo thus conveys the same information that the agency
considered and relied on in issuing the amended compliance
order, we cannot say the district court abused its discretion
in declining to strike it from the record.  *Cf. Thompson v.
United States Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir.
1989) (explaining that the "whole administrative record" for
purposes of judicial review of agency action includes
materials "directly or indirectly considered by agency
decision-makers" (emphasis omitted) (quoting *Exxon Corp.
v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981))).

## C.

We now turn to whether EPA was entitled to summary
judgment on the merits.  We review the district court's grant
of summary judgment de novo.  *Nw. Env't Advocs. v. EPA*,
537 F.3d 1006, 1014 (9th Cir. 2008).  The Sacketts' core

argument is premised on interpreting Justice Scalia's plurality opinion in *Rapanos v. United States*, 547 U.S. 715 (2006), as providing the governing standard for determining CWA jurisdiction over wetlands.[7]   In *Rapanos*, the Court considered "whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into

---

[7] The Sacketts also argue that EPA failed to comply with the Corps' 1987 Wetlands Delineation Manual when evaluating their property, and that their property does not contain wetlands at all.   We reject both arguments.   Even assuming the 1987 Manual was still operative, *but see Tin Cup, LLC v. U.S. Army Corp of Eng'rs*, 904 F.3d 1068, 1072 (9th Cir. 2018), EPA complied with the manual here.   The manual identifies a procedure for identifying wetlands in "atypical situations," such as when "recent human activities" have resulted in "removal of vegetation" and "placement of dredged or fill material over hydric soils."   In this circumstance, the agency is instructed to try and "determine the type of vegetation that previously occurred," including by consulting recent aerial photography, conducting onsite inspections, and observing adjacent vegetation.   EPA did all of those things here.

As for EPA's conclusion that there were in fact wetlands on the property, we review the agency's conclusion for substantial evidence. *Ctr. for Biological Diversity v. Esper*, 958 F.3d 895, 910 (9th Cir. 2020). That standard is easily satisfied.   The applicable regulations define wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions."   33 C.F.R. § 328.3(b) (2008).   During his May 2008 site visit, Olson "observed that all portions of the Sackett property where native soil was removed but fill material had not been placed . . . were inundated or ponded/saturated to the surface."   Olson's photos from the site visit corroborate these observations.   EPA's inspection report from the prior year further explained that "strips of excavated ground revealed wetland soils" on the Sacketts' lot and that the vegetation on the south end of the lot "consisted of the wetland species."   Photos from the 2007 site visit reflect such conditions.   Representative photos from both the 2007 and 2008 site visits are included in an appendix to this opinion.   We therefore proceed on the understanding that the Sacketts' property contains wetlands.

traditional navigable waters, constitute[d] 'waters of the United States' within the meaning of the [CWA]." *Id.* at 729 (plurality opinion). The Sixth Circuit approved of the Corps' assertion of jurisdiction under the applicable regulations, which included as "waters of the United States" wetlands that were "adjacent" to any tributary that fed a navigable water. *Id.* at 729–30. The Court held that the Sixth Circuit had applied the wrong legal standard to evaluate whether the wetlands fell within the scope of the CWA, and that a remand was necessary. *Id.* at 757.

No opinion garnered a majority. Justice Scalia, writing for four Justices, rejected the regulatory definition of "adjacency" and instead concluded that, under the statute, "waters of the United States" extend only to "relatively permanent, standing or flowing bodies of water" and to wetlands with a "continuous surface connection" to such permanent waters. *Id.* at 739, 742.

Justice Kennedy concurred in the judgment. He accepted the regulatory definition of adjacency, *id.* at 775 (Kennedy, J., concurring in the judgment), but he rejected the Corps' position that wetlands are necessarily "waters of the United States" any time they are "bordering, contiguous [with], or neighboring" a tributary, 33 C.F.R. § 328.3(c) (2008), "however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778. Justice Kennedy interpreted the CWA as imposing an additional requirement for regulatory jurisdiction over wetlands: "jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Id.* at 779. This "significant nexus" inquiry would turn on whether the wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the

chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"**8** *Id.* at 780.

