Index of Exhibits

Exhibit A    *State of California, et al. v. Andrew Wheeler, et al.*

Exhibit B    *State of California, et al. v. Michael Regan, et al.*—Order Granting Motion to Remand

Exhibit C    *Waterkeeper Alliance, Inc., et al. v. U.S. Environmental Protection Agency, et al.*

Exhibit D    South Carolina Coastal Conservation League, *et al. v.* Michael Regan, *et al.* Order granting Motion for Voluntary Remand Without Vacatur

Exhibit E    Pueblo of Laguna, *et al. v.* Michael Regan, *et al.* Memorandum Opinion and Order Granting Motion to Remand and Finding Vacatur Issue Now Moot

Exhibit F    ADEQ letter to Michael S. Regan dated October 1, 2021

Exhibit G    Standing Declaration of Steve Trussell in Support of Business-Intervenors-Defendants' Cross-Motion for Summary Judgment

Exhibit H    Declaration of Don Parrish in Support of the Amicus Brief of Business Coalition in Support of the Agencies' Motion to Remand without Vacatur

Exhibit I    Declaration of Robert Matthew Mains in Support of Business-Intervenors Defendants' Motion to Stay

Exhibit J    Declaration of Rick Wajda in Support of Business-Intervenors-Defendants' Motion to Stay

Exhibit K    Declaration of Jim McCulley in Support of Business-Intervenors-Defendants' Motion to Stay

Exhibit L    Declaration of National Stone, Sand & Gravel Association in Support of Business-Intervenors-Defendants' Motion to Stay

# EXHIBIT A

864            467 FEDERAL SUPPLEMENT, 3d SERIES

tantamount to the power to hire. As for the stop sales order, Plaintiffs' own briefing acknowledges that it "halted much"—but not all—"of their work." Id. That does not reveal the power to fire, much less to hire. And, as noted above, similar arguments have been rejected by the Ninth Circuit and previous Northern District of California decisions.

### vi. Common law relationship.

[33, 34]  "According to California common law, the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." Salazar, 944 F.3d at 1032 (internal quotation marks and citations omitted). Volkswagen's direct payments to salespeople and authority to stop sales of its own vehicles do not implicate the "manner and means" by which Plaintiffs sold Volkswagen cars. And, as previously noted, mandatory training has previously been found insufficient to demonstrate an employment relationship. Indeed, far greater control over the manner and means of work has been rejected as inadequate to allege an employment relationship. See id. at 1027–28, 1032 (although McDonalds required franchisee to sell its products, use certain computer systems, employ Hamburger University-educated managers, and have employees wear standardized uniforms, these requirements merely constituted "quality control and maintenance of brand standards" and did not demonstrate a common law employment relationship).

Plaintiffs point out that "[a]t this stage [they] must only establish the plausibility of their joint employer claims." Opp'n to VW MTD at 27. But they have failed to do even that. The employment claims are dismissed. Both sides agree that that result also requires dismissing Plaintiffs' waiting time penalties, wage statement, and UCL claims because those claims are derivative

of the Labor Code claims. VW MTD at 25 n.22; Opp'n to VW MTD at 29. Those claims are dismissed as well. Because Plaintiffs have not previously had a chance to amend these claims, dismissal is without prejudice.

### IV.  CONCLUSION

For the forgoing reasons, the motions to dismiss are granted. Plaintiffs are granted leave to amend only the Labor Code claims, claims derivative of the Labor Code claims, and claims based on fraudulent omissions by Volkswagen Group of America. Any amended complaint must be filed within forty-five days of the filing of this Order.

IT IS SO ORDERED.



State of CALIFORNIA,
et al., Plaintiffs,

v.

Andrew WHEELER, et al., Defendants.

Case No. 20-cv-03005-RS

United States District Court,
N.D. California.

Signed 06/19/2020

**Background:** States brought Administrative Procedure Act (APA) action against Environmental Protection Agency (EPA) and Army Corps of Engineers for declaratory and injunctive relief, alleging that administrative rule which would narrow definition of "waters of the United States" subject to federal regulation under Clean Water Act (CWA) was not in accordance with law and was arbitrary and capricious.

**CALIFORNIA v. WHEELER** 865
Cite as 467 F.Supp.3d 864 (N.D.Cal. 2020)

States moved for preliminary injunction, or order under APA, to stay effective date of rule.

**Holdings:** The District Court, Richard Seeborg, J., held that:

(1) states did not show likelihood of success on merits of claim that rule was not in accordance with law;

(2) states did not show likelihood of success on merits of claim that rule was arbitrary and capricious; and

(3) to extent that balance of equities favored states, it did not overcome lack of stronger showing of likelihood of success on merits.

Motion denied.

**1. Injunction** ⟐1092

An application for preliminary injunctive relief requires the plaintiff to establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

**2. Injunction** ⟐1092, 1093

The sliding-scale test for preliminary injunctions provides that a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, provided that the plaintiff also satisfies the other factors for a preliminary injunction, including the likelihood of irreparable harm.

**3. Administrative Law and Procedure** ⟐1743

For an agency action to survive judicial review under the Administrative Procedure Act (APA), the decisionmaking process that ultimately leads to the agency action must be logical and rational. 5 U.S.C.A. § 706(2).

**4. Administrative Law and Procedure** ⟐1749

On Administrative Procedure Act (APA) review of an agency action, courts should be careful not to substitute their own judgment for that of the agency. 5 U.S.C.A. § 706(2).

**5. Administrative Law and Procedure** ⟐1935

A court reviewing an agency action under the Administrative Procedure Act (APA) may uphold the agency action only on the grounds that the agency invoked when it took the action. 5 U.S.C.A. § 706(2).

**6. Administrative Law and Procedure** ⟐1935

On Administrative Procedure Act (APA) judicial review of agency action, post hoc rationalizations may not be considered. 5 U.S.C.A. § 706(2).

**7. Environmental Law** ⟐701

States failed to establish likelihood of success on merits of their Administrative Procedure Act (APA) claim against Environmental Protection Agency (EPA) and Army Corps of Engineers alleging that administrative rule which would narrow definition of "waters of the United States" subject to federal regulation under Clean Water Act was not in accordance with law, as factor disfavoring preliminary injunction, or order under APA, to stay effective date of rule; states offered little more than policy argument that narrowness of rule served poorly to carry out objectives of Clean Water Act (CWA), as states did not cite any precedent construing what had to be included as "waters of the United States" subject to CWA. 5 U.S.C.A. §§ 705, 706(2)(A); Federal Water Pollution Control Act § 101 et seq., 33 U.S.C.A. § 1251 et seq.

**8. Environmental Law** ⟜173

The term "navigable waters" under the Clean Water Act (CWA) includes something more than traditional navigable waters. Federal Water Pollution Control Act § 101 et seq., 33 U.S.C.A. § 1251 et seq.

> See publication Words and Phrases for other judicial constructions and definitions.

**9. Administrative Law and Procedure** ⟜2210

A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.

**10. Environmental Law** ⟜701

States failed to establish likelihood of success on merits of their Administrative Procedure Act (APA) claim against Environmental Protection Agency (EPA) and Army Corps of Engineers alleging that administrative rule which would narrow definition of "waters of the United States" subject to federal regulation under Clean Water Act (CWA) was arbitrary and capricious, as factor disfavoring preliminary injunction, or order under APA, to stay effective date of rule, to extent that states alleged that agencies had not adequately justified fundamental change in policy and their discounting of scientific evidence that they previously had marshaled in support of prior rule; states' allegations amounted to policy disagreement over how broadly statute compelled agencies to extend federal regulation. 5 U.S.C.A. §§ 705, 706(2)(A); Federal Water Pollution Control Act § 101 et seq., 33 U.S.C.A. § 1251 et seq.

**11. Administrative Law and Procedure** ⟜2210

The point of *Chevron* deference is to leave the discretion provided by the ambi-

guities of a statute with the implementing agency.

**12. Environmental Law** ⟜701

States failed to establish likelihood of success on merits of their Administrative Procedure Act (APA) claim against Environmental Protection Agency (EPA) and Army Corps of Engineers alleging that administrative rule which would narrow definition of "waters of the United States" subject to federal regulation under Clean Water Act was arbitrary and capricious, as factor disfavoring preliminary injunction, or order under APA, to stay effective date of rule, to extent that states alleged that rule disregarded primary objective of Act to protect water quality; agencies' choice, through implementing rule, of different approach and different balance between federal and state responsibilities did not mean that they had disregarded Clean Water Act's (CWA) objective of protecting water quality. 5 U.S.C.A. §§ 705, 706(2)(A); Federal Water Pollution Control Act § 101 et seq., 33 U.S.C.A. § 1251 et seq.

**13. Environmental Law** ⟜701

States failed to establish likelihood of success on merits of their Administrative Procedure Act (APA) claim against Environmental Protection Agency (EPA) and Army Corps of Engineers alleging that administrative rule which would narrow definition of "waters of the United States" subject to federal regulation under Clean Water Act (CWA) was arbitrary and capricious, as factor disfavoring preliminary injunction, or order under APA, to stay effective date of rule, to extent that states alleged that requirement in rule irrationally excluded wetlands that flooded in periodic events and that rule provided no workable methodology to distinguish ephemeral and intermittent streams; states merely made some showing that rule provisions might lack clarity and present some administrability challenges. 5

U.S.C.A. §§ 705, 706(2)(A); Federal Water Pollution Control Act § 101 et seq., 33 U.S.C.A. § 1251 et seq.

**14. Environmental Law ⟿701**

States failed to establish likelihood of success on merits of their Administrative Procedure Act (APA) claim against Environmental Protection Agency (EPA) and Army Corps of Engineers alleging that administrative rule which would narrow definition of "waters of the United States" subject to federal regulation under Clean Water Act was arbitrary and capricious, as factor disfavoring preliminary injunction, or order under APA, to stay effective date of rule, to extent that states alleged that agencies had not addressed reliance interests that could have arisen under their prior policy approach; although it might not have been anticipated that agencies would reverse course to degree that they did, permissible scope of federal regulation under Clean Water Act (CWA) had long been uncertain. 5 U.S.C.A. §§ 705, 706(2)(A); Federal Water Pollution Control Act § 101 et seq., 33 U.S.C.A. § 1251 et seq.

**15. Environmental Law ⟿701**

To extent that balance of equities favored preliminary relief, it did not weigh so heavily so as to overcome lack of showing of likelihood of success on merits, and thus did not warrant preliminary injunction, or order under Administrative Procedure Act (APA), to stay effective date of rule, in states' APA action against Environmental Protection Agency (EPA) and Army Corps of Engineers alleging that administrative rule which would narrow definition of "waters of the United States" subject to federal regulation under Clean Water Act (CWA) was not in accordance with law and was arbitrary and capricious; balance of equities may have somewhat favored preliminary relief given interest in maintaining status quo and lack of any special urgency necessitating immediate implementation of rule. 5 U.S.C.A. §§ 705, 706(2)(A); Federal Water Pollution Control Act § 101 et seq., 33 U.S.C.A. § 1251 et seq.

———

Bryant B. Cannon, CA Department of Justice Office of the CA Attorney General, San Francisco, CA, Catherine Mitchell Wieman, Jessica Barclay-Strobel, Tatiana Koleva Gaur, Office of the Attorney General, Los Angeles, CA, Roxanne J. Carter, California Department of Justice Office of the Attorney General, San Diego, CA, for Plaintiff State of California.

Timothy L. Hoffman, Pro Hac Vice, New York State Attorney General's Office, Buffalo, NY, Philip Bein, Pro Hac Vice, New York State Attorney General's Office, New York, NY, for Plaintiff State of New York.

Jason Elliott James, Pro Hac Vice, Illinois Attorney General's Office, Chicago, IL, for Plaintiff State of Illinois.

Daniel P. Bock, Pro Hac Vice, Michigan Department of Attorney General Environment, Natural Resources, and Agriculture, Lansing, MI, for Plaintiff State of Michigan.

William G. Grantham, Pro Hac Vice, NM Attorney General's Office, Albuquerque, NM, for Plaintiff State of New Mexico.

Paul Andrew Garrahan, Oregon Department of Justice Natural Resources Section, Salem, OR, for Plaintiff State of Oregon.

Alison B. Hoffman, Pro Hac Vice, RI Office of Attorney General, Providence, RI, for Plaintiff State of Rhode Island.

Laura B. Murphy, Pro Hac Vice, VT Attorney General's Office, Montpelier, VT, for Plaintiff State of Vermont.

Ronald Leo LaVigne, Jr., Pro Hac Vice, Attorney at Law, Olympia, WA, for Plaintiff State of Washington.

Gabe Johnson-Karp, Pro Hac Vice, Madison, WI, for Plaintiff State of Wisconsin.

Seth Schofield, Pro Hac Vice, David Seth Frankel, Pro Hac Vice, Massachusetts Office of the Attorney General, Boston, MA, for Plaintiff Commonwealth of Massachusetts.

Nathan Michael Potter Taylor, Pro Hac Vice, New York City Law Department, New York, NY, for Plaintiff City of New York.

Hubert T. Lee, Jonathan Brightbill, Phillip Roark DuPre, U.S. Department of Justice, Washington, DC, for Defendants Andrew Wheeler, R. D. James, United States Environmental Protection Agency, United States Army Corps of Engineers.

Elizabeth P. McCarter, Pro Hac Vice, Attorney at Law Tennessee Attorney Generals Office, Nashville, TN, for Defendant State of Tennessee.

Benjamin Michael Flowers, Pro Hac Vice, Office of the Ohio Attorney General, Columbus, OH, for Defendant State of Ohio.

### ORDER DENYING MOTION FOR PRELIMINARY RELIEF

RICHARD SEEBORG, United States District Judge

### I. INTRODUCTION

This case is a challenge to a new rule that will substantially narrow the definition of what are "waters of the United States" subject to federal regulation under the Clean Water Act. Plaintiffs seek a court order preventing the new rule from taking effect, pending a determination on the merits of the case. Plaintiffs point to

significant irreparable harms that will occur before the litigation is resolved, if the rule is legally invalid but allowed to go into operation now. Were the court tasked with the question of whether the new rule represents wise environmental policy or the best approach to protecting water resources that could be supported by scientific data, the result might be different. The court's narrow role, however, is only to evaluate whether the rule has been adopted in compliance with the requirements of the Administrative Procedure Act. In that context, plaintiffs have not made a sufficient showing to support an injunction or an order delaying the effective date of the new rule.

### II. BACKGROUND

Congress enacted the Clean Water Act (CWA or Act) in 1972. The Act's stated objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U.S.C. § 1251(a). The Act further declares, "[i]t is the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." § 1251(b). By its terms, the Act applies only to "the waters of the United States, including the territorial seas."[1] The Environmental Protection Agency and the Army Corps of Engineers (the Agencies or defendants) both have responsibilities under the Act for regulating activities that may affect the waters of the United States.

---

1. More specifically the Act prohibits discharge of pollutants into "navigable waters," which are then defined as "the waters of the

United States, including the territorial seas." The import of the word "navigable" is discussed further below.

The rule being challenged in this litigation is The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020) (2020 Rule or Rule), which is scheduled to take effect on June 22, 2020. While the parties dispute how much acreage of wetlands and how many miles of waterways will be removed from regulation under the CWA by adoption of the 2020 Rule, there is no quarrel that it represents a substantial pullback from the scope of jurisdiction the Agencies have historically asserted.

*The 1980s Rule*

The Corps first promulgated regulations defining "waters of the United States" in the 1970s. *See, e.g.,* 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the late 1980s, the Agencies adopted regulatory definitions of that statutory phrase substantially similar to the 1977 definition. *See* 51 Fed. Reg. 41,251 (Nov. 13, 1986) (Corps regulations); *see also* 53 Fed. Reg. 20,764 (June 6, 1988) (EPA's codification of nearly identical regulatory text). The parties refer to this as the 1980s Rule.

The Agencies' application of the 1980s rule came under Supreme Court scrutiny three times. First, in *United States v. Riverside Bayview*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Court deferred to the Corps' assertion of jurisdiction over wetlands "actually abut[ting]" a traditional navigable water. *Id.* at 131-35 & n.9, 106 S.Ct. 455 (1985). Several years later, in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("*SWANCC*"), the Court rejected the Corps' assertion of jurisdiction over non-navigable, isolated, intrastate waters. It held that the term "navigable" must be given meaning within the context and application of the CWA. *Id.* at 171-72, 121 S.Ct. 675; *see also id.* at 167-68, 121 S.Ct. 675 ("[T]o rule for [the Corps],

we would have to hold that the jurisdiction of the Corps extends to ponds that are not adjacent to open water ... [T]he text of the statute will not allow this."). In 2003, the Agencies issued guidance for applying the 1980s Rule in light of the limitations imposed by *SWANCC* (the *SWANCC* Guidance).

Most recently, in *Rapanos v. United States*, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), a fractured court produced three separate articulations of the outer limits of the Corp's jurisdiction over wetlands. A four-justice plurality held that the consolidated cases before the Court should be remanded for failure to establish jurisdiction. *See id.* at 757, 126 S.Ct. 2208 (Scalia, J., plurality). Applying a different test, Justice Kennedy also concluded remand was appropriate, and he therefore concurred in the judgment. *See id.* at 786-87, 126 S.Ct. 2208 (Kennedy, J., concurring). The dissent would have upheld the Corps' finding of jurisdiction. *See id.* at 810, 126 S.Ct. 2208 (Stevens, J., dissenting). The Agencies subsequently issued guidance instructing that the 1980s Rule should be applied in light of *Rapanos* by adhering to Justice Kennedy's approach (the *Rapanos* Guidance).