Although the Scalia plurality did not entirely reject the concept of a "significant nexus," which derived from earlier Supreme Court caselaw, it opined that only wetlands with a "physical connection" to traditional navigable waters had the requisite nexus to qualify as "waters of the United States." *Id.* at 755 (plurality opinion).

The Sacketts argue that the Scalia plurality provides the governing legal standard. They further argue that, because their property does not contain wetlands with a continuous surface connection to any "waters of United States," the agency's assertion of jurisdiction over their property ran afoul of the CWA and the APA.

In interpreting *Rapanos* to evaluate this argument, we are not writing on a blank slate. In *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007), we concluded that "Justice Kennedy's concurrence provides the controlling rule of law" from *Rapanos*. *Id.* at 999–1000. To reach this determination, we engaged in the inquiry the Supreme Court established in *Marks v. United States*, 430 U.S. 188 (1977), under which the controlling holding of a fractured decision is "the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases." *Healdsburg*, 496 F.3d at 999. In determining that narrowest ground, we relied heavily on the Seventh Circuit's decision in *United States v. Gerke*

---

**8** Consistent with *Riverside Bayview Homes*, Justice Kennedy infers that this significant nexus requirement is satisfied when a wetland directly abuts on a traditional navigable water. *Rapanos*, 547 U.S. at 780.

24           SACKETT V. USEPA

*Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006) (per curiam), which likewise applied *Marks* to conclude that the Kennedy concurrence supplied the controlling rule in *Rapanos*. *Healdsburg*, 496 F.3d at 999–1000. Under *Healdsburg*, therefore, our circuit's law is that Justice Kennedy's understanding of "significant nexus" provides the governing standard for determining when wetlands are regulable under the CWA.

The Sacketts contend that a later en banc decision of our court fatally undermines *Healdsburg* such that it is no longer law of the circuit. In *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc), we clarified how we perform a *Marks* analysis to interpret a fractured decision. We reflected "that the *Marks* inquiry at times has 'baffled and divided the lower courts that have considered it,'" and we observed that two approaches to applying *Marks* had come to predominate: a reasoning-based approach and a results-based approach. *Id.* at 1020–21 (quoting *Nichols v. United States*, 511 U.S. 738, 746 (1994)). Under the reasoning-based approach, courts "look to those opinions that concurred in the judgment and determine whether one of those opinions sets forth a rationale that is the logical subset of other, broader opinions. When, however, no common denominator of the Court's reasoning exists, we are bound only by the specific result." *Id.* at 1028 (quotation marks omitted). Under the results-based approach, the controlling holding from the fractured case in question is the rule that "would necessarily produce results with which a majority of the Justices . . . would [have] agree[d]." *Id.* at 1021 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 947 F.2d 682, 694 (3d Cir. 1991), *aff'd in part, rev'd in part*, 505 U.S. 833 (1992)). Our court in *Davis* embraced the reasoning-based approach, *see id.* at 1028, and we remain bound by that holding.

The Sacketts argue that the court in *Healdsburg* did not employ a reasoning-based framework when performing its *Marks* analysis of *Rapanos*, and they contend that *Healdsburg* is therefore no longer good law after *Davis*. We disagree.**[9]** In our circuit, a three-judge panel may abandon the holding of a prior panel only when intervening higher authority is "clearly irreconcilable" with that earlier panel opinion. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Therefore, we will disregard *Healdsburg* only if it is clearly irreconcilable with our en banc decision in *Davis*.

It is not. We explained in *Davis* that the narrowest opinion for purposes of a *Marks* analysis is the opinion that concurs in the judgment that is "the logical subset of other, broader opinions," and which therefore represents "a common denominator of the Court's reasoning." *Davis*, 825 F.3d at 1028. In *Healdsburg*, our *Marks* analysis consisted of a single paragraph that endorsed the Seventh Circuit's *Marks* analysis in *Gerke*. *See Healdsburg*, 496 F.3d at 999–1000.

*Gerke*, in turn, elaborated on why the Kennedy concurrence articulated a narrower ground for reversing than did the Scalia plurality such that "the Kennedy concurrence is the least common denominator." *Gerke*, 464 F.3d at 725.