*The 2015 Rule*

In 2015, the Agencies revised the regulatory definition of "waters of the United States." *See* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) (2015 Rule). When promulgating the 2015 Rule, the Agencies stated an intent to adopt the test set out in Justice Kennedy's *Rapanos* concurrence, which permitted jurisdiction over wetlands and waters that were not navigable in the traditional sense only where they had a "significant nexus" to waters that are or were navigable in fact, or that could reasonably be made navigable. Therefore, to establish that waters and

wetlands covered by the scope of the Rule's text would have such a "nexus," the Agencies prepared a scientific literature review. The EPA's Office of Research and Development produced a report entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (the Connectivity Report) which considered over 1200 peer-reviewed publications. The Agencies also relied on an independent review of the Connectivity Report by EPA's Science Advisory Board (SAB). The Connectivity Report made a case for the importance of upstream non-navigable waters and wetlands, and described how they impact downstream navigable waters.

Multiple parties sought judicial review of the 2015 Rule in courts across the country. One court of appeals and multiple district courts stayed or enjoined the 2015 Rule, concluding plaintiffs established a likelihood of successfully invalidating the rule. *See In re EPA & DOD Final Rule,* 803 F.3d 804, 808 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (2018)[2]; *Oregon Cattlemen's Ass'n v. EPA,* No. 3:19-cv-564, Dkt. No. 58 (July 26, 2019), *vacated as moot,* Dkt. No. 81 (D. Or. Mar. 2, 2020); *Texas v. EPA,* No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018); *Georgia v. Pruitt,* 326 F. Supp. 3d 1356 (S.D. Ga. 2018); *North Dakota v. EPA,* 127 F. Supp. 3d 1047 (D.N.D. 2015); *North Dakota v. EPA,* No. 3:15-cv-59, Dkt. No. 250 (D.N.D. Sept. 18, 2018). Two courts eventually ruled on summary judgment that the 2015 Rule was "unlawful" and remanded it to the Agencies. *Georgia v. Wheeler,* 418 F. Supp. 3d 1336, 1372 (S.D.Ga. 2019); *Texas v. EPA,* 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019).

*The Repeal Rule*

In 2017, the Agencies began reconsidering the 2015 Rule, which was stayed at the time. They conducted a notice-and-comment rulemaking process. Before issuing a new rule, however, the Agencies issued a rule repealing the 2015 Rule and reinstating the pre-2015 Rule regulatory definition of "waters of the United States." 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule"). The Repeal Rule went into effect on December 23, 2019. *Id.* Although multiple parties sought judicial review of the Repeal Rule in various district courts, it and its reinstatement of the earlier regulations, remains in force pending the 2020 Rule taking effect. As such, the current governing regime is essentially the 1980s Rule as modified by the *SWANCC* Guidance and the *Rapanos* Guidance.

*The 2020 Rule*

On January 23, 2020, the Agencies signed the final 2020 Rule revising the definition of "waters of the United States." The Agencies contend the Rule is intended "to end the decades of disputes and uncertainty surrounding the scope of these terms and to provide more administrable rules." They insist the Rule defines the limits of federal jurisdiction "consistent with the Constitution, CWA, and case law," and that it "establishes categorical bright lines to improve regulatory clarity."

The 2020 Rule defines the "waters of the United States" as: "(1) The territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than waters that are themselves wetlands)." 85 Fed. Reg. at 22,273. The Rule also specifies

---

2.  The Supreme Court reversed the Sixth Circuit's jurisdictional determination, holding that challenges must be brought in district

courts. *Nat'l Ass'n of Mfrs. v. Dep't of Def.,* —— U.S. ——, 138 S. Ct. 617, 624, 199 L.Ed.2d 501 (2018).

"exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id.* at 22,270; *see also id.* at 22,340-41 (regulatory text to be codified). "Ephemeral features" are categorically excluded under the 2020 Rule. *Id.* at 22,340. Discharges of pollutants to such non-jurisdictional waters, however, remain regulated under the Rule if those discharges are conveyed to downstream navigable waters. *Id.* at 22,297.

The Agencies contend that in developing the new definition they were "guided by the Act's policies and objectives; case law, including both the plurality and concurring opinions in *Rapanos*; scientific principles; and administrability." The Agencies claim they have balanced Congress' goal "to restore and maintain the integrity of the Nation's waters while maintaining the states' primary responsibilities and rights to prevent, reduce, and eliminate pollution and to plan the development and use of their land and water resources." The Agencies point to "technical analyses and legal discussion" in some 1,500 pages of the Rule preamble, a Resource and Programmatic Assessment ("RPA"), an Economic Analysis, and a Response to Comments document, to argue they adequately explained and justified the basis of the 2020 Rule and its departure from prior policy.

Plaintiffs in this action are seventeen states, the North Carolina Department of Environmental Quality, the District of Columbia, and the City of New York. Twenty-three other states have been permitted to intervene in this action in support of the 2020 Rule.[3]

As noted, plaintiffs seek declaratory and injunctive relief under the Administrative Procedures Act (APA). Their complaint asserts the 2020 Rule is arbitrarily inconsistent with the Agencies' prior findings, and contrary to the meaning and objectives of the CWA.[4]

### III. LEGAL STANDARDS

#### A. Injunctions

[1, 2]   An application for preliminary injunctive relief requires the plaintiff to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. N.R.D.C., Inc.,* 555 U.S. 7, 21-22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The Ninth Circuit has clarified, however, that courts in this Circuit should still evaluate the likelihood of success on a "sliding scale." *Alliance for Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134 (9th Cir. 2011) ("[T]he 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."). As quoted in *Cottrell*, that test provides that, "[a] preliminary injunction is appropriate when a plaintiff demonstrates ... that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided, of course, that "plaintiffs must also satisfy the other [*Winter*] factors" including the likelihood of irreparable harm. *Id.* at 1135.

Here, defendants note their disagreement with the *Cottrell* "sliding scale" stan-

---

3.   Motions for leave to intervene brought by other interested parties remain under submission and will be decided in due course. In the interim, briefs of those proposed intervenors have been considered in the nature of *amicus* briefs.

4.   Other challenges to the 2020 Rule have been filed in a number of district courts, and at least one other motion for a preliminary injunction is pending.

dard, although they do not argue this court is free to disregard it. As will appear, the determination here is that plaintiffs have not shown a likelihood of success and that to the extent they arguably have shown serious questions going to the merits, the balance of hardships does not tip so strongly to one side as to warrant preliminary relief. Accordingly, defendants will not have been prejudiced by application of the *Cottrell* standard.

## B.   Section 705

As an alternative to their request for a traditional injunction precluding the Agencies from implementing the 2020 Rule, plaintiffs also seek an order under section 705 of the APA. That section authorizes a court "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." As suggested by the text of the statute and conceded by plaintiffs, the prerequisites for issuance of an order under section 705 are substantively identical to those for issuance of a preliminary injunction. The parties were asked to provide supplemental briefing, however, on the question of whether the concerns that apply when a court is considering issuing a so-called "nationwide injunction" apply equally to an order issued under the express statutory authority of section 705 to "postpone the effective date of an agency action." While plaintiffs have presented some compelling arguments that an order under section 705 properly stays agency action as a whole, without regard to geography or the identity of the particular plaintiffs, ultimately this case does not require resolution of that question.

## C.   The APA

[3–6]  Under section 706 of the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). Accordingly, the decision-making process that ultimately leads to the agency action must be "logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998). Courts should be careful, however, not to substitute their own judgment for that of the agency. *Suffolk Cty. v. Sec'y of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977). Ultimately, a reviewing court may uphold agency action "only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 135 S. Ct. 2699, 2710, 192 L.Ed.2d 674 (2015). Post hoc rationalizations may not be considered. *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). In evaluating APA claims, courts typically limit their review to the administrative record existing at the time of the decision. *Sw. Ctr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996); accord *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1117 (9th Cir. 2007).

## IV. DISCUSSION

### A.   Success on the merits

As noted above, agency rules are subject to being set aside under the APA if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." Here, plaintiffs contend the 2020 rule is "arbitrary and capricious" because in their view the Agencies lacked an adequate scientific and factual basis for changing their policy so dramatically. Plaintiffs also point to various specific aspects of the rule that they contend are not rational or reasonable. Plaintiffs separately argue the 2020 rule is otherwise "not in accordance with the law" because, they insist, it is inconsistent with the "text, structure, and purpose" of the Clean Water Act. The latter point will be addressed first, because it implicates the available guidance from the Supreme Court, which then indirectly bears on the issues of "arbitrary and capricious."

### 1. *Accordance with the law*

[7]  Although the meaning of "waters of the United States" in the Clean Water Act has been extensively addressed in no fewer than three Supreme Court cases, the validity of the 2020 rule presents a completely new question. In the prior cases, the issue was always whether the agencies had gone *too far* in extending the scope of federal regulation. Now, the question is whether the agencies have not gone far enough. So, while some guiding principles may be distilled from existing precedents, this is largely a blank slate.

[8]  The one point on which everyone agrees—"everyone" meaning the parties in this case and all of supreme court justices who have written or joined opinions on the issue—is that "navigable waters" does not in fact mean navigable waters in the ordinary sense a layperson might expect. "[T]he Act's term 'navigable waters' includes something more than traditional navigable waters. We have twice stated that the meaning of 'navigable waters' in the Act is broader than the traditional

understanding of that term." *Rapanos*, 547 U.S. at 731, 126 S.Ct. 2208. As a result, the challenge in interpreting the meaning of "waters of the United States" lies in reconciling the fact that it must consist of something more than just waters that are navigable or could reasonably be made so, with the fact that it must have *some* limitations.

The phrase, therefore, is indisputably ambiguous. As a result, the court is compelled to apply *Chevron* deference when evaluating whether the Agencies' interpretation of it is lawful.[5] The Supreme Court has explained *Chevron* deference as follows:

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts .... If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

Furthermore, and of particular relevance here, *Brand X* explained "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *Id.* at 981, 125 S.Ct. 2688. The Court elaborated:

---

5.   *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct.

2778, 81 L.Ed.2d 694 (1984).

Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act .... For if the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency .... An initial agency interpretation is not instantly carved in stone. On the contrary, the agency ... must consider varying interpretations and the wisdom of its policy on a continuing basis ... for example, in response to changed factual circumstances, or a change in administrations .... That is no doubt why in *Chevron* itself, this Court deferred to an agency interpretation that was a recent reversal of agency policy.

*Brand X*, 545 U.S. at 981–82, 125 S.Ct. 2688 (quotes and citations omitted).

[9] Finally, one more important principle emerges from *Brand X*. "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982, 125 S.Ct. 2688.

Here, plaintiffs acknowledge that *Chevron* deference applies. They then argue, however, that the 2020 Rule does not survive review even under *Chevron* because, in their view, it is not a *reasonable* interpretation of the statute. Plaintiffs' argument rests heavily on the notion that the 2020 Rule largely adopts the position of the *Rapanos* plurality, and that the other five justices agreed the plurality's standard was not appropriately grounded in the statute. Plaintiffs' argument fails for multiple reasons. First, it is suspect to

attempt to cobble together a holding from the concurrence and the dissent. *See generally Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (quotation and citation omitted)).

More fundamentally, even if the concurrence and the dissent can be read together to stand for the proposition that the *Rapanos* plurality's articulation of the maximum permissible reach of the statute is an improper construction, a holding that the Agencies *must* construe the statute more broadly is a bridge too far. Finally, nothing in either the *Rapanos* concurrence or the dissent—or in the two read together—can be characterized as a holding "that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982, 125 S.Ct. 2688.

In the absence of precedent construing what *must* be included as "waters of the United States," plaintiffs are left with little more than policy arguments that the narrowness of the 2020 Rule serves poorly to carry out the objectives of the CWA. As compelling as those arguments may be, they do not provide a sufficient basis for a court to substitute its judgment for the policy choices of the Agency. Had Congress chosen to speak more clearly about how broadly CWA jurisdiction was to extend, or if the CWA did not contemplate the balancing of interests in pursuit of its ultimate goals, it might be possible to characterize the 2020 Rule as an "unreasonable" interpretation. At least at this juncture and on the current record, howev-

er, plaintiffs have not shown they are likely to succeed in making that claim.

Finally, plaintiffs contend the 2020 Rule is contrary to law insofar as it excludes from its scope interstate waters that do not otherwise qualify for protection.[6] Plaintiffs insist that waters or wetlands that cross state lines have always been subject to federal jurisdiction. While that may otherwise be so, the CWA did not employ "interstate" in its definition of "navigable waters" or to describe "waters of the United States." Accordingly, plaintiffs have not shown a likelihood of success on the merits of their claim that the 2020 Rule is "otherwise contrary to law."

### 2. Arbitrary and capricious

[10, 11]   Plaintiffs present four basic arguments that the 2020 Rule is arbitrary and capricious. First, plaintiffs contend the Agencies have not adequately justified the fundamental change in policy and their discounting of the scientific evidence they previously had marshalled in support of the 2015 Rule. As set out above, Agencies are not precluded from reversing course "since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Brand X*, 545 U.S. at 982, 125 S.Ct. 2688. Indeed, a policy change may be permissible simply because there has been a "change in administrations."

The requirement is only that agencies must *explain* the basis for their change, and defendants have adequately done so here. The need for a new rule was manifest, and had been for decades. The 1980s rule had been cut back by the courts, leaving a patchwork of regulations and "guidance" documents. The 2015 Rule had been rejected by courts. Certainly, the Agencies could have promulgated a new rule that remained expansive while attempting to address the concerns courts had raised about the outer limits of jurisdiction under the CWA. It is no secret that a motivating factor in choosing to go the opposite direction was a "change in administrations," but that does not make it improper.[7]

Plaintiffs' arguments that the Agencies disregarded the scientific evidence they previously had gathered is ultimately a policy disagreement as well. The Agencies have articulated reasons they contend the science does not compel a different result, but the real difference in opinion is whether the statute clearly compels the Agencies to extend federal regulation to the broadest permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for water quality the science suggests might be achievable. Because the Agencies may reasonably conclude they have no such statutory duty,

---

6. Although plaintiffs present this as an issue of potentially great effect, the Agencies contend it actually would apply in very few instances.

7. The Supreme Court's decision yesterday in *Department of Homeland Security v. Regents of the Univ. of California*, — U.S. —, 140 S.Ct. 1891, 1902-03, 207 L.Ed.2d 353 (2020) provides an instructive contrast. There, the Court found an agency failed adequately to explain and justify a policy change in a brief memorandum issued by the director. Here, the agencies engaged in a full notice and

comment rulemaking process, generating a fulsome record of the basis for the policy change. Another aspect of the *DHS v. Regents* decision is also relevant here. The Court stated: "We do not decide whether DACA or its rescission are sound policies. The wisdom of those decisions is none of our concern . . . . We address only whether the agency complied with the procedural requirement that it provide a reasoned explanation for its action." 140 S.Ct. at 1916 (quotations and citations omitted). Likewise, the wisdom of the 2020 Rule, and whether it is a sound policy, is not the subject of review here.

discounting evidence of possible benefits is not plainly arbitrary or capricious.

[12] Second, plaintiffs contend the 2020 Rule "disregards" the primary objective of the CWA to protect water quality. This, however, adds little to the arguments they have already made. That the Agencies now choose a different approach, and a different balance between federal and state responsibilities does not mean they have disregarded the primary objective of the statute in an arbitrary or capricious manner that is likely to warrant setting aside the Rule.

[13] Third, plaintiffs take issue with two specific aspects of the 2020 rule. They complain the requirement that a non-navigable water source must contribute surface water flow to a jurisdictional water in a "typical year" irrationally excludes wetlands that flood in periodic events, and that the term "typical year" is inadequately defined in any event. Similarly, plaintiffs contend the Rule provides no workable methodology to distinguish between "ephemeral" streams, which are categorically excluded from coverage, and "intermittent" streams, which are not. Plaintiffs have made some showing that these provisions of the 2020 Rule may lack clarity and present some administrability challenges. Those potential issues, however, are not sufficient to conclude the Rule should be preliminarily enjoined as arbitrary and capricious.

[14] Finally, plaintiffs fault the Agencies for not addressing "reliance interests" that may have arisen under their prior policy approach. Although it may not have been anticipated that the Agencies would reverse course to the degree they have, given the long uncertainty about the permissible scope of federal regulation under the CWA, it is difficult to see how significant cognizable reliance interests would have arisen. In any event, to the extent some such interests did arise, plaintiffs have not shown how they would invalidate the 2020 Rule.

### B.   Irreparable harm and other factors

Had plaintiffs made a stronger showing on the merits, the interest in preserving the status quo would count heavily towards providing preliminary relief, either as a traditional injunction or as a stay order under section 705. Although substantial environmental harm might only accumulate over a period of time, it is reasonable to assume that some of the effects of withdrawing federal protection for some waters and wetlands will begin to manifest immediately, and certainly over the course of time this action is likely to be pending. That said, the agencies and the intervenor states, have raised substantial challenges to the adequacy of the showing of irreparable harm, particularly insofar as it rests on a number of speculative assumptions. Additionally, unless section 705 is read to permit a stay of the rule without regard to particular geographic impacts, plaintiffs likely have failed to show that the harms to which they point apply with equal force in all parts of the country, which could have a bearing on the propriety of a so-called "nationwide injunction."