---

**[9]** A prior decision of our court considered this precise question. In *United States v. Robertson*, 875 F.3d 1281 (9th Cir. 2017), we held that *Healdsburg* was not clearly irreconcilable with *Davis* and therefore remained law of the circuit. *Id.* at 1291–92. But the Supreme Court summarily vacated the judgment in that case because the defendant died while his petition for certiorari was pending. *See Robertson v. United States*, 139 S. Ct. 1543 (2019) (Mem.) (granting writ of certiorari, vacating the judgment, and remanding "for consideration of the question whether the case is moot").

The two opinions begin on common ground, as Justice Kennedy had himself expressed. *Rapanos*, 547 U.S. at 767 (Kennedy, J., concurring in the judgment) ("The plurality's opinion begins from a correct premise. As the plurality points out . . . in enacting the [CWA] Congress intended to regulate at least some waters that are not navigable in the traditional sense."). *Gerke* recognized that the plurality and the concurrence also agreed that for wetlands to fall within CWA jurisdiction, they had to share some connection with traditional navigable waters. *See* 464 F.3d at 724–25. As the Seventh Circuit further explained, "[t]he plurality Justices thought that Justice Kennedy's ground for reversing was narrower than their own. . . . Justice Kennedy expressly rejected two 'limitations' imposed by the plurality on federal authority over wetlands under the Clean Water Act." *Id.* at 724 (quoting *Rapanos*, 547 U.S. at 768).

Admittedly, *Gerke*'s analysis does not fit neatly into either a reasoning-based or a results-based *Marks* framework, and portions of the opinion are consistent with the results-based *Marks* analysis that we rejected in *Davis*. *See, e.g.*, *id.* (explaining that Justice Kennedy's approach will yield a result that will command five votes "in most cases") (emphasis omitted). The results-based aspects of *Gerke* present some tension with *Davis*, but to be superseded under *Miller v. Gammie*, "[i]t is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (citation and quotation marks omitted). Thus, although *Gerke* is not a paradigmatic example of a reasoning-based *Marks* analysis, it is not "clearly irreconcilable" with such an approach. And because *Healdsburg* adopted *Gerke*'s application of *Marks*, we conclude that *Healdsburg*'s "theory or reasoning" was

likewise not clearly undercut by *Davis*.  *Miller*, 335 F.3d at 900.

The Sacketts also contend that *Healdsburg* is clearly irreconcilable with intervening authority in another way. They argue that *Healdsburg* relied on the *Rapanos* dissent in its *Marks* analysis, and that shortly after *Davis*, we held that dissents could not be considered for purposes of a *Marks* analysis.  The Sacketts cite to our decision in *Cardenas v. United States*, 826 F.3d 1164 (9th Cir. 2016), in which we wrote that the "narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices *who support the judgment*."  *Id.* at 1171 (emphasis added) (quoting *Davis*, 825 F.3d at 1020).  But this language in *Cardenas* is no more than a direct quotation from *Davis*, a decision in which we explicitly reserved judgment on the very question that the Sacketts assert *Cardenas* decided. *Davis*, 825 F.3d at 1025 ("Here, we assume but do not decide that dissenting opinions may be considered in a *Marks* analysis."); *id.* at 1025 n.12 ("We note that . . . the D.C. Circuit explicitly stated that it was not free to combine a dissent with a concurrence to form a *Marks* majority.  We emphasize here, however, that we do not decide that issue." (quotation marks and citation omitted)).  Thus, *Davis* cannot stand for the proposition that dissents are off-limits in a *Marks* inquiry, and neither can *Cardenas*, which cited *Davis* only in passing and did not consider that question.**[10]**

---

**[10]** We also note that a three-judge panel decision such as *Cardenas* could not have superseded *Healdsburg*, an earlier decision of our court, because it is not an intervening *higher* authority.  *See Miller*, 335 F.3d at 899.