[15] The balance of equities or hardships may also lean somewhat in plaintiffs' favor, given the interest in maintaining the status quo, and the lack of any special urgency necessitating immediate implementation of the 2020 Rule. That does not weigh so heavily, however, as to overcome the lack of a stronger showing on the merits.

Finally, under the circumstances of this case, the question of whether an injunction would be "in the public interest" is subsumed in the other factors. This is because even though an invalid rule would not serve the public interest, a valid rule could not be enjoined based only on a court's

CANNARA v. NEMETH  877
Cite as 467 F.Supp.3d 877 (N.D.Cal. 2020)

assessment that it was not good public policy.

### V. CONCLUSION

The motion for a preliminary injunction or an order staying the effective date of the 2020 Rule is denied.

**IT IS SO ORDERED.**



---

Alex CANNARA et al., Plaintiffs,

v.

Karla NEMETH et al., Defendants.

Case No. 19-cv-04171-JD

United States District Court,
N.D. California.

Signed 06/17/2020

**Background:** Electric and gas ratepayers brought action against California Public Utilities Commission (CPUC), its members, and various state government entities seeking declaratory and injunctive relief challenging decision by CPUC to impose a charge on ratepayers in connection with California urgency bill that established a fund to help cover the losses from future wildfires caused by public utilities. Defendants moved to dismiss.

**Holdings:** The District Court, James Donato, J., held that:

(1) ratepayers' action was a challenge to an order affecting utility rates as would preclude federal court jurisdiction under the Johnson Act, and

(2) CPUC proceeding satisfied the reasonable notice and hearing requirements of Johnson Act, as required to preclude from federal court jurisdiction ratepayers' action.

Motion granted.

**1. Federal Courts ⟺2078, 2080**

A jurisdictional attack from a motion to dismiss for lack of subject matter jurisdiction may be facial or factual. Fed. R. Civ. P. 12(b)(1).

**2. Federal Courts ⟺2078**

In a facial attack in a motion to dismiss for lack of subject matter jurisdiction, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. Fed. R. Civ. P. 12(b)(1).

**3. Federal Courts ⟺2080**

In a factual attack in a motion to dismiss for lack of subject matter jurisdiction, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. Fed. R. Civ. P. 12(b)(1).

**4. Federal Courts ⟺2078**

In a facial jurisdictional challenge in a motion to dismiss for lack of subject matter jurisdiction, the court takes all factual allegations in the complaint as true and draws all reasonable inferences in plaintiffs' favor. Fed. R. Civ. P. 12(b)(1).

**5. Federal Civil Procedure ⟺2533.1**
    **Federal Courts ⟺2080**

In a factual challenge in a motion to dismiss for lack of subject matter jurisdiction, the court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment and need not presume the truthfulness of the plaintiff's allegations. Fed. R. Civ. P. 12(b)(1).

**6. Federal Civil Procedure ⟺1772**

To survive a motion to dismiss for failure to state a claim, plaintiffs must allege enough facts to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

# EXHIBIT B

1
2
3
4
5
6
7                           UNITED STATES DISTRICT COURT
8                          NORTHERN DISTRICT OF CALIFORNIA
9

10   STATE OF CALIFORNIA, et al.,                    Case No. 20-cv-03005-RS
             Plaintiffs,
11

12        v.                                          **ORDER GRANTING MOTION TO
                                                      REMAND**
13   MICHAEL REGAN[1], et al.,

14           Defendants.

15

16        This is one of several cases filed in various United States District Courts throughout the

17   nation challenging rules promulgated by the United States Environmental Protection Agency and

18   the United States Army Corps of Engineers that define "waters of the United States" for purposes

19   of applying the Clean Water Act, *see e.g.*, *Conservation Law Foundation v. United States*

20   *Environmental Protection Agency*, No. 1:20-cv-10820 (D. Mass.); *Pascua Yaqui Tribe v. United*

21   *States Environmental Protection Agency*, 4:20-cv-00266 (D. Ariz.), including another case

22   pending in this court, *Waterkeeper Alliance, Inc.. v. United States Environmental Protection*

23   *Agency* 3:18-cv-3521 RS (N.D.Cal.).

24        Defendants seek voluntary remand to the agencies and dismissal of this case. Plaintiffs

25   oppose remand unless the current rule is vacated. The issue of whether vacatur is warranted or not

26   appears to be moot, however, given that the *Pascua Yaqui* court issued an order on August 13,

27

28   [1]  EPA Administrator Michael Regan is automatically substituted for Andrew Wheeler, pursuant
     to Rule 25(d) of the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

1   2021 vacating the rule.

2        Were it still necessary to reach the issue, this court would not be inclined to impose

3   vacatur. Plaintiffs argue that defendants have now acknowledged "severe deficiencies" in the

4   current rule and admit to "irreversible harms," thereby presenting a different situation than when

5   their application for a preliminary injunction was denied. Defendants, however, appear to be

6   reconsidering the rule primarily for policy reasons—issues the order denying a preliminary

7   injunction pointedly observed were outside the scope of the judicial inquiry at that juncture. While

8   it is within defendants' discretion to modify their policies and regulatory approaches, and it may

9   ultimately resolve some or all of plaintiffs' objections to the current rule, there has been no

10  evaluation of the merits—or concession by defendants—that would support a finding that the rule

11  should be vacated.[2] Accordingly, the motion to remand is granted. The Clerk shall close the file.

12

13  **IT IS SO ORDERED.**

14

15  Dated: September 16, 2021

16

17  RICHARD SEEBORG
    Chief United States District Judge

18

19

20

21

22

23

24

25

26  [2] The State Intervenors do not oppose remand as long as it does not imply any determination,
    tentative or otherwise, that the existing rule is legally deficient. Nothing in this order so concludes,
27  or is based on any assertion by defendants that could be read as having such an implication.

28
    CASE NO. 20-cv-03005-RS

2

United States District Court
Northern District of California

# EXHIBIT C

2021 WL 4221585
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

WATERKEEPER ALLIANCE, INC., et al., Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al., Defendants.

Case No. 18-cv-03521-RS

|

09/16/2021

RICHARD SEEBORG, Chief United States District Judge

### ORDER GRANTING MOTION TO REMAND

*1  This is one of several cases filed in various United
States District Courts throughout the nation challenging rules
promulgated by the United States Environmental Protection
Agency and the United States Army Corps of Engineers that
define "waters of the United States" for purposes of applying
the Clean Water Act, *see e.g.*, *Conservation Law Foundation
v. United States Environmental Protection Agency*, No. 1:20-
cv-10820 (D. Mass.); *Pascua Yaqui Tribe v. United States
Environmental Protection Agency*, 4:20-cv-00266 (D. Ariz.),
including another case pending in this court, *State California
v. Regan*, 3:20-cv-3005 RS (N.D.Cal.).

Defendants seek voluntary remand to the agencies and
dismissal of this case. Plaintiffs oppose remand unless the
current rule is vacated. The issue of whether vacatur is
warranted or not appears to be moot, however, given that
the *Pascua Yaqui* court issued an order on August 13, 2021
vacating the rule.

Were it still necessary to reach the issue, this court would
not be inclined to impose vacatur. Plaintiffs' argument that
vacatur is appropriate in light of defendants' supposed

acknowledgement of "legal error" embodied in the present
rule is not persuasive. Defendants do not concede the rule is
legally impermissible, and in *California v. Regan*, this court
concluded the plaintiffs were unlikely to succeed on the merits
in showing such legal error. Rather, defendants appear to be
reconsidering the rule for policy reasons. While it is within
defendants' discretion to modify their policies and regulatory
approaches, and it may ultimately resolve some or all of
plaintiffs' objections to the current rule, there has been no
evaluation of the merits   or concession by defendants—that
would support a finding that the rule should be vacated.

Intervenors Chantell and Michael Sackett oppose remand as
to one specific provision   relating to "adjacent wetlands"
— which they contend the agencies would lack discretion
to eliminate or substantially revise on remand. The Sackett's
argument, however, rests on their position that the four-justice

plurality opinion in   *Rapanos v. United States*, 547 U.S.
715, 126 S.Ct. 2208 (2006) is controlling. The Ninth Circuit
has recently rejected that very claim by the Sacketts. *Sackett
v. U.S. Env't Prot. Agency*, 8 F.4th 1075, 1091 (9th Cir.
2021)("For all these reasons, the Sacketts' arguments fail...the
Kennedy concurrence is still the controlling opinion from
*Rapanos*.")

Accordingly, the motion to remand is granted. The Clerk shall
close the file. **IT IS SO ORDERED.**

Dated: September 16, 2021

RICHARD SEEBORG

Chief United States District Judge

**All Citations**

Slip Copy, 2021 WL 4221585

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, *et al.*, ) ) ) Plaintiffs, ) ) v. ) ) MICHAEL REGAN,[1] in his official ) capacity as Administrator of the U.S. ) Environmental Protection Agency, *et al.*, ) ) Defendants, ) ) AMERICAN FARM BUREAU ) FEDERATION, *et al.*, ) ) Intervenor-Defendants. ) ) | Case No. 2:20-cv-01687-BHH |

### ORDER

Having considered Defendants' Motion for Voluntary Remand Without Vacatur

(ECF No. 140) and the parties' responses thereto, the Court hereby GRANTS the Motion.

Accordingly, the Navigable Waters Protection Rule: Definition of "Waters of the United

States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) is remanded without vacatur. All other

pending motions are hereby denied as moot and this action is dismissed.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

July 14, 2021
Charleston, South Carolina

---

[1] EPA Administrator Michael Regan is automatically substituted for Andrew Wheeler pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF LAGUNA; PUEBLO OF
JEMEZ,

      Plaintiffs,

v.                                                                 CIV. No. 1:21-cv-00277-WJ-KK

MICHAEL REGAN, in his official capacity
as Administrator of the United States
Environmental Protection Agency;
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; TAYLOR N.
FERRELL, in his official capacity as
Acting Assistant Secretary of the Army for
Civil Works; UNITED STATES ARMY
CORPS OF ENGINEERS,

Defendants.

### MEMORANDUM OPINION AND ORDER
### GRANTING MOTION TO REMAND
### and
### FINDING VACATUR ISSUE NOW MOOT

THIS MATTER comes before the Court upon Defendants' Motion for Voluntary

Remand of the Navigable Waters Protection Rule Without Vacatur, filed on July 2, 2021 by

Defendants United States Environmental Protection Agency ("EPA"), EPA Administrator

Michael Regan, the United States Army Corps of Engineers ("Corps"), and Acting

Assistant Secretary of the Army Jaime Pinkham (collectively, the "Agencies") **(Doc. 28)**.

Having reviewed the parties' pleadings and the applicable law, the Court GRANTS the parties'

unopposed request to remand the matter to the Agencies, but finds the question of whether the

Navigable Waters Protection Rule should be vacated on remand to be MOOT.

## BACKGROUND

This case is one of several filed in various United States District Courts throughout the nation challenging rules promulgated by the United States Environmental Protection Agency and the United States Army Corps of Engineers that define "waters of the United States" for purposes of applying the Clean Water Act. The Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA"), seeks "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251 *et seq.* Among other provisions, the CWA prohibits "the discharge of any pollutant by any person" without a permit or other authorization, 33 U.S.C. § 1311(a), to "navigable waters," defined as "the waters of the United States," *id.* at 1362(7).

During the past ten years, federal agencies comprehensively revised the regulatory definition of "waters of the United States." Most recently, the Agencies revised the definition of "waters of the United States" with the Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) (the "NWPR" or "Rule"). Plaintiffs, the Jemez and Laguna Pueblos, challenge the NWPR and claim that the Agencies acted arbitrarily and unlawfully in promulgating that rule and by doing so violated their Trust duties to the Pueblos. Defendants seek voluntary remand to the agencies and dismissal of this case. Plaintiffs oppose remand unless the current rule is vacated.

## DISCUSSION

On September 7, 2021, after briefing on the motion to remand was completed, Plaintiffs filed a Notice of Supplemental Authority regarding a recent decision in the federal District of Arizona vacating the NWPR, the same rule challenged by Pueblos in this matter. *Pascua Yaqui Tribe v. United States Environmental Protection Agency*, No. CV-20- 00266-TUC-RM (D. Ariz.)

2

(order issued Aug. 30, 2021). Doc. 35-1.[1] In that case, the U.S. District Court for the District of Arizona issued an order on August 13, 2021 vacating the Rule. The *Pascua Yaqui* court granted Plaintiffs' "request that remand include vacatur" because:

> [t]he seriousness of the Agencies' errors in enacting the NWPR, the likelihood that the Agencies will alter the NWPR's definition of "waters of the United States," and the possibility of serious environmental harm if the NWPR remains in place upon remand, **all weigh in favor of remand with vacatur.**

Doc. 35-1 at 3 (emphasis added). On September 17, 2021, the Agencies also filed a *Notice of Supplemental Authority Concerning Motion for Remand* (Doc. 39), providing the Court with notice of a recent decision from the United States District Court for the District of Massachusetts and two recent decisions from the United States District Court for the Northern District of California remanding the NWPR. All three cases found the issue of vacatur to be moot in light of the ruling in *Pascua Yaqui*. *See Conservation Law Foundation v. EPA*, No. 1:20-cv-10820, Doc. No. 122 (D. Mass. Sept. 1, 2021) (finding that "the most prudent step to resolve this case in this court is to grant the request for voluntary remand and dismiss this case without independently vacating the challenged Rule"); *California v. Regan*, No. 20-cv-03005, Doc. No. 271 (N.D. Cal. Sept. 16, 2021) ("The issue of whether vacatur is warranted or not appears to be moot, however, given that the *Pascua Yaqui* court issued an order on August 13, 2021 vacating the rule."); and *Waterkeeper Alliance, Inc. v. EPA*, No. 18-cv-03521, Doc. No. 125 (N.D. Cal.Sept. 16, 2021) (same). Docs. 39-1, 39-2 & 39-3.

The mootness of the vacatur issue by no means suggests how this Court would have ruled on the matter. Interestingly, the Northern District of California in *Waterkeeper Alliance* stated that it "would not be inclined to impose vacatur" . . . "were it still necessary to reach the issue"

---

[1] *Pascua* was still pending in the District of Arizona as of the time the reply brief was filed. *See* Doc. 34 at 3, n.1.

because Defendants "do not concede the rule is legally impermissible." Doc. 39-3 at 2. That court also noted that in *California v. Regan*, the Northern District of California concluded that plaintiffs were "unlikely to succeed on the merits in showing such legal error" and that rather, the Agencies appeared to be "reconsidering the rule for policy reasons":

> While it is within defendants' discretion to modify their policies and regulatory approaches, and it may ultimately resolve some or all of plaintiffs' objections to the current rule, there has been no evaluation of the merits—or concession by defendants—that would support a finding that the rule should be vacated.

Doc. 39-3 at 2. This Court also follows that line of analysis, making no finding in particular regarding the vacatur issue except to note that vacatur of the NWPR Rule flows purely from its mootness following the *Pascua Yaqui* rather than from any consideration of its merits.

Therefore, the Court finds that because a federal court has already vacated the Rule, the question of whether this Court should remand without vacatur in response to Defendants' motion is NOW MOOT. *See S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (central mootness inquiry is whether "circumstances changed … that forestall any occasion for meaningful relief."); *cf., e.g.*, *Motion Robbins v. Dyck O'Neal*, Inc., No. 18-2623-DDC-TJJ, 2019 WL 3453563, at \*1 (D. Kan. July 31, 2019) (denying a pending motion as moot in light of changed circumstances).

Accordingly, the Motion to Remand the NWPR to the Agencies is GRANTED. The Clerk of Court shall close the file in this case.

      **IT IS SO ORDERED**.

WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE

4

EXHIBIT F



Douglas A. Ducey
Governor

**ARIZONA DEPARTMENT**
OF
**ENVIRONMENTAL QUALITY**



Misael Cabrera
Director

Oct 1, 2021

Michael S. Regan, Administrator
Environmental Protection Agency
USEPA Headquarters
William Jefferson Clinton Building, South
1200 Pennsylvania Avenue, N. W. Mail Code: 1101A
Washington, DC 20460

RE: State of Arizona Input on Proposed Revision to the Definition of "Waters of the United
States", Docket ID No. EPA-HQ-OW-2021-0328

Dear Administrator Regan,

This letter is in response to the June 9, 2021, announcement that it is the Administration's intent
to revise the definition of Waters of the United States (WOTUS) and repeal the Navigable
Waters Protection Rule (NWPR). I would like to thank you for soliciting feedback from the
States before drafting any rule changes by the USEPA.

While the NWPR did impact Arizona's regulatory landscape, the EPA press release from June 9,
2021, is not entirely accurate in suggesting the majority of waters in Arizona were at risk
because of the Navigable Waters Protection Rule (NWPR). In fact, the statement, "the EPA and
Department of the Army have determined that this rule is leading to significant environmental
degradation" is confusing to us as the only evidence provided was the number of waters that
were no longer regulated. Equating lack of regulation to environmental degradation is not
completely accurate.