Moreover, the Sacketts' argument mischaracterizes *Healdsburg* because *Healdsburg* does not directly or indirectly depend on the *Rapanos* dissent, even though *Healdsburg* does cite to the dissent in its *Marks* analysis. As explained above, *Healdsburg* relied heavily on *Gerke*. Later, when rejecting an argument that *Gerke* improperly used the *Rapanos* dissent in its *Marks* analysis, the Seventh Circuit clarified that *Gerke* had not relied on the dissent. The Seventh Circuit explained that, in *Gerke*, the operative narrower-grounds inquiry compared the concurrence and the plurality, and that, although *Gerke* did make "the same narrower-grounds point in comparing the concurrence with the dissenting opinion . . . that comparison was not necessary to resolving the appeal, so it was dicta." *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 621 (7th Cir. 2014). Because *Healdsburg* primarily relied on *Gerke*, we similarly conclude that the mention of the *Rapanos* dissent in *Healdsburg* does not indicate that *Healdsburg* relied on that dissent.

For all these reasons, the Sacketts' arguments fail, and *Healdsburg* remains law of the circuit—meaning the Kennedy concurrence is still the controlling opinion from *Rapanos*.**[11]**

---

**[11]** The Sacketts further contend that *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), makes clear that the Scalia plurality provides the Court's authoritative opinion on the meaning of the CWA. It is true that in *County of Maui*, all four opinions refer only to the *Rapanos* plurality when interpreting the CWA. *See, e.g.*, *id.* at 1478 (Kavanaugh, J., concurring) (noting that the majority's reading of "discharge" "adheres to the interpretation set forth in Justice Scalia's plurality opinion in *Rapanos*"). But *County of Maui* did not concern the scope of "waters of the United States." The question presented in *County of Maui* was an entirely different one—the meaning of pollution from a

### D.

We therefore apply Justice Kennedy's "significant nexus" inquiry to evaluate whether EPA has jurisdiction to regulate the Sacketts' property. In answering this question, we also use the regulations that were in effect when EPA issued the amended compliance order.**[12]** *See United States v. Lucero*, 989 F.3d 1088, 1104–05 (9th Cir. 2021) (holding that the definition of "waters of the United States" from the regulation that was in place at the time of the defendant's conduct applied, despite the promulgation of a new regulation that narrowed that definition while the case was pending on appeal). The Sacketts' only challenge to those regulations is premised on the Scalia plurality being the controlling opinion.

Under the APA, a court may set aside agency action if it is "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a

---

point source under the CWA, *id.* at 1468 (majority opinion)—so there was no reason to rely on the distinctions between the Scalia plurality and the Kennedy concurrence in *Rapanos*. *See Hawai'i Wildlife Fund v. County of Maui*, 886 F.3d 737, 748 (9th Cir. 2018) ("In past cases, we have recognized Justice Kennedy's concurrence in *Rapanos* . . . as controlling. But we have only done so in the context of 'determin[ing] whether a wetland that is not adjacent to and does not contain a navigable-in-fact water is subject to the CWA.'" (quoting *Robertson*, 875 F.3d at 1288–89)), *vacated and remanded*, 140 S. Ct. 1462. *County of Maui* is thus inapposite here and does not disturb our interpretation of *Rapanos*.

**[12]** The Sacketts object to the district court's citation to agency guidance issued after the amended compliance order. We need not address this argument because we do not rely for any part of our analysis on that agency guidance.

court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "As a reviewing court, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quotation marks omitted). "Where the agency has relied on relevant evidence . . . that a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence, and this court must affirm the agency's finding." *Ctr. for Biological Diversity v. Esper*, 958 F.3d 895, 910 (9th Cir. 2020) (quotation marks and brackets omitted).

It is clear that the requirements of the Kennedy concurrence and the applicable regulations are satisfied here. The record plainly supports EPA's conclusion that the wetlands on the Sacketts' property are adjacent to a jurisdictional tributary and that, together with the similarly situated Kalispell Bay Fen, they have a significant nexus to Priest Lake, a traditional navigable water.