In this discussion it is also critical to distinguish between a "water" or "stream" and a "water
way" or "drainage". The statement that "New Mexico and Arizona, where nearly every one of
over 1,500 streams assessed has been found to be non-jurisdictional" inaccurately presumes that
waterways or drainages that flow only as a result of precipitation and for a limited time should be
regulated the same as relatively permanent waters. This extreme interpretation of WOTUS, and
the legitimate debate surrounding whether or not this aligns with the original Congressional
intent, *is the root cause of the wasteful 30-year debate and seemingly unending litigation.*

In response to implementation of the NWPR, the State of Arizona recognized the importance of a
'local control approach' at the state level to protect Arizona's precious water resources no longer
considered WOTUS. Prior to the NWPR becoming effective in 2020, ADEQ had already

**Phoenix Office**
1110 W. Washington St. | Phoenix, AZ 85007
602-771-2300

**Southern Regional Office**
400 W. Congress St. | Suite 433 | Tucson, AZ 85701
520-628-6733

azdeq.gov

Page 2 of 4

initiated a stakeholder process to create a local control approach, which culminated in the Arizona Surface Water Protection Program (SWPP). This program was signed into law by Arizona Governor Doug Ducey on May 5, 2021 and will become effective on September 29, 2021 with final rulemaking for the program completed by December 2022. We are justifiably proud of this state effort to protect important waters no longer considered WOTUS.

The lack of a durable definition of WOTUS has created a tremendous amount of waste for those States on the front lines of administering the Clean Water Act (CWA). In the first year after the NWPR became effective, ADEQ estimates we have spent more than $2 million dollars to implement the rule. This includes a significant portion of staff time taken away from mission critical activities, such as sampling and monitoring pollutants in Arizona waters, implementing projects to reduce pollutant impacts to Arizona waters, and permitting and compliance activities.

On August 30, 2021, a federal court judge in Tucson vacated the NWPR. In light of this order, Arizona is once again forced to change course and adapt to a new set of circumstances. The continued shifting of the WOTUS definition in recent years creates uncertainty and confusion for thousands of Arizona residents, businesses and regulators. The lack of a durable definition has the potential for impacting ADEQ's mission; to protect and enhance public health and the environment in Arizona.

As you and your team at USEPA undertake this important effort, please recognize the important and unique perspective the States have as the primary regulators of the CWA. Our efforts to implement the now vacated NWPR and to create and implement a new State program have given ADEQ unique insights. We have outlined below some design principles that we believe are needed.

**Maps create clarity**

Arizona's new State program benefits from a clearly defined list of lakes, rivers, streams and other water bodies covered under the Clean Water Act and SWPP. The new Arizona program requires that list be maintained and updated with stakeholder input, as needed, to protect human health and the environment. This feature allows ADEQ to map the waters subject to our permitting authority and allows our groundbreaking permitting and compliance portal, myDEQ, to issue protective general permits to thousands of Arizona customers. Any new or revised rule should also provide sufficient clarity that a list of waters regulated by the Clean Water Act is easily maintained. USEPA should invest the necessary resources in order to create a similar map of those waters considered to be WOTUS.

**Consider an impact-based approach**

A WOTUS definition rulemaking that balances regulatory burden with environmental and human health protection by accounting for the ultimate impacts to the environment is consistent with the CWA intent and with Arizona's needs. EPA should consider the impact of the discharge or activity on waters considered WOTUS in its forthcoming WOTUS definition rulemaking. Not

Page 3 of 4

all discharges or activities need be covered by a NPDES permit in order for the intent of the Clean Water Act to be achieved. And not all waterways should fall under federal jurisdiction.

EPA has made similar impact-based determinations in regulations regarding stormwater discharges. For example, in Municipal Separate Storm Sewer System permits, discharges of potable water, firefighting-related waters and other sources need only be considered if they are identified as sources of pollutants. A second example is that construction sites under one acre do not need a construction NPDES permit. Regulating the most important and impactful discharges will allow States to maintain the improvement made by the Clean Water Act over the years while focusing resources on the most important improvements that still must be made.

**Consider truly modernizing the rule**

Processes for probability estimation and modeling have long been a material part of EPA's risk assessments in other programs. Similar processes for probabilistic risk estimation, coupled with data science, and satellite imagery, all undergirded by the acceptance that not every waterway and drainage should fall under federal jurisdiction, is a solid ingredient list for a durable definition of WOTUS.

**Give States the tools to implement any new definition of WOTUS before implementation**

EPA should ensure that any tools required for the implementation of a revised definition are released well in advance of the effective date of that new definition. The tools required to implement NWPR were not delivered in a timely fashion to the States; both the Streamflow Duration Assessment Methodology and Typical Year tools were released for end users without sufficient training, input and feedback from end users. This created waste for ADEQ, USEPA and the Army Corp of Engineers.

**Fund the work of States to perform the science necessary to make WOTUS determinations**

The science behind WOTUS determination is expensive and requires knowledge, skills, and abilities that States will need to maintain. USEPA should support that effort by providing funds directly to state agencies through increased grant funding with agreed upon deliverables in commitments related to that funding.

**A Durable Definition of Waters of the United States**

A durable definition of WOTUS may not be feasible solely from a regulatory perspective; Congress should act to clearly define its intent and the reach of the Clean Water Act. We understand that this suggestion is beyond the stated scope of your stakeholder effort; that does not diminish its necessity, however. It is Arizona's suggestion that a broad consensus can only come from the expressed intent of Congress and may be the only path that can truly create a durable definition of WOTUS.

Page 4 of 4

The fact is that de minimis discharge or exposure thresholds are present in many of our key environmental laws.  The Clean Air Act, Resource Conservation and Recovery Act, The Emergency Planning and Community Right to Know Act, the Safe Drinking Water Act, and the recent Lautenberg Chemical Safety Act all have de minimis discharge or exposure thresholds below which there is no regulation.  It is not an accident that we have not had a 30-year debate and three Supreme Court cases arguing the "the air of the US".

Again, my sincere thanks for being open to input on this extremely important undertaking for both of our organizations.

Sincerely,

Misael Cabrera, PE
Director, ADEQ

EXHIBIT G

1   D. Lee Decker (Bar No. 013202)
Bradley J. Glass (Bar No. 022463)
2   Stuart S. Kimball (Bar No. 026681)
GALLAGHER & KENNEDY, P.A.
3   2575 East Camelback Road
Phoenix, Arizona 85016-9225
4   Telephone:  (602) 530-8000
Facsimile:   (602) 530-8500
5   dld@gknet.com
brad.glass@gknet.com
6   stuart.kimball@gknet.com

7   Attorneys for Business-Intervenors-Defendants

8

             UNITED STATES DISTRICT COURT

9

               DISTRICT OF ARIZONA

10

11   PASQUA YAQUI TRIBE, *ET AL.*,     No. 4:20-cv-00266-TUC-RM

            Plaintiffs,    **STANDING DECLARATION OF**
12                    **STEVE TRUSSELL IN SUPPORT**
   v.                 **OF BUSINESS-INTERVENORS-**
13                    **DEFENDANTS' CROSS-MOTION**
   UNITED STATES ENVIRONMENTAL  **FOR SUMMARY JUDGMENT**
14   PROTECTION AGENCY, *ET AL.*,

15            Defendants,   (Assigned to the Honorable Rosemary
                     Márquez)
16   and

17   ARIZONA ROCK PRODUCTS ASSOCIATION, *ET AL.*,
18
             Business-Intervenors-
19            Defendants,

20   and

21   CHANTELL SACKETT AND MICHAEL
   SACKETT,
22
            Intervenor-Defendants.
23

24      I, Steve Trussell, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,

25   that the following statements are true and correct.

26      1.   I am the Executive Director of Business-Intervenor-Defendant Arizona

27   Rock Products Association ("ARPA") and am authorized to prepare and submit this

28   Standing Declaration in Support of the Cross-Motion for Summary Judgment filed by

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1  Business-Intervenors-Defendants.

2        2.      I received a B.A. and Master's Degree from Arizona State University and a

3  Post-Baccalaureate Degree from Ottawa University.

4        3.      I have been the Executive Director of ARPA since 2007. In that role, I am

5  responsible for the promotion and preservation of the sustainability of the rock and

6  construction materials industry through active involvement in the community relations,

7  regulatory, and political processes. I regularly interact with and generally understand the

8  interests of other trade organizations, including the other Business-Intervenors-Defendants

9  in this matter.

10       4.      Each Business-Intervenor-Defendant advocates for regulatory standards and

11  policies that enable the success of the industry members that they represent. *See* Arizona

12  Rock Products Association, https://www.azrockproducts.org/ (last visited July 12, 2021);

13  National Stone, Sand, and Gravel Association, https://www.nssga.org/ (last visited July

14  12, 2021); Arizona Cattle Feeders Association; Home Builders Association of Central

15  Arizona, https://www.hbaca.org/ (last visited July 12, 2021); Arizona Farm and Ranch

16  Group, https://www.azfarmranch.org/ (last visited July 12, 2021); and Arizona Farm

17  Bureau, https://www.azfb.org/ (last visited July 12, 2021).

18       5.      I have reviewed and am familiar with the allegations made by the Plaintiffs

19  in their Complaint.

20       6.      I have experience with and personal knowledge of how the Clean Water Act

21  ("CWA") and definition of "Waters of the United States" or "WOTUS" impacts ARPA's

22  members, as well as those members of the other Business-Intervenors-Defendants.

23       7.      I understand that Plaintiffs seek to reinstate an unlawful and already

24  repealed 2015 rulemaking by the U.S. Environmental Protection Agency ("EPA") and the

25  U.S. Army Corps of Engineers (the "Agencies") that attempted to broadly define WOTUS

26  for purposes of the CWA. *See* Clean Water Rule: Definition of "Waters of the United

27  States," 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule").

28       8.      To reinstate the 2015 Rule, Plaintiffs have asked the Court to set aside two

2

1  subsequent final agency actions: one that repealed the 2015 Rule and replaced it with the

2  definition of WOTUS that existed prior to issuance of the 2015 Rule (*see* Definition of

3  "Waters of the United States"–Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626

4  (Oct. 22, 2019) ("2019 Repeal Rule") and a second that promulgated a revised definition

5  of WOTUS (*see* The Navigable Waters Protection Rule: Definition of "Waters of the

6  United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("NWPR").

7       9.     ARPA's and the other Business-Intervenors-Defendants' members own

8  and/or use land for a broad variety of purposes including aggregate mining; the production

9  and supply of asphalt, asphaltic concrete, ready mix concrete, and Portland cement for

10  road and other infrastructure construction; farming; ranching and other livestock

11  production; home and commercial building; and highway, heavy, industrial, and

12  municipal-utility construction.  Conducting these activities often requires determining if

13  property includes surface water features subject to CWA jurisdiction, including CWA

14  permitting requirements and the threat of criminal and civil liability if an activity occurs in

15  WOTUS without a permit.

16       10.    Because ARPA's and the other Business-Intervenors-Defendants' members

17  stand to be significantly harmed if Plaintiffs succeed in reinstating the 2015 Rule and

18  setting aside the 2019 Repeal and NWPR, they intervened in this matter.

19       11.    Business-Intervenors-Defendants have a protectable interest in the action

20  before this Court that may be impaired or impeded by the disposition of this litigation.

21  Specifically, the governing definition of WOTUS, the issue directly at stake in this

22  litigation, dictates the regulatory scheme under which Business-Intervenors-Defendants'

23  members must operate their aggregate mining, farming, ranching, construction, and other

24  business activities. An unfavorable ruling in this Court would be controlling over

25  Intervenor's members' Arizona operations and would heighten the regulatory burdens on

26  those operations. It also could cause regulatory chaos and uncertainty that the 2020 Rule

27  was intended to correct.

28       12.    Plaintiffs seek to overturn the NWPR.  If successful, Plaintiffs would

3

1    deprive regulated parties, including Business-Intervenors-Defendants and their members,

2    of much needed clarity and predictability. Indeed, in promulgating the 2020 Rule, Agency

3    Defendants explained that the 2020 Rule "is intended to establish categorical bright lines

4    that provide clarity and predictability for regulators and the regulated community" (85

5    Fed. Reg. at 22,325), as well as resolve the legal deficiencies of the 2015 Rule (*id.* at

6    22,272).

7         13.    If, as Plaintiffs request, the Court reinstates an expanded version of the 2015

8    Rule, Business-Intervenors-Defendants and their members will be subjected to heightened

9    regulatory burdens and potential enforcement.  Each would be required to comply with a

10   broader definition of WOTUS and the CWA's prohibition against unauthorized

11   "discharges." Further, many of Business-Intervenors-Defendants' members may be

12   required to obtain costly CWA permits even for operations or developments on dry land

13   areas in Arizona or elsewhere.

14        14.    A declaration that the 2020 Rule is unlawful or a reinstatement of the 2015

15   Rule would substantially impair or impede the interests of Business-Intervenors-

16   Defendants' members; therefore, in order to protect those interests, Business-Intervenors-

17   Defendants are submitting a Motion for Summary Judgment and Memorandum in Support

18   thereof and request that Court enter summary judgment in their favor.

19        I declare under penalty of perjury that the foregoing is true and correct.

20        Executed July 13, 2021.

21

22

23        Steve Trussell

24

25

26

27

28   8586431v1/21054-0011

4

# EXHIBIT H

1   MAYER BROWN LLP
    Timothy S. Bishop* (IL 6198062)
2   Brett E. Legner* (IL 6256268)
    71 S. Wacker Drive
3   Chicago, IL 60606
    Telephone: (312) 701 7829
4   Facsimile: (312) 706 8607
    Email: tbishop@mayerbrown.com
5
    C. Mitchell Hendy (State Bar No. 282036)
6   350 Grand Ave, 25th Floor
    Los Angeles, CA 90071
7   Telephone: (213) 229 5142
    Facsimile: (213) 625 0248
8   Email: mhendy@mayerbrown.com
9   Colleen M. Campbell* (D.C. 219082)
    Washington, DC
10  Telephone: (202) 263 3413
    Facsimile: (202) 263-3300
11  Email: ccampbell@mayerbrown.com
12  *Counsel for Amicus Curiae American Farm Bureau Federation,*
    *et al.*
13  *Pro hac vice*
14                    UNITED STATES DISTRICT COURT
15                    NORTHERN DISTRICT OF CALIFORNIA
16
17  STATE OF CALIFORNIA, *et al.*,            No. 20-cv-03005-RS
18              *Plaintiffs,*                 **DECLARATION OF DON PARRISH
                                              IN SUPPORT OF THE AMICUS
19        v.                                  BRIEF OF BUSINESS COALITION
                                              IN SUPPORT OF THE AGENCIES'
20  MICHAEL REGAN, et al.,                    MOTION TO REMAND WITHOUT
                                              VACATUR**
21              *Defendants,*
                                              Date:    September 9, 2021
22        and                                 Time:    1:30 p.m.
                                              Dept:    San Francisco Courthouse,
23  STATE OF GEORGIA, *et al.*,                        Courtroom 3—17th Floor
                                              Judge:   Hon. Richard Seeborg
24              *Defendant-Intervenors.*
25
26
27
28
                                    DECLARATION OF DON PARRISH, CASE NO. 3:20-CV-03005

1     I, Don Parrish, declare based upon personal knowledge that:

2       1.     I am over eighteen years of age, suffer from no disability that would preclude me

3 from giving this declaration, and make this declaration upon personal knowledge.

4       2.     I offer this Declaration based on my 30 years working primarily on Clean Water Act

5 ("CWA") issues on behalf of farmers, ranchers, and industry groups in a wide variety of business

6 areas.

7       3.     I am the Senior Director of Regulatory Affairs at the American Farm Bureau

8 Federation ("AFBF"). AFBF is a voluntary general farm organization formed in 1919, representing

9 about 6 million member families through Farm Bureau organizations in all 50 states plus Puerto

10 Rico. Each state Farm Bureau is an independent entity, affiliated with AFBF through a membership

11 agreement. Individual and family Farm Bureau members are associate members of AFBF.

12       4.     AFBF's primary function is to advance and promote the interests of farmers and

13 ranchers and their rural communities. This involves advancing, promoting, and protecting the

14 economic, business, social, and education interests of farmers and ranchers across the United States.

15 AFBF seeks to promote the development of reasonable and lawful environmental regulations and

16 regulatory policy that affect the use and development of agricultural land.

17       5.     AFBF has a dedicated staff and expends a great amount of resources to advocate on

18 many issues before Congress, the Executive Branch and federal courts to serve the interests of

19 farmers and ranchers. AFBF routinely lobbies the federal government to improve the regulatory

20 climate for farmers and ranchers and to protect their ability to make productive use of their land.

21       6.     The scope of federal jurisdiction under the Clean Water Act is of key importance to

22 AFBF and its members. AFBF has expended great resources related to promoting a lawful and

23 reasonable interpretation of the CWA.

24       7.     In addition to my role at AFBF, I am the Chairman of the Waters Advocacy

25 Coalition ("WAC" or "the Coalition"), a position in which I have served since its inception in 2010.

26 My duties as Chairman of the Waters Advocacy Coalition include holding weekly meetings,

27 responding to requests for information from the government and the general public, providing

28 information on government regulations to the Coalition's members, assisting the members with

1  participation in legislation and rulemaking processes, and ensuring the Coalition's members are

2  able to express their interests to government entities.