First, there was nothing arbitrary about EPA's determination that the Sacketts' wetlands were adjacent to a jurisdictional tributary, and thus fell into the relevant regulatory definition of "waters of the United States." 33 C.F.R. § 328.3(a)(1), (5), (7) (2008) (defining a wetland that is adjacent to a tributary of a traditional navigable water as a water of the United States). At the time of the challenged compliance order, artificial barriers did not defeat adjacency. *See id.* § 328.3(c) ("Wetlands separated from other waters of the United States by man-made dikes or barriers . . . and the like are 'adjacent wetlands.'"); *see also Rapanos*, 547 U.S. at 780. EPA therefore properly concluded that the wetlands on the Sacketts' lot were

adjacent to the unnamed tributary to Kalispell Creek thirty feet away, notwithstanding that Kalispell Bay Road lies in between the property and the tributary.**[13]** Officials from the site visit also observed that the tributary is "relatively permanent" based on U.S. Geological Survey mapping as well as its flow, channel size, and form. Moreover, because this unnamed tributary eventually flows into Priest Lake, a traditional navigable water, via Kalispell Creek, the tributary is jurisdictional—that is, it is itself a water of the United States. *See* 33 C.F.R. § 328.3(a)(5) (explaining that tributaries to jurisdictional waters are themselves jurisdictional). Accordingly, EPA's conclusion that the Sacketts' lot was adjacent to a jurisdictional tributary was neither arbitrary nor capricious.

We turn next to Justice Kennedy's "significant nexus" inquiry: whether "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring in the judgment).

At the time of the amended compliance order, EPA had explained that "'[s]imilarly situated' wetlands include all wetlands adjacent to the same tributary." U.S. EPA & Army Corps of Engineers, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States & Carabell v. United States (June 5, 2007),

---

**[13]** EPA and Corps scientists who inspected the site concluded that a "shallow subsurface flow is occurring" beneath the road, connecting the Sacketts' lot to the tributary and the Kalispell Bay Fen wetland system to the north. This bolsters the agency's conclusion that the road should not defeat adjacency.

https://www.epa.gov/sites/production/files/2016-04/docum
ents/rapanosguidance6507.pdf.   Here, EPA appropriately
concluded based on the observations from the site visit and
maps of the area that, like the Sacketts' wetlands, the
Kalispell Bay Fen is adjacent to the unnamed tributary to
Kalispell Creek.**[14]**  Therefore, the Sacketts' wetlands and the
Fen are similarly situated for purposes of evaluating whether
they have a significant nexus to Priest Lake.

The record further supports EPA's conclusion that these
wetlands, in combination, significantly affect the integrity of
Priest Lake.  Water from these wetlands makes its way into
Priest Lake via the unnamed tributary and Kalispell Creek.
According to the July 2008 memo, these wetlands provide
important ecological and water quality benefits; indeed, the
memo identified this wetlands complex, which is one of the
five largest along the 62-mile Priest Lake shoreline, as
"especially important in maintaining the high quality of
Priest Lake's water, fish, and wildlife."   The agency's
conclusion that the Sacketts' wetlands, combined with the
similarly situated Fen, "significantly affect the chemical,
physical, and biological integrity of" Priest Lake was a
reasonable one which we will not second-guess. *Rapanos*,
547 U.S. at 780 (Kennedy, J., concurring in the judgment);
*see also San Luis & Delta-Mendota Water Auth.*, 747 F.3d
at 621 (emphasizing that "we do not sit as a panel of referees
on a professional scientific journal, but as a panel of
generalist judges obliged to defer to a reasonable judgment
by an agency" (brackets omitted) (quoting *City of Los*

---

**[14]** The July 2008 Memo further explained that the Sacketts' wetlands
and the Fen remain interconnected via a subsurface flow, and historical
aerial photographs establish that they used to be a single wetland
complex, both of which reinforce the agency's conclusion that the two
are similarly situated.

*Angeles v. Dep't of Transp.*, 165 F.3d 972, 977 (D.C. Cir. 1999))).

In sum, EPA reasonably determined that the Sacketts' property contains wetlands that share a significant nexus with Priest Lake, such that the lot was regulable under the CWA and the relevant regulations.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment in EPA's favor.

**AFFIRMED.**

## APPENDIX



View south from Kalispell Bay Road along east edge of
Sackett property, taken during 2008 site visit.



View north from Old Schneiders Road of south and west
edges of property, taken during 2008 site visit.

36               SACKETT V. USEPA



East side of the lot showing strip of excavated ground that was being filled when EPA officials arrived, taken during 2007 site visit.