3        8.    WAC and its members, including AFBF, advocated against the 2015 expansion of

4  the definition of jurisdictional Waters of the United States ("WOTUS"), for the repeal of the 2015

5  Rule, and for a more certain and narrower definition of WOTUS like that adopted in the 2020

6  Navigable Waters Protection Rule. Their advocacy throughout has reflected the great harm to their

7  member landowners and operators that results from broad and uncertain federal jurisdiction beyond

8  what Congress intended in the CWA. Vacating that Rule would cause great harm to the Business

9  Coalition *amici* ("*amici*") and WAC's members. I submit this declaration to describe some of the

10  harms that arose from prior, broader definitions of WOTUS that have been addressed by the 2020

11  Navigable Waters Protection Rule ("NWPR"), which the *amici* and WAC's members support.

12        9.    Vacating that Rule would expose the *amici*'s and WAC's members to the same

13  enormously burdensome and illegal regime imposed by the Environmental Protection Agency

14  ("EPA") and the U.S. Army Corps of Engineers ("the Corps") (collectively "the agencies") prior

15  to promulgation of the NWPR, in the 2015 Rule and before.[1]

16                    ***WAC Members' Involvement in WOTUS Regulation***

17        10.    The Waters Advocacy Coalition represents a large cross-section of the Nation's

18  construction, transportation, real estate, mining, manufacturing, forestry, agriculture, energy,

19  wildlife conservation, and public health and safety sectors—all of which are vital to a thriving

20  national economy and provide much-needed jobs. The Coalition's members—which include most

21  of the *amici* in this case—are committed to a successful American economy, the success of the

22

23     [1]    A few months prior to finalization of the NWPR, the agencies repealed the 2015 Rule,
reinstating the pre-2015 regulatory regime, including 2008 guidance that based jurisdiction on a

24  vague "significant nexus" test. The Repeal Rule has been challenged in lawsuits pending in
multiple courts. If both the NWPR and Repeal Rule were found unlawful, the 2015 Rule would

25  apply in some states, but the 2008 guidance would apply in most states as the result of injunctions
issued by various district courts against the 2015 Rule. This mess is impossible for businesses to

26  analyze to determine if their property contains jurisdictional WOTUS, the more so because both
the 2015 Rule and the prior regulatory regime used (different) vague standards. Any uncertain test

27  for WOTUS harms landowners and users, but my declaration focuses principally on harms
flowing from the 2015 Rule for ease of comparison.

28

1    respective industries that they represent, and the protection and preservation of America's wetlands

2    and waters, and believe that clear CWA regulation will help further these goals.

3         11.     Among other organizations, Coalition members include: American Farm Bureau

4    Federation ("AFBF"), American Petroleum Institute ("API"), American Road &, Transportation

5    Builders Association ("ARTBA"), Chamber of Commerce of the United States ("the Chamber"),

6    Leading Builders of America ("LBA"), National Association of Home Builders ("NAHB"),

7    National Cattlemen's Beef Association ("NCBA"), National Corn Growers Association

8    ("NCGA"), National Mining Association ("NMA"), National Pork Producers Council ("NPPC"),

9    and the National Stone, Sand and Gravel Association ("NSSGA"). From my experience working

10    with these organizations on CWA issues at WAC, I am aware that each of these organizations has

11    for years devoted substantial resources toward lobbying and other efforts to advocate for a

12    reasonable scope of federal jurisdiction under the CWA, because the member organizations that

13    they represent are the directly regulated parties that stand to be significantly harmed by an overly-

14    broad definition of "WOTUS."

15         12.     In my capacity at WAC and AFBF, I have also collaborated for years through

16    extensive litigation and lobby efforts with the National Alliance of Forest Owners ("NAFO"),

17    Public Lands Council ("PLC"), and the U.S. Poultry & Egg Association on CWA issues. From that

18    collaboration, I am aware that those organizations also represent the directly regulated parties

19    harmed by a bloated or unclear definition of WOTUS, and thus treat the scope of CWA jurisdiction

20    as a key issue to advance the interests of their members.

21         13.     Since its inception, the Coalition and its members have been involved in every

22    permutation of CWA regulation. The definition of "WOTUS" under the CWA is of paramount

23    interest to WAC members, because the ability of their members to plan projects and organize their

24    affairs is highly sensitive to the scope of the agencies' regulatory jurisdiction. Members' operations

25    are irreparably disrupted by an overly broad or ambiguous assertion of CWA jurisdiction.

26         14.     The Coalition was formed in 2010, when I and other individuals familiar with the

27    needs of the industries that would eventually make up the Coalition learned that some members of

28    Congress introduced an amendment to the CWA that would result in the removal of the word

1   "navigable" from the Act. This was deeply concerning to the members of the Coalition because

2   removal of the word "navigable" from the CWA could result in a significant expansion of federal

3   jurisdiction under the CWA to virtually all water, along with the lands that water touches.

4        15.    The Coalition and its members were at the center of efforts to convince Congress

5   not to undertake such a dramatic expansion in CWA jurisdiction, because it would result in a

6   massive infringement on landowners' use of their land, and increase costs and regulatory burden

7   on nearly every aspect of ordinary business operations across the American economy. The Coalition

8   demonstrated to Congress that this expansion of federal jurisdiction under the CWA would

9   unreasonably expand federal permitting requirements, increase exposure of the Coalition's

10   members to civil penalties, potential criminal liability, and private lawsuits over alleged violations

11   of the CWA, result in job losses and business closures, and cause delays and add costs for services,

12   such as construction of roads, schools, and homes, and growing our nation's food, that ordinary

13   people depend upon every day. Congress decided not to proceed with the removal of the word

14   "navigable" from the CWA.

15        16.    The Obama Administration apparently did not agree with Congress's decision not

16   to remove the word "navigable" and sought to accomplish through regulatory action what it could

17   not accomplish through legislation. The agencies promulgated a sweeping regulatory definition of

18   WOTUS in the mis-labelled "Clean Water Rule" (the 2015 Rule), which effectively wrote the word

19   "navigable" out of the Act.

20        17.    The Coalition and its members vigorously opposed the 2015 Rule, for much the

21   same reasons they objected to amending the CWA.[2] In negotiations regarding the proposal, officials

22

23   [2] The Coalition members and the *amici* filed extensive comments regarding the proposed 2015
     Rule and how it would harm their membership. *See* WAC, Comment Letter on 2015 Rule (Nov.
24   13, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-14568; *see also*
     AFBF, Comment on the 2015 Rule (Dec. 4, 2014),
25   https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-18005; API, Comment
     Letter on 2015 Rule (Nov. 14, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-
26   2011-0880-15115; ARTBA, Comment Letter on 2015 Rule (Nov. 14, 2014),
     https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-17359; Chamber, Comment
27   Letter on the 2015 Rule (Nov. 12, 2014), https://www.regulations.gov/document?D=EPA-HQ-
     OW-2011-0880-19343; NAFO, Comment Letter on 2015 Rule (Nov. 14, 2014),
28   https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-15247; NAHB, Comment

1    in the Obama Administration argued that their proposed regulatory changes would add clarity and

2    transparency to regulation of "Waters of the United States" under the CWA by creating a

3    presumption that businesses should *assume* their activities would impact a WOTUS and, therefore,

4    should seek federal permits for ordinary business activities that would not previously have required

5    a permit. These permits historically come at great cost: As the Supreme Court has noted, "[t]he

6    average applicant for an individual permit spends 788 days and $271,596 in completing the process,

7    and the average applicant for a nationwide permit spends 313 days and $28,915—not counting

8    costs of mitigation or design changes." *Rapanos v. United States*, 547 U.S. 715, 725 (2006)

9    (plurality) (quoting Sunding & Zilberman, The Economics of Environmental Regulation by

10    Licensing: An Assessment of Recent Changes to the Wetland Permitting Process, 42 Natural

11    Resources J. 59, 74–76 (2002) ).

12        18.    The scope of federal jurisdiction under the CWA certainly had not been clear under

13    the prior regime, which is why the regulated community had supported rulemaking. But the 2015

14    Rule exacerbated the problem still more. It required jurisdictional determinations and permits over

15    a sweeping array of activities that had never previously been covered. This sweeping coverage over

16    desiccated features remote from waterways only served to add more confusion.

17        19.    The agencies promulgated the final 2015 Rule in June 2015. From its inception, the

18    2015 Rule was vigorously contested in various district courts by States, industry interests, and NGO

19    groups. The Coalitions' members remained at the center of these efforts. Several members filed an

20    original suit challenging the 2015 Rule in the Southern District of Texas, and also participated in

21    litigation contesting the jurisdiction of the Sixth Circuit Court of Appeals to hear challenges to the

22

23    Letter on 2015 Rule (Nov. 14, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-
2011-0880-19540; NAFO, Comment Letter on 2015 Rule (Nov. 14, 2014),

24    https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-15247; NCBA & PLC,
Comment Letter on 2015 Rule (Oct. 28, 2014), https://www.regulations.gov/document?D=EPA-

25    HQ-OW-2011-0880-10183; NCGA, Comment Letter on 2015 Rule (Nov. 14, 2014),
https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-14968; NMA, Comment

26    Letter on 2015 Rule (Nov. 14, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-
2011-0880-15169; NSSGA, Comment Letter on 2015 Rule (Nov. 13, 2014),

27    https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-14412; U.S. Poultry & Egg

28    Ass'n, et al., Comment Letter on 2015 Rule (Nov. 5, 2014),
https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-14469.

Case 4:20-cv-00266-RM    Document 105-1    Filed 10/25/21    Page 46 of 84

Case 4:20-cv-  266-RM    Document 91-1    Filed 08/ /21    Page 7 of 24
Case 3:20-cv-03005-RS    Document 254-1    Filed 08/06/21    Page 7 of 24

1   2015 Rule. Another member filed an original suit challenging the 2015 Rule in the Northern District

2   of Oklahoma. Many members also participated as intervenors in suits challenging various aspects

3   of the 2015 Rule before the Southern District of Georgia and the Western District of Washington,

4   and as *amicus curiae* before the District of North Dakota and the Tenth Circuit Court of Appeals.

5         20.    Simultaneously with this ongoing litigation, the agencies recognized that the 2015

6   Rule was likely unlawful, and promulgated a so-called Applicability Date Rule to delay the

7   effective date of the 2015 Rule while they engaged in a two-step rulemaking process to first repeal,

8   and second replace, the 2015 Rule. WAC members and the *amici* participated extensively in

9   discussions with the agencies during this ongoing rulemaking and submitted detailed comments,

10  both individually and as a group.[3] *Amici* also participated in litigation challenging these later

11  regulatory efforts as intervenor-defendants before the Southern District of New York, the District

12  of Colorado, the Western District of Washington, and the District of South Carolina.

13        21.    As part of WAC's and AFBF's participation in the ongoing WOTUS Rule litigation

14  described above, I personally submitted a declaration on September 20, 2016 in litigation before

15  the U.S. Court of Appeals for the Sixth Circuit, explaining the serious harms that the 2015 Rule

16  would impose on AFBF members. (Ex. A). I also submitted a declaration on February 6, 2018 in

17  support of AFBF's challenge to the 2015 Rule in the Southern District of Texas (Ex. B), and another

18  declaration in support of AFBF's challenge as an intervenor-plaintiff to the 2015 Rule in the

19  Southern District of Georgia on September 10, 2018 (Ex. C). These declarations explained the

20  irreparable harms caused to industry members by the vague, overly broad 2015 Rule, and by an

21  uncertain regulatory climate. Any statement made in those declarations remains true except insofar

22  as it has been superseded by anything I have said here.

23        22.    From my participation in WOTUS litigation with them, I am aware that WAC

24  members and *amici* submitted numerous declarations explaining how the regulatory definition of

25

26  [3] For WAC comments on each rulemaking stage, *see* supra, p. 6, n. 2; WAC, Comment Letter on
     Applicability Date Rule (Dec. 13, 2017), https://www.regulations. gov/document?D=EPA-HQ-

27  OW-2017-0644-0375; WAC, Comment Letter on Repeal Rule (Sept. 27, 2017),
     https://www.regulations.gov/document?D=EPA-HQ-OW-2017-0203-11027; WAC, Comment

28  Letter on NWPR (Apr. 29, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-
     2018-0149-684.

DECLARATION OF DON PARRISH, CASE NO. 3:20-CV-03005

Case 4:20-cv-00266-RM   Document 105-1   Filed 10/25/21   Page 47 of 84

Case 4:20-cv-266-RM   Document 91-1   Filed 08/06/21   Page 8 of 24
Case 3:20-cv-03005-RS   Document 254-1   Filed 08/06/21   Page 8 of 24

1   WOTUS is important to their organizational missions, and further that many members submitted
2   declarations describing the significant harms caused to them by an expansion of jurisdiction under
3   the CWA and by an overly-broad, uncertain WOTUS Rule. *See* Excerpts of Addendum to the
4   Opening Br. of Municipal Pet'rs, *In Re EPA*, No. 15-3751 (6th Cir. Nov. 1, 2016) (Dkt. 129-2) (Ex.
5   D) (compiling declarations filed before the Sixth Circuit Court of Appeals); Exhibit D to Business
6   Intervenor-Plaintiffs' Motion to Amend the Court's Preliminary Injunction, *Georgia v. Wheeler*,
7   No. 2:15-cv-79 (S.D. Ga. Sept. 26, 2018) (Dkt. 208) (Ex. E) (compiling 7 member declarations).

8         23.   Several courts agreed that the 2015 Rule was likely unlawful, and issued regional
9   preliminary injunctions guarding against its enforcement. And in cases initiated by members of the
10   *amici* here, the federal district courts in Texas and Georgia held the 2015 Rule to be unlawful and
11   remanded it to the agencies, while keeping their regional preliminary injunctions in place.

12         24.   Also during the ongoing WOTUS rule litigation, the District of South Carolina
13   issued a nationwide injunction vacating the Applicability Date Rule, which had prevented the 2015
14   Rule from going into effect in the states not covered by a preliminary injunction. As a result, the
15   2015 Rule entered into effect in those unprotected states in 2018.

16               ***The Serious Harms Caused by Unclear, Uncertain WOTUS Regulation***

17         25.   The entry into force of the 2015 Rule on a patchwork basis created a deeply
18   troubling state of affairs for WAC and the *amici*'s members. Members who operated nationwide
19   found themselves straddling two conflicting legal regimes and unable to plan for their multistate
20   operations.

21         26.   In the jurisdictions where it entered into effect, the 2015 Rule dramatically expanded
22   the scope of CWA jurisdiction as it applies to land in use for farming, ranching, mining, and
23   construction—you name it. *See* Exs. B, C. But it did not, as promised, provide regulatory clarity
24   and consistency. Rather, it continued to prove very difficult for individual farmers and business
25   owners to determine whether a feature on their property would be considered a "water of the United
26   States."

27         27.   This is because, while the pre-2015 regime was often unclear and left businesses in
28   the dark as to the jurisdictional status of their property, the 2015 Rule was even worse, sweeping

1    in countless only sometimes-wet landscape features that are ubiquitous in and around farmland, on

2    building sites, and in and around mining operations. *See* Ex. B, ¶ 6. These common features

3    included drains carrying rainfall away from farm fields, ordinary farm ditches, drainage ditches

4    along roadsides, retention ponds, and low areas in fields where water channels or temporarily pools

5    after heavy rains.

6         28.    As an example, Figure 1 below depicts the type of sometimes-wet low areas,

7    otherwise known as "puddles," that the 2015 Rule may have covered as a depressional wetland and

8    for which coverage under the pre-2015 regime was unclear. *See* AFBF, Comment on the 2015 Rule,

9    App. A at 38, https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-18005 (Nov.

10   14, 2014).



20        29.    The 2015 Rule also brought under its umbrella man-made features, like purpose-

21   built ponds to water livestock. For example, under the 2015 Rule, the feature in Figure 2 below

22   depicts a former logging road. Under the 2015 Rule, this type of feature was likely deemed to be a

23   "tributary" to a "navigable water."  API, Comment Letter on 2015 Rule at 129 (Nov. 14, 2014),

24   https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-15115. Under the pre-2015

25   regime, there is not a bright line rule that would have excluded this feature.

26

27

28



30.     Although the 2015 Rule purported to exclude puddles, rills, swales, and some ditches from jurisdiction, those exclusions were meaningless because they were undefined, unclear, and many such features were swallowed up by the all-inclusive definitions of covered features such as wetlands and tributaries. Under a broad rule that does not clearly exempt such features, members had to either seek exorbitantly expensive permits or else internalize significant costs to avoid accidentally building or operating in features that had not previously been classified as a WOTUS, but were now potentially jurisdictional. Every time members plowed a field, sank a shovel in the ground, built a road through uplands, placed a pipe in the ground, or moved waste or soil—activities that occur on *land*, not on water—they were required to expend resources to obtain a permit or avoid features that could potentially be classified as "WOTUS."

31.     The need to procure additional permits or avoid jurisdictional features increased the cost of conducting ordinary business operations sharply. For example, it is my understanding from my experience with individuals in the homebuilding industry that the cost of building a home significantly spiked. As another example, the National Association of Manufacturers explained that energy exploration and production companies expected the number of permits required for projects to *double* under the 2015 Rule. Ex. D, at A-6.

- 10 -

1       32.     Seeking additional permits is not an option for all businesses. Jurisdictional

2 determinations come at great cost and delay. Indeed, a jurisdictional determination from the

3 agencies can take around six months to a year to receive. During the intervening months, a business

4 owner or farmer is trapped waiting in limbo. Further, a CWA permit comes with the cost of

5 consultants, engineers, permit applications, mitigation costs, and compliance costs that make it an

6 untenable option for many businesses. *See* Tr. of Oral Argument in *SWANCC v. U.S. Army Corps*

7 *of Engineers*, No. 99-1178, at 40 (U.S. Sup. Ct. Oct. 31, 2000) (observing that the successive permit

8 applications and regulatory decisions required for the isolated ponds at issue in *SWANCC* totaled

9 47,000 pages). And, in some cases, a permit will be denied or unavailable.

10       33.     Thus, some members operating under the 2015 Rule significantly decreased their

11 productivity to avoid potentially jurisdictional features. I am aware of farmers who had to avoid

12 plowing certain parts of their fields or, in some cases, take areas entirely out of production for fear

13 of accidentally plowing through a remote ditch that qualified as a WOTUS. Another farmer-AFBF

14 member submitted a declaration in the WOTUS litigation explaining that, under the 2015 Rule, he

15 would need to create a fifteen-foot buffer around drainage ditches on his farm to avoid the risk of

16 any fertilizers or pesticides accidentally reaching those ditches. Ex. E, at A-16. And some farmers

17 were even harder hit. I estimate that in certain regions of the country, the 2015 Rule stood to take

18 around 20% of farmland out of production on account of the need to create a buffer to avoid

19 potentially jurisdictional features.

20       34.     As a result of these costs, some projects were delayed, reduced, or even entirely

21 prevented. These delays and reduced productivity could come at the loss of jobs and sometimes

22 threaten the closure of businesses. For example, the National Association of Manufacturers

23 explained that application of the 2015 Rule and its expanded permitting requirements "could

24 impede the construction and operation of new facilities or expansions and could cost American

25 jobs." Ex. E, at A-6. NAHB explained that many homebuilders would delay or abandon projects to

26 avoid the costs imposed under the 2015 Rule. *Id.* at A-23.

27       35.     Members of NSSGA would experience similar harms. *See* Ex. E, at A-2-3. The

28 coverage of dry stream beds and isolated wetlands in the definition of WOTUS renders the

1   permitting process much more difficult, costly, and time consuming for its member companies,

2   which are responsible for producing essential raw materials for construction projects. *Id.* An overly

3   expansive definition of WOTUS makes it difficult and expensive for these companies to supply

4   customers with aggregate needed for essential public works projects, including new road

5   construction, flood control, water and wastewater treatment, and repair of existing highways and

6   bridges. *Id.* NSSGA anticipates that, if required to operate under the 2015 Rule, some property

7   owners would have to abandon reserves because of these increased compliance costs. *Id.*

8        36.    These harms extend to businesses large and small. One landowner located in

9   Delaware explained that the 2015 Rule would require him to abandon planned improvements to his

10   land, which would no longer be economically feasible. Because some portions of his land contained

11   physical signs of occasional water flow, there was a significant risk that these land features were

12   covered under the 2015 WOTUS Rule. The enormous burden and cost of obtaining a CWA permit

13   rendered it too expensive for him to clear his land for cattle grazing and to harvest valuable timber.

14   The location of a probable jurisdictional feature on his land, and the resulting inability to improve

15   his land, significantly lowered the land's value. Ex. D, at 74a-78a.

16        37.    Areas in the Southwest were particularly hard hit by the 2015 Rule's assertion of

17   jurisdiction over certain forms of "ephemeral waters," such as those depicted below in Figure 3,

18   that are dry most of the year and only contain water during periods of heavy rain, which may or

19   may not occur in a given year. These features often reflect one-time extreme water events and are

20   not reliable indicators of regular flow. In the desert, rainfall occurs infrequently; and sandy, lightly

21   vegetated soils are highly erodible. Thus washes, arroyos, and other erosional features often reflect

22   physical indicators that trigger the assertion of jurisdiction under the 2015 Rule, even if they were

23   formed by a long-past and short-lived flood event, and the topography has persisted for years or

24   even decades without again experiencing flow. *See* Ariz. Mining Ass'n, Comment on 2015 Rule at

25   7-11 (Nov. 18, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-

26   13951. The NWPR, in contrast, clearly excludes these types of features.

27

28

DECLARATION OF DON PARRISH, CASE NO. 3:20-CV-03005



38.     Typically, farmers would consider these types of features to be *land*, not water. When ephemeral features such as those depicted above are treated as jurisdictional, it creates a huge issue to communicate to our farmers that such features are actually treated as water.

39.     While it is often difficult to determine what remote features are covered by the 2015 Rule (or, indeed, its predecessors), the price of any mistake under the CWA is steep. Violations expose farmers and business owners, including owners of small and medium-sized operations, to potentially millions of dollars in civil penalties as well as the risk of criminal liability.

40.     The case of John Duarte is illustrative of the burdens the 2015 Rule imposed on small and medium-sized farms and businesses. John Duarte purchased 400 acres of agricultural land in California. At the time John purchased the land, its previous owner had placed the land into a local conservation program for two ten-year terms. Under the terms of this conservation program, the United States Department of Agriculture considered the land farmed, although it had not been used for the production of crops for twenty years. Prior to this twenty-year period, all 400 acres of the land had a history of wheat production – a history documented by the USDA. When the term of the conservation program ended, John decided not to re-enter his land into it. Instead, John began to use the land to grow wheat. When he plowed his land, the Army Corps of Engineers stepped in and determined, first, that the isolated vernal pools on John's land were now "waters of the United

- 13 -
DECLARATION OF DON PARRISH, CASE NO. 3:20-CV-03005

1   States" under the 2015 Rule and, second, that plowing the land was not "ordinary activity" because

2   the previous owner had voluntarily entered the land into a temporary conservation program and,

3   therefore, had not plowed the land in twenty years.  As a result of these findings, John faced millions

4   of dollars in civil penalties for violating the CWA and was forced to reach a settlement with the

5   U.S. Government to save his family farm and preserve his livelihood.  *See also, e.g.*, *Borden Ranch*

6   *v. U.S. Army Corps of Engineers*, 537 U.S. 99 (2002) (affirming by equally divided Court a $1

7   million civil penalty against farmer who plowed an isolated vernal pool to switch crops).

8                   ***Example of Problematically Overbroad Jurisdiction***

9       41.   The photograph below, Figure 4, is illustrative of the type of feature that was

10   regulated by the federal government under the 2015 Rule. *See* AFBF, Comments on the 2015 Rule

11   at App. A, 31,  https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-18005 (Dec.

12   4, 2014). Figure 4 will be referenced repeatedly hereafter to demonstrate the harms caused by an

13   overly-broad definition of WOTUS.



1    42.    Figure 4 depicts a portion of a field on a Tennessee farm. The depression in the
2    middle of that field is caused by occasional bursts of heavy rain. This type of feature is common
3    on farms in the Southeastern United States in states such as Tennessee, Alabama, and Mississippi.
4    This type of feature will certainly not be considered a "water" triggering federal jurisdiction under
5    the NWPR.

6    43.    Treating this feature as jurisdictional would have a significant detrimental impact
7    on this farmers' ability to utilize this land and on the commercial value of the land itself. Based on
8    my knowledge and experience, I would estimate that the land shown in Figure 4 would be valued
9    at approximately $3,000 per acre. The costs of avoiding this feature or the cost of obtaining and
10   complying with an EPA permit could amount to an approximately $600 per acre decrease in the
11   commercial value of the land shown in Figure 4. These costs are significant for farms consisting of
12   hundreds or thousands of acres, which may have many such features.

13   44.    The devaluation of commercial value of land on a farm—or for any other business—
14   has collateral effects beyond simply the cost of applying for permits. It amounts to a reduction in
15   the business's capital, which has significant effects on the terms and availability of loans and other
16   forms of financing that businesses depend upon to operate. Land containing jurisdictional features
17   under the 2015 Rule such as ephemeral drains, ditches, and other low areas had less value while
18   the 2015 Rule was in effect because of the land-use restrictions imposed on jurisdictional waters
19   and surrounding land, even when there was no water in the feature and it otherwise appeared to be
20   dry land. The added cost of seeking a permit for agricultural or non-agricultural use made the land
21   more difficult to sell and lowered its value.

22   45.    The land depicted in Figure 4 was eventually sold and a manufacturing facility was
23   constructed on the site. Based on my experience, if a feature like the one in Figure 4 is determined
24   to be jurisdictional under the CWA, the costs associated with mitigating it to proceed with
25   development could reach $3000 *per linear foot.*

26   46.    Figure 4 also demonstrates how an overly broad definition of WOTUS is
27   counterproductive to achieving the goals of the Clean Water Act. Figure 4 depicts an erosion feature
28   that occurs during periods of heavy rain. When these rains occur, soil and other chemical inputs

1    such as fertilizer and pesticides common to agriculture are washed away through the feature where

2    they may contribute to pollution of downstream waters. Ordinarily, a farmer would attempt to

3    mitigate the feature to prevent harm to the environment and prevent the loss of valuable topsoil.

4    Under the 2015 Rule, however, a farmer could not take even environmentally friendly action

5    without incurring the costs of applying for a federal permit. If a farmer could not obtain a permit,

6    the farmer would be forced to retain a feature that harms the farmer's business *and* the

7    environment— all as a result of the expansion of CWA jurisdiction under the 2015 Rule.

8                                    ***Harms Under the Pre-2015 Regime***

9          47.    Businesses also suffered from amorphous and broad standards in place under the

10   pre-2015 regime which would again control if the NWPR is vacated and the Repeal Rule takes

11   effect. Under the pre-2015 regime, businesses and industries were subject to the significant nexus

12   standard derived from Justice Kennedy's opinion in *Rapanos*, which was first applied by the

13   agencies through a guidance document adopted in 2008, and later defined through a broad, vague

14   multi-step test under the 2015 Rule advocated by Plaintiffs in this case. As a central feature of both

15   the pre-2015 regime and the 2015 Rule, the significant nexus standard caused substantial hardship

16   to businesses.

17         48.    Figure 4 represents a desiccated feature that could have been designated a "water of

18   the United States" under the pre-2015 regime just as it was under the 2015 Rule, because the

19   "significant nexus" standard under which the Corps of Engineers deemed it jurisdictional applied

20   under both regimes. The standard generated significant confusion under both regimes. It sometimes

21   reached features that looked like land, and nothing like water (just like Figure 4, above). Thus, the

22   landowner had no way to tell that this remote, desiccated feature was under the jurisdiction of the

23   CWA until the Corps determined that it was.

24         49.    These types of features can, and often do, stretch onto neighbors' properties. Under

25   the 2015 Rule, neighboring landowners with property onto which such a feature stretched would

26   similarly experience the negative repercussions of a jurisdictional determination, including

27   restrictions on the use of their land and lowered property value, based on a determination in which

28   they did not participate and of which they likely had no notice. Any post-determination use of the

1    land, whether it is continued farming or sale for mineral production or other development, must

2    account for the feature's new status as a "water of the United States." As stated previously, this

3    requires all of the landowners impacted by the feature to either avoid impacting the feature or incur

4    the costs of applying for an EPA permit. Under the pre-2015 regime, these features on neighbors'

5    properties would be subject to a case-by-case determination, and property owners faced serious

6    confusion regarding how a determination on their neighbor's property impacted the feature on their

7    own land, or rendered it jurisdictional.

8         50.    Moreover, the outcome of the case-specific, highly subjective significant nexus

9    determination for a feature like the one in Figure 4 can depend on the Corps district in which the

10   land is located. It is my understanding that different Corps districts would apply the standard

11   differently, potentially reaching different results for identical features based on the happenstance

12   of where they are located. That means that whether a landowner is forced to bear the costs and

13   burdens as well as the potential liabilities of having a jurisdictional feature depends not on the

14   nature of the feature but the arbitrary boundaries of the Corps district in which his or her land is

15   located. This random, unjust, and inconsistent application of the "significant nexus" standard added

16   to the already significant harms suffered by farmers and business owners prior to the most recent

17   regulatory action.

18        51.    I am also aware of instances under the pre-2015 regime in which the Corps required

19   permits for minor agricultural maintenance and repairs, such as replacing aging-out or obsolete

20   farm infrastructure. Requiring federal permits for insignificant farm maintenance tasks often

21   discourages them entirely, because obtaining a permit entails multiple incremental costs, sometimes

22   generating lawyer fees that surpass the cost of the farm maintenance itself—as well as the value of

23   the very land itself. In those instances, the jurisdictional overreach is tantamount to taking the land

24   itself, because the farmer effectively can no longer use it.

25        52.    As one example, I am aware of a farmer who received a local permit to perform

26   maintenance on a sugar and cattle operation. Under the local permit (which required only 60 days

27   to obtain), the farmer was required to install three ditch blocks for wetlands mitigation on 0.05 acres

28   at the northern end of the property. As part of that local permitting process, the farmer had spoken

1   to a tribal archeologist, who did not raise any tribal preservation issues. But when the farmer applied

2   for a federal permit (governed by the pre-2015 regime, in a state where the 2015 Rule was enjoined),

3   the federal reviewer raised concerns with historical preservation and tribal protections. Although

4   the farmer explained that the tribal archaeologist during the local permitting process had noted no

5   concerns, the federal reviewer refused to consider the local process and insisted that the background

6   investigatory work be redone. This consisted of an archeological assessment that would have cost

7   $42,000. After nine months (working with three different reviewers and a Corps archeologist), the

8   NWPR entered into effect and the farmer was no longer required to obtain a federal permit. During

9   this entire process, it was unclear how federal permitting would provide any Tribal or

10  environmental resource benefit.

11        53.   Also under the prior regime, I am aware of another farmer who sought to replace

12  two outfall structures on the perimeter of a 2,400 acre property that had been farmed for over 60

13  years. Those outfall structures would have required less costly general federal permits under the

14  pre-2015 regime. Rather than looking at the narrow maintenance the farmer needed to make, the

15  federal reviewer looked at the farm field as a whole and wanted to claim as jurisdictional wetland

16  areas isolated in the middle of her 2,400 acre property—thus increasing the size of the jurisdictional

17  area and requiring the farmer receive much costlier, individual permits (*see supra* ¶ 17)—for

18  wetlands that were not farmed or touched by the improvement. In June of last year, the reviewer

19  explained that under the NWPR, a permit would no longer be required.

20        54.   Overall, both the pre-2015 regime and the 2015 Rule generated untenable confusion

21  for property owners and the *amici*'s members, because both regimes regulated features that looked

22  like land, not water. The owners had no clear way of knowing that these features were jurisdictional.

23                        ***The Benefits of the NWPR***

24        55.   Following significant efforts on the part of the *amici* and other WAC members to

25  advocate for a clear, reasonable definition of WOTUS, and following the culmination of the

26

27

28

- 18 -

1     agencies' efforts to repeal and replace the 2015 Rule, the agencies published the 2020 Navigable

2     Waters Protection Rule ("the NWPR") in April 2020.[4]

3          56.     The NWPR became effective on June 22, 2020, except in the State of Colorado,

4     where it entered effect on April 26, 2021 after the Tenth Circuit reversed and vacated a preliminary

5     injunction against it taking effect within that State. *See* Mandate issued, *Colorado v. EPA*, No. 20-

6     1238 (10th Cir. Apr. 26, 2021); *see also* Order, *Colorado v. EPA*, No. 20-1238 (10th Cir. Mar. 2,

7     2021).

8          57.     Based on my understanding of the application of the NWPR, I believe the NWPR

9     achieves what the 2015 Rule and 2008 guidance failed to do by addressing the lack of clarity under

10     those regulatory regimes. The NWPR provides increased regulatory clarity and consistency for the

11     business community and eliminates the unnecessary costs and burdens imposed upon businesses

12     by prior unlawful expansion of the CWA and the uncertainty of jurisdictional criteria.

13          58.     From my experience working with AFBF members over the past year, I believe that

14     the NWPR provides greater clarity to farmers and results in less overreach by agency staff (who,

15     under broader or less clear standards in the past, had exercised jurisdiction over land far removed

16     from water features). Farmers that I interact with are now much more certain regarding when they

17

18     [4] For the *amici*'s comments regarding the NWPR, *see*, AFBF, Comment Letter on NWPR (April 18, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11394; API,

19     Comment Letter on NWPR (April 15, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5456; ARTBA, Comment Letter on NWPR (April 15, 2019),

20     https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-4366; Chamber, Comment Letter on NWPR (April 15, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-

21     2018-0149-4569; NAFO, Comment Letter on NWPR (April 15, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-4609; NAHB, Comment

22     Letter on NWPR (April 15, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-4623; NCBA & PLC, Comment Letter on NWPR (April 15, 2019),

23     https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-4673; NCGA, Comment Letter on NWPR (April 15, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-

24     2018-0149-4707; NMA, Comment Letter on NWPR (April 15, 2019),

25     https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-4608; NSSGA, Comment Letter on NWPR (April 15, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-

26     2018-0149-4541; North Carolina Farm Bureau, Comment Letter on the NWPR (Apr. 15, 2019),

27     https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5179;U.S. Poultry & Egg Association, Comment Letter on NWPR (April 15, 2019),

28     https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5441; *see also supra*, p. 8 n.3.

DECLARATION OF DON PARRISH, CASE NO. 3:20-CV-03005

1    do and do not need to consult the Army Corps. In practice, the NWPR operates to require farmers

2    to obtain a federal permit when they are developing a new area or engaging in a significant change

3    in land use—but not for minor maintenance and repairs.

4         59.    Among its most critical features, the NWPR clearly excludes ephemeral features

5    that flow only in direct response to precipitation. This exclusion is critical for the *amici*'s members.

6    A standard that reaches such ephemerals sweeps in many features that look just like land; property

7    owners are stunned to learn that these features are treated as waters. The NWPR also provides clear

8    definitions of what waters qualify as jurisdictional "adjacent" waters and as "tributaries." These

9    features of the NWPR are essential to the ability of WAC members to determine what is and is not

10   jurisdictional, to avoid lengthy delays and exorbitant permitting costs, and to avoid the loss of

11   productivity that results from a broad and unclear definition of WOTUS.

12        60.    Another critical feature, the NWPR allows farmers to maintain their prior converted

13   cropland as exempt from CWA requirements with haying or grazing instead of having to plant crop

14   every five years. The NWPR maintains an exclusion for "prior converted cropland" so long as it

15   has not been reverted to wetlands and abandoned. 85 Fed. Reg. 22,320. Cropland is considered

16   abandoned if not used in support of agricultural purposes in the immediately preceding five years,

17   but the NWPR clarifies that agricultural land use *includes* grazing and haying. *Id.* Farmers greatly

18   benefit from not having to interrupt their livestock operations every five years and operate and

19   maintain agronomic equipment solely to maintain their prior converted cropland status. Indeed, not

20   forcing the farmers to plow and work the soil may improve soil characteristics.

21        61.    The brighter line definitions offered in the NWPR have allowed construction,

22   building, mining, farming, and other business to go forward without the delays, costs, and

23   uncertainties discussed above. For example, under the NWPR, it is clear that the types of features

24   depicted in Figures 1, 2, 3 and 4 are not considered "waters of the United States." This means that,

25   should the NWPR stay in place, the *amici*'s members and WAC Coalition's members would no

26   longer need to incur the costs of avoiding these features or applying for federal permits in order to

27   conduct ordinary, but essential, business operations.

28

1    62.    Also significantly, the NWPR has permitted homebuilders to operate under less

2   regulatory strain and burden during the present housing shortage, with significant and positive

3   implications on the cost of affordable homes.

4    63.    The NWPR also alleviates unreasonable burdens that an overly-broad definition of

5   WOTUS places on states. For example, the State of Tennessee, prior to the 2015 Rule, did not have

6   any state water quality standards for the type of remote, desiccated feature depicted in Figure 4.

7   Were this feature to be covered under the CWA, the State would be forced to develop and enforce

8   water quality standards for that feature under Section 301 of the CWA. The resources to develop

9   and enforce these new standards would have to come at the expense of other services the state

10   provides to the Coalition's members and to the citizens of Tennessee.

11    64.    The NWPR further provides a more appropriate federal-state balance in regulating

12   our Nations waters. Based on my experience, state and local officials are the more appropriate, and

13   more efficient, parties to determine if and how to regulate ephemeral, remote features in any given

14   State. It is local conservation districts that provide the true backbone of natural resource and water

15   preservation. Both States and federal agencies depend on them in implementing conservation

16   programs, and farmers, ranchers, and other local businesses are more used to dealing with these

17   local officials who are more involved in their ordinary operations.

18                          ***Harms Caused by Vacating the NWPR***

19    65.    Vacating the NWPR would cause significant harm to the *amicis*' and WAC's

20   members. Most obviously, businesses across the United States would lose the clear jurisdictional

21   standards that the NWPR offers. They would also again be subject to the harmful and difficult to

22   predict significant nexus standard.

23    66.    Absent a clear standard, farmers with drainage ditches and ephemeral drains located

24   in and around farm fields would need to again exercise caution and avoid placing seed, fertilizer

25   and pesticides into those potentially regulated features to avoid CWA liability for an unauthorized

26   discharge of pollutants into a "water of the United States." This would require many to put parts of

27   their land out of use, or instead expend often cost-prohibitive amounts on a consultant. Similarly,

28   tree farmers often rely on aerial application of pesticides for the health and safety of the trees. If

1    the ditches running alongside a row of trees may be classified as "waters of the United States," tree

2    farmers may forgo this step or scale back operations rather than seek a permit. In either case, this

3    would result in significant harm to their businesses, which would have ripple effects on the local

4    economy, as tree farmers in this situation would be less likely to hire the workers they rely on to

5    prune and harvest the trees.

6          67.    Ranchers, builders, mining operations, and other Coalition members would need to

7    exercise caution—or even delay or avoid—constructing and maintaining important infrastructure,

8    such as roads, fences, ditches, ponds and culverts, when those improvements are constructed in a

9    landscape feature that may or may not be a regulated "water of the United States."

10        68.    Return to a broader definition of WOTUS would also be detrimental to constructing

11    homes, roads, schools, and infrastructure. Take homebuilding as an example. NAHB estimates that

12    25% of the value of a new home is caused by compliance with government regulations, a large

13    portion of which is associated with CWA compliance. Any expansion of federal regulation would

14    add to that cost —which could be particularly detrimental during the present housing shortage.

15        69.    A broader, less clear definition of WOTUS would impact all landowners and

16    operators, coming at a loss of productivity and jobs, but would hit small and mid-sized operations

17    the hardest. That is because these are the businesses least able to weather a reduction in productivity

18    or afford a costly jurisdictional determination.

19        70.    Without the NWPR in place, businesses must either scale back important and

20    otherwise lawful activities, roll the dice and assume the risk of potentially crippling liability, or

21    incur tens of thousands of dollars plus months or years of delay in performing services essential to

22    the economy while they seek precautionary permits.

23        71.    Should the NWPR be vacated, I believe that it is likely that a great deal of routine

24    and minor farm maintenance activities would *again* require federal permits. Such excessive federal

25    coverage not only dis-incentivizes farm maintenance altogether, but is often cost prohibitive and in

26    many cases exceeds the cost or value of the land altogether. But even more pernicious, such

27    excessive administrative overreach may lead to the loss of farms that have been in families for

28    generations as many farmers, already struggling financially as a result of the COVID-19 pandemic,

1   are unable to make repairs. Additionally, observing the stark regulatory burden, younger

2   generations may be dissuaded from taking over the farm for their parents.

3        72.    Even more, vacating the NWPR would require members to confront the serious risk

4   (and uncertainty) that even the unlawful 2015 Rule could be reinstated, as parallel actions

5   challenging the Repeal Rule (though currently subject to stays or extensions of time) are pending

6   throughout district courts nationwide. For example, a challenge to the Repeal Rule and the NWPR

7   is pending before this Court. *See Waterkeeper Alliance, Inc. v. Regan*, 3:18-cv-03521 (N.D. Cal.

8   June 13, 2018); *see also Murray v. EPA*, 1:19-cv-1498 (N.D.N.Y. May 11, 2020); *Navajo Nation*

9   *v. Wheeler*, 2:20-cv-602 (D.N.M. June 22, 2020); *New Mexico Cattle Growers' Ass'n v. EPA*, 19-

10  cv-988 (D.N.M. Apr. 27, 2020); *Oregon Cattlemen's Assoc. v. EPA*, 3:19-cv-564 (D. Or. May 1,

11  2020); *Pascua Yaqui Tribe et al. v. EPA*, 4:20-cv-00266 (D. Ariz. June 22, 2020); *Pueblo of Laguna*

12  *v. Regan*, 1:21-cv-277 (D.N.M. Mar. 26, 2021); *Puget Soundkeeper Alliance v. EPA*, 2:20-cv-950

13  (W.D. Wash. June 22, 2020). If there is a possibility that the 2015 Rule will be reinstated, the

14  Coalitions' and the *amici*'s members must plan and prepare their activities to guard against

15  inadvertent "discharges" of "pollutants" to "waters" that could once-again be categorized as

16  "waters of the United States."

17       73.    Putting the risk of the 2015 Rule coming back into place aside, should the scope of

18  CWA jurisdiction continue to flip-flop or remain uncertain, many members of *amici* and WAC will

19  be irreparably harmed by their inability to plan their farming and business activities, such as

20  planning the purchase of seed, fertilizer, and crop protection tools.

21       74.    It is my firm belief that the NWPR will not result in any harm to the environment.

22  The permitting programs under the CWA are only one part of a robust regulatory framework at the

23  state and federal level, including under other provisions of the CWA, designed to protect and

24  preserve our Nation's waters. Indeed, other CWA programs provide federal grants to states to assist

25  with maintaining water quality. Additional federal laws, including the Solid Waste Disposal Act,

26  the Resource Conservation and Recovery Act, and the Safe Drinking Water Act, protect natural

27  resources and waters. And states can, and often do, enact greater regulation.

28

DECLARATION OF DON PARRISH, CASE NO. 3:20-CV-03005

1       75.    Protecting our Nation's water quality and ensuring access to clean water is as
2   important to the Coalition's members as it is to the groups challenging the NWPR. This belief stems
3   from my personal background in agriculture. I was raised in a farming family and can attest that
4   the health and integrity of this Nation's land and water is, and always has been, of great importance
5   to me and my family, and to the farm families I meet. But we believe that there is an important
6   distinction between using a statute as Congress intended to coordinate a permitting program in
7   "navigable" waters, versus extending federal power beyond the CWA's limits to regulate land-
8   based activities far removed from such features.

    I declare under penalty of perjury that the foregoing is true and correct.


Executed: July 30, 2021                   _____

                                   Don Parrish

DECLARATION OF DON PARRISH, CASE NO. 3:20-CV-03005

# EXHIBIT I

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| PASQUA YAQUI TRIBE, *ET AL.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*,<br><br>Defendants,<br><br>and<br><br>ARIZONA ROCK PRODUCTS ASSOCIATION, *ET AL.*,<br><br>Business-Intervenors-Defendants,<br><br>and<br><br>CHANTELL SACKETT AND MICHAEL SACKETT,<br><br>Intervenor-Defendants. | No. 4:20-cv-00266-TUC-RM<br><br>**DECLARATION OF ROBERT MATTHEW MAINS IN SUPPORT OF BUSINESS-INTERVENORS-DEFENDANTS' MOTION TO STAY**<br><br>(Assigned to the Honorable Rosemary Márquez) |

I, Robert Matthew Mains, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct.

1.     I am the Development Specialist at The Drees Company, a Kentucky Corporation dba Drees Homes in Ft. Mitchell, Kentucky and I am authorized to prepare and submit this Declaration in Support of the Motion to Stay filed by Business-Intervenors-Defendants.

2.     I am a resident of the state of Kentucky, over 18 years of age, have personal knowledge of the matters contained herein, and I am competent to testify thereto.

3.     Drees Homes is a family-owned builder and currently ranks as the nation's 18th largest privately-owned homebuilder, and the 34th largest overall.

4.     As the Development Specialist at Drees Homes, I am responsible for

1

1   navigating the entitlement process for internally developed communities.  I am also

2   responsible for coordinating the neighborhood design, soliciting bids, hiring contractors,

3   and managing budgets throughout the development period.

4       5.      Drees Homes is sensitive to the issues around water quality and we ensure

5   that we maintain the best practices throughout the development and homebuilding

6   process.  This includes regular maintenance of the erosion control features and making

7   sure any of these measures are repaired if necessary.

8       6.      As a Development Specialist, I must stay informed of the various federal

9   and state laws, rules and ordinances that affect home building in the region.  The Clean

10  Water Act term "waters of the United States" has a large impact on land development

11  because it defines which geographic features on a site fall under the authority of the

12  federal government.  Therefore, I keep informed about changes to the term "waters of the

13  United States" and I keep abreast of court cases that impact how the United States Corps

14  of Engineers (Corps) and Environmental Protection Agency ("EPA") interpret that term.

15      7.      I understand that the U.S. District Court for the District of Arizona issued a

16  decision that vacated and remanded the Corps and EPA 2020 definition of "waters of the

17  United States," also known as the Navigable Waters Protection Rule ("NWPR").  In

18  addition, I am aware that in response to this decision the EPA and Corps "have halted

19  implementation of the Navigable Waters Protection Rule and are interpreting 'waters of

20  the United States' consistent with the pre-2015 regulatory regime until further notice."

21  *Waters of the United States, Order Vacating and Remanding the Navigable Waters*

22  *Protection Rule,* https://www.epa.gov/wotus.

23                      **IMPACTS ON HOME BUILDING**

24      8.      Under the NWPR "[e]phemeral features, including ephemeral streams,

25  swales, gullies, rills, and pools" are not "waters of the United States." 33 C.F.R. §

26  328.3(b)(3).

27      9.      Due to the Arizona decision, the federal government is suddenly treating

28  ephemeral streams as jurisdictional.

2

1    10.    In our region, ephemeral streams are everywhere.  Therefore, we often must

2    impact them to develop a project.  The NWPR allowed us to grade sites with ephemeral

3    features more efficiently, keeping the costs down for our customers, with little or no

4    impact on the water quality in and around the site.

5    11.    Now, pursuant to an EPA website, we will need to determine whether

6    ephemeral streams are jurisdictional, and we will often need to obtain permits to impact

7    them.

8    12.    This sudden change requires Drees Homes to rehire consultants to create

9    new surveys of our projects and develop reports, seek approved jurisdictional

10    determinations from the Corps, obtain permits and mitigate for any impacts to ephemeral

11    features.

12    13.    With each new potential project, we hire an environmental consultant to

13    evaluate the site and determine if the proposed development will impact jurisdictional

14    waters of the US.  This is all part of a due diligence period that takes place while we have

15    a contract on the land but before we close on the property.  All in-process projects will

16    need to be reevaluated causing delays and uncertainty moving forward.  We need time to

17    adjust to changes in regulations.

18    **CORPS and EPA's LACK OF PROCESS**

19    14.    If the Corps and EPA had utilized the Administrative Procedure Act "notice

20    and comment" process to repeal or amend the NWPR, Drees Homes would have had time

21    to plan for the changes to the definition of "waters of the United States."  However, the

22    government has instead abruptly "flipped a switch."

23    15.    Drees Homes takes time costing out and evaluating potential properties that

24    we hope to develop before purchasing them.  As mentioned, we have an environmental

25    consultant map streams and wetlands.  We also perform title searches, geological

26    investigations, and Phase 1 environmental surveys.  We also submit improvement plans

27    to local municipalities and state agencies and gain all approvals before closing on the

28    property.

3

1     16.     We went under contract or purchased those properties based on an

2  understanding of the development costs/issues. Now, this has swiftly changed without the

3  time to obtain the approved jurisdictional determinations and other approvals as planned.

4  Therefore, we have overpaid for these properties. If the government had used the notice

5  and comment process, we would have had the time to obtain the approved jurisdiction

6  determinations and necessary approvals as expected when we purchased them.

7     17.     In addition, due to the Arizona decision we have ongoing projects where we

8  must obtain permits and mitigate for features that just last month were not under the

9  control of the federal government or we must redesign the projects to avoid the now

10  jurisdictional features.

11     18.     For example, we have a piece of land under contract in Burlington,

12  Kentucky that we are referring to as "The Wach Property." This property is

13  approximately 50 acres with quite a few "ephemeral streams" intersecting the site. With

14  the recent change we have had to quickly go back and redesign some areas to avoid the

15  ephemeral streams. However, there are some impacts that cannot be avoided. We

16  anticipate keeping the impacts within a range that we will only need a Nationwide permit.

17  This, however, also opens the need to perform a Bat study or pay into the Imperiled Bat

18  Fund for mitigation. In addition, we will also need to do an archeological survey of some

19  sort. The bat studies can only take place during the summer which pushes us beyond our

20  contract date. If the change had not been so abrupt, we may have had time to plan

21  accordingly. The alternative to the bat study is paying the mitigation fees of $4000/acre,

22  times a factor of 1.5 due to the location, and we are clearing 28 acres. I estimate the

23  Nationwide permit, bat mitigation fees, and Archeological report to cost approximately

24  $190,000 that we would not have incurred prior to the recent rule change. This issue is

25  compounded by the fact that a Nationwide permit generally takes 3-6 months which will

26  cause delays with closing on the property and may also push us beyond our contract date.

27  These changes not only impact us but also the people we are purchasing land from and our

28  future homeowners.

4

19.     The Arizona ruling will create a great deal of needless development costs to Drees Homes and cause delays in the approval process.  Ultimately, this will raise the costs of the homes and become a burden on future home buyers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  October 21, 2021

Robert Matthew Mains

Robert Matthew Mains

5

EXHIBIT J

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Pasqua Yaqui Tribe, *et al.*, | No. 4:20-cv-00266-TUC-RM |
| Plaintiffs, | **DECLARATION OF RICK WAJDA IN SUPPORT OF BUSINESS-INTERVENORS-DEFENDANTS' MOTION TO STAY** |
| v. | |
| United States Environmental Protection Agency, *et al.*, | (Assigned to the Honorable Rosemary Márquez) |
| Defendants, | |
| and | |
| Arizona Rock Products Association, *et al.*, | |
| Business-Intervenors-Defendants, | |
| and | |
| Chantell Sackett and Michael Sackett, | |
| Intervenor-Defendants. | |

I, Rick Wajda, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct.

1.     I am the Chief Executive Officer of the Indiana Builders Association and am authorized to prepare and submit this Declaration in Support of the Motion to Stay filed by Business-Intervenors-Defendants.

2.     I received a Bachelor of Science in Marketing from Butler University.

3.     I have been the Chief Executive Officer of the Indiana Builders Association since 2005. In that role, I work with members of the Indiana General Assembly and Indiana's regulatory agencies to ensure housing affordability is taken into consideration when policy makers craft laws and regulations for Indiana's citizens. I regularly interact with and generally understand the interests of other trade organizations, including the

1

1  other Business-Intervenors-Defendants in this matter.

2      4.    The Indiana Builders Association ("IBA") is a statewide trade organization

3  representing Indiana's home building, remodeling and light commercial construction

4  industry. Established in 1952, IBA has 22 local affiliates across Indiana and is associated

5  with the National Association of Home Builders in Washington, D.C. IBA educates and

6  advocates for the construction industry to positively impact legislative, regulatory, and

7  legal issues that affect housing affordability.

8      5.    I have experience with and personal knowledge of how the Clean Water Act

9  ("CWA") and definition of "Waters of the United States" or "WOTUS" impacts home

10  builders in Indiana. Furthermore, I am aware the federal District Court in Arizona

11  recently vacated the Navigable Waters Protection Rule ("NWPR"). In addition, I am

12  aware that the federal Environmental Protection Agency has now declared (nationwide)

13  that it will no longer implement the NWPR but will instead utilize the rules that were in

14  place before 2015.

15      6.    By law, Indiana's isolated wetlands are defined as being a Class I, Class II,

16  or Class III wetland. Class I are the lowest class of wetland, while Class III are the

17  highest.

18      7.    The state of Indiana recently passed legislation that amended state law

19  requiring a permit from the Indiana Department of Environmental Management ("IDEM")

20  for the proposed filling of a wetland. The new legislation clarifies that a permit is not

21  required to place fill material in "isolated wetlands" that do not require a permit under the

22  federal Clean Water Act ("CWA"). The law also clarifies that the proposed grading or

23  filling of ephemeral streams (defined as streams that carry flow only in direct response to

24  rainfall or snow melt) does not require a permit unless one would be required under the

25  CWA.

26      8.    Indiana's recently enacted legislation provided some regulatory relief to

27  property owners who must impact low quality Class I type wetlands. Reducing these

28  costly mitigation factors helped IBA's members' ability to provide safe and achievable

1  housing to Hoosiers looking to own a home at a time when the cost of housing continues
2  to rise due to a myriad of factors.

3      9.    Due to the Arizona decision, IBA members will now need to obtain permits
4  to impact isolated wetlands and ephemeral streams.

5      10.    The cost for property owners to mitigate isolated wetlands in Indiana can
6  now be as much as $120,000 an acre.

7      11.    Regulations at the federal, state and local level now account for roughly
8  25% of the cost of a house.

9      12.    When a developer is looking at a piece of property, they must often obtain a
10  jurisdictional determination ("JD") from the federal government. The JD allows the
11  property owner to know whether the federal government has authority over their property.
12  If large areas of wetlands are located on the property it is usually in the best interest of the
13  developer or builder to incorporate those features into the development plan and work
14  around them.

15      13.    The EPA's recent decision to implement the pre-2015 regulatory CWA
16  regime not only impacts the recently enacted legislation in Indiana, but severely impacts
17  the ability to develop those smaller isolated wetlands that are not economically feasible to
18  work around.

19      14.    As the CEO of the IBA, I have received phone calls from constituents and
20  members of our association who thought they were going to see some regulatory relief last
21  year when the new NWPR took effect only to find out that after a short amount of time,
22  the long-awaited certainty and clarity that the NWPR rule gave landowners has been
23  stricken by the Arizona court ruling.

24      15.    I am aware of one current project northwest of Indianapolis that is facing
25  over $1 million in mitigation costs for a 200-lot subdivision, adding $5,000 to the cost of
26  each house for isolated wetlands on the property.

27      16.    The National Association of Home Builders' economic department
28  estimates that for each $1,000 added to the cost of a house in Indiana 4,304 Hoosier

3

households are priced out of the market.  These are real obstacles in today's already challenging housing market that only become more of an obstacle with the Arizona court ruling.

17.   The IBA supports the protection of high-quality wetlands across the state of Indiana and appreciates the functions they provide.  However, the protection of small pockets of isolated wetlands that may have developed on a property due to a myriad of factors does not justify the level of regulation and costs incurred by the property owner to mitigate impacting them.


I declare under penalty of perjury that the foregoing is true and correct.

Executed:                    .

_Rick Wajda_

Rick Wajda

10/21/21

4

EXHIBIT K

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| PASQUA YAQUI TRIBE, *ET AL.*, | No. 4:20-cv-00266-TUC-RM |
| Plaintiffs, | **DECLARATION OF JIM McCULLEY IN SUPPORT OF BUSINESS-INTERVENORS-DEFENDANTS' MOTION TO STAY** |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*, | (Assigned to the Honorable Rosemary Márquez) |
| Defendants, | |
| and | |
| ARIZONA ROCK PRODUCTS ASSOCIATION, *ET AL.*, | |
| Business-Intervenors-Defendants, | |
| and | |
| CHANTELL SACKETT AND MICHAEL SACKETT, | |
| Intervenor-Defendants. | |

I, Jim McCulley, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct.

1.    I am a resident of the State of South Carolina, over 18 years of age, have personal knowledge of the matters contained herein, and I am competent to testify thereto.

2.    I am the owner of Watershed Eco, LLC and a Senior Professional Wetland Scientist (#000471). Watershed Eco is an environmental consulting firm involved in the delineation and permitting of wetlands and waterbodies for builders, developers, property owners and government entities.  Watershed Eco has offices in Delaware and South Carolina and performs its services in New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, North Carolina, South Carolina, Georgia and Florida.

3.    I have been involved in wetland delineation and permitting for over 35 years

1

1    and have served on the National Academy of Sciences Wetlands Characterization

2    Committee that authored "Wetlands: Characteristics and Boundaries."

3        4.    As a Wetland Scientist, I stay informed of the various federal and state

4    regulatory changes that effect my business.  One of the regulations that I stay informed of

5    the is the definition of the federal Clean Water Act ("CWA") term "waters of the United

6    States."  Furthermore, I stay informed of court cases that impact how the United States

7    Corps of Engineers (Corps) and Environmental Protection Agency ("EPA") interpret the

8    term "waters of the United States."

9        5.    I understand that the U.S. District Court for the District of Arizona issued a

10   decision that vacated and remanded the Corps and EPA 2020 definition of "waters of the

11   United States," also known as the Navigable Waters Protection Rule ("NWPR").

12       6.    Watershed Eco is currently working on 77 projects in the Eastern United

13   States, all of which are affected by the recent Arizona Court decision that vacated the

14   NWPR.  The total value of these project is over $100 million.

15                    **JURISDICTIONAL DETERMINATIONS**

16       7.    As a Wetland Scientist, I conduct wetland delineations and jurisdictional

17   determinations for my clients.  A wetland delineation consists of office and field work to

18   identify soils, vegetation and hydrology characteristics and map the wetland/upland

19   boundary in the field to be surveyed.  A jurisdictional determination requires a report

20   detailing the findings of the office and field investigations as well as a survey of the

21   wetland/upland boundary to be reviewed by the Corps of Engineers with a potential field

22   visit to review the findings and the boundary.  The Corps then issues a letter approving the

23   boundary as an Approved Jurisdictional Determination or AJD.

24       8.    After providing a detailed report on my findings to my client, certain clients

25   request that I obtain an "approved jurisdictional determination" ("AJD") from the Corps.

26   An AJD is "a Corps document stating the presence or absence of waters of the United

27   States on a parcel or a written statement and map identifying the limits of waters of the

28   United States on a parcel." 33.C.F.R. § 331.2.

                                    2

1

## CATEGORIES OF PROJECTS

2      9.    My clients' projects that are impacted by the recent Arizona District Court

3 decision can be categorized in four different groups, expanded on below.

4      10.    First, Corps personnel have visited some project sites and those personnel

5 have determined and conveyed that mapped boundary accurately represents "waters of the

6 United States" that are present on site under the NWPR. However, the Corps has not yet

7 sent a formal "AJD" letter. These projects have moved forward in anticipation of an

8 official letter based on the site visit and findings in the field. Significant resources have

9 been spent based on these field findings and the government's assurances. Now, however,

10 due to the Arizona decision, with no warning the property owners cannot rely on the site

11 visit and the assertion by the Corps. This puts these projects into limbo and will require

12 that the landowners conduct new wetland delineations, get new JDs and possibly revise

13 site plans.

14      11.    Second, certain projects were reviewed by the Corps under the NWPR and

15 the Corps determined that no CWA permit was required because the project is not

16 impacting any jurisdictional features. In these cases, the Corps has either issued a "No

17 Permit Required Letter" or verbally informed the landowner that a permit was not

18 required. These property owners do not have an official AJD but are moving forward

19 with their projects based on the Corps' communication. These property owners have no

20 idea where their projects stand with regard to "waters of the United States" and whether

21 they can rely on the Corps assertion that no permit was required.

22      12.    Third, Watershed Eco has issued reports for certain clients that describe

23 geographic features on their sites, explaining which features are and are not "waters of the

24 United States" under the NWPR. These clients have designed their projects to avoid any

25 "waters of the United States" and have moved forward with their site work. They may,

26 however, impact features that are not considered "waters of the United States" under the

27 NWPR. If these clients are not aware of the Arizona decision, they may be impacting

28 geographic features that the Corps and EPA suddenly (with no warning) consider

3

1  jurisdictional and these landowners could be in violation of the CWA.

2      13.    Finally, certain clients have received an AJD from the Corps describing
3  resources regulated under NWPR.  According to Corps policy, AJDs are binding on the
4  Corps for five years.  However, the letters that accompany an AJD provide that the
5  determination is valid for five years unless new information warrants revision.  My
6  clients' projects are moving through the local land use approval process and municipal
7  regulators are delaying approvals because the regulators are aware of the Arizona
8  decision, and they want the Corps to provide additional information.  My clients are
9  rightfully concerned that the Corps will reverse their AJDs by arguing that the vacation of
10  the NWPR  is "new information."

11                          **IMPACTS**

12      14.    If the Corps and EPA had utilized the Administrative Procedure Act "notice
13  and comment" process to repeal or amend the NWPR, my clients would have time to plan
14  for the changes to the definition of "waters of the United States."  It would allow them to
15  assess how any new proposal would impact their site with regards to regulated water
16  bodies and they could then decide, depending on project timing, to re-delineate water
17  bodies according to the new rule,  or complete the project under the current rule.

18

19

20      I declare under penalty of perjury that the foregoing is true and correct.

21      Executed:

22

23                                          Jim McCulley

24

25

26

27

28

                                    4

# EXHIBIT L

<table>
<tr><td>1</td><td colspan="2"></td></tr>
<tr><td>2</td><td colspan="2" align="center">UNITED STATES DISTRICT COURT</td></tr>
<tr><td>3</td><td colspan="2" align="center">DISTRICT OF ARIZONA</td></tr>
</table>

| | |
|---|---|
| Pasqua Yaqui Tribe, *et al.*, | No. 4:20-cv-00266-TUC-RM |
| Plaintiffs, | **DECLARATION OF NATIONAL STONE, SAND & GRAVEL ASSOCIATION IN SUPPORT OF BUSINESS-INTERVENORS-DEFENDANTS' MOTION TO STAY** |
| v. | |
| United States Environmental Protection Agency, *Et Al.*, | |
| Defendants, | (Assigned to the Honorable Rosemary Márquez) |
| and | |
| Arizona Rock Products Association, *et al.*, | |
| Business-Intervenors-Defendants, | |
| and | |
| Chantell Sackett and Michael Sackett, | |
| Intervenor-Defendants. | |

I, Michael W. Johnson, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct.

    1.    I am the National Stone, Sand & Gravel Association CEO and President and am authorized to prepare and submit this Declaration in Support of the Motion to Stay filed by Business-Intervenors-Defendants.

    2.    I received a BA in Art & Science from University of Kentucky in 1990.

    3.    I have been President and CEO of the National Stone, Sand and Gravel Association ("NSSGA") since August 2013. In that role, I am responsible for executing and staffing a 25 person trade association and all the jobs and responsibilities therewithin. I regularly interact with and generally understand the interests of other trade organizations, including the other Business-Intervenors-Defendants in this matter.

1

1      4.    The NSSGA member companies are responsible for the essential raw
2  materials found in every home, building, road, bridge and public works project in the U.S.
3  and produce more than 90% of the crushed stone and 70% of the sand and gravel
4  consumed annually in the United States. The industry employs about 100,000 men and
5  women nationally. NSSGA and its predecessor organizations have represented the
6  industry for over 100 years.

7      5.    NSSGA works to advance public policies that protect and expand the safe,
8  environmentally responsible use of aggregates. NSSGA favors a public policy
9  environment that fosters business growth for the aggregates construction materials
10  industries, including reasonable regulations.

11      6.    I have reviewed and am familiar with the allegations made by Plaintiffs in
12  their Complaint.

13      7.    I have experience with and personal knowledge of how the Clean Water Act
14  ("CWA") and definition of "Waters of the United States" or "WOTUS" impacts our
15  association, as well as those members of the other Business-Intervenors-Defendants.

16      8.    NSSGA submitted comments on the 2015 rule and NWPR. NSSGA's
17  comments included numerous examples of how the 2015 rule would make the 404
18  permitting process more difficult and expensive due to the inclusion of dry stream beds
19  and isolated wetlands. NSSGA met with EPA, has had members testify before congress,
20  on the costs and uncertainty of unclear rules NSSGA has worked to inform members
21  about rule via presentations, webinars and articles. Members have found the clarity of the
22  NWPR to aid in permitting and protecting navigable waters, and a return to prior rule is
23  confusing and difficult.

24      9.    NSSGA has worked with its members on CWA jurisdictional issues for
25  decades, and can readily defend its members' interests in opposing the 2015 rule and
26  supporting the 2020 rule.

27      10.    I understand that Plaintiffs seek to reinstate an unlawful and already
28  repealed 2015 rulemaking by the U.S. Environmental Protection Agency ("EPA") and the

2

1   U.S. Army Corps of Engineers (the "Agencies") that attempted to broadly define WOTUS

2   for purposes of the CWA. *See* Clean Water Rule: Definition of "Waters of the United

3   States," 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule").

4         11.    To reinstate the 2015 Rule, Plaintiffs have asked the Court to set aside two

5   subsequent final agency actions: one that repealed the 2015 Rule and replaced it with the

6   definition of WOTUS that existed prior to issuance of the 2015 Rule (*see* Definition of

7   "Waters of the United States"–Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626

8   (Oct. 22, 2019) ("2019 Repeal Rule") and a second that promulgated a revised definition

9   of WOTUS (*see* The Navigable Waters Protection Rule: Definition of "Waters of the

10   United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("NWPR").

11         12.    Because aggregates were often created by water, they are located near water,

12   so jurisdictional definitions are of primary importance. The scope and reach of CWA

13   jurisdiction has a direct impact on the costs of planning, financing, constructing, and

14   operating an aggregates facility. Aggregates operators invest in properties with quality

15   aggregates for decades in the future, and under the rule those reserves will become

16   increasingly difficult to permit due to their proximity to natural wetlands, flood plains,

17   and intermittent streams. The rule would impose additional permitting and mitigation

18   costs and add significant time delays in permitting for aggregates mining activities. The

19   rule will make it even more difficult and expensive for companies to meet the needs of

20   their customers. These customers depend on a steady supply of aggregates for essential

21   public works projects such as new road construction, flood control, water and wastewater

22   treatment, and the repair of existing bridges and highways. Ultimately these increased

23   infrastructure costs will be borne by taxpayers. The uncertainty surrounding this issue

24   makes opening a new operation or expanding an existing operation that much more

25   difficult. In some cases, property owners will have to walk away from reserves because of

26   increased compliance costs.

27         13.    I understand that the Court vacated the NWPR in an order dated August 30,

28   2021. Specifically, the governing definition of WOTUS, the issue directly at stake in this

litigation, dictates the regulatory scheme under which Business-Intervenors-Defendants' members must operate their aggregate mining, farming, ranching, construction, and other business activities.

14.     I understand that the Agency Defendants have interpreted the Court's unfavorable ruling vacating the NWPR as controlling over our association members' operations and heightens the regulatory burdens on those operations. The Court's decision to vacate the NWPR has caused regulatory chaos and uncertainty. Changing from the 2020 Rule to the pre-2015 regulatory structure and possibly allowing the rule to go into effect has a damaging effect on the aggregates industry. Because of the confusion and uncertainty, producers will likely hold off on permitting new facilities or expansions, possibly causing shortages of crucial building materials for vital infrastructure projects.

15.     The Court's decision to vacate the NWPR has deprived regulated parties, including our association members, of much needed clarity and predictability.

16.     The Court's decision to vacate the NWPR has resulted in our association members being subjected potential civil and criminal enforcement.

17.     In order to prevent irreparable harm to the industry, a return to the 2020 NWPR is needed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: 10/19/21.

